# In the United States Court of Appeals for the Fifth Circuit

STATE OF TEXAS,

*Plaintiff-Appellant,*

*v.*

ALEJANDRO MAYORKAS, SECRETARY, U.S. DEPARTMENT OF HOMELAND SECURITY; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; MERRICK GARLAND, U.S. ATTORNEY GENERAL; UNITED STATES DEPARTMENT OF JUSTICE,

*Defendants-Appellees.*

On Appeal from the United States District Court for the Western District of Texas, Del Rio Division

## BRIEF OF APPELLANT

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

AUSTIN KINGHORN
Deputy Attorney General for Legal Strategy

RYAN D. WALTERS
Chief, Special Litigation Division

RYAN G. KERCHER
Deputy Chief, Special Litigation Division
Texas State Bar No. 24060998
Ryan.Kercher@oag.texas.gov

OFFICE OF THE TEXAS ATTORNEY GENERAL
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548

# Certificate of Interested Persons

No. 24-50717

## State of Texas,

*Plaintiff-Appellant,*

*v.*

## Alejandro Mayorkas, Secretary, U.S. Department of Homeland Security; United States Department of Homeland Security; Merrick Garland, U.S. Attorney General; United States Department of Justice,

*Defendants-Appellees.*

Under the fourth sentence of Fifth Circuit Rule 28.2.1, appellee, as a governmental party, need not furnish a certificate of interested persons.

/s/ Ryan G. Kercher
Ryan G. Kercher
*Counsel of Record for Plaintiff-Appellant State of Texas*

## STATEMENT REGARDING ORAL ARGUMENT

In *United States v. Texas (Enforcement Priorities)*, 599 U.S. 670 (2023), the Supreme Court issued a narrow holding concerning States' standing when challenging federal law enforcement discretion. Appellees' arguments below, and the District Court's adoption of those arguments, misread and vastly expand *Enforcement Priorities* to preclude States from challenging federal executive action granting affirmative immigration relief. Given the significant constitutional questions posed by the disputed interpretation of *Enforcement Priorities*, oral argument is warranted and would aid the Court's decision process.

# Table of Contents

Certificate of Interested Persons ............................................................. i

Statement Regarding Oral Argument ..................................................... ii

Table of Contents .................................................................................. iii

Table of Authorities ...............................................................................v

Introduction .............................................................................................1

    Statement of Jurisdiction ...................................................................3

    Issues Presented .................................................................................3

    Statement of the Case........................................................................ 4

        I.    Legal and Factual Background .............................................. 4

            A.   Federal statute controls alien asylum claims and parole. ................... 4

            B.   Appellees create a rule and repurpose an app. .................................5

            C.   The Final Rule and the CBP One app circumvent federal statute. .....7

            D.   The Final Rule injures Texas........................................................... 9

        II.   Procedural Background.........................................................12

            A.   Texas brings suit..............................................................................12

            B.   The District Court's opinion misapplies *Enforcement Priorities*........14

Summary of the Argument....................................................................14

Standard of Review ...............................................................................16

Argument................................................................................................16

I.    Texas Has Article III Standing.............................................16

   A.   Texas has an injury in fact. ............................................17

   B.   Texas's injury in fact is legally cognizable.......................19

   C.   Texas's harms are traceable to the Final Rule and redressable by this Court. . .................................................................................29

   D.   Texas is entitled to special solicitude in the standing inquiry. ..........32

II.   Texas Has a Right to Challenge, and this Court has Jurisdiction to Review, the Final Rule Under the APA.............................................34

   A.   Texas is within the zone of interests and has a cause of action. ........34

   B.   The Final Rule is final agency action. .............................36

   C.   The Final Rule is reviewable under the APA. ...................38

   D.   Vacatur is the appropriate remedy. ................................ 40

Conclusion ...............................................................................41

Certificate of Service ..................................................................43

Certificate of Compliance...........................................................43

# Table of Authorities

Cases                                                                 Page(s)

*Agostini v. Felton,*
    521 U.S. 203 (1997) ................................................................ 22

*Arizona v. United States,*
    567 U.S. 387 (2012) ....................................................... 34, 35, 41

*Bennett v. Spear,*
    520 U.S. 154 (1997) ................................................................ 37

*Biden v. Texas,*
    142 S. Ct. 2528 (2022) .......................................................... 25

*Braidwood Mgmt., Inc. v. Becerra,*
    104 F.4th 930 (5th Cir. 2024) ............................................. 40

*Cargill v. Garland,*
    57 F.4th 477 (5th Cir. 2023) (en banc) ............................. 40

*Carpenters Indus. Council v. Zinke,*
    854 F.3d 1 (D.C. Cir. 2017) (Kavanaugh, J.) ............... 29, 30

*Clarke v. Commodity Futures Trading Comm'n,*
    74 F.4th 627 (5th Cir. 2023) ............................................... 37

*Cochran v. SEC,*
    20 F.4th 194 (5th Cir. 2021) ............................................... 23

*Cruz-Miguel v. Holder,*
    650 F.3d 189 (2d Cir. 2011) ................................................. 5

*Data Mktg. P'ship, LP v. United States Dep't of Lab.,*
    45 F.4th 846 (5th Cir. 2022) ............................................... 37

*Dep't of Commerce v. New York,*
    588 U.S. 752 (2019) .................................................. 22, 29, 30

*Dep't of Homeland Sec. v. Thuraissigam,*
    140 S. Ct. 1959 (2020) ...................................................... 4, 27

*DHS v. Regents of the Univ. of Cal.*,
140 S. Ct. 1891 (2020) ...........................................................passim

*United States v. Texas ("Enforcement Priorities")*,
143 S. Ct. 1964 (2023) ........................................................... 19

*FDA v. Alliance for Hippocratic Medicine (Alliance)*,
602 U.S. 367 (2024) ........................................................... 18, 30

*Franciscan Alliance, Inc. v. Becerra*,
47 F.4th 368 (5th Cir. 2022) ........................................................... 40

*Garland v. Aleman Gonzalez*,
596 U.S. 543 (2022) ........................................................... 31

*Griener v. United States*,
900 F.3d 700 (5th Cir. 2018) ........................................................... 16

*Heckler v. Chaney*,
470 U.S. 821 (1985) ...........................................................passim

*Jennings v. Rodriguez*,
*138 S. Ct. 830 (2018)* ........................................................... 4

*Lane v. Halliburton*,
529 F.3d 548 (5th Cir. 2008) ........................................................... 16

*Lexmark Intern., Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014) ...........................................................34

*Linda R.S. v. Richard D.*,
410 U.S. 614 (1973) ........................................................... 19, 20

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ........................................................... 17

*Massachusetts v. EPAs*,
549 U.S. 497 (2007) ........................................................... 17

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
567 U.S. 209 (2012) ...........................................................35

*Missouri v. Biden*,
680 F. Supp. 3d 630 (W.D. La. 2023) ...........................................................32

*Monsanto Co. v. Geertson Seed Farms*,
130 S. Ct. 2743 (2010) ...........................................................29

*Nat'l Pork Producers Council v. EPA*,
    635 F.3d 738 (5th Cir. 2011) ............................................. 37

*Natl. Infusion Ctr. Assn. v. Becerra*,
    116 F.4th 488 (5th Cir. 2024) ......................................... 30

*New Mexico v. McAleenan*,
    450 F. Supp. 3d 1130 (D.N.M. 2020) ............................ 36

*NiGen Biotech, L.L.C. v. Paxton*,
    804 F.3d 389 (5th Cir. 2015) ......................................... 31

*Plyler v. Doe*,
    457 U.S. 202 (1982) ........................................................ 11

*R.J. Reynolds Tobacco CO. v. U.S. Food & Drug Admin.*,
    No. 6:20-cv-00176, 2022 WL 17489170 (E.D. Tex. Dec. 7, 2022) ................ 40

*Rodriguez de Quijas v. Shearson/Am. Express, Inc.*,
    490 U.S. 477 (1989) ....................................................... 22

*Roe v. Mayorkas*,
    No. 22-CV-10808-ADB, 2023 WL 3466327 (D. Mass. May 12, 2023) ........... 39

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016) ................................................. 29, 30

*State Oil Co. v. Khan*,
    522 U.S. 3 (1997) .......................................................... 22

*Syncor Int'l Corp. v. Shalala*,
    127 F.3d 90 (D.C. Cir. 1997) ......................................... 38

*Texas Med. Ass'n v. United States Dep't of Health & Hum. Servs.*,
    No. 6:22-cv-372, 2023 WL 1781801 (E.D. Tex. Feb. 6, 2023) (Kernolde, J.) .. 41

*Texas v. Biden (MPP)*,
    20 F.4th 928 (5th Cir. 2021) ...................................... passim

*Texas v. Biden*,
    554 F. Supp. 3d 818 (N.D. Tex. 2021) ........................... 25

*Texas v. Cardona*,
    ---F.Supp.3d---, No. 4:23-CV-604, 2024 WL 3658767 (N.D. Tex. Aug. 5, 2024) (O'Connor, J.) .................................................. 32

*Texas v. EEOC*,
    933 F.3d 433 (5th Cir. 2019) ............................... 36, 37, 38

*Texas v. Garland*,
No. 5:23-CV-034-H, 2024 WL 967838 (N.D. Tex. Feb. 27, 2024) .......11, 12, 13

*Texas v. United States (DACA)*,
50 F.4th 498 (5th Cir. 2022) ..................................................................passim

*Texas v. United States*,
*549 F. Supp. 3d 572 (S.D. Tex. 2021)* .....................................................26

*Texas v. United States (DAPA)*,
809 F.3d 134 (5th Cir. 2015) ..................................................................passim

*Texas v. United States*,
40 F.4th 205 (5th Cir. 2022) ......................................................................31

*Texas v. United States*,
691 F. Supp. 3d 763 (S.D. Tex. 2023) .......................................................28

*Texas v. United States*,
86 F. Supp. 3d 591 (S.D. Tex. 2015) .........................................................27

*United States v. Texas (Enforcement Priorities)*,
599 U.S. 670 (2023) ...............................................................................ii, 38

*Wyoming ex rel. Clark v. United States*,
539 F.3d 1236 (10th Cir. 2008) .................................................................35

**Constitutional Provisions & Statutes**

28 U.S.C. § 1331, 1346, and 1361 ....................................................................3

5 U.S.C. § 551(4) ...........................................................................................40

5 U.S.C. § 701(a)(1) .......................................................................................39

5 U.S.C. §§702-03 ...........................................................................................3

5 U.S.C. § 702 ..........................................................................................15, 33

5 U.S.C. § 704 ................................................................................................36

5 U.S.C. § 706 .........................................................................................13, 30

8 U.S.C. § 1103 ..............................................................................................31

6 U.S.C. § 202 ................................................................................................31

8 U.S.C. § 1182 ..............................................................................................31

8 U.S.C. § 1182 (a)(6)(C) ................................................................................4

8 U.S.C. § 1182 (a)(7) .................................................................. 4

8 U.S.C. § 1182(a)(7)(A)(i)(I) ..................................................... 4

8 U.S.C. § 1182(a)(7)(i) .............................................................. 4

8 U.S.C. § 1182(d)(5) ................................................................. 39

8 U.S.C. § 1182(d)(5)(A) ............................................... 4, 5, 36, 39

8 U.S.C. § 1182(d)(5)(B) ......................................................... 5, 6

8 U.S.C. § 1221-1232 ................................................................ 31

8 U.S.C. § 1225 .......................................................................... 4

8 U.S.C. § 1225 (a)(1) ................................................................. 4

8 U.S.C. § 1225 (b)(1)(A)(i) ....................................................... 4

8 U.S.C. § 1225 (b)(1)(B)(iii)(IV) .............................................. 4

8 U.S.C. § 1225(a)-(b) ................................................................ 4

8 U.S.C. § 1225(b)(1)(A)(i) ........................................................ 4

8 U.S.C. § 1225(b)(2) .................................................................. 5

8 U.S.C. § 1252(a)(2)(B)(ii) ...................................................... 39

8 U.S.C. § 1252(f)(1) ................................................................. 31

8 U.S.C. § 1611(b)(1)(A) ........................................................... 11

28 U.S.C. § 1291 .......................................................................... 3

28 U.S.C. § 1331 & 2201(a) ......................................................... 3

Tex. Health & Safety Code § 61.001 ........................................ 17

Tex. Health & Safety Code § 311.043 ....................................... 17

**Rules & Regulations**

8 C.F.R. § 1.3(a)(4)(vi) ............................................................. 26

8 C.F.R. § 235.3(b)(4) ................................................................. 5

8 C.F.R. § 274a.12(c)(14) (2022) .............................................. 26

Fed. R. Civ. P. 12(b)(1) .......................................................... 3, 18

42 C.F.R. , at 117a ..................................................................... 26

42 C.F.R. § 417.422(h) .............................................................. 26

88 Fed. Reg. 11, 727 ..............................................................................................10

88 Fed. Reg. 11, 729 ............................................................................................. 4

88 Fed. Reg. 11,704 ...............................................................................................7

88 Fed. Reg. 11,707 .............................................................................................. 8

88 Fed. Reg. 31, 318 .............................................................................................. 9

88 Fed. Reg. 31, 358 .............................................................................................. 8

88 Fed. Reg. 31, 376 ........................................................................................ 10, 12

88 Fed. Reg. 31,314 ............................................................................................... 8

88 Fed. Reg. 31,316 .......................................................................................... 9, 10

88 Fed. Reg. 31,358 ..............................................................................................10

# Introduction

The federal executive has no authority to re-write statutes passed by Congress creating standards and procedures for entry into the United States, the evaluation of alien claims for asylum, or the parole of aliens recently arrived across America's southwest border. The federal executive certainly has no authority to expand those statutes to allow more, otherwise inadmissible, aliens through American ports of entry. Yet that is precisely what the U.S. Departments of Homeland Security and of Justice have done in this case, pursuing the Biden-Harris Administration's plainly failed immigration policies to the detriment of States bearing the brunt of illegal immigration unhindered by federal authority. The federal agencies and officials sued in the instant suit are, by now, well-practiced in finding novel methods to avoid scrutiny and consequences for their lawless pursuit of lawlessness at the nation's southern border.

This time, Appellees are trying a sort of Texas two-step. Aware they cannot overtly broaden federal restrictions on alien asylum and parole, Appellees cleverly adopted a rule that purports to presume aliens seeking asylum are ineligible. That's step one. The second step is the kicker: Appellees' rule has an exception. That exception is so broad that it not only swallows the rule, but it functionally expands the ability of otherwise inadmissible aliens to enter the United States, claim asylum, receive parole, and benefit from the services that states like Texas must—by federal compulsion—provide.

Appellees passed an administrative rule, following notice and comment, allowing aliens in Mexico to use an electronic app to make an appointment at U.S.

ports of entry. While the rule purports to presume aliens seeking asylum are ineligible for asylum, the rule also excepts from that presumption anyone using the app. The rule thus acts as a siren song that draws aliens to U.S. ports of entry where the aliens can then claim asylum free from any negative presumption—and federal officials make no case-by-case determinations of asylum claims under the rules—and are waived into States like Texas on parole in astonishing numbers.

Once in Texas, these otherwise inadmissible aliens compound Texas's burden to provide healthcare, education, and law enforcement services to aliens present within its borders. Appellees' program circumvents federal law, and their attempts to insulate their unlawful rule from scrutiny or challenge fail. The District Court, below, respectfully erred in its single paragraph of analysis when granting Appellees' motion to dismiss under Rule 12(b)(6). The Court should reverse and remand.

# Statement of Jurisdiction

Plaintiff invoked the district court's jurisdiction under 28 U.S.C. §§ 1331 and 2201(a) because its claims arose under the United States Constitution and were brought under 5 U.S.C. §§702-03 and 28 U.S.C. § 1331, 1346, and 1361. ROA.9. The district court entered an amended order granting Defendants' motion to dismiss without prejudice pursuant to Federal Rule of Civil Procedure 12(b)(1) on August 5, 2024. ROA.732–45. Plaintiff filed a timely notice of appeal from that order on September 3, 2024. ROA.746–47. This court has jurisdiction under 28 U.S.C. § 1291.

# Issues Presented

1. Whether Texas has Article III standing to challenge a federal agency rule circumventing the statutory requirement for case-by-case evaluation of alien asylum claims.

2. Whether the APA precludes the Texas's claims for injunctive relief and vacatur.

## I.     Legal and Factual Background

### A. Federal statute controls alien asylum claims and parole.

Most asylum claims … ultimately fail, and some are fraudulent." *Dep't of Homeland Sec. v. Thuraissigam*, 140 S. Ct. 1959, 1963 (2020). "[A] substantial number of [aliens] who cross the [southern] border ultimately are not found to have a valid asylum claim." 88 Fed. Reg. 11, 729; ROA.449.

The authority of the Department of Homeland Security (DHS) to process aliens "present in the United States" is statutory. 8 U.S.C. § 1225; ROA.439. Federal law deems such aliens "applicant[s] for admission" to the United States. 8 U.S.C. § 1225 (a)(1); ROA.439. Aliens lacking valid entry documents "at the time of application for admission" are "inadmissible," and therefore, "removable." *Thuraissigam*, 140 S. Ct. at 1964 (citing 8 U.S.C. § 1182(a)(7)(A)(i)(I)); ROA.439. Immigration officers must inspect aliens seeking admission to the United States and detain such aliens until their immigration proceedings are concluded. 8 U.S.C. § 1225(a)-(b); *see Jennings v. Rodriguez*, 138 S. Ct. 830, 836-37 (2018); ROA.439. When an officer determines an alien lacks valid entry documents, the alien is subject to expedite removal. 8 U.S.C. § 1225(b)(1)(A)(i); *see* 8 U.S.C. § 1182 (a)(6)(C), (7); ROA.439.

Aliens may avoid removal by seeking asylum (showing a fear of persecution) and/or parole. 8 U.S.C. § 1182(a)(7)(i), (d)(5)(A); 8 U.S.C. § 1225 (b)(1)(A)(i); *see* 8 C.F.R. § 235.3(b)(4); ROA.439. Asylum claims do not entitle an alien to immediate release. 8 U.S.C. § 1225 (b)(1)(B)(iii)(IV) (applicants "shall be detained pending a

final determination of credible fear of persecution and, if found not to have such a fear, until removed"); *see also* 8 U.S.C. § 1225(b)(2); ROA.439–40.

Parole is "affirmative immigration relief" allowing aliens to remain in the country. *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1906 (2020). By federal statute, parole requires a "case-by-case" determination of whether "urgent humanitarian reasons or significant public benefit" justify release of aliens into the United States. 8 U.S.C. § 1182(d)(5)(A); ROA.440.

Congress added the case-by-case determination requirement in response to increasing use of parole "to admit entire categories of aliens who do not qualify for admission under any other category in immigration law, with the intent that they will remain permanently in the United States." H.R. Rep. No. 104-469, at 140 (1996); *see also Cruz-Miguel v. Holder*, 650 F.3d 189, 199 n.15 (2d Cir. 2011) (explaining that "this change was animated by concern that parole under § 1182(d)(5)(A) was being used by the executive to circumvent congressionally established immigration policy"); ROA.440. Congress emphasized that DHS "may not parole into the United States an alien who is a refugee unless the Attorney General determines that compelling reasons in the public interest *with respect to that particular alien* require that *the alien* be paroled into the United States rather than be admitted as a refugee." 8 U.S.C. § 1182(d)(5)(B) (emphasis added); ROA.440–41.

## B. Appellees create a rule and repurpose an app.

In 2020, Customs and Border Protection (CBP) began using a mobile application to provide travelers with access to Form I-94 information, to schedule appointments for perishable cargo, and to assist international organizations seeking

to help individuals enter the United States; the app was called CBP One. ROA.441.

In 2023, DHS announced a new function for the CBP One app. *Id.* Effective January 12, 2023, aliens in Central and Northern Mexico seeking "to travel to the United States" could use the app "to submit information in advance and schedule an appointment to present themselves at certain Southwest Border land ports of entry." ROA.441–42. DHS would expand use of the CBP One app "[o]nce the Title 42 order eventually lifts," allowing aliens to "use the CBP One application for scheduling an appointment to present themselves for inspection and to initiate a protection claim instead of coming directly to a port of entry to wait." ROA.442.

The following month, DHS and the Department of Justice (DOJ) issued a joint notice of proposed rulemaking previewing the federal government's change in immigration policy after expiration of the Title 42 Order. 88 Fed. Reg. 11,704; ROA.442. On May 16, 203, Appellees jointly issued the Circumvention of Lawful Pathways rule (Final Rule), with an effective date of May 11, 2023. 88 Fed. Reg. 31,314; ROA.442.

The CBP One app is "broadly available to migrants in central and northern Mexico." 88 Fed. Reg. 11,707 n.25; ROA.443. It "enables noncitizens without appropriate documents for admission who seek to travel to the United States through certain southwest border land ports of entry (POEs) the ability to submit information through a module within the application instead of coming directly to wait at a POE." ROA.442–43.

Aliens are invited to download the CBP One app and select a time and place to cross the border; the app asks "undocumented travelers" to identify if they are

arriving by land, air, or sea. ROA.443–44. It then prompts aliens to input their names and allow CBP One to access their location. ROA.444. Users then submit a photo, along with their contact and family information. *Id.* To request an appointment, the alien must be in Central or Northern Mexico and may choose between eight ports of entry—five of which are in Texas. *Id.* "The app is not a method of seeking asylum in the United States, and CBP officers do not determine the validity of claims for protection." 88 Fed. Reg. 31, 358; ROA.444. Instead, the Final Rule confers a legal benefit on aliens using the CBP One app: "Once present in the United States, those who use this mechanism [CBP One app] can make claims for asylum and other forms of protection and are exempted from this rule's rebuttable presumption on asylum eligibility." 88 Fed. Reg. 31, 318; ROA.445–46.

Appellees have announced several expansions of the number of available appointments on the CBP One app. ROA.446. Initially, 740 daily appointments were available using the app; Appellees expanded those appointments to 1,000 daily appointments, and again to 1,450 daily appointments. ROA.446–47.

### C. The Final Rule and the CBP One app circumvent federal statute.

The Final Rule nominally creates a rebuttable presumption of asylum ineligibility, 88 Fed. Reg. at 31,321-322, but simultaneously creates an exception that swallows the presumption almost whole: aliens using the CBP One app and presenting an asylum claim at a POE are exempt from the "rebuttable presumption."

> The rule imposes a rebuttable presumption of ineligibility for asylum upon certain [aliens] who enter the United State from Mexico

at the southwest land border or adjacent coastal borders without documents sufficient for lawful admission as described in [the] INA …

***

The rule also exempts from the rebuttable presumption a[n] [alien] if the [alien] or a member of the [alien]'s family with whom the [alien] is traveling … presented at a POE, pursuant to a pre-scheduled time and place …

88 Fed. Reg. at 31,321-322.

The Final Rule thus entices aliens to travel to a POE for an appointment scheduled using the CBP One app where CBP officers waive them into the United States to claim asylum without determining "the validity of any claims for protection." 88 Fed. Reg. 31,358. The ruse of the "rebuttable presumption" against asylum eligibility allows Appellees to style the Final Rule as a "condition[] on asylum eligibility," ROA.578, while actually using an "exception" to that condition, *id.*, to circumvent the case-by-case evaluation created by the INA. ROA.443.

That the Final Rule entices aliens to POEs is not mere conjecture. The Final Rule admits its intent is to entice aliens to the POE by "enourag[ing] [aliens] to avail themselves" of this method of entering the United States. ROA.444; 88 Fed. Reg. 31,316.

Nor is it mere conjecture that Appellees use the Final Rule to waive app-using aliens through POEs. The Final Rule admits the app is intended to "streamline[]" illegal aliens' experience at the POE. ROA.444; 88 Fed. Reg. 11, 727; *see also* 88 Fed. Reg. 31, 376. The intended streamlining has worked, creating a flood of illegal

immigrants paroled through POEs: the House Committee on Homeland Security reports that between January 12, 2023 and September 30, 2023, 95.8% of all inadmissible aliens who scheduled appointments through the CBP One app were ultimately issued a "Notice to Appear" and released into the United States on parole. ROA.447. The data show that 266,846 aliens were paroled into the United States from 278, 341 app-scheduled appointments. ROA.447. The CBP One app has "facilitated the largest expansion of migrant processing at ports of entry along the southern border in U.S. history." ROA.443.

Of those hundreds of thousands of aliens waived through the parole process—with no case-by-case determination, as required by statute—some 7,332 such aliens were Special Interest Aliens (SIA) from 24 countries designated as a national security concern because of their Islamic terrorist activities. Thus, Appellees used the Final Rule, which they call a "condition[] on asylum eligibility," to parole thousands of inadmissible—and potentially dangerous—aliens into the United States. ROA.447–48.

### D. The Final Rule injures Texas.

Texas contains more than half of the border between the United States and Mexico, including five ports of entry: Brownsville, El Paso, Eagle Pass, Hidalgo, and Laredo. ROA.448. The Final Rule, and its use of the CBP One app, invite illegal aliens into Texas and inflict injuries and costs on the State, including for public education, law enforcement and incarceration, unreimbursed health care, and other public services for illegal aliens. ROA.448. Appellees' use of the Final Rule to expand the number of aliens released into Texas constitutes a sovereign injury, inasmuch as

it pressures the State to alter its laws in order to avoid incurring expenses related to services provided to noncitizens. ROA.449. By February 2024, "nearly 450,000 migrants [had] been allowed into the U.S. under the [CBP One app] process." ROA.651. Contrary to Appellees' contention that the Final Rule and its app are meant to curtail illegal immigration," the Final Rule "has resulted in more than a quarter of a million immigrants being released into the United States," according to federal data released shortly after institution of the Final Rule. ROA.450.

CBP's own data demonstrate a dramatic increase in inadmissible aliens crossing the southwest border following institution of the Final Rule. *Id.* This increase causes depressed wages by adding tens of thousands of illegal aliens to the Texas workforce per month. *Id.* This harms not only Texas's sovereignty, but the public fisc, as well. *Id.* Monetary relief cannot relieve these harms; as such, these injuries constitute irreparable harm to the State and its taxpayers. *Id.*

The Final Rule's resultant influx of illegal aliens injures Texas in other ways, such as public healthcare costs. Texas funds the Emergency Medicaid program, providing health coverage for low-income children, families, seniors, and the disabled. ROA.450. The program costs the State tens of millions of dollars annually, and under federal law, Texas must include illegal immigrants in its coverage. *Id.* Similarly, Texas funds the Children's Health Insurance Program, offering low-cost health coverage for children from birth through age 18. *Id.* Texas spends tens of millions of dollars annually on CHIP expenditures for illegal aliens. *Id.* In 2022, Texas spent roughly $72.2 million to provide Emergency Medicaid coverage to illegal aliens, and roughly $30.9 million in 2022 to provide CHIP Perinatal Coverage

to such aliens. *Texas v. Garland*, No. 5:23-CV-034-H, 2024 WL 967838, at *11 (N.D. Tex. Feb. 27, 2024); ROA.647. "Texas is legally obligated to bear part of the cost of those services" "when qualifying aliens obtain health care services in Texas [that are ] covered by Emergency Medicaid." *Garland*, 2024 WL 967838, at *11 (citing 8 U.S.C. § 1611(b)(1)(A)); ROA.647.

Texas also funds the Family Violence Program, providing emergency shelter and supportive services to victims and their children. ROA.450. Each year, Texas spends over a million dollars per year on providing program services to illegal aliens. ROA.450.Texas also faces the costs of uncompensated state public hospital care for illegal aliens, which reach into the hundreds of millions of dollars per year. ROA.450.

The Final Rule also injures Texas by creating additional burdens on its education system. Texas is constitutionally obligated to provide free education to children of unlawfully present aliens. *Plyler v. Doe*, 457 U.S. 202 (1982); ROA.648. Texas does so at a cost of millions of dollars per year. ROA.648. *Garland* is again instructive. Texas Education Agency estimates put "the average entitlement from state and local sources for fiscal year 2023" at "$9,564 per student for the entire school year." *Garland*, 2024 WL 967838, at *11; ROA.648. "To provide additional bilingual education, which Texas does for most alien children, Texas must spend $11,781 to educate each student. *Garland*, 2024 WL 967838, at *11; ROA.648. "Texas has encountered a sizeable number of such alien children in its schools," including some "19,071 … released to sponsors in Texas" from October 2021 to September 2022, and "Texas's education costs rise with an increase in alien children." *Garland*, 2024

WL 967838, at *11; ROA.648. These costs persist so long as the children remain enrolled in schools. *Garland*, 2024 WL 967838, at *11; ROA.648.

The Final Rule also injures Texas by raising law enforcement costs. The Texas Department of Criminal Justice (TDCJ) spends a daily amount of $77.49 systemwide for an individual inmate, and "held 6,914 undocumented criminal aliens with at least one felony or two misdemeanor convictions for violations of state or local law for a total of 2,019,635 days of incarceration for these aliens" in fiscal year 2022. *Garland*, 2024 WL 967838, at *11; ROA.648. This amounts to TDCJ spending $156,501,516 to incarcerate these aliens. *Garland*, 2024 WL 967838, at *11; ROA.648. Federal reimbursement for such expenses is a fraction of the cost incurred by the State—in fiscal year 2021, that fraction was less than 1/10: Texas "spent $153,786,422 incarcerating criminal aliens but received only $14,883,040 in federal reimbursement." *Garland*, 2024 WL 967838, at *11; ROA.648–49. Moreover, Texas spends approximately $4.69 per day on criminal aliens released on parole or mandatory supervision. *Garland*, 2024 WL 967838, at *11; ROA.649. "Texas incurs costs from incarcerating [aliens]," and "to the extent the number of aliens in TDCJ custody increases, TDCJ's unreimbursed expenses will increase as well. *Garland*, 2024 WL 967838, at *11; ROA.649.

## II.    Procedural Background

### A. Texas brings suit.

Following adoption of the Final Rule, Texas brought suit to end the federal government's lawless parole of inadmissible aliens into the State. ROA.436–61.

Texas sued the United States Department of Homeland Security and its Secretary, Alejandro N. Mayorkas, in his official capacity. ROA.437. Texas also sued the United States Department of Justice, and United States Attorney General Merrick Garland in his official capacity. *Id*.

Texas's suit brings three claims. *First*, that the Final Rule's exception from the presumption of ineligibility for asylum exceed statutory authority and is not in accordance with the law under 5 U.S.C. § 706(2)(A), (C). ROA.451. *Second*, the Final Rule's exception to the presumption of ineligibility is arbitrary and capricious under 5 U.S.C. § 706(2)(A). ROA.455. *Third*, Appellees' use and implementation of the "DHS Scheduling System" is *ultra vires*. ROA.457.

Texas seeks relief in several forms. *First*, it seeks a ruling that the Final rule is unlawful and consequent vacatur. ROA.460. *Second*, it seeks a declaration that Appellees' conduct is unlawful. *Id. Third*, it seeks a permanent injunction prohibiting Appellees from implementing the Final Rule's exception from the presumption of ineligibility for asylum aliens who pre-schedule a time and place to present at a port of entry using a DHS scheduling system, including the CBP One app. *Id. Fourth*, it seeks a permanent injunction prohibiting Appellees from paroling aliens who pre-schedule a time an place to present at a port of entry using a DHS scheduling system, including the CBP One app in excess of statutory authority. *Id. Fifth*, award the State of Texas costs and reasonable attorneys' fees. *Id. Sixth*, such other and further relief as the Court deems equitable and just. *Id*.

Appellees moved to dismiss Texas's amended complaint under Rules 12(b)(1) and (6).

## B. The District Court's opinion misapplies *Enforcement Priorities*.

The District Court issued its Amended Memorandum Opinion and Order granting Appellees' 12(b)(1) motion, and refraining to exercise jurisdiction to rule on Appellees' 12(b)(6) motion. ROA.573. In a single paragraph of analysis, the District Court held Texas lacked Article III standing, incorrectly holding that the Final "Rule and its appointment exception do not involve the exercise of coercive power over Texas" under *Enforcement Priorities*. ROA.572. The instant appeal followed. ROA.746.

## Summary of the Argument

**I.** Texas has met its burden of establishing injury in fact. The influx of aliens into Texas under the Final Rule's "presumption" of ineligibility—and its nullifying exception—damages Texas by increasing costs the State incurs to provide education and healthcare to aliens, and by increasing law enforcement costs associated with detaining and monitoring those aliens who commit additional crimes after arriving in Texas.

**II.** Texas's injury is legally cognizable. Appellees' "presumption" against asylum eligibility and its capacious exception both entice aliens to arrive at POEs and then allow Appellees to waive those aliens through without a case-by-case determination of asylum claims. This practice goes beyond simple non-enforcement under *Enforcement Priorities* because it bestows the benefit of entry into the United States on aliens; this constitutes affirmative immigration relief, as opposed to a decision to arrest/deport or not. Moreover, Appellees' use of the Final Rule to vitiate the case-by-case asylum determination mandated by federal law abdicates

Appellees' statutory obligations—a clear case in which states may assert standing under *Enforcement Priorities*.

**III.**    Texas's harms are traceable to the Final Rule and redressable by this Court. Absent the Final Rule's exception to its nominal "presumption" of ineligibility, Appellees cannot claim authority to waive app-using aliens across the border at POEs to claim asylum; nor could Appellees claim authority to forego the case-by-case asylum claim evaluation mandated by federal statute. Texas's harms are thus traceable to the Final Rule. Additionally, should the Court vacate the Final Rule—the default remedy for unlawful federal rules—Appellees' flood of inadmissible aliens would subside.

**IV.**    Texas is entitled to special solicitude in this case. *First*, Texas has a procedural right to challenge agency action in case granted by the APA pursuant to 5 U.S.C. § 702. Additionally, the Final Rule affects Texas's quasi-sovereign interests because it pressures Texas to alter its own laws to accommodate the influx of aliens, such as altering how the State provides healthcare, education, and law enforcement.

**V.**    Texas is within the zone of interest of the INA and the APA. Texas has an interest in seeing the nation's immigration laws enforced, at least in part because it bears the consequences when federal officials and agencies abdicate their immigration responsibilities. Texas also has a quasi-sovereign interest in protecting its territory from intrusion. Texas is also in the zone of interest under the APA specifically for challenging federal parole policy.

**VI.**    The Final Rule is final agency action because, following notice, and comment, the Final Rule consummates Appellees' decisionmaking process, as

evidenced by Appellees' rapid institution of the Final Rule. Moreover, the Final Rule binds Appellees' actions and creates legal consequences—especially for the paroled aliens—by providing unexamined asylum claims parole into the State of Texas.

**VII.** The Final Rule is reviewable under the APA. The Final Rule is a programmatic circumvention around statutory parole and asylum requirements, rather than a one-off enforcement decision. The authority to institute such a program is not delegated to Appellees by law, but has rather been adopted as a "rule" under the APA.

**VIII.** Vacatur is the appropriate remedy for Appellees' unlawful rule. Vacatur is the default remedy under this Court's precedents for unlawful federal rules.

## Standard of Review

"The standard of review for a district court's dismissal under Rule 12(b)(1) is de novo." *Griener v. United States*, 900 F.3d 700, 703 (5th Cir. 2018). Court's "take the well-pled factual allegations of the complaint as true and view them in the light most favorable to the plaintiff." *Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008).

## Argument

### I. Texas Has Article III Standing.

Texas has demonstrated each of the three elements required to have standing to bring its claims: (a) an injury in fact, (b) fairly traceable to the challenged action, (c) that will likely be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*,

504 U.S. 555, 560–61 (1992). Once a concrete injury is shown, the magnitude of that injury is irrelevant to the standing inquiry. *See, e.g.*, *Massachusetts v. EPAs*, 549 U.S. 497, 525–26 (2007).

"Federal law requires the State to provide emergency Medicaid to noncitizens and public education to all children, regardless of their immigration status." *Texas v. United States (DACA)*, 50 F.4th 498, 517 (5th Cir. 2022). On top of these federally required costs, other expenditures are required by preexisting state law. Texas law requires local governments to provide healthcare for the indigent. *See* Tex. Health & Safety Code §§ 61.001 *et seq.* Texas law also requires nonprofit hospitals to provide unreimbursed care for the indigent as a condition of maintaining nonprofit status. *See id.* § 311.043.

## A. Texas has an injury in fact.

"For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'" *DACA*, 50 F.4th at 518. Moreover, large-scale policies are amenable to challenge using large-scale statistics and figures. *Texas v. Biden (MPP)*, 20 F.4th 928, 971 (5th Cir. 2021) (holding, "Texas's standing is robustly supported by just such big-picture evidence. There is nothing 'conjectural' or 'hypothetical' about that"); *see also id.* at 972–73 (noting that despite no evidence of the MPP-eligible aliens specifically imposing costs, stranding satisfied because it was "easy to see" that "at least some MPP-termination-caused immigrants will certainly seek healthcare services from the State," because it was "a simple causal inference based on a simple change in incentives" and therefore not speculative); *DACA*, 50 F.4th at 517–18 (finding sufficient for standing that "[t]he record does not indicate precisely what

portion of all costs for illegal aliens is spent on DACA recipients, but no one disputes that some are."); *Texas v. United States (DAPA)*, 809 F.3d 134, 155 (5th Cir. 2015) (holding that Texas established injury in fact without precisely quantifying the costs of issuing driver's licenses to DAPA beneficiaries).

As described above, *supra* at Statement of the Case I.D, Texas incurs substantial cost due to the presence of illegal aliens within the State. These costs run into the hundreds of millions of dollars, and include education, healthcare, and law enforcement expenditures.

The District Court's reliance on *FDA v. Alliance for Hippocratic Medicine (Alliance)*, 602 U.S. 367, 374 (2024), is misplaced. ROA.743. There, private plaintiffs lacked standing to challenge FDA's approval of mifepristone, which plaintiffs did not prescribe, based on their desire that *other* providers would not prescribe it either. *Id.* at 374. Relevant here, *Alliance* reaffirmed that standing is established if Texas shows "a predictable chain of events leading from the government action to the asserted injury." *Id.* at 385. Texas has done just that—the Final Rule created an unprecedented flow of aliens across the southwest border and into Texas, adding to the already considerable burden Texas bears to manage the resulting health and law enforcement needs created by substantially unregulated immigration.

Appellees also maintain that because Texas is not the object of the challenged agency action, it cannot have standing. But the Fifth Circuit has repeatedly rejected this argument when States have challenged unlawful immigration policies. *See DACA*, 50 F.4th at 517 ("The Government asserts there is a presumption against

standing by plaintiffs who are not the objects of the government action they challenge. Our decision in *DAPA* rejected the applicability of this presumption.").

**B. Texas's injury in fact is legally cognizable.**

The Supreme Court's decision in *United States v. Texas* ("*Enforcement Priorities*"), 143 S. Ct. 1964 (2023), does not apply to cases like this one. That case addressed Texas's and Louisiana's challenge to the Department of Homeland Security's guidelines, which stated that DHS would not arrest certain criminal aliens whom Congress provided "shall" be arrested. *Enforcement Priorities*, 143 S. Ct. at 1968. "The [challenged] Guidelines prioritize the arrest and removal from the United States of noncitizens who are suspected terrorists or dangerous criminals, or who have unlawfully entered the country only recently, for example," over the categories of criminal aliens that Congress mandated be arrested. *Id.* The Court characterized the case as "[t]he States essentially want[ing] the Federal Judiciary to order the Executive Branch to alter its arrest policy so as to make more arrests." *Id.* The Supreme Court held that Article III standing was lacking because "a citizen lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution." *Id.* (quoting *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973)).

This holding was based *solely* on the rule that a party typically lacks standing to compel the arrest and prosecution of another. *See id.* The majority emphasized its narrow holding: "[t]he discrete standing question raised by this case rarely arises because federal statutes that purport to *require* the Executive Branch to make arrests or bring prosecutions are rare. …This case therefore involves both a highly unusual

provision of federal law and a highly unusual lawsuit." *Id.* at 1974.

The Court held that "our Article III decision today should in no way be read to suggest or imply that the Executive possesses some freestanding or general constitutional authority to disregard statutes requiring or prohibiting executive action," but that "case is categorically different" from other standing decisions "because it implicates only one discrete aspect of the executive power—namely, the Executive Branch's traditional discretion over whether to take enforcement actions against violators of federal law." *Id.* "[T]his case raises only the narrow Article III standing question of whether the Federal Judiciary may in effect order the Executive Branch to take enforcement actions against violators of federal law—here, by making more arrests." *Id.*

The Court emphasized that "[t]he Court's standing decision today is narrow and simply maintains the longstanding jurisprudential status quo." *Id.* at 1975 (citing *Linda R.S.*, 410 U.S. at 619). It described the States' standing argument as a "novel" one that "if accepted, would entail expansive judicial direction of the Department's arrest policies." *Id.* at 1973. And it described the case as an "extraordinarily unusual lawsuit" because the States "want[ed] a federal court to order the Executive Branch to alter its arrest policies so as to make more arrests." *Id.* at 1976. "This case concerns *only* arrest and prosecution policies, and we therefore address *only* that issue" *Id.* at 1974 n.5 (emphases added); *see also id.* at 1990 (Alito, J., dissenting) (recognizing that "[t]he Court … holds only that, with some small and equivocal limitations that I will discuss, no party may challenge the Executive's 'arrest and prosecution policies'").

This extremely narrow and "highly unusual" case does not apply here. That is because Texas's injuries are not based on a mere failure to arrest particular aliens—they are based on the grant of affirmative relief to aliens who use an app and show up to a Texas POE claiming asylum. This case does not involve any attempt to compel the arrest or prosecution of anyone, so *Enforcement Priorities* does not undermine standing here; none of the relief sought here requires Appellees to take any immigration, deportation, or criminal action against any particular aliens.

The *Enforcement Priorities* majority cautioned that, while "States sometimes have standing to sue the United States or an executive agency or officer," 143 S. Ct. at 1972 n.3, "federal policies frequently generate indirect effects on state revenues or state spending and when a State asserts, for example, that a federal law has produced only those kinds of indirect effects, the State's claim for standing can become more attenuated," *id.* (cleaned up). Note that this mild language—"can become attenuated"—does not preclude standing based on indirect costs to States in all cases.

The *Enforcement Priorities* Court recognized that the States had asserted an injury due to monetary costs, *see id.* at 1970, given their evidence that "the Department's failure to comply with those statutory mandates imposes costs on the States" including "that they must continue to incarcerate or supply social services such as healthcare and education to noncitizens who should be (but are not being) arrested by the Federal Government." *Id.* at 1969. But *those* indirect injuries were not *judicially cognizable* because they were indirect costs *that arose from the Federal Government's failure to arrest certain criminal aliens. Id.* at 1970; *see also id.* at 1993

(Alito, J., dissenting) (describing States' injuries as increased criminal justice, education, and healthcare costs due to criminal aliens "who were released" and "not detained" by federal immigration authorities); *id.* at 1994 (States' concrete injuries were from "the cost of criminal supervision of aliens who should have been held in DHS custody"). That situation does not hold in this case.

Regardless, *Enforcement Priorities* did not overrule *Dep't of Commerce v. New York*, 588 U.S. 752 (2019), which upheld indirect injury supporting States' standing to challenge federal agency action, *see id.* at 753 ("diminishment of political representation, loss of federal funds, degradation of census data, and diversion of resources" were sufficient to give States and municipalities standing to sue over the proposed inclusion of a citizenship question on the 2020 census); *see also Enforcement Priorities*, 143 S. Ct. at 1977 (Gorsuch, J., concurring in the judgment) (noting this).

Lower courts may not preemptively refuse to apply on-point Supreme Court precedent even where subsequent Supreme Court cases are in tension with it:

> "We reaffirm that '[i]f a precedent of this Court has *direct application* in a case, yet appears to rest on reasons rejected in some other line of decisions,' the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." *Agostini v. Felton*, 521 U.S. 203, 237 (1997) (emphasis added) (quoting *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989)); *see also* Bryan A. Garner et al., *The Law of Judicial Precedent* 302 (2016). Indeed, even if the tension between the two cases was so stark that we could confidently predict *Free Enterprise Fund*'s impending demise, we would still have to follow it—it is the Supreme Court's "prerogative alone to overrule one of its precedents." *State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997).

*Cochran v. SEC*, 20 F.4th 194, 206 n.11 (5th Cir. 2021) (citations truncated), *aff'd and remanded sub nom. Axon Enter., Inc. v. FTC*, 142 S. Ct. 890 (2023). This Court should continue to apply *Dep't of Commerce* and existing Fifth Circuit precedent in this area.

The Supreme Court even took pains to note that it was "not suggest[ing] that federal courts may never entertain cases involving the Executive Branch's alleged failure to make more arrests or bring more prosecutions." *Enforcement Priorities*, 143 S. Ct. at 1973. Although the *Enforcement Priorities* rule does not apply to this case, its exceptions would apply even if it did.

### 1. The Final Rule is affirmative immigration relief—not mere non-enforcement.

The *Enforcement Priorities* majority noted that "a challenge to an Executive Branch policy that involves both the Executive Branch's arrest or prosecution priorities *and* the Executive Branch's provision of legal benefits or legal status could lead to a different standing analysis. … because the challenged policy might implicate more than simply the Executive's traditional enforcement discretion." 143 S. Ct. at 1974. The Court cited two cases challenging DACA as exemplars of this exception: *DHS v. Regents of Univ. of Cal.,* 140 S. Ct. 1891, 1906–07 (2020) (benefits such as work authorization and Medicare eligibility accompanied by non-enforcement meant that the policy was "more than simply a non-enforcement policy"); and the key Fifth Circuit precedent of *DAPA*, 809 F.3d at 154 (*Linda R.S.* "concerned only nonprosecution," which is distinct from "both nonprosecution and the conferral of benefits")).

The DACA program counted as the provision of benefits even though that agency action did not itself supply those benefits. *See Regents,* 140 S. Ct. at 1902 (explaining that work authorization for deferred action recipients is "permitted under regulations long predating DACA's creation" and that "[p]ursuant to other regulations, deferred action recipients are considered 'lawfully present' for purposes of, and therefore eligible to receive, Social Security and Medicare benefits"); *see also* 8 C.F.R. § 274a.12(c)(14) (2022) (work authorization); 8 C.F.R. § 1.3(a)(4)(vi) (Social Security); 42 C.F.R. § 417.422(h) (Medicare).

So, too, here. As described above, *supra* at Statement of the Case I.D, the admission into Texas offered by the Final Rule bestows healthcare, education, and CHIP benefits on newly-arrived aliens in Texas. Texas's injuries are not based on a mere failure to arrest particular parole-eligible aliens—instead, the Final Rule's extraordinary grant of *en masse* parole (like a grant of deferred action) is not mere non-enforcement but constitutes "affirmative immigration relief":

> DACA is not simply a non-enforcement policy. For starters, the DACA Memorandum did not merely "refus[e] to institute proceedings" against a particular entity or even a particular class. [*Heckler v. Chaney*, 470 U.S. 821, 832 (1985)]. Instead, it directed USCIS to "establish a clear and efficient process" for identifying individuals who met the enumerated criteria. Based on this directive, USCIS solicited applications from eligible aliens, instituted a standardized review process, and sent formal notices indicating whether the alien would receive the two-year forbearance. These proceedings are effectively "adjudicat[ions]." *Id.*, at 117a. And the result of these adjudications— DHS's decision to "grant deferred action"—is an "affirmative act of approval," the very opposite of a "refus[al] to act," *Chaney*, 470 U.S. at 831–832. In short, the DACA Memorandum does not announce a passive non-enforcement policy; it created a program for conferring

affirmative immigration relief. The creation of that program—and its rescission—is an "action [that] provides a focus for judicial review." *Id.*, at 832.

*DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1906 (2020) (citations truncated).

This exception applies to this case due to the effects that parole has on aliens and States. *See Enforcement Priorities*, 143 S. Ct. at 1974 (citing its previous decision reaching the merits of the termination of MPP causing injuries to States via granting parole to aliens, *Biden v. Texas*, 142 S. Ct. 2528 (2022), as raising different standing issues). Increasing grants of parole even *indirectly* through termination of MPP satisfied this test:

> [T]he decision to terminate MPP "is more than a non-enforcement policy." *Regents*, 140 S. Ct. at 1907. Although the termination of MPP *itself* does not confer affirmative benefits, the interaction between the termination of MPP and the lack of detention capacity necessarily means more aliens will be released and paroled into the Plaintiff States. And parole *does* create affirmative benefits for aliens such as work authorization.

*Texas v. Biden*, 554 F. Supp. 3d 818, 845 (N.D. Tex. 2021) (emphases in original), *rev'd on other grounds*, *Biden*, 597 U.S. 785. In this case, the challenged agency action—directly increasing the number of parolees—even more directly causes this injury. When a policy "has increased the number of aliens released on parole into the United States, including Texas," *MPP*, 20 F.4th at 966, that meant that more aliens were being protected by parole status to use healthcare services and public education. *Id.* at 968. This was sufficient for Article III standing and remains the case here.

Texas's injuries on this basis are not *indirect*—courts in the DACA litigation described these same injuries from "affirmative immigration relief" that makes aliens eligible for benefits and lawful presence as *direct* costs to the States. *See DACA*, 50 F.4th at 517 ("Texas asserts standing based on direct injury. It claims that DACA inflicts pocketbook injuries on the State in the form of healthcare, education, and social services costs."); *id.* at 520 ("Accordingly, Texas has demonstrated standing based on its direct injury."); *Texas v. United States*, 549 F. Supp. 3d 572, 589 (S.D. Tex. 2021) (Hanen, J.) (vacated in part on other grounds by 50 F.4th 498 (5th Cir. 2022)) ("DACA recipients' presence also represents direct costs in the areas of healthcare, education, and social services."). *Enforcement Priorities* concerned a claim of indirect injury because the challenged agency action was a refusal to take criminal aliens into custody, a failure to act. But a direct chain of affirmative actions is cognizable for standing even if the harm is several links down the chain—while a man may not be said to *directly* harm another when he callously stands by as he falls (*Enforcement Priorities*), the man does *directly* harm another if he pushes an object that then causes the other to fall (*DACA*, termination of Remain-in-Mexico in *MPP*—and the Final Rule).

As with the termination of MPP, the DACA program did not directly provide these benefits, "but an agency action need not directly confer public benefits to be more than nonenforcement. Instead, removing a categorical bar on receipt of governmental benefits and thereby making a class of persons newly eligible for them provides a focus for judicial review." *MPP*, 20 F.4th at 987 (cleaned up). Paroling aliens makes them eligible for benefits, imposing *direct* costs on Texas.

## 2. Texas has standing because the agency action challenged here constitutes an abdication of Appellees' statutory responsibilities.

The *Enforcement Priorities* majority noted that "a plaintiff arguably could obtain review of agency non-enforcement if an agency 'has consciously and expressly adopted a general policy that is so extreme as to amount to an abdication of its statutory responsibilities.'" *Id.* at 1973–74 (citing *Heckler v. Chaney*, 470 U.S. 821, 833 n.4 (1985)). "So too, an extreme case of non-enforcement arguably could exceed the bounds of enforcement discretion and support Article III standing." *Id.* at 1974. "But the States have not advanced a *Heckler*-style 'abdication' argument in this case or argued that the Executive has entirely ceased enforcing the relevant statutes," so the Court did not analyze this potential basis for standing. *Id.*

The Final Rule is just such an extreme example that constitutes abdication of Appellees' statutory responsibilities to grant parole only on a case-by-case basis for significant public benefit or urgent humanitarian reasons. "Deciding to parole aliens *en masse* is the opposite of … case-by-case decisionmaking." *MPP*, 20 F.4th at 942. Indeed, "the whole point of the 'case-by-case' requirement that Congress added in IIRIRA" was to prevent DHS from "parol[ing] aliens *en masse*." *Id.* at 997. Yet the Final Rule relies on precisely the type of programmatic parole that the INA expressly prohibits.

Judge Hanen had previously found that States had standing to challenge DAPA based on this abdication theory. *See Texas v. United States*, 86 F. Supp. 3d 591, 636–41 (S.D. Tex. 2015) (Hanen, J.); *id.* at 641 ("The States claim that, unlike the FDA's action at issue in *Heckler,* the DAPA program is a total abdication and

surrender of the Government's statutory responsibilities. They contend that the DAPA Directive basically concedes this point, and this Court agrees."). Indeed, Judge Hanen relied on APA reviewability under *Heckler v. Chaney, id.* at 641, to also find standing—the same analysis adopted by the *Enforcement Priorities* majority.

The *Enforcement Priorities* majority found that the States there had "not advanced a *Heckler*-style 'abdication' argument in that case or argued that the Executive has entirely ceased enforcing the relevant statutes." 143 S. Ct. at 1974. And Justice Gorsuch's concurrence notes that a claim under the Take Care Clause could be an abdication argument. *Id.* at 1977-78. Here, the Final Rule "prevents immigration officials from enforcing these [limiting] provisions of the" parole statute. *Texas*, 549 F. Supp. 3d at 608. As explained above, this violates the Take Care Clause, and the States therefore have standing based on an abdication argument. Recently, Judge Hanen found States had standing on this basis to challenge DACA. *See Texas v. United States*, 691 F. Supp. 3d 763, 780 (S.D. Tex. 2023), *appeal filed*, No. 23-40653 (5th Cir. Nov. 9, 2023).

Now that the Supreme Court has explicitly approved abdication of statutory responsibilities as a basis for standing, this Court should find standing for the States here on this additional ground—this case involves allegations of total disregard of Congress's limits on the parole authority and thus constitutes an abdication of Appellees' statutory responsibilities.

## C. Texas's harms are traceable to the Final Rule and redressable by this Court.

Injury must be "fairly" traceable to the defendant and be "likely" redressable by the relief sought. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). When it comes to the "inherently imprecise" task of discerning traceability, "common sense" and "basic economics" are "useful tool[s]." *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 6 (D.C. Cir. 2017) (Kavanaugh, J.).

Here, Texas has shown that the Final Rule will result in a variety of direct economic harms. "Texas has satisfied the second requirement for standing by showing that its costs are 'fairly traceable' to [the Final Rule]" because the rescission of the Rule would reduce the number of paroled aliens in the State, "thereby reducing the financial burdens on the State." *DACA*, 50 F.4th at 519.

In other words, there is at least a "substantial risk," *Monsanto Co. v. Geertson Seed Farms*, 130 S. Ct. 2743, 2747 (2010), that the Final Rule paroles more aliens into Texas who would otherwise never enter the United States at all. Indeed, the Supreme Court has found that a State has standing where federal action will result in a predictable *future* loss of revenue. *See Dep't of Commerce v. New York*, 588 U.S. at 767 (predictable loss of future funding is an injury in fact, even if amount is uncertain.)

Ultimately, the Final Rule gives aliens eligibility for government benefits they otherwise would not have. This increased incentive for illegal aliens to present at POEs and effectuate entry into the United States imposes massive costs on Texas, and the State will need to spend more money on law enforcement, education, and

Emergency Medicaid because of it. *See Natl. Infusion Ctr. Assn. v. Becerra*, 116 F.4th 488, 499 (5th Cir. 2024) (finding traceability based on changing "incentives" that are likely to make third parties act in 'predictable ways.'") (quoting *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 383 (2024)).

And since Texas challenges government action, "[c]ausation and redressability typically overlap as two sides of a causation coin." *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 6 n.1 (D.C. Cir. 2017). In the same way Texas's injuries are "fairly traceable" to the Final Rule, Texas has shown its injury is "likely to be redressed by a favorable judicial decision." *Spokeo, Inc.*, 578 U.S. 330. "After all, if a government action causes an injury, enjoining the action usually will redress that injury." *Carpenters Indus. Council*, 854 F.3d at 6 n.1. In other words, all the economic harm to Texas will be prevented—and thus remedied, by vacatur, of the Final Rule. 5 U.S.C. § 706.

Normally, to satisfy redressability, a plaintiff must show that it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *DACA*, 50 F.4th at 519–20 (cleaned up). "With special solicitude, however, … [t]he standard is met if there is some possibility that the requested relief will reduce the harm." *Id*. at 520 (cleaned up).

Redressability holds even if relief must filter downstream through third parties uncertain to comply with the result, provided the relief would either: (1) remove an obstacle for a nonparty to act in a way favorable to the plaintiff; or (2) influence a nonparty to act in such a way. *See, e.g., Dep't of Commerce*, 588 U.S. at 767–68 ("[T]hird parties will likely react in predictable ways."); *Bennett*, 520 U.S. at 169

(defendants' actions need not be "the very last step in the chain of causation");
*NiGen Biotech, L.L.C. v. Paxton*, 804 F.3d 389, 396–98 (5th Cir. 2015).

Finally, Appellees argue that Texas's injuries caused by the Final Rule are not redressable by any relief from this Court because of the limitation on injunctive relief in 8 U.S.C. § 1252(f)(1). ROA.575. But that provision does not bar the injunctive relief that Texas seeks.

Section 1252(f)(1) only precludes injunctions that "order federal officials to take or refrain from taking actions to enforce, implement, or otherwise carry out" authority granted under 8 U.S.C. §§ 1221-1232. *Garland v. Aleman Gonzalez*, 596 U.S. 543, 550 (2022). As described *supra*, Statement of the Case I.C, the Final Rule constitutes an affirmative program conferring parole on otherwise inadmissible aliens. This is no mere refusal to enforce the law, but rather a judicially cognizable injury that leads to direct injuries to Texas. *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1906 (2020).

Moreover, Appellees rely on none of the INA provisions to which Section 1252(f)(1) apply. Appellees rely on 6 U.S.C. § 202, 8 U.S.C. § 1103, and 8 U.S.C. § 1182, and Section 1252(f)(1) applies to none of them. Section 1252(f)(1) therefore does not preclude the relief Texas seeks here.

Section 1252(f)(1) likewise does not preclude vacatur. Appellees' arguments to the contrary below, ROA.690–92, directly contradict this Court's well-established precedent. *DACA*, 50 F. 4th at 528 ("As an initial matter, § 1252(f)(1) does not apply to vacatur."); *Texas v. United States*, 40 F.4th 205, 219 (5th Cir. 2022) (rejecting DHS argument that "vacatur 'prohibits' DHS from implementing the [challenged

agency action] and *de facto* 'enjoin[s] or restrain[s]' the agency's enforcement decisions," and was therefore barred by Section 1252(f)(1)).

## D. Texas is entitled to special solicitude in the standing inquiry.

The *Enforcement Priorities* majority never used the phrase "special solicitude" or addressed it in its analysis. *See Texas v. Cardona*, ---F.Supp.3d---, No. 4:23-CV-604, 2024 WL 3658767, at *20 (N.D. Tex. Aug. 5, 2024) (O'Connor, J.) (explaining continued viability of special solicitude doctrine post-*Enforcement Priorities*), *appeal filed*, No. 24-10910 (5th Cir. Oct. 7, 2024); *see also Missouri v. Biden*, 680 F. Supp. 3d 630, 718–19 (W.D. La. 2023) (recognizing the continued viability of special solicitude doctrine), *rev'd in part on other grounds*, 83 F.4th 350 (5th Cir. 2023).

Appellees may argue that *Enforcement Priorities* overturns the special solicitude doctrine. But, again, lower courts may not preemptively refuse to apply on-point Supreme Court precedent even where subsequent Supreme Court cases are in tension with it. *Cochran*, 20 F.4th at 206 n.11.

When special solicitude applies, "a state can establish standing without meeting all the normal standards for redressability and immediacy." *DACA*, 50 F.4th at 514. "Normally, to satisfy redressability, a plaintiff must show that it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 519–20 (cleaned up). "With special solicitude, however, … [t]he standard is met if there is *some possibility* that the requested relief will reduce the harm." *Id.* at 520 (emphasis added; cleaned up). Texas has satisfied the test for special solicitude standing because it has shown that (1) there is "a procedural right to challenge the action in question" and (2) the challenged action "affect[ed] one of

the State's quasi-sovereign interests." *DACA*, 50 F.4th at 514 (citing *DAPA*, 809 F.3d at 151-52).

### 1. Texas has a procedural right to challenge the agency action here.

Texas in this case established a procedural right to challenge the Final Rule under the APA because it has suffered a legal wrong and is being adversely affected or aggrieved by it. *See* 5 U.S.C. § 702; *see also MPP*, 20 F.4th at 970 n.10 (noting that such a procedural right is not limited to notice-and-comment claims but includes substantive claims under the APA).

As in *DACA*, Texas here uses its procedural right to "challenge[] DHS's affirmative decision to set guidelines for granting lawful presence to a broad class of illegal aliens." *DACA*, 50 F.4th at 514. "Congress intended for those 'suffering legal wrong because of agency action' to have judicial recourse, and the [S]tates fall well within that definition." *Id.* (quoting *DAPA*, 809 F.3d at 152). Texas thus satisfies the first element of special solicitude.

### 2. The Final Rule affects Texas's quasi-sovereign interests.

Texas also satisfies the second element because the Final Rule affects its quasi-sovereign interests. "'One helpful indication' of a quasi-sovereign interest is 'whether the injury is one that the State, if it could, would likely attempt to address through its sovereign lawmaking powers.'" *DACA*, 50 F.4th at 515 (quotation omitted). Indeed, "[a]n agency action may affect a quasi-sovereign interest if it is alleged to damage certain 'sovereign prerogatives [that] are now lodged in the Federal Government.'" *Id.* (quoting *Massachusetts*, 549 U.S. at 519). The Final Rule's pressure on Texas to change its laws relating to its prison system, public

education system, and participation in the Medicaid program gives "rise to a quasi-sovereign interest." *DACA*, 50 F.4th at 515.

In *DACA*, the Fifth Circuit concluded that the State's interest in classifying aliens was a quasi-sovereign interest. *Id.* The Final Rule implicates those quasi-sovereign interests just as the DACA Memorandum did. If Texas sought to change the classifications of parole recipients to alleviate its injuries, it would be threatened with federal preemption. The Fifth Circuit acknowledged these federal preemption concerns in *DACA*, concluding that "DACA implicates preemption concerns" because it classifies aliens and their status, which is a power only the federal government can exercise. *Id.* at 516. "An attempt by Texas to establish an alternative classification system or work authorizations would be preempted, despite the State's likely interest in doing so." *Id.* (citing *Arizona*, 567 U.S. at 409). The same is true under the Final Rule.

## II. Texas Has a Right to Challenge, and this Court has Jurisdiction to Review, the Final Rule Under the APA.

### A. Texas is within the zone of interests and has a cause of action.

Texas is well within the zone of interests of the INA for APA purposes, and numerous courts across this country have had no difficulty finding as much. Appellees vastly overstate the challenge of the zone of interests test, which the Supreme Court has characterized as "not especially demanding." *Lexmark Intern., Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014) (quotation omitted). A party's interests must only be "arguably within the zone of interests to be

protected or regulated by the statute." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012). "[T]he statute in question need not indicate that Congress intended to benefit the plaintiff's interests." *Wyoming ex rel. Clark v. United States*, 539 F.3d 1236, 1243 (10th Cir. 2008).

It should come as no surprise, therefore, that courts routinely hold that States "have an interest in seeing the INA enforced, and in participating in notice and comment to voice their concerns." *DACA*, 50 F.4th at 521; *see also DAPA*, 809 F.3d at 152 ("[T]he states are within the zone of interests of the Immigration and Nationality Act ("INA"); they are not asking us to 'entertain citizen suits to vindicate the public's nonconcrete interest in the proper administration of the laws.'" (quoting *Massachusetts*, 549 U.S. at 516–17). There are several reasons States are within the zone of interests of the INA, including because States "bear[ ] many of the consequences of unlawful immigration." *DAPA*, 809 F.3d at 163 (quoting *Arizona v. United States*, 567 U.S. 387, 397 (2012)) ("Texas satisfies the zone-of-interests test not on account of a generalized grievance but instead as a result of the same injury that gives it Article III standing—Congress has explicitly allowed states to deny public benefits to illegal aliens."). Another reason the States have an interest in INA enforcement is the quasi-sovereign interest in protecting its territory, an interest inherently intertwined with federal control over immigration law. *See DAPA*, 809 F.3d at 151–52; *Arizona*, 567 U.S. at 417 ("As a sovereign, Arizona has the inherent power to exclude persons from its territory, subject only to those limitations expressed in the Constitution or constitutionally imposed by Congress. That power has long been recognized as inherent in sovereignty.") (Scalia, J.,

concurring in part and dissenting in part).

Finally, precedent is not limited to the broad assertion of standing under the INA. Prior courts have held that the States have both Article III standing and prudential standing under the APA zone of interests test specifically to challenge parole policy under 8 U.S.C. § 1182(d)(5)(A) because of the impact such policies have on their duty to manage the public welfare, including both statutorily required spending and voluntary additional spending due to compelling humanitarian crisis. *See New Mexico v. McAleenan*, 450 F. Supp. 3d 1130, 1174 n.5 (D.N.M. 2020) ("'[P]arties such as state and local governments that can show that the United States' parole decisions were made contrary to 'significant public benefit' under 8 U.S.C. § 1182(d)(5)(A), are at least 'arguably' within the statute's zone of interests."); *id.* ("'[W]here a party, such as a state or local government, faces harm from the United States' decision to parole asylees, that party is within § 1182(d)(5)(A)'s interests."); *id.* at 1184 (recognizing that even voluntary expenditures on parolees may confer Article III standing where parole polices "harm [the State's] quasi-sovereign interests in the health and safety of its citizens in general"); *id.* ("Increased use of state-funded services is an injury sufficient for Article III standing.").

### B. The Final Rule is final agency action.

The Final Rule is final agency action, which the Fifth Circuit's most relevant precedent instructs, should be addressed first because "that analysis contextualizes the standing inquiry." *Texas v. EEOC*, 933 F.3d 433, 441 (5th Cir. 2019). Finality finds its origins in the APA, which only allows judicial review of "final" agency action. 5 U.S.C. § 704. Agency action is "final" for the purposes of judicial review

if two conditions are met: (1) the agency action "mark[s] the consummation of the agency's decision making process" and is not "merely tentative or interlocutory [in] nature," and (2) the action determines "rights or obligations" and imposes "legal consequences." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (cleaned up). The Supreme Court has long taken a pragmatic approach to finality, viewing the APA's finality requirement as "flexible." *EEOC*, 933 F.3d at 441 (cleaned up). Both finality prongs are satisfied here.

The Final Rule marks the consummation of DHS's decision-making. The Fifth Circuit recognizes that even "guidance letters can mark the 'consummation' of an agency's decision-making process." *Nat'l Pork Producers Council v. EPA*, 635 F.3d 738, 755 (5th Cir. 2011). "[T]he key question [for the first finality prong] is whether [the agency action] is 'subject to further agency review.'" *Clarke v. Commodity Futures Trading Comm'n*, 74 F.4th 627, 638 (5th Cir. 2023); *Data Mktg. P'ship, LP v. United States Dep't of Lab.*, 45 F.4th 846, 854 (5th Cir. 2022). Here, implementation of the Final Rule, like termination of the Migrant Protection Protocols (MPP) in *MPP*, 20 F.4th 928, 948 (5th Cir. 2021), alters the status quo and determines Appellees' approach to parole for a specified population of inadmissible aliens, satisfying the first prong.

The Final Rule also binds DHS and imposes legal consequences, meeting the second finality prong. Generally, when an agency "loses discretion" because of an action, "[t]hat's textbook final agency action." *Data Mktg. P'ship, LP*, 45 F.4th at 854. Even partial removal of discretion suffices. *Clarke*, 74 F.4th at 638. The Final Rule here mandates parole approvals, evidenced by the 100% approval rate. *Texas v.*

*United States*, 86 F. Supp. 3d 591, 670 n.101 (S.D. Tex. 2015), *aff'd*, *DAPA*, 809 F.3d 134. Even if approval were not mandatory, the presumption that satisfying the Final Rule eligibility requirements satisfies the statutory significant public benefit requirement *is* mandatory. *See* 89 Fed. Reg. at 67465. Agency documents that bind the agency to a particular legal position, such as the Final Rule, are substantive rules and thus final. *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94 (D.C. Cir. 1997); *DAPA*, 809 F.3d at 171.

The Final Rule establishes eligibility for a unique program, altering the rights of aliens and imposing obligations on Appellees and imposing costs on the States. Guidance ending the Migrant Protection Protocols in *Biden v. Texas*, for example, had to be carried out by DHS staff, yet the guidance "resulted in 'rights and obligations [being] determined.'" 597 U.S. at 808 (citation omitted). As the Fifth Circuit has noted, the existence of substantial legal consequences affirms that an action is final. *EEOC*, 933 F.3d at 441. Thus, the Final Rule constitutes final agency action under the APA.

## C. The Final Rule is reviewable under the APA.

The APA establishes a "basic presumption of judicial review for one suffering legal wrong because of agency action." *Regents of the Univ. of Cal.*, 591 U.S. at 16–17. This presumption can only be rebutted if the relevant statute explicitly precludes review or if the action is committed to agency discretion by law, as clarified in *Heckler v. Chaney*, 470 U.S. 821 (1985). Neither exception applies here. Establishing unreviewability is a high bar, and "where substantial doubt about the congressional intent exists, the general presumption favoring judicial review of administrative

action is controlling." *DAPA*, 809 F.3d at 164 (cleaned up). Only a narrow set of matters are deemed "committed to agency discretion," such as enforcement decisions or instances where "there is no law to apply." *Id.* at 163. This is not the case here, as Congress provided clear legal criteria for parole eligibility and a specific process for determining whether those criteria are met. *See* 8 U.S.C. § 1182(d)(5). Indeed, providing such criteria and curtailing Executive discretion to grant parole was the express purpose of amending § 1182(d)(5)(A).

First, no statute bars judicial review. Under 5 U.S.C. § 701(a)(1), reviewability is the default unless statutes expressly preclude it. While the INA states that "no court shall have jurisdiction to review … any other decision" of DHS that is specified to be within the agency's discretion (8 U.S.C. § 1252(a)(2)(B)(ii)), courts have repeatedly rejected the idea that this provision bars review of programmatic challenges like the one here. For example, in *MPP*, the Fifth Circuit rejected the argument that § 1252(a)(2)(B)(ii) renders unreviewable "an entire program …affecting thousands or millions of people," as opposed to individual cases. *MPP*, 20 F.4th at 977. Similarly, the *Roe v. Mayorkas* court found that § 1252(a)(2)(B)(ii) does not preclude judicial review of DHS's parole policies under the APA, since 8 U.S.C. § 1182(d)(5)(A) provides sufficient guidance to make the action reviewable. *Roe v. Mayorkas*, No. 22-CV-10808-ADB, 2023 WL 3466327, at *8–9 (D. Mass. May 12, 2023).

Second, the Final Rule is not committed to agency discretion by law. It constitutes a "rule" under the APA, which is defined as an "agency statement of general … applicability and future effect" that either prescribes law or policy. 5

U.S.C. § 551(4). *Heckler*'s doctrine does not apply to agency rules like the Final Rule; it generally applies to one-off enforcement decisions, not programmatic actions. *MPP*, 20 F.4th at 978, 984. Even if *Heckler* were relevant, exception to reviewability is rebutted because the statute in question provides specific guidelines for exercising parole authority. The Supreme Court stated that DHS's parole discretion is "not unbounded," being limited to urgent humanitarian reasons or significant public benefit, and must be "reasonable and reasonably explained" under the standards of the APA. *Biden*, 597 U.S. at 806–07.

In short, the Final Rule's implementation triggers eligibility for various benefits, making it subject to judicial review. This action removes barriers to benefit eligibility, providing a clear focus for review. *DAPA*, 809 F.3d at 167 (quoting *Heckler*, 470 U.S. at 832). Even if *Heckler*'s presumption applied, the statutory criteria guiding parole decisions would override it, ensuring that DHS's exercise of parole is bounded by law and open to APA review. *MPP*, 20 F.4th at 982; *Biden*, 597 U.S. at 806–07.

### D. Vacatur is the appropriate remedy.

"[V]acatur of an agency action is the default rule in this Circuit." *Cargill v. Garland*, 57 F.4th 477, 472 (5th Cir. 2023 (en banc); *see also Braidwood Mgmt., Inc. v. Becerra*, 104 F.4th 930, 952 (5th Cir. 2024). Indeed, '[v]acatur is the only statutorily prescribed remedy for a successful APA challenge to a regulation." *Franciscan Alliance, Inc. v. Becerra*, 47 F.4th 368, 374-75 (5th Cir. 2022); *see also R.J. Reynolds Tobacco CO. v. U.S. Food & Drug Admin.*, No. 6:20-cv-00176, 2022 WL 17489170, at *21 (E.D. Tex. Dec. 7, 2022) (Barker, J. (rejecting Federal Defendants' arguments

against availability of vacatur under the APA); *Texas Med. Ass'n v. United States Dep't of Health & Hum. Servs.*, No. 6:22-cv-372, 2023 WL 1781801, at *13 (E.D. Tex. Feb. 6, 2023) (Kernolde, J.) (same).

Because "[t]he Constitution requires 'an *uniform* Rule of Naturalization,'" *DAPA*, 809 F.3d at 187 (quoting U.S. Const. art. I, § 8, cl.4) (emphasis original), "and the Supreme Court has described immigration policy as 'a comprehensive and *unified* system,'" *id.* at 188 (quoting *Arizona v. United States*, 567 U.S. 387, 401 (2012)). Thus, "[p]artial implementation of [the challenged immigration policy] would "detract[] from the 'integrated scheme of regulation' created by Congress." *Id.* (quoting *Arizona*, 567 U.S. at 401). Accordingly, the Court should continue to interpret the APA as authorizing the remedy of vacatur and recognize that it nullifies the agency action universally rather than precludes its application to any particular parties.

## Conclusion

The Court should reverse the Trial Court's granting of Appellees' Rule 12(b)(1) motion and remand for further proceedings.

Dated: November 20, 2024

Ryan D. Walters
Chief, Special Litigation Division

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

Austin Kinghorn
Deputy Attorney General for Legal Strategy

Respectfully submitted,

*/s/ Ryan G. Kercher*

RYAN G. KERCHER
Deputy Chief, Special Litigation Div.
Texas State Bar No. 24060998
Ryan.Kercher@oag.texas.gov

OFFICE OF THE TEXAS ATTORNEY
GENERAL
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700

COUNSEL FOR APPELLANT

## Certificate of Service

On November 20, 2024, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

*/s/ Ryan G. Kercher*
RYAN G. KERCHER
Dep. Chief, Special Litigation Division

## Certificate of Compliance

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 10,758 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the same program used to calculate the word count).

*/s/ Ryan G. Kercher*
RYAN G. KERCHER
Dep. Chief, Special Litigation Division