# In the United States Court of Appeals for the Fifth Circuit

STATE OF TEXAS,

*Plaintiff-Appellants*,

*v.*

ALEJANDRO MAYORKAS, SECRETARY, U.S. DEPARTMENT OF HOMELAND SECURITY; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; MERRICK GARLAND, U.S. ATTORNEY GENERAL; UNITED STATES DEPARTMENT OF JUSTICE,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Western District of Texas, Del Rio Division

## RECORD EXCERPTS FOR APPELLANT'S BRIEF

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

Austin Kinghorn
Deputy Attorney General for Legal Strategy

Ryan D. Walters
Chief, Special Litigation Division

RYAN G. KERCHER
Deputy Chief, Special Litigation Division
Texas State Bar No. 24060998
Ryan.Kercher@oag.texas.gov

JACOB PRZADA
Special Counsel
Texas State Bar No. 24125371
Jacob.Przada@oag.texas.gov

OFFICE OF THE TEXAS ATTORNEY GENERAL
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548

# Table of Contents

1. Docket sheet (ROA.1)..................................................... Tab 1
2. Amended Complaint (ROA.436) .................................. Tab 2
3. Motion to Dismiss (ROA.558) ...................................... Tab 3
4. Response to Motion to Dismiss (ROA.644) ................... Tab 4
5. Reply in support of Motion to Dismiss (ROA.682) ......... Tab 5
6. Amended Memorandum and Order (ROA.732)............ Tab 6
7. Notice of Appeal (ROA.746) ....................................... Tab 7

[see 5th Cir. R. 30.1 for requirements and limitations]

**TAB 1: DOCKET SHEET (ROA.1)**

# U.S. District Court [LIVE]
## Western District of Texas (Del Rio)
## CIVIL DOCKET FOR CASE #: 2:23-cv-00024-AM

STATE OF TEXAS v. Mayorkas et al
Assigned to: Chief Judge Alia Moses
Cause: 05:702 Administrative Procedure Act

Date Filed: 05/23/2023
Jury Demand: None
Nature of Suit: 899 Other Statutes:
Administrative Procedures Act/Review or
Appeal of Agency Decision
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**STATE OF TEXAS**                      represented by   **Amy Snow Hilton**
PO Box 12548, Capitol Station
Special Litigation Division
78711, Ste Mc-019
Austin, TX 78711
512-463-4139
Email: amy.hilton@oag.texas.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher D. Hilton**
Office of the Attorney General of Texas
P O Box 12548
Capital Station
Austin, TX 78701
512-463-2120
Fax: 512-320-0667
Email: chris@stonehilton.com
*TERMINATED: 11/14/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ryan G. Kercher**
Office of the Attorney General
PO Box 12548, MC 009
Austin, TX 78711-2548
512-936-2613
Email: ryan.kercher@oag.texas.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jacob Edward Przada**
Office of the Attorney General of Texas
P.O. Box 12548, Capitol Station
Ste Mc-009
Austin, TX 78711-2548
512-936-2669

**RE.004**

Email: jacob.przada@oag.texas.gov
*ATTORNEY TO BE NOTICED*

**Kimberly Gdula**
Office of the Attorney General
P.O. Box 12548-Capitol Station
Austin, TX 78711-2548
512-463-2120
Fax: 512-320-0667
Email: kimberly.gdula@oag.texas.gov
*ATTORNEY TO BE NOTICED*

**Leif A. Olson**
Office of the Attorney General of Iowa
1305 E. Walnut St.
Des Moines, IA 50319
515-954-9564
Email: leif.olson@ag.iowa.gov
*TERMINATED: 08/15/2023*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

| | | |
|---|---|---|
| **Alejandro Mayorkas**<br>*In His Official Capacity as Secretary of Departy of Homeland Security* | represented by | **Katherine J. Shinners**<br>DOJ-Civ<br>P.O. Box 868 Ben Franklin Station<br>Washington, DC 20044<br>202-598-8259<br>Fax: 202-305-7000<br>Email: katherine.j.shinners@usdoj.gov<br>*LEAD ATTORNEY*<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **U.S. Department of Homeland Security** | represented by | **Katherine J. Shinners**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **Merrick Garland**<br>*In His Official Capacity as Attorney General of the United States* | represented by | **Katherine J. Shinners**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED* |

**Defendant**

**U.S. Department of Justice**  represented by  **Katherine J. Shinners**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 05/23/2023 | 1 (p.8) | COMPLAINT ( Filing fee $ 402 receipt number ATXWDC-17472810), filed by STATE OF TEXAS. (Attachments: # 1 (p.8) Exhibit 1, # 2 (p.76) Civil Cover Sheet)(Hilton, Amy) (Entered: 05/23/2023) |
| 05/23/2023 | 2 (p.76) | REQUEST FOR ISSUANCE OF SUMMONS by STATE OF TEXAS. (Attachments: # 1 (p.8) Request for Issuance of Summons, # 2 (p.76) Request for Issuance of Summons, # 3 (p.98) Request for Issuance of Summons, # 4 (p.120) Request for Issuance of Summons, # 5 (p.156) Request for Issuance of Summons, # 6 (p.158) Request for Issuance of Summons, # 7 (p.162) Request for Issuance of Summons, # 8 (p.165) Request for Issuance of Summons, # 9 (p.166) Request for Issuance of Summons, # 10 (p.167) Request for Issuance of Summons)(Hilton, Amy) (Entered: 05/23/2023) |
| 05/23/2023 |  | Case assigned to Chief Judge Alia Moses. CM WILL NOW REFLECT THE JUDGE INITIALS AS PART OF THE CASE NUMBER. PLEASE APPEND THESE JUDGE INITIALS TO THE CASE NUMBER ON EACH DOCUMENT THAT YOU FILE IN THIS CASE. (ls) (Entered: 05/23/2023) |
| 05/23/2023 | 3 (p.98) | Summons Issued as to Merrick Garland, Alejandro Mayorkas, U.S. Department of Homeland Security, U.S. Department of Justice, U.S. Attorney and U.S. Attorney General (ls) (Entered: 05/23/2023) |
| 06/15/2023 | 4 (p.120) | SUMMONS Returned Executed by STATE OF TEXAS. All Defendants. (Attachments: # 1 (p.8) Merrick Garland-US DOJ, # 2 (p.76) Alejandro Mayorkas-US Atty, # 3 (p.98) Alejandro Mayorkas-US Atty-WD, # 4 (p.120) US Dept of Homeland Sec.-US AG, # 5 (p.156) US Dept Homeland Sec.-US Atty-WD, # 6 (p.158) US DOJ, # 7 (p.162) US DOJ-US AG, # 8 (p.165) US DOJ-US Atty-WD)(Hilton, Amy) (Entered: 06/15/2023) |
| 06/16/2023 | 5 (p.156) | NOTICE of Attorney Appearance by Leif A. Olson on behalf of STATE OF TEXAS. Attorney Leif A. Olson added to party STATE OF TEXAS(pty:pla) (Olson, Leif) (Entered: 06/16/2023) |
| 07/17/2023 | 6 (p.158) | MOTION to Appear Pro Hac Vice by James Edward Dingivan by on behalf of Merrick Garland, Alejandro Mayorkas, U.S. Department of Homeland Security, U.S. Department of Justice. (Dingivan, James) (Entered: 07/17/2023) |
| 07/18/2023 | 7 (p.162) | Unopposed MOTION for Extension of Time to File Answer re 1 (p.8) Complaint by Merrick Garland, Alejandro Mayorkas, U.S. Department of Homeland Security, U.S. Department of Justice. (Attachments: # 1 (p.8) Proposed Order)(Dingivan, James) (Entered: 07/18/2023) |
| 07/18/2023 | 8 (p.165) | ORDER GRANTING 7 (p.162) Motion for Extension of Time to Answer ; All Defendants. Signed by Chief Judge Alia Moses. (ls) (Entered: 07/19/2023) |
| 07/20/2023 | 9 (p.166) | ORDER GRANTING 6 (p.158) Motion to Appear Pro Hac Vice for Attorney Katherine J. Shinners for Merrick Garland,Katherine J. Shinners for Alejandro |

24-50717.3

| | | Mayorkas,Katherine J. Shinners for U.S. Department of Homeland Security,Katherine J. Shinners for U.S. Department of Justice. Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. Registration is managed by the PACER Service Center Signed by Chief Judge Alia Moses. (ls) (Entered: 07/20/2023) |
|---|---|---|
| 08/02/2023 | 10 (p.167) | Unopposed MOTION to Withdraw as Attorney *Leif A. Olson* by STATE OF TEXAS. (Attachments: # 1 (p.8) Proposed Order)(Olson, Leif) (Entered: 08/02/2023) |
| 08/02/2023 | 11 (p.170) | DEFICIENCY NOTICE: re 10 (p.167) Unopposed MOTION to Withdraw as Attorney *Leif A. Olson* (am3) (Entered: 08/02/2023) |
| 08/02/2023 | 12 (p.171) | CORRECTED MOTION to Withdraw as Attorney *Leif A. Olson* by STATE OF TEXAS. (Attachments: # 1 (p.8) Proposed Order)(Olson, Leif) (Entered: 08/02/2023) |
| 08/15/2023 | 13 (p.174) | ORDER GRANTING 12 (p.171) Motion to Withdraw as Attorney. Signed by Chief Judge Alia Moses. (aa) (Entered: 08/16/2023) |
| 08/24/2023 | 14 (p.175) | NOTICE of Attorney Appearance by Ryan G. Kercher on behalf of STATE OF TEXAS. Attorney Ryan G. Kercher added to party STATE OF TEXAS(pty:pla) (Kercher, Ryan) (Entered: 08/24/2023) |
| 08/24/2023 | 15 (p.177) | NOTICE of Attorney Appearance by Kimberly Gdula on behalf of STATE OF TEXAS. Attorney Kimberly Gdula added to party STATE OF TEXAS(pty:pla) (Gdula, Kimberly) (Entered: 08/24/2023) |
| 08/24/2023 | 16 (p.179) | Unopposed MOTION for Leave to File Motion to Dismiss *in Excess of 20 pages* by Merrick Garland, Alejandro Mayorkas, U.S. Department of Homeland Security, U.S. Department of Justice. (Attachments: # 1 (p.8) Defs.' Motion to Dismiss, # 2 (p.76) Appendix Appendix to Motion to Dismiss, # 3 (p.98) Proposed Order)(Shinners, Katherine) (Entered: 08/24/2023) |
| 08/25/2023 | 17 (p.232) | DEFICIENCY NOTICE: re 16 (p.179) Unopposed MOTION for Leave to File Motion to Dismiss *in Excess of 20 pages* (ccr) (Entered: 08/25/2023) |
| 08/25/2023 | 18 (p.233) | CORRECTED MOTION for Leave to File Motion to Dismiss *in Excess of 20 pages (Unopposed)* by Merrick Garland, Alejandro Mayorkas, U.S. Department of Homeland Security, U.S. Department of Justice. (Attachments: # 1 (p.8) Defs.' Motion to Dismiss, # 2 (p.76) Appendix to Defs.' Motion to Dismiss, # 3 (p.98) Proposed Order)(Shinners, Katherine) (Entered: 08/25/2023) |
| 08/30/2023 | 19 (p.286) | ORDER GRANTING 18 (p.233) Motion for Leave to File Signed by Chief Judge Alia Moses. (aa) (Entered: 08/31/2023) |
| 08/30/2023 | 20 (p.287) | DEFENDANTS MOTION TO DISMISS COMPLAINT by Merrick Garland, Alejandro Mayorkas, U.S. Department of Homeland Security, U.S. Department of Justice. (aa) (Entered: 08/31/2023) |
| 09/11/2023 | 21 (p.336) | Unopposed MOTION for Extension of Time to File Response/Reply as to 20 (p.287) MOTION to Dismiss by STATE OF TEXAS. (Attachments: # 1 (p.8) Proposed Order)(Gdula, Kimberly) (Entered: 09/11/2023) |
| 09/12/2023 | 22 (p.340) | ORDER GRANTING PLAINTIFF'S MOTION FOR EXTENSION OF TIME : GRANTING 21 (p.336) Motion for Extension of Time to File Response re 21 (p.336) Unopposed MOTION for Extension of Time to File Response as to 20 (p.287) MOTION to Dismiss Signed by Chief Judge Alia Moses. (aa) (Entered: 09/15/2023) |

| | | |
|---|---|---|
| 11/10/2023 | 23 (p.341) | Unopposed MOTION for Leave to File Amended Complaint by STATE OF TEXAS. (Attachments: # 1 (p.8) Proposed Order, # 2 (p.76) Exhibit First Amended Complaint, # 3 (p.98) Exhibit Exh. 1 to Amended Complaint)(Hilton, Amy) (Entered: 11/10/2023) |
| 11/13/2023 | 24 (p.420) | Unopposed MOTION to Withdraw as Attorney *and Designation of Attorney in Charge* by STATE OF TEXAS. (Attachments: # 1 (p.8) Proposed Order)(Hilton, Amy) (Entered: 11/13/2023) |
| 11/13/2023 | 25 (p.423) | MOTION for Extension of Time to File Response/Reply by STATE OF TEXAS. (Attachments: # 1 (p.8) Proposed Order)(Hilton, Amy) (Entered: 11/13/2023) |
| 11/13/2023 | 26 (p.427) | ORDER GRANTING 24 (p.420) Motion to Withdraw as Attorney. Signed by Chief Judge Alia Moses. (aa) (Entered: 11/14/2023) |
| 11/14/2023 | 27 (p.428) | ADVISORY TO THE COURT by STATE OF TEXAS . (Hilton, Amy) (Entered: 11/14/2023) |
| 12/06/2023 | 28 (p.430) | NOTICE of Attorney Appearance by Jacob Edward Przada on behalf of STATE OF TEXAS. Attorney Jacob Edward Przada added to party STATE OF TEXAS(pty:pla) (Przada, Jacob) (Entered: 12/06/2023) |
| 02/05/2024 | 29 (p.432) | ORDER DENIED with out prejudice 20 (p.287) Motion to Dismiss ; GRANTING 23 (p.341) Motion for Leave to File Signed by Chief Judge Alia Moses. (jaw) (Entered: 02/05/2024) |
| 02/05/2024 | 30 (p.436) | AMENDED COMPLAINT against Merrick Garland, Alejandro Mayorkas, U.S. Department of Homeland Security, U.S. Department of Justice amending 1 (p.8) Complaint, filed by STATE OF TEXAS.(jaw) (Entered: 02/05/2024) |
| 02/22/2024 | 31 (p.511) | Unopposed MOTION for Extension of Time to File Answer re 30 (p.436) Amended Complaint by Merrick Garland, Alejandro Mayorkas, U.S. Department of Homeland Security, U.S. Department of Justice. (Attachments: # 1 (p.8) Proposed Order)(Shinners, Katherine) (Entered: 02/22/2024) |
| 02/23/2024 | | Text Order GRANTING 31 (p.511) Motion for Extension of Time to Answer entered by Chief Judge Alia Moses. (This is a text-only entry generated by the court. There is no document associated with this entry.) (CRlc) (Entered: 02/23/2024) |
| 03/15/2024 | 32 (p.515) | Unopposed MOTION for Leave to File Dispositive Motion in Excess of 20 Pages *(Defendants' Motion to Dismiss)* by Merrick Garland, Alejandro Mayorkas, U.S. Department of Homeland Security, U.S. Department of Justice. (Attachments: # 1 (p.8) Defendants' Motion to Dismiss First Am. Compl., # 2 (p.76) Proposed Order)(Shinners, Katherine) (Entered: 03/15/2024) |
| 03/15/2024 | 34 (p.558) | MOTION to Dismiss FIRST AMENDED COMPLAINT by Merrick Garland, Alejandro Mayorkas, U.S. Department of Homeland Security, U.S. Department of Justice. (aa) (Entered: 04/11/2024) |
| 04/10/2024 | 33 (p.557) | ORDER MOOTING 25 (p.423) Motion for Extension of Time to File Response/Reply re 25 (p.423) MOTION for Extension of Time to File Response/Reply , 32 (p.515) Unopposed MOTION for Leave to File Dispositive Motion in Excess of 20 Pages *(Defendants' Motion to Dismiss)* ; GRANTING 32 (p.515) Motion for Leave to File Signed by Chief Judge Alia Moses. (aa) (Entered: 04/11/2024) |
| 04/17/2024 | | |

| | 35 (p.595) | Joint MOTION for Extension of Time to File Response/Reply as to 34 (p.558) MOTION to Dismiss by STATE OF TEXAS. (Attachments: # 1 (p.8) Proposed Order)(Hilton, Amy) (Entered: 04/17/2024) |
|---|---|---|
| 04/17/2024 | 36 (p.600) | MOTION to Appear Pro Hac Vice by Robert D. Green by on behalf of Merrick Garland, Alejandro Mayorkas, U.S. Department of Homeland Security, U.S. Department of Justice. (Attachments: # 1 (p.8) Proposed Order)(Green, Robert) (Entered: 04/17/2024) |
| 04/19/2024 | 37 (p.604) | ORDER GRANTING 35 (p.595) Motion for Extension of Time to File Response/Reply re 35 (p.595) Joint MOTION for Extension of Time to File Response/Reply as to 34 (p.558) MOTION to Dismiss After due consideration of the law, the Court finds that the motion is meritorious. It is therefore ORDERED that Joint Motion for Extension of Time is GRANTED. Plaintiff's Response to Defendants' Motion to Dismiss deadline shall be May 9, 2024. and Defendants' Reply in Support of their Motion to Dismiss deadline shall be May 30, 2024. Signed by Chief Judge Alia Moses. (aa) (Entered: 04/22/2024) |
| 04/26/2024 | 38 (p.605) | ORDER DENYING 36 (p.600) Motion to Appear Pro Hac Vice Signed by Chief Judge Alia Moses. (jaw) (Entered: 04/30/2024) |
| 05/09/2024 | 39 (p.606) | Unopposed MOTION for Leave to Exceed Page Limitation by STATE OF TEXAS. (Attachments: # 1 (p.8) Brief Response to Motion to Dismiss, # 2 (p.76) Proposed Order)(Hilton, Amy) (Entered: 05/09/2024) |
| 05/10/2024 | 40 (p.643) | IT IS ORDERED that the Plaintiff's Unopposed Motion for Leave to File a Response to Dispositive Motion in Excess of Twenty Pages 39 (p.606) be GRANTED. Signed by Chief Judge Alia Moses. (jaw) (Entered: 05/10/2024) |
| 05/10/2024 | 41 (p.644) | RESPONSE TO DEFENDANTS' MOTION TO DISMISS, filed by STATE OF TEXAS, re 34 (p.558) MOTION to Dismiss filed by Defendant Merrick Garland, Defendant U.S. Department of Homeland Security, Defendant U.S. Department of Justice, Defendant Alejandro Mayorkas (jaw) (Entered: 05/10/2024) |
| 05/30/2024 | 42 (p.678) | Unopposed MOTION for Leave to File Defendants' Reply in Support of Motion to Dismiss in Excess of Ten Pages by Merrick Garland, Alejandro Mayorkas, U.S. Department of Homeland Security, U.S. Department of Justice. (Attachments: # 1 (p.8) Reply in Support of Motion to Dismiss, # 2 (p.76) Proposed Order)(Shinners, Katherine) (Entered: 05/30/2024) |
| 05/31/2024 | 43 (p.705) | ORDER GRANTING 42 (p.678) Motion for Leave to File Signed by Chief Judge Alia Moses. (aa) (Entered: 05/31/2024) |
| 07/03/2024 | 44 (p.706) | MOTION for Leave to File Notice of Supplemental Authority *in Support of Motion to Dismiss* by Merrick Garland, Alejandro Mayorkas, U.S. Department of Homeland Security, U.S. Department of Justice. (Attachments: # 1 (p.8) Notice of Supplemental Authority, # 2 (p.76) Proposed Order)(Shinners, Katherine) (Entered: 07/03/2024) |
| 07/08/2024 | 45 (p.714) | ORDER GRANTING 44 (p.706) Motion for Leave to File. IT IS FURTHER ORDERED that the Plaintiff may respond to the Notice of Supplemental Authority, but only by July 15, 2024. Signed by Chief Judge Alia Moses. (jaw) (Entered: 07/08/2024) |
| 07/15/2024 | 46 (p.715) | NOTICE of Filing Response to Notice of Supplemental Authority by STATE OF TEXAS (Hilton, Amy) (Entered: 07/15/2024) |

| | | |
|---|---|---|
| 08/02/2024 | 47 (p.718) | MEMORANDUM OPINION AND ORDER GRANTING 34 (p.558) Motion to Dismiss, the Defendants' Motion to Dismiss (ECF No. 34) is GRANTED. The Amended Complaint is DISMISSED WITHOUT PREJUDICE. Texas shall have thirty (30) days from the date of this Memorandum Opinion and Order to amend its pleading to allege facts sufficient to establish Article III standing. Signed by Chief Judge Alia Moses. (ccr) (Entered: 08/05/2024) |
| 08/05/2024 | 48 (p.732) | AMENDED MEMORANDUM OPINION AND ORDER re 34 (p.558) Motion to Dismiss filed by Merrick Garland, U.S. Department of Homeland Security, U.S. Department of Justice, Alejandro Mayorkas. Signed by Chief Judge Alia Moses. (am3) (Entered: 08/05/2024) |
| 09/03/2024 | 49 (p.746) | Appeal of Final Judgment 48 (p.732) by STATE OF TEXAS. Filing fee $605 receipt number ATXWDC-19180836 (Kercher, Ryan) Modified on 9/4/2024 to add filing fee information (kc). (Entered: 09/03/2024) |
| 09/03/2024 | | *** 48 (p.732) NOTICE OF INTERLOCUTORY APPEAL as to 48 (p.732) Memorandum Opinion and Order by STATE OF TEXAS. Filing fee $ 605, receipt number ATXWDC-19180836. Per 5th Circuit rules, the appellant has 14 days, from the filing of the Notice of Appeal, to order the transcript. To order a transcript, the appellant should fill out (Transcript Order) and follow the instructions set out on the form. This form is available in the Clerk's Office or by clicking the hyperlink above. (am3) (Entered: 09/06/2024) |
| 09/17/2024 | 50 (p.748) | TRANSCRIPT REQUEST by STATE OF TEXAS. (Kercher, Ryan) (Entered: 09/17/2024) |

**Tab 2: Amended Complaint (ROA.436)**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
DEL RIO DIVISION

STATE OF TEXAS
    *Plaintiff*,

v.

ALEJANDRO MAYORKAS, in his official
capacity as Secretary of Department of
Homeland Security; UNITED STATES
DEPARTMENT OF HOMELAND
SECURITY; MERRICK GARLAND, in his
official capacity as Attorney General of the
United States, UNITED STATES
DEPARTMENT OF JUSTICE,
    *Defendants.*

No. 2:23-cv-00024

---

## STATE OF TEXAS'S FIRST AMENDED COMPLAINT

In a farcical attempt to address the invasion of illegal aliens across the southern border following the end of Title 42, the Biden Administration published a new Final Rule inviting migrants to download an app to schedule a convenient time and place to cross the border illegally. The Biden Administration is inviting these otherwise inadmissible aliens to enter the United States through official ports of entry and funneling them into the country by granting them parole at a rate of nearly 96%. This massive influx of aliens includes thousands of migrants from 24 countries designated as national security concerns. The Biden Administration is inviting hundreds of thousands of aliens into Texas, releasing them into the country, and inflicting serious costs on the State of Texas. The Biden Administration's attempt to manage the southern border by app and parole aliens *en masse* does not meet even the lowest expectation of competency. This scheme runs afoul of the laws Congress passed to regulate immigration, and the Final Rule's exemption from

the presumption of ineligibility for asylum for aliens who use Defendants' scheduling app should be vacated and enjoined.

## I.   PARTIES

1.      The State of Texas is a sovereign State of the United States of America.

2.      Defendant United States Department of Homeland Security is a federal cabinet agency responsible for implementing and enforcing certain immigration-related statutes, policies, and directives. DHS is a Department of the Executive Branch of the United States government. DHS oversees the United States Citizenship and Immigration Services, United States Customs and Border Protection, and United States Immigration and Customs Enforcement.

3.      Defendant Alejandro N. Mayorkas is the Secretary of Homeland Security and the head of DHS. He is sued in his official capacity.

4.      Defendant Merrick Garland is the United States Attorney General. Attorney General Garland oversees the Department of Justice. He is sued in his official capacity.

5.      Defendant the United States Department of Justice is a Department of the Executive Branch of the United States government.

## II.   JURISDICTION & VENUE

6.      The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, and 2201(a). This action arises under 5 U.S.C. §§ 702–03 and 28 U.S.C. §§ 1331, 1346, and 1361.

7.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and 1391(e). Defendants are United States agencies and officers sued in their official capacities. The State of Texas is a resident of this judicial district and a substantial part of the events or omissions giving rise to this complaint occurred and continue to occur within the Western District of Texas, Del

Rio Division.

8.     The Court is authorized to award the requested declaratory and injunctive relief under 5 U.S.C. § 706 and 28 U.S.C. §§ 1361, 2201, and 2202, and its inherent equitable powers.

### III.     BACKGROUND

9.     In March 2020, under the Trump Administration, the Centers for Disease Control and Prevention invoked Title 42, to address public health concerns about COVID-19. The Title 42 Order allowed immigration officials to turn arriving aliens away at the border without placing them in immigration proceedings or considering their asylum claims.

10.     On January 30, 2023, the Biden Administration announced it would terminate the Title 42 Order on May 11, 2023.[1]

11.     Since then, Defendants have anticipated a surge in illegal immigration at the Southwest Border of the United States as a result of that termination.[2]

12.     President Biden warned that the Southwest Border is going to be "chaos for a while" after the expiration of the Title 42 Order and he acknowledged there has been "chaos at the border for a number of years."[3]

---

[1] OMB, *Statement of Administration Policy: H.R. 382 and H.J. Res. 7* (Jan. 30, 2023), https://www.whitehouse.gov/wp-content/uploads/2023/01/SAP-H.R.-382-H.J.-Res.-7.pdf (announcing White House plan to let public health emergency expire on May 11).

[2] *See* Press Release, DHS Continues to Prepare for End of Title 42; Announces New Border Enforcement Measures and Additional Safe and Orderly Processes (Jan. 5, 2023), https://www.dhs.gov/news/2023/01/05/dhs-continues-prepare-end-title-42-announces-new-border-enforcement-measures-and.

[3] *Biden quietly admits the border has been in chaos 'for a number of years' ahead of Title 42 expiration*, Fox News (May 11, 2023), https://www.foxnews.com/politics/biden-quietly-admits-border-been-chaos-number-

*Texas's First Amended Complaint*                                                                                       3

A.      **Legal Background**

13.      Upon the expiration of the Title 42 Order, the United States returned to normal immigration operations governed by Title 8 of the United States Code.

14.      Section 1225 of Title 8 of the United States Code establishes procedures for DHS to process aliens "present in the United States" and deems them "applicant[s] for admission" to the United States. 8 U.S.C. § 1225(a)(1).[4] Aliens who lack valid entry documents "at the time of application for admission" are "inadmissible" and therefore "removable." *Dep't of Homeland Sec. v. Thuraissigam*, 140 S. Ct. 1959, 1964 (2020) (citing 8 U.S.C. § 1182(a)(7)(A)(i)(I)).

15.      Aliens seeking admission to the United States must be inspected by immigration officers. 8 U.S.C. §1225(a)(3); *see Jennings v. Rodriguez*, 138 S. Ct. 830, 836–37 (2018).

16.      Aliens must be detained until their immigration proceedings are concluded. 8 U.S.C. § 1225(b).

17.      An alien is subject to *expedited* removal when an officer determines that the alien lacks valid entry documents. 8 U.S.C. § 1225(b)(1)(A)(i); *see* 8 U.S.C. § 1182(a)(6)(C), (7).

18.      Aliens may avoid removal by seeking asylum, indicating a fear of persecution, or by being paroled into the United States. 8 U.S.C. § 1182(a)(7)(i); *id.* at (d)(5)(A); 8 U.S.C. § 1225(b)(1)(A)(i); *see* 8 C.F.R. § 235.3(b)(4)

19.      Even if an alien raises an asylum claim, the alien is not entitled to immediate release. Applicants "*shall* be detained pending a final determination of credible fear of persecution and, if

---

years-ahead-title-42-expiration.

[4] Section 1225 refers to the Attorney General, but those functions have been transferred to the Secretary of Homeland Security. *See Dep't of Homeland Sec. v. Thuraissigiam*, 140 S. Ct. 1959, 1965 n.3 (2020).

found not to have such a fear, until removed." 8 U.S.C. § 1225(b)(1)(B)(iii)(IV) (emphasis added); *see also* 8 U.S.C. § 1225(b)(2).

20.     "Most asylum claims . . . ultimately fail, and some are fraudulent." *Thuraissigiam*, 140 S. Ct. at 1963.

21.     Aliens may also be allowed to remain in the country by being released on parole, which constitutes "affirmative immigration relief." *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1906 (2020).

22.     Congress has directed that parole may be granted only "on a case-by-case basis," and even then only for "urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A).

23.     Congress added those restrictions—the case-by-case basis for urgent humanitarian reasons or significant public benefit—to the parole power in 1996, because:

> The text of section 212(d)(5) is clear that the parole authority was intended to be used on a case-by-case basis to meet specific needs, and not as a supplement to Congressionally-established immigration policy. In recent years, however, **parole has been used increasingly to admit entire categories of aliens who do not qualify for admission under any other category in immigration law, with the intent that they will remain permanently in the United States**. This contravenes the intent of section 212(d)(5), but also illustrates why further, specific limitations on the Attorney General's discretion are necessary.

H.R. Rep. No. 104-469, at 140 (1996) (emphasis added); *see also Cruz-Miguel v. Holder*, 650 F.3d 189, 199 n.15 (2d Cir. 2011) (explaining that "this change was animated by concern that parole under § 1182(d)(5)(A) was being used by the executive to circumvent congressionally established immigration policy").

24.     Congress also emphasized that DHS "may not parole into the United States an alien who

is a refugee unless the Attorney General determines that compelling reasons in the public interest with respect to that particular alien require that the alien be paroled into the United States rather than be admitted as a refugee." 8 U.S.C. § 1182(d)(5)(B).

25.     Defendants cannot use their power to parole aliens *en masse*.

26.     The Biden Administration has a history of paroling aliens *en masse*. The Biden Administration unveiled one such policy in earlier this year[5], which was promptly enjoined.[6]

## B.     The CBP One App and Circumvention of Lawful Pathways Rule

23.     On October 28, 2020, CBP launched the CBP One mobile application on the Apple App and Google Play stores.

24.     The CBP One app was originally used to provide travelers with access to Form I-94 information, schedule inspection appointments for perishable cargo, and to assist international organizations who sought to help individuals enter the United States.

25.     On January 12, 2023, DHS announced a new scheduling function in the CBP One app.

26.     Effective January 12, 2023, aliens located in Central or Northern Mexico who "[s]ought to travel to the United States" could use the CBP One app "to submit information in advance and schedule an appointment to present themselves at certain Southwest Border land

---

[5] *Biden admin to allow for the release of some migrants into the U.S. with no way to track them*, NBC NEWS, https://www.nbcnews.com/politics/biden-admin-plans-order-release-migrants-us-no-way-trackrcna83704 (May 10, 2023 8:44 a.m. CDT).

[6] *Florida v. Mayorkas, et al.*, case no. 3:23-cv-9962-TKW-ZCB (N.D. Fla.), (Preliminary Injunction, May 16, 2023, Dkt. 30).

ports of entry."[7]

28. On February 23, 2023, the Department of Homeland Security (DHS) and the Department of Justice (DOJ) jointly issued a notice of proposed rulemaking previewing the federal government's change in immigration policy after expiration of the Title 42 Order. 88 Fed. Reg. 11,704.

27. DHS announced that it would expand the use of the CBP One App "[o]nce the Title 42 order eventually lifts," allowing aliens to "use the CBP One application for scheduling an appointment to present themselves for inspection and to initiate a protection claim instead of coming directly to a port of entry to wait."[8]

29. On May 16, 2023, Defendants jointly issued the Final Rule, the Circumvention of Lawful Pathways, with an effective date of May 11, 2023. 88 Fed. Reg. 31,314.

30. This Final Rule represents a significant change in asylum and border policy. Under the Final Rule, migrants are presumed ineligible for asylum unless they have "presented at a port of entry at a pre-scheduled time using the CBP One app" or satisfy some other exception.[9] *See* 88 Fed. Reg. 31,317, 31,325.

31. The CBP One app "enables noncitizens without appropriate documents for admission who seek to travel to the United States through certain southwest border land ports of

---

[7] *DHS Scheduling System for Safe, Orderly and Human Border Processing Goes Live on CBP One App*, Dep't of Homeland Security, https://www.dhs.gov/news/2023/01/12/dhs-scheduling-system-safe-orderly-and-humane-border-processing-goes-live-cbp-onetm (Jan. 12, 2023) .

[8] *Id.*

[9] Fact Sheet: Circumvention of Lawful Pathways (May 11, 2023), https://www.dhs.gov/news/2023/05/11/fact-sheet-circumvention-lawful-pathways-final-rule.

entry (POEs) the ability to submit information through a module within the application instead of coming directly to wait at a POE."[10]

32.    Once there, "CBP officers do not determine the validity of any claims for protection." 88 Fed. Reg. 31,358.

33.    DHS described the expansion of the CBP One app to schedule appointments at the border as "a continuation of the Biden administration's expansion of lawful pathways and opportunities to access them."[11]

34.    The CBP One app has "facilitated the largest expansion of migrant processing at ports of entry along the southern border in U.S. history."[12]

35.    The Rule contemplates that the CBP One app will "significantly increase the number of individuals, including those who *may* be seeking asylum, that CBP can process at land border ports of entry." 88 Fed. Reg. 11,719 (emphasis added); *see also* 88 Fed. Reg. 31,331 ("[T]he expanded use of the CBP One app is expected to . . . enable CBP to . . . expand its ability to process noncitizens at POEs, including those who *may* be seeking asylum[.]") (emphasis added).

36.    The CBP One app is "broadly available to migrants in central and northern Mexico." 88 Fed. Reg. 11,707 n.25.

37.    Aliens are invited to download the CBP One app and select a time and place to cross the border.

---

[10] *Id.*

[11] *U.S. plans to admit nearly 40,000 asylum-seekers per month through mobile app*, CBS News, https://www.cbsnews.com/news/asylum-seekers-cbp-one-mobile-app-u-s-plans-admit-nearly-40000-monthly/ (May 31, 2023).

[12] *Id.*

38.     The use of the CBP One app is intended to "streamline[]" illegal aliens' experience at the port of entry. 88 Fed. Reg. 11,727; *see also* 88 Fed. Reg. 31,376.

39.     The CBP One app asks "undocumented travelers" to identify if they are arriving by land, air, or sea. *See* CBP One Mobile Application Traveler User Guide: Submit Advance Information Capability for Non-Citizens (Exh. 1).

40.     It then prompts them to input their names and allow CBP One access to their location. *See* Exh. 1.

41.     The app prompts the user to submit a photo and submit their contact and family information. *See* Exh. 1.

42.     Next, the app prompts the user to select their preferred port of entry to the United States. The user can then request an appointment to cross the border and appear at their preferred port of entry. *See* Exh. 1.

43.     A migrant must be in central or northern Mexico to request an appointment through the CBP One app. Exh. 1 at 19, 25, 32.

44.     The CBP One app allows them to choose between 8 ports of entry, 5 of which are in Texas.[13]

45.     The CBP One app does not ask migrants whether they intend to seek asylum or other form of protection from removal. *See generally* Exh. 1. "The app is not a method of seeking asylum in the United States, and CBP officers do not determine the validity of any claims for protection." 88 Fed. Reg. 31,358.

---

[13] *CBP One Mobile Application*, U.S. Customs & Border Protection, https://www.cbp.gov/about/mobile-apps-directory/cbpone.

46.     The Rule dictates that once the migrants present at the border at their scheduled time and place, they may seek asylum or other forms of protection from removal. 88 Fed. Reg. 31,316.

47.     The Final Rule is intended to "encourage[] migrants to avail themselves" of this method of coming to the United States. 88 Fed. Reg. 31,314. It does so by establishing a rebuttable presumption of asylum ineligibility for illegal aliens who cross the border *without* using the CBP One app. 88 Fed. Reg. 31,314.[14]

48.     To be allowed to remain in the United States after crossing the border, users of the CBP One app are supposed to satisfy some exception from removal. *See* 88 Fed. Reg. 31,318 ("Once present in the United States, those who use [the CBP One app] can make claims for asylum and other forms of protection" from removal.).

49.     Through the Final Rule and the expanded use of the CBP One app, Defendants are encouraging aliens to illegally cross the border without establishing that they meet some exception from removal or have a legal basis to remain in the country.

50.     The Final Rule works in conjunction with the Administration's expanded parole policies and processes to expedite and streamline the processing of aliens at the border and move them into the country more quickly. *See, e.g.*, 88 Fed. Reg. 31,317 (listing the use of the CBP One app as part of the Biden Administration's "expand[ed] safe and orderly options for migrants to enter the United States").

51.     The Rule confers a legal benefit on aliens who use the CBP One app: "Once present in the United States, those who use this mechanism [CBP One app] can make claims for asylum

---

[14] This presumption does not apply to unaccompanied children. 88 Fed. Reg. 31,318.

and other forms of protection and are exempted from this rule's rebuttable presumption on asylum eligibility." 88 Fed. Reg. 31,318.

52.     The Biden Administration is using executive authority to circumvent statutory law. By using the pre-scheduling feature of the CBP One app, the Biden Administration exempts these aliens from the presumption of ineligibility for asylum and considers these otherwise inadmissible aliens to have entered "lawfully."

53.     In an interview with NPR, DHS Assistant Secretary for Border and Immigration Policy, Blas Nunez-Neto, said "You know, what we have done is really oversee a historic increase in lawful pathways to the U.S., including at our port of entry through the CBP One application. . . . And what we are really trying to do here is incentivize migrants to use safe, lawful and orderly pathways that, again, we have expanded dramatically over the last two years."[15]

54.     The aliens who use the CBP One app are overwhelmingly released into the country on parole.

55.     Together, the CBP One app and the Final Rule function as another Biden Administration parole program and an extension of the Biden Administration's lax border policies.

56.     Defendants have continued to announce expansions on the number of available appointments on the CBP One app.

57.     Initially, Defendants distributed approximately 740 CBP One appointments per

---

[15] *Title 42 ended. How is the Department of Homeland Security handling the situation?*, NPR, https://www.npr.org/2023/05/12/1175711841/title-42-ended-how-is-the-department-of-homeland-security-handling-the-situation.

day.[16] Defendants then increased the number of daily appointments to 1,000 per day, following the expiration of the Title 42 order.[17] Most recently, CBP announced that available appointments would increase to 1,450 per day.[18]

58.     According to information received from DHS by the House Committee on Homeland Security, between January 12, 2023 and September 30, 2023, 95.8% of all inadmissible aliens who scheduled appointments through the CBP One app were ultimately issued a "Notice to Appear" and released into the United States on parole.[19] The data reveals that 278,431 appointments were scheduled on the CBP One app, and 266,846 migrants were released into the interior.[20]

59.     Among those aliens who scheduled appointments through the CBP One app and released on parole were approximately 7,332 Special Interest Aliens (SIA) from 24 countries designated as a national security concern because of their Islamic terrorist activities.[21] These aliens

---

[16] *CBP One Appointments Increased to 1,450 Per Day*, U.S. Customs & Border Protection, https://www.cbp.gov/newsroom/national-media-release/cbp-one-appointments-increased-1450-day (June 30, 2023).

[17] *Id.*; *see also CBP Makes Changes to CBP One App*, U.S. Customs & Border Protection, https://www.cbp.gov/newsroom/national-media-release/cbp-makes-changes-cbp-one-app (May 5, 2023).

[18] *Supra* n.15.

[19] *New Documents Obtained by Homeland Majority Detail Shocking Abuse of CBP One App*, U.S. House of Representatives, https://homeland.house.gov/2023/10/23/new-documents-obtained-by-homeland-majority-detail-shocking-abuse-of-cbp-one-app/ (Oct. 23, 2023).

[20] *Id.*

[21] Letter from Senator Grassley to Secretary Mayorkas (Oct. 26, 2023), https://www.grassley.senate.gov/imo/media/doc/grassley_to_dhs_mayorkas_cpb_miller_ice_lechleitner_-_cbp_one.pdf.

---

*Texas's First Amended Complaint*                                                                    12

were inadmissible but Defendants allowed them entry under parole via the CBP One app.

60.     While DHS has parole authority, "[i]mportantly, the authority is not unbounded."
*Biden v. Texas*, 142 S. Ct. 2528, 2543 (2022).

61.     "And under the APA, DHS's exercise of discretion within that statutory
framework must be reasonable and reasonably explained." *Id.*

## C.     Effects of the Final Rule on Texas

44.     The Biden Administration's reckless and unlawful open border policies are
overwhelming Texas's border communities. Texas contains more than half of the border between
the United States and Mexico, and a large share of aliens crossing into the United States arrive
through the Texas-Mexico border. Through the CBP One app, the Biden Administration is inviting
illegal aliens to cross the border at five ports of entry in the State of Texas: Brownsville, El Paso,
Eagle Pass, Hidalgo, and Laredo.

45.     By inviting illegal aliens into Texas, Defendants will inflict costs on the State for
public education, law enforcement and incarceration, unreimbursed health care, and other public
services for illegal aliens. For example, the Final Rule will cause Texas to "incur significant costs
in issuing driver's licenses." *Texas v. United States (DAPA)*, 809 F.3d 134, 155 (5th Cir. 2015).
Texas law subsidizes driver's licenses, including for noncitizens who have "documentation issued
by the appropriate United States agency that authorizes [them] to be in the United States." *Id.*
(quoting Tex. Transp. Code § 521.142(a)). Aliens paroled into the United States will be eligible for
subsidized driver's licenses.[22] By enabling more aliens to secure subsidized licenses, the Final Rule

---

[22]     Tex.     Dep't     of     Pub.     Safety,     *Verifying     Lawful     Presence*,
https://www.dps.texas.gov/sites/default/files/documents/driverlicense/documents/verifyinglawfulpres
ence.pdf (listing "Parolees" as eligible for driver's licenses).

*Texas's First Amended Complaint*                                                              13

will impose significant financial harm on the State of Texas. *See DAPA*, 809 F.3d at 155.

46.     By expanding the number of aliens released into the country, Defendants are pressuring Texas to change its laws in order not to incur expenses related to services provided to noncitizens. This constitutes a sovereign injury. *See, e.g., Texas v. Becerra*, 577 F. Supp. 3d 527 (N.D. Tex. 2021).

47.     Defendants acknowledge that "a substantial proportion of migrants who cross the [southern] border ultimately are not found to have a valid asylum claim." 88 Fed. Reg. 11,729. Yet, Defendants are encouraging the influx of migrants with meritless—if any—claims of asylum that will result in additional migrants entering and remaining in Texas, thus forcing the State to expend taxpayer resources on health care, education, social services, and similar services for such migrants. The Final Rule creates incentives to invite inadmissible aliens to United States, including to Texas.

48.     CBP has published data showing a dramatic increase in the number of inadmissible aliens at the southwest border. Indeed, the number of inadmissible aliens entering the United States at the southwest border is at an all-time high.[23]

49.      This increase facilitates, for example, the depression of wages resulting from adding tens of thousands of new persons to the workforce per month. These harms will be substantial, both to Texas's sovereignty and to the public fisc, and cannot be undone through monetary remedies and thus they constitute irreparable harm to the State of Texas and its taxpayers.

---

[23]     *Nationwide Encounters*, U.S. Customs & Border Patrol, https://www.cbp.gov/newsroom/stats/nationwide-encounters.

50.     The State funds multiple healthcare programs that cover illegal aliens. The provision of these services—utilized by illegal aliens—results in millions of dollars of expenditures per year. These services include the Emergency Medicaid program, the Texas Family Violence Program, and the Texas Children's Health Insurance Program.

51.     The Emergency Medicaid program provides health coverage for low-income children, families, seniors, and the disabled. Federal law requires Texas to include illegal aliens in its Emergency Medicaid program. The program costs the State tens of millions of dollars annually.

52.     The Texas Family Violence Program provides emergency shelter and supportive services to victims and their children in the State of Texas. Texas spends over a million dollars per year on the Texas Family Violence Program for services to illegal aliens.

53.     The Texas Children's Health Insurance Program offers low-cost health coverage for children from birth through age 18. Texas spends tens of millions of dollars each year on CHIP expenditures for illegal aliens.

54.     Further, Texas faces the costs of uncompensated care provided by state public hospital districts to illegal aliens which results in expenditures of hundreds of millions of dollars per year.

55.     Aliens and the children of those aliens receive education benefits from the State at significant taxpayer expense. Defendants' parole of aliens increases education expenditures by the State of Texas each year for children of those aliens.

56.     Because the Final Rule's exception of aliens who pre-schedule their entry at a United States port of entry through a DHS scheduling system, including the CBP One app, from the presumption of ineligibility for asylum is invalid and unlawful, it must be vacated and enjoined.

*See, e.g.*, *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019) ("The ordinary practice is to vacate unlawful agency action."); *Nat'l Min. Ass'n v. U.S. Army Corps of Engineers*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (unlawful agency regulations are vacated); *Gen Chem. Corp. v. United States*, 817 F.2d 844, 848 (D.C. Cir. 1987) ("The APA requires us to vacate the agency's decision if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]'").

## IV.  CLAIMS FOR RELIEF

### COUNT 1
### The Final Rule's Exception from the Presumption of Ineligibility
### for Asylum Exceeds Statutory Authority and Is Not in Accordance with Law
### (5 U.S.C. § 706(2)(A), (C))

54.    The APA prohibits agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

55.    "[A]n agency literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 374 (1986).

56.    An agency acts unlawfully when it exercises power beyond the bounds of its statutory authority. *See, e.g.*, *SAS Inst., Inc. v Iancu*, 138 S. Ct. 1348, 1359 (2018).

57.    The Rule excludes from the presumption of ineligibility for asylum those aliens who "[p]resent[] at a port of entry, pursuant to a pre-scheduled time and place, or present[] at a port of entry without a pre-scheduled time and place if the alien demonstrates by a preponderance of the evidence that it was not possible to access or use the DHS scheduling system due to language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle." 88 Fed. Reg. 31, 450; 8 C.F.R. § 208.33(2)(ii)(B).

58.     Defendants lack statutory authority to exclude from the Rule's presumption of ineligibility for asylum aliens who "use the DHS scheduling system," including the CBP One app, to pre-schedule a time and place to enter a United States port of entry.

59.     Secretary Mayorkas is charged with overseeing all functions of the Border Patrol program and the detention and removal program. 6 U.S.C. § 251.

56.     Under Section 1103, Secretary Mayorkas is required to "guard the boundaries and borders of the United States against the illegal entry of aliens." 8 U.S.C. § 1103(a)(5).

57.     In the Final Rule, Defendants invoke 8 U.S.C. § 1103(g)(2) as the basis for the Attorney General's authority to promulgate the rule. Under that statute, the Attorney General is authorized to "establish such regulations, issue such instructions, . . . and perform such other acts as the Attorney General determines to be necessary for carrying out this section." 8 U.S.C. § 1103(g)(2); *see also* 88 Fed. Reg. 31,323 (citing 8 U.S.C. § 1103(g)(2) as a basis for the Attorney General's authority to promulgate the Final Rule).

58.     Nothing in Title 8 authorizes either the Attorney General or the Secretary of Homeland Security to encourage and incentivize aliens without documents sufficient for lawful admission to enter a United States port of entry. 8 U.S.C. § 1103(g)(2).

59.     Yet, the Final Rule acknowledges that otherwise inadmissible aliens "are ***encouraged and incentivized*** . . . to make an appointment using the CBP One app to present themselves at a POE for inspection." 88 Fed. Reg. 31342 (emphasis added).

60.     Defendants expect that use of the CBP One app will increase immigration at these ports of entry and allow them to "process significantly more" aliens into the United States. 88 Fed. Reg. 31,326.

61.     Far from guarding against the illegal entry of aliens, through the Final Rule, Secretary Mayorkas is proactively inviting and encouraging otherwise inadmissible aliens to present at ports of entry without consideration of whether they have a legitimate claim for protection from removal.

62.     The Rule "incentivizes [aliens without documents sufficient for lawful admission] to use . . . orderly means . . . to enter the United States to seek asylum and other forms of protection" by exempting them from the Rule's presumption of ineligibility for asylum. 88 Fed. Reg. 31,316. This exceeds—and is contrary to— Secretary Mayorkas's statutory authority.

63.     The Attorney General's authority under 8 U.S.C. § 1103 is limited to establishing regulations that are necessary to carrying out the requirements of that section—one of which is to guard against the illegal entry of aliens. *Compare* 8 U.S.C. § 1103(g)(2), *with* 8 U.S.C. § 1103(a)(5). By promulgating the Final Rule, the Attorney General is undermining the purposes of section 1103.

64.     Defendants lack statutory authority to encourage and incentivize aliens to enter a United States port of entry without a legal basis to be in the United States.

65.     Defendants rely on 8 U.S.C. § 1103(a)(1), (3) and 6 U.S.C. § 202 for their statutory authority to promulgate the Rule. But Defendants cannot rely on these general grants of discretion to establish enforcement policies to award aliens who use the CBP One app an "exempt[ion] from the [R]ule." 88 Fed. Reg. 31,339; *see Texas v. United States*, 86 F. Supp. 3d 591, 660 (S.D. Tex. 2015).

66.     Defendants lack statutory authority to exclude an alien from the presumption of ineligibility for asylum on the basis that the alien pre-scheduled a time and place to present at a port of entry through a DHS scheduling system, including through the CBP One app.

67.    Defendants lack statutory authority to confer the legal benefit of being exempt from the Rule's presumption of ineligibility for asylum on aliens who do not have documents sufficient for lawful entry on the basis that they pre-scheduled a time and place to present a port of entry, including through the CBP One app.

68.    Moreover, the government's policy of releasing on parole nearly 96% of otherwise inadmissible aliens who use the CBP One app is contrary to the requirements of the parole statute, 8 U.S.C. § 1182(d)(5)(A), and the mandatory detention provisions in 8 U.S.C. § 1225(b)(1)–(2).

69.    By paroling *en masse* aliens who pre-schedule their arrival at a port of entry, including through the CBP One app, Defendants are giving these aliens access to a legal process they would not otherwise have but for their use of the DHS scheduling system (CBP One).

70.    The government cannot parole aliens *en masse*. The practice of paroling *en masse* aliens who use the CBP One app is not a valid exercise of the government's § 1182 power, and it violates the mandatory detention provisions in § 1225.

71.    Defendants have "gone beyond what Congress has permitted [them] to do." *City of Arlington v. FCC*, 569 U.S. 290, 298 (2013). They have no "power to act unless and until Congress" gives it to them. *Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 112 (2d Cir. 2018). They are equally powerless to disregard express statutory commands. *League of Women Voters v. Newby*, 838 F.3d 1, 9–12 (D.C. Cir. 2016).

72.    Accordingly, Defendants have exceeded their authority by promulgating the Final Rule.

## COUNT 2
## The Final Rule's Exception is Arbitrary and Capricious
### (5 U.S.C. § 706(2)(A))

73.     "Federal administrative agencies are required to engage in reasoned decisionmaking." *Michigan v. EPA*, 576 U.S. 743, 750 (2015) (internal quotation marks omitted). "Not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must logical and rational." *Id.*

74.     Although agencies are entitled to deference, "the arbitrary and capricious standard of review . . . is by no means a rubber stamp." *Texas v. United States*, 524 F. Supp. 3d 598, 653 (S.D. Tex. 2021) (quoting *United States v. Garner*, 767 F.2d 104, 116 (5th Cir. 1985)).

75.     The Final Rule is arbitrary and capricious for multiple reasons.

76.     First, while the Final Rule purports to reduce illegal immigration, the Final Rule is rife with concessions that this rule will operate to increase the number of illegal aliens processed at the border. *E.g.*, 88 Fed. Reg. 31,326 & 31,396 ("CBP intends to increase the number of available appointments in the CBP One app and is committed to processing as many noncitizens as is operationally feasible.").

77.     Second, the Final Rule fails to consider the effects of this rule on Texas. While the rule says the "Departments expect that this rule will result in decreased strain on border states, local communities, and NGOs," the Rule cites no data supporting this assertion and includes no analysis of costs to Texas as a result of this Final Rule—even though Texas is home to 5 of the 8 ports of entry at which aliens can pre-schedule an appointment. 88 Fed. Reg. 31,325. The Rule ignores costs to Texas and asserts that "[t]he direct costs of the rule are borne by migrants and the Departments." 88 Fed. Reg. 31,447.

78. States "bear[] many of the consequences of unlawful immigration," and "[t]he problems posed to the State by illegal immigration must not be underestimated." *Arizona v. United States*, 567 U.S. 387, 397, 398 (2012).

79. Defendants have a "clear and obvious responsibility to consider . . . Texas's expenses and costs," *Texas*, 524 F. Supp. at 655, and they failed to do so.

80. Defendants' failure to consider this factor is independently sufficient to set aside the Final Rule. *See, e.g.*, *Regents of the Univ. of Cal.*, 140 S. Ct. at 1913.

81. Courts "must set aside agency action where there are shortcomings in the agency's explanations." *Alliance for Hippocratic Medicine v. FDA*, 78 F.4th 210, 245 (5th Cir. 2023) (internal quotation marks omitted).

82. For this additional reason, the Final Rule does not "rest[] on a consideration of the relevant factors." *Michigan*, 576 U.S. at 750 (internal quotation marks omitted). Because the Final Rule reflects no consideration of the costs to Texas as a result of excepting aliens who pre-schedule their arrival at a port of entry from the presumption against eligibility for asylum, it is arbitrary and capricious.

83. But even if the Administration had considered Texas's costs as well—and it did not—it failed to consider whether it could achieve its goals through a less-burdensome or less-sweeping means. This too renders its resulting decision arbitrary and capricious.

84. The Rule's intent to "decrease irregular migration" by putting a "condition on asylum eligibility" is arbitrary and capricious because nothing in the Rule requires aliens who benefit from the Rule to demonstrate any previous intention to have crossed the border between ports of entry or without authorization. 88 Fed. Reg. 31,331; 88 Fed. Reg. 31,344.

85. The Rule is arbitrary and capricious because it conveys a benefit on aliens without documents sufficient for admission who pre-schedule their entry at a United States port of entry through a DHS scheduling system, including the CBP One app. 88 Fed. Reg. 31,340.

86. By paroling *en masse* aliens who pre-schedule their arrival at a port of entry, including through the CBP One app, Defendants are giving these aliens access to a legal process they would not otherwise have but for their use of the DHS scheduling system (CBP One). For these reasons, the Final Rule is arbitrary and capricious should be set aside.

## COUNT 3
### Defendants' Use and Implementation
### of the "DHS Scheduling System" is *ultra vires*.

87. In this Count, Texas asserts both a common law *ultra vires* claim and an *ultra vires* claim under 5 U.S.C. § 702. *See Apter v. Dep't of Health & Human Servs.*, 80 F.4th 579 (5th Cir. 2023).

88. "[A]n agency literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 374 (1986).

89. An agency acts unlawfully when it exercises power beyond the bounds of its statutory authority. *See, e.g.*, *SAS Inst., Inc. v Iancu*, 584 U.S. --, 138 S. Ct. 1348, 1359 (2018).

90. The Rule excepts from the presumption of ineligibility for asylum aliens who pre-schedule a time and place to present at a port of entry through "the DHS scheduling system," which is currently the CBP One app. 88 Fed. Reg. 31,317; 88 Fed. Reg. 31,450.

91. While the Rule posits that it "does not provide for, prohibit, or otherwise set any policy regarding DHS's discretionary authority to make parole determinations for those who use the CBP One app," 88 Fed. Reg. 31,331, this statement is belied by data released by DHS and the

House.

92.     According to information received from DHS by the House Committee on Homeland Security, between January 12, 2023, and September 30, 2023, 95.8% of all inadmissible aliens who scheduled appointments through the CBP One app were ultimately issued a "Notice to Appear" and released into the United States on parole.[24]

93.     That nearly 96% of aliens who use the CBP One app are paroled into the country indicates Defendants are not conducting a "case-by-case" evaluation of whether an alien qualifies for parole, contrary to statutory authority.

94.     Defendants are granting parole *en masse* to aliens who use the CBP One app, in violation of the INA. 8 U.S.C. § 1182(d)(5)(A).

95.     A release for anything other than "urgent humanitarian reasons" or "significant public benefit"—that is, something more than a mere preference not to detain—is an illegal use of the parole authority under the INA. Absent a proper invocation of 8 U.S.C. § 1182, which must be done on a case-by-case basis, any premature release of an alien claiming asylum is illegal under section 1225.

96.     Defendants may only act pursuant to express statutory authority.

97.     Defendants do not have statutory authority to operate a mass parole program.

98.     On information and belief, when an alien uses the CBP One app "to schedule a time and place to present at a [Southwest Border] [port of entry]," Defendants presume the alien satisfies the criteria necessary to be paroled into the United States.

---

[24] *New Documents Obtained by Homeland Majority Detail Shocking Abuse of CBP One App*, U.S. House of Representatives, https://homeland.house.gov/2023/10/23/new-documents-obtained-by-homeland-majority-detail-shocking-abuse-of-cbp-one-app/ (Oct. 23, 2023).

99.     Defendants do not have statutory authority to presume aliens who use the CBP One app to schedule a time and place to present at the border satisfy the criteria for parole.

100.    Nor does the Final Rule authorize Defendants to presume aliens who use the CBP One app to schedule a time and place to present at the border satisfy the criteria for parole.

101.    On information and belief, when an alien uses the CBP One app "to schedule a time and place to present at a [Southwest Border] [port of entry]," the alien is presumed to satisfy the criteria necessary to be granted asylum or other form of protection from removal.

102.    Defendants are using the CBP One app, whose expanded use is memorialized in the Rule, to incentivize otherwise inadmissible aliens to schedule appointments to enter at a port of entry, regardless of whether they ever intended to enter the United States illegally or have a legitimate asylum claim or satisfy the criteria for parole.

103.    The major questions doctrine applies. The exception from the presumption of asylum ineligibility for aliens who use the "DHS Scheduling System," including the CBP One app, and paroling these aliens *en masse*, presents an issue of vast economic and political significance.

**DECLARATORY JUDGMENT**

The Declaratory Judgment Act authorizes federal courts to declare the rights of litigants. 28 U.S.C. § 2201. The issuance of a declaratory judgment can serve as the basis for an injunction to give effect to the declaratory judgment. *Steffel v. Thompson*, 415 U.S. 452, 461 n.11 (1974).

**V.    CONCLUSION**

For the reasons described above, the State of Texas is entitled to a declaration that Defendants are violating the law and the Final Rule's exception from the presumption of ineligibility for asylum for aliens who pre-schedule a time and place to present at a port of entry is

unlawful, unconstitutional, and unenforceable, and Defendants' expanded use and implementation of the CBP One App is unlawful, unconstitutional, and unenforceable.

## VI.    DEMAND FOR RELIEF

The State of Texas respectfully requests that the Court:

a.  Hold unlawful and set aside (*i.e.,* vacate) the Final Rule's exception from the presumption of ineligibility for asylum aliens who pre-schedule a time and place to present a port of entry using a DHS scheduling system, including the CBP One app;

b.  Declare Defendants' actions unlawful;

c.  Issue a permanent injunction prohibiting Defendants from implementing the Final Rule's exception from the presumption of ineligibility for asylum aliens who pre-schedule a time and place to present at a port of entry using a DHS scheduling system, including the CBP One app;

d.  Issue a permanent injunction prohibiting Defendants from paroling aliens who pre-schedule a time and place to present at a port of entry using a DHS scheduling system, including the CBP One app in excess of statutory authority;

e.  Award the State of Texas costs and reasonable attorneys' fees;

f.  Award such other relief as the Court deems equitable and just.

Dated Nov. 10, 2023.

Respectfully submitted.

**KEN PAXTON**
Attorney General of Texas

**RYAN D. WALTERS**
Chief, Special Litigation Division

**BRENT WEBSTER**
First Assistant Attorney General

**GRANT DORFMAN**
Deputy First Assistant Attorney General

*/s/ Amy Snow Hilton*

**AMY SNOW HILTON**
Special Counsel
Texas Bar No. 24097834
Amy.Hilton@oag.texas.gov

**RALPH MOLINA**
Deputy Attorney General for Legal Strategy

**COUNSEL FOR THE STATE OF TEXAS**

Office of the Attorney General of Texas
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 463-2100

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
DEL RIO DIVISION

| | |
|---|---|
| STATE OF TEXAS<br>    *Plaintiff,*<br><br>v.<br><br>ALEJANDRO MAYORKAS, in his official capacity as Secretary of Department of Homeland Security; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; MERRICK GARLAND, in his official capacity as Attorney General of the United States, UNITED STATES DEPARTMENT OF JUSTICE,<br><br>    *Defendants.* | No. 2:23-cv-00024 |

---

**EXHIBIT 1**

---

**RE.038**



# CBP One™ Mobile Application Traveler User Guide

Submit Advance Information Capability

For Non-Citizens



**U.S. Customs and Border Protection**

24-50717.463

# Table of Contents



U.S. Customs and
Border Protection

1. **CBP One™ Mobile Application**

   a) **Overview**

   b) **Log In**

2. **Traveler – Land – Submit Advance Information**

   a) **Overview**

   b) **Register Travelers**

   c) **Ask for an Appointment**

      i. **What If I Need to Change My Port Of Entry?**

      ii. **What If I Need to Edit My Registration?**

   d) **Accept and Schedule an Appointment**

      i. **What If I Don't Want the Appointment I Received?**

      ii. **What If I Need More Time to Respond?**

   e) **Cancel an Appointment**

   f) **Delete My Registration**

   g) **Troubleshooting**

      i. **My Video Selfie Keeps Failing**



# CBP One™ Mobile Application

Overview

24-50717.465

Case 2:23-cv-00024-AM   Document 28-3 Filed 02/03/23 Page 35 of 79



**CBP One™** is a mobile application that serves as a single portal to a variety of CBP services.  Through a series of guided questions, the app will direct each type of user to the appropriate services based on their needs.

## To Access CBP One™

Download CBP One™ from the Apple App Store or Google Play Store.







Questions?  Contact us at: CBPOne@cbp.dhs.gov

**RE.042**

Case 2:23-cv-01024-AM Document 28-3 Filed 02/03/23 Page 43 of 79



## Log In with Login.gov

Select **LOG IN OR SIGN UP.** CBP One™ will redirect you to login.gov, where you can either create an account or log in to an existing account.









# Submit Advance Information

Traveler - Land

24-50717.468

Case 2:23-cv-00024-AM   Document 20-3   Filed 07/03/23   Page 46 of 79



U.S. Customs and
Border Protection

Submit Advance Information is a capability available to Travelers in CBP One™.

This capability allows you to submit your information and schedule an appointment to arrive at a southwest Port of Entry for inspection.  This is for undocumented non-citizen travelers only.

To submit your advance information and get an appointment at a Port of Entry, you must:

1. **Register Travelers**

2. **Ask for An Appointment**

3. **Accept and Schedule an Appointment**

4. **Arrive at the Port of Entry**





# Register Travelers

RE.046

24-50717.470

# Submit Advance Information: Register Travelers


U.S. Customs and Border Protection

## 1. Select Traveler

From the home screen, select **Traveler | Viajero**.



## 2. Select Land

Select **Land | Tierra**, then select **CONTINUE**.




Questions?  Contact us at: CBPOne@cbp.dhs.gov

**RE.047**

24-50717.4718

Case 2:23-cv-00024-AM Document 393 Filed 02/05/23 Page 37 of 49



U.S. Customs and
Border Protection

## 3. Select Submit Advance Information

Select **Submit Advance Information | Enviar Información Anticipada**.



## 4. Fill Out Traveler Profile

If you are a first-time user, a pop-up will appear. Select **Edit Profile**. Fill out the fields and select **SAVE**.







**U.S. Customs and Border Protection**

## 5. Select a Language

Select your preferred language, then select **CONTINUE**.



## 6. Allow Location Permissions

A pop-up requesting permission to use location services will appear.  Select to allow CBP One™ to use your location.



Questions?  Contact us at: CBPOne@cbp.dhs.gov          **RE.049**          24-50717.473

30

Case 2:23-cv-00724-AMM Document 23 Filed 12/05/23 Page 23 of 149



U.S. Customs and
Border Protection

## 7. Read Instructions

Review the instructions on-screen, then select **CONTINUE.**



## 8. Select Register Travelers

Select **REGISTER TRAVELERS.**





Case 2:23-cv-00274-AM Document 23 Filed 02/05/23 Page 40 of 49

## 9. Select Add Traveler

Review the instructions on-screen, then select **ADD TRAVELER.**



## 10. Select Take a Photo

Select **TAKE A PHOTO.**



Questions?  Contact us at: CBPOne@cbp.dhs.gov

**RE.051**

24-50717.4752



# Submit Advance Information: Register Travelers

Case 2:23-cv-00724AM Document 23 Filed 02/05/23 Page 15 of 49

## 11. Take a Photo

Follow the instructions on-screen, then select **Submit Photo**. Please make sure that your photo clearly captures your face. This photo will be used later to verify your identity.





## 12. Select Scan Passport

If you have a passport, select **SCAN PASSPORT (OPTIONAL).** If you do not have a passport, skip to **Step 14**.



# Submit Advance Information: Register Travelers

## 13. Scan Passport

Align the information page of your passport within the rectangle on-screen.  Wait for CBP One™ to scan your passport.




## 14. Fill Out Biographical Information

Fill out any remaining required fields, then select **CONTINUE.**



Case 2:23-cv-00724AM Document 23 Filed 02/05/23 Page 47 of 49



## 15. Fill Out Contact, Employment, and Travel Information

Fill out the required fields, then select **CONTINUE**.





## 16. Fill Out Family Information

Fill out the required fields, then select **SAVE**.







## 17. Add Additional Travelers

Repeat **Steps 9-16** for everyone traveling with you. Everyone must be going to the same United States address and have the same prior foreign address. Ensure all travelers are listed, then select **CONTINUE**.

## 18. Fill Out United States Address and Emergency United States Contact Information

Fill out the required fields, then select **CONTINUE**.









U.S. Customs and Border Protection

## 19. Fill Out Prior Foreign Address and Preparer Information

Fill out the required fields, then select **CONTINUE**.





## 20. Select a Requested Port of Entry

Select a requested Port of Entry from the dropdown list, then select **CONTINUE.** You will have the opportunity to change this when you ask for an appointment, if needed.





# Submit Advance Information: Register Travelers


**U.S. Customs and Border Protection**

## 20. Submit Your Registration

Review the screen and ensure that all information is accurate, then select **SUBMIT**.  Review the pop-up and select **Yes, Submit.**




## 21. Select OK

Review the pop-up and select **OK**.  You have successfully registered.  You will receive a confirmation email at the email address you used to log in to CBP One™.  Please save your confirmation number(s).






U.S. Customs and
Border Protection

## NEXT STEPS

Now that you have registered, **you can ask for an appointment at your requested Port of Entry (See Page 20).** You must be in central or northern Mexico to ask for an appointment.



# Ask for an Appointment

24-50717.483

# Submit Advance Information: Ask for an Appointment



## 1. Select Traveler

From the home screen, select **Traveler | Viajero**.



## 2. Select Land

Select **Land | Tierra,** then select **CONTINUE**.






## 3. Select Submit Advance Information

Select **Submit Advance Information | Enviar Información Anticipada**.



## 4. Select a Language

Select your preferred language, then select **CONTINUE**.






# Submit Advance Information: Ask for an Appointment

## 5. Read Instructions

Review the instructions on-screen, then select **CONTINUE.**



## 6. Select Your Registration

Select your registration. Make sure it is complete and accurate. You may only select one registration. If more than one registration with the same traveler's name is selected, you will receive an error and be prohibited from asking for an appointment using the second registration.



Questions?  Contact us at: CBPOne@cbp.dhs.gov

**RE.062**

24-50717.48

# Submit Advance Information: Ask for an Appointment



## 7. Ask for an Appointment

Select **ASK FOR AN APPOINTMENT.** You must ask for an appointment between 11 a.m. CST and 10 a.m. CST / 10 a.m. MST and 9 a.m. MST. You must be in central or northern Mexico to ask for an appointment.



## 8. Select Yes, Ask

Review the pop-up and select **Yes, Ask.**







# Submit Advance Information: Ask for an Appointment

## 9. Select OK

Review the pop-up and select **OK.** You have successfully asked for an appointment.





## NEXT STEPS

Now that you have asked for an appointment, you must wait for appointments to be announced at 11 a.m. CST / 10 a.m. MST.

If you receive an appointment, CBP One™ will send you an email and a push notification. **You must accept and schedule the appointment before 10 a.m. CST / 9 a.m. MST (See Page 27).** You must be in central or northern Mexico to accept and schedule an appointment.

If you do not receive an appointment, you can try again by repeating **Steps 1-9**.



U.S. Customs and
Border Protection

## What If I Need to Change My Port of Entry?

If you need to change your requested Port of Entry for any reason, follow **Steps 1-7**, then select **Change My Port Of Entry.**

## What If I Need to Edit My Registration?

At the moment, CBP One™ does not allow you to edit your registration. If you need to change anything in your registration, please **delete the registration (See Page 40).**

After you have deleted your registration, you can re-register with the correct information.







# Accept and Schedule an Appointment

24-50717.490



## 1. Select Traveler

From the home screen, select **Traveler | Viajero**.



## 2. Select Land

Select **Land | Tierra,** then select **CONTINUE**.






## 3. Select Submit Advance Information

Select **Submit Advance Information | Enviar Información Anticipada**.



## 4. Select a Language

Select your preferred language, then select **CONTINUE**.






## 5. Read Instructions

Review the instructions on-screen, then select **CONTINUE.**



## 6. Select Your Registration

Select your registration.





## 7. Select Accept Appointment

Review the screen, then select **ACCEPT APPOINTMENT.** You must be in central or northern Mexico to accept and schedule an appointment.





## 8. Take a Video Selfie

Follow the instructions on-screen, then select **Continue.**







## 9. Schedule Your Appointment

Review the screen and ensure that all information is accurate, then select **SCHEDULE**.  Review the pop-up and select **Yes, Schedule.**




## 9. Select OK

Review the pop-up and select **OK.**  You have successfully scheduled an appointment.  You will receive a confirmation email at the email address you used to log in to CBP One™.  Please save your confirmation number(s).






## What If I Don't Want the Appointment I Received?

If you received an appointment that you don't want to accept and schedule, you can decline the appointment. Follow **Steps 1-6**, then select **DECLINE APPOINTMENT.**

## What If I Need More Time to Respond?

If you need more time to respond to an appointment for any reason, you can extend your deadline to 10 a.m. CST / 9 a.m. MST the following day. Follow **Steps 1-6**, then select **I NEED MORE TIME.** You can only extend your deadline once.








# Cancel an Appointment

24-50717.497

Case 2023-cv-00624AM Document 243 Filed 01/05/23 Page 53 of 749



## 1. Select Traveler

From the home screen, select **Traveler | Viajero**.



## 2. Select Land

Select **Land | Tierra,** then select **CONTINUE**.






Case 2:23-cv-00024AM-DB Document 243 Filed 10/05/23 Page 639 of 749

U.S. Customs and Border Protection

## 3. Select Submit Advance Information

Select **Submit Advance Information | Enviar Información Anticipada**.



## 4. Select a Language

Select your preferred language, then select **CONTINUE**.




Case 2:23-cv-00624-AMM Document 243 Filed 02/05/23 Page 59 of 749



U.S. Customs and
Border Protection

## 5. Read Instructions

Review the instructions on-screen, then select **CONTINUE.**



## 6. Select Your Registration

Select your registration.



Case 2:23-cv-00024-AM Document 243 Filed 12/05/23 Page 68 of 749



U.S. Customs and
Border Protection

## 7. Select Cancel Appointment

Select **CANCEL APPOINTMENT.**



## 8. Select Yes, Cancel

Review the pop-up and select **Yes, Cancel.**



Case 2:23-cv-00724AM-P Document 2393, Filed 12/05/23 Page 67 of 749

U.S. Customs and
Border Protection

## 9. Select OK

Review the pop-up and select **OK.** You have successfully canceled an appointment. You will receive a confirmation email at the email address you used to log in to CBP One™.

## NEXT STEPS

To receive a new appointment at a Port of Entry, please **Ask for an Appointment (See Page 20).**







# Delete My Registration

24-50717.503



## 1. Select Traveler

From the home screen, select **Traveler | Viajero**.



## 2. Select Land

Select **Land | Tierra,** then select **CONTINUE**.






## 3. Select Submit Advance Information

Select **Submit Advance Information | Enviar Información Anticipada**.



## 4. Select a Language

Select your preferred language, then select **CONTINUE**.




Case 2:23-cv-00024-AM Document 293 Filed 02/05/23 Page 74 of 749



U.S. Customs and
Border Protection

## 5. Read Instructions

Review the instructions on-screen, then select **CONTINUE.**



## 6. Select Your Registration

Select your registration.





# Submit Advance Information: Delete My Registration

Case 2:23-cv-00084 AM Document 293 Filed 02/05/23 Page 74 of 749

## 7. Select Delete Registration

Select **DELETE REGISTRATION.** You can only delete your registration if you have not asked for an appointment and do not currently have an appointment.



## 8. Select Yes, Delete

Review the pop-up and select **Yes, Delete.**



Case 2:23-cv-00024 Document 2293 Filed 02/05/23 Page 84 of 749



U.S. Customs and
Border Protection

## 9. Select OK

Review the pop-up and select **OK.** You have successfully deleted your registration.





## NEXT STEPS

To receive an appointment at a Port of Entry, please **Register Travelers (See Page 7).**



# Troubleshooting

24-50717.509

# Submit Advance Information: Troubleshooting


U.S. Customs and Border Protection

## My Video Selfie Keeps Failing

If your video selfie repeatedly fails when you try to accept and schedule an appointment **(Page 31, Step 8)**, you will receive the pop-up below.





### 1. Take a Video Selfie of Another Traveler

Try taking a video selfie of someone else in your registration.

If you don't have anyone else in your registration, or if the video selfie continues to fail, continue to **Step 2**.

### 2. Delete Your Registration and Re-Register

Delete your registration and re-register with a higher quality photo **(Page 13, Step 11)**.

**Tab 3: Motion To Dismiss (ROA.558)**

FILED

March 15, 2024

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY: _____ AA

DEPUTY

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**DEL RIO DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | |
| | § | Case No. 2:23-CV-00024-AM |
| ALEJANDRO MAYORKAS, | § | |
| Secretary of Homeland Security, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT**

Dated:      March 15, 2024          Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

WILLIAM C. PEACHEY
*Director*

EREZ REUVENI
*Counsel*

CHRISTINA P. GREER
BRIAN C. WARD
*Senior Litigation Counsel*

By: */s/ Katherine J. Shinners*
KATHERINE J. SHINNERS (*pro hac vice*)
*Senior Litigation Counsel*
DC Bar No. 978141
U.S. Department of Justice, Civil Division
Office of Immigration Litigation – DCS
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel: (202) 598-8259
Fax: (202) 305-7000
Email: katherine.j.shinners@usdoj.gov

ELISSA P. FUDIM
*Trial Attorney*

*Attorneys for Defendants*

Plaintiff, the State of Texas, challenges a rule promulgated by the Departments of Homeland Security (DHS) and Justice (DOJ) (collectively, "the Departments") that limits the circumstances in which noncitizens can obtain asylum. *See* Circumvention of Lawful Pathways, 88 Fed. Reg. 31,314 (May 16, 2023) (the "Rule"); Circumvention of Lawful Pathways, 88 Fed. Reg. 11,704, 11,708 (proposed Feb. 23, 2023) (notice of proposed rulemaking (NPRM)). Plaintiff contends that the Rule—which imposes a limit on asylum eligibility for certain noncitizens—will increase the number of noncitizens residing in Texas, causing the State to suffer injury. This argument fails for several independent reasons. The Supreme Court has recently recognized that States lack any cognizable interest in the federal government's enforcement of the immigration laws and has also cautioned against recognizing state standing in any context based on such attenuated theories of injury. Even on their own terms, Texas's claims to injury are fundamentally flawed given that the Rule imposes a limit on eligibility for asylum for certain noncitizens and thus could not be expected to increase the overall number of noncitizens entering the State of Texas.

Further, Plaintiff's complaints about other aspects of the immigration system referenced in the Rule could not be redressed through relief against the Rule. Any relief Plaintiff requests pertaining to the Rule would not impact the release of noncitizens on parole, as the Rule does not govern parole determinations or set any policies relating thereto. Moreover, the Immigration and Nationality Act (INA) bars the coercive relief Plaintiff seeks, which would prohibit application of an exception in the Rule in expedited removal or removal proceedings. Nor can Plaintiff obtain relief directly prohibiting grants of parole to noncitizens after they arrive at a port of entry (POE) pursuant to a pre-scheduled appointment, as this would impermissibly interfere with DHS's discretionary authority to grant parole. Additionally, Plaintiff is not within the zone of interests protected by the pertinent provisions of the INA.

Even if Plaintiff's Complaint could withstand these threshold hurdles, it should be dismissed for failure to state any viable claim. Plaintiff's challenges in Counts 1 and 2 to the Rule's appointment exception under the Administrative Procedure Act (APA) are without merit because the Rule—including the challenged exception—reflects a considered, reasonable approach to addressing irregular migration that is well within the Departments' statutory authority and duties, and the Departments considered relevant factors in adopting this approach. Plaintiff's new allegations in Count 3 about DHS's parole practices should likewise be dismissed because DHS is acting well within its broad, discretionary authority if it grants parole to noncitizens who enter at POEs, and because Plaintiff has not identified a discrete agency action or policy concerning parole that could be subject to challenge under the APA.

## BACKGROUND

Processing Under Title 42 and Title 8. From March 20, 2020, until May 11, 2023, most noncitizens without documents sufficient for entry who sought to enter the United States at its southwest land and adjacent coastal borders—whether or not at a designated POE—were subject to expulsion under a series of public health orders issued by the Centers for Disease Control and Prevention to combat the COVID-19 pandemic (Title 42 Orders). *See* Public Health Reassessment and Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, 86 Fed. Reg. 42,828 (Aug. 5, 2021). Under the Title 42 Orders, covered noncitizens were generally not permitted to cross the border to enter the United States at POEs and, if encountered in the United States, were generally expelled to Mexico or their home countries without processing under the immigration authorities at Title 8, including processing for asylum. *See id.*; ECF 30, First Am. Compl. (FAC, or "Complaint") ¶ 9.

Under the INA—that is, absent the Title 42 Orders—noncitizens in the United States without documents sufficient for entry are required to be processed under the INA's substantially more resource-intensive procedures. *See* 8 U.S.C. § 1101 *et seq.* Such noncitizens, whether they present at a POE or are encountered after crossing irregularly between POEs, are deemed applicants for admission and must be inspected by immigration officers. *See* 8 U.S.C. § 1225(a)(1), (3).[1] Applicants for admission who upon inspection are determined to be inadmissible because they are not in possession of a valid travel document may be subject to expedited removal procedures. *See* 8 U.S.C. § 1225(b)(1)(A). Congress has provided that noncitizens who are in the United States may generally apply for asylum, a form of discretionary relief from removal based on a fear of persecution on account of a protected ground. 8 U.S.C. § 1158(a), (b)(1)(A); *see also id.* § 1101(a)(42). Congress has also mandated that noncitizens may not be removed to a country where their life or freedom would be threatened because of a protected ground or they would be tortured. 8 U.S.C. § 1231(b)(3) (statutory withholding of removal); Pub. L. No. 105-277, div. G, § 2242 (Oct. 21, 1998) (codified at 8 U.S.C. § 1231 note), 8 C.F.R. §§ 208.16(c), 208.17(a), 208.18, 1208.16(c), 1208.17(a), 1208.18 (protection under the Convention Against Torture (CAT)).

Thus, if a U.S. Customs and Border Protection (CBP) officer determines upon inspection at a POE that a noncitizen is subject to expedited removal procedures, the noncitizen may be removed without further hearing or review, unless they indicate an intent to apply for asylum or a fear of persecution or torture, in which case CBP refers them to asylum officers for a credible fear interview to assess any persecution and torture claims. 8 U.S.C.

---

[1] While entering the country outside a port of entry is a crime, 8 U.S.C. § 1325, even "an alien who tries to enter the country illegally is treated as an 'applicant for admission,'" *DHS v. Thuraissigiam*, 140 S. Ct. 1959, 1982 (2020).

§ 1225(b)(1)(A)(ii); 8 C.F.R. § 208.30. If the noncitizen demonstrates at the credible fear interview a significant possibility that they could establish eligibility for asylum, statutory withholding of removal, or CAT protection, they are either retained by the asylum officer for further review of their asylum application, or placed in removal proceedings under 8 U.S.C. § 1229a before an immigration judge of the Executive Office for Immigration Review (EOIR), where they may apply for asylum or other protection as a defense to removal. 8 U.S.C. § 1225(b)(1)(B)(ii), (v); 8 C.F.R. §§ 208.30(c)–(g), 1208.2(b). Upon inspection at a POE, CBP officers also have discretion to process undocumented noncitizens for other appropriate dispositions instead of expedited removal, including referring them directly to Section 1229a removal proceedings before EOIR, which are commenced by issuance of a "notice to appear." *See* 8 U.S.C. §§ 1225(b)(2)(A), 1229(a)(1); *Matter of E-R-M-*, 25 I. & N. Dec. 520, 521–24 (BIA 2011); FAC ¶ 58 (1st).[2]

CBP officers further have discretion to parole inadmissible noncitizens into the United States "on a case-by-case basis for urgent humanitarian reasons or significant public benefit," regardless of whether they are processed for expedited removal or Section 1229a removal proceedings. *See* 8 U.S.C. § 1182(d)(5)(A). Parole is generally permissible for noncitizens subject to expedited removal "whose continued detention is not in the public interest" as determined by DHS officials, provided they do not present a national security, public safety, or flight risk. 8 C.F.R. §§ 212.5(b)(5), 235.2(c), 235.3(b)(2)(iii), 235.3(b)(4)(ii).

The Rule. In early 2023, the President announced that the public health emergency would end on May 11, 2023, which would cause the then-operative Title 42 Order to terminate. FAC

---

[2] At page 13 of the Complaint, the paragraph numbering goes from 61 back to 44. FAC at 13. Thus, as applicable, citations to paragraphs 44-61 will indicate whether they are intended to cite to first set of such paragraphs "(1st)" or the second set of such paragraphs "(2d)".

¶ 10; 88 Fed. Reg. at 11,708. Absent further action, the end of the Title 42 Order was expected to cause the number of migrants seeking to irregularly enter the United States at the southwest border to surge to or remain at all-time highs—an estimated 11,000 migrants daily. 88 Fed. Reg. at 31,331. The Departments thus faced a looming urgent situation: absent policy change, the end of the Title 42 Order would result in many more migrants crossing the border and asserting protection claims, which would in turn overwhelm DHS's ability to process migrants in a safe, expeditious, and orderly way and lead to an increase in the number of noncitizens released into the country. To prevent this expected situation, the Departments promulgated the Rule, following an NPRM, a 33-day comment period, and review of 51,952 comments. 88 Fed. Reg. at 31,314, 31,324; *see also* 88 Fed. Reg. at 11,704; FAC ¶¶ 11, 28–29. The Rule has been in effect since May 11, 2023, and it provides that most noncitizens who enter the United States during the following two years at the southwest land border or adjacent coastal borders after traveling through a country other than their country of citizenship or nationality are subject to a rebuttable presumption of ineligibility for asylum unless they avail themselves of certain orderly processes for entry into the United States or seek and are denied protection in that third country. 88 Fed. Reg. at 31,321-23. The presumption of asylum ineligibility applies to asylum determinations in any context, including in removal proceedings and in credible fear screenings. 8 C.F.R. §§ 208.13(f), 1208.13(f), 208.33(b), 1208.33(b). The Rule was enacted under the Departments' authority to "by regulation establish limitations and conditions . . . under which an alien shall be ineligible for asylum." 8 U.S.C. § 1158(b)(2)(C); *see also id.* § 1158(d)(5)(B).

Specifically, the Rule provides that "[a] rebuttable presumption of ineligibility for asylum applies to an alien who" "enters the United States from Mexico at the southwest land

border or adjacent coastal borders without documents sufficient for lawful admission" "and whose entry was[:]" (1) "[b]etween May 11, 2023, and May 11, 2025," (2) "[s]ubsequent to the end of implementation of the Title 42 public health Order," and (3) "[a]fter the alien traveled through a country other than the alien's country of citizenship [or] nationality." 8 C.F.R. §§ 208.33(a)(1), 1208.33(a)(1). The presumption does not apply to unaccompanied children or to those who used certain orderly pathways or processes for entry into the United States or meaningfully sought protection in a third country—namely, those who were "provided appropriate authorization to travel to the United States to seek parole, pursuant to a DHS-approved parole process"; "[p]resented at a port of entry, pursuant to a pre-scheduled time and place"; "presented at a port of entry without a pre-scheduled time and place" but who can "demonstrate[] by a preponderance of the evidence that it was not possible to access or use the DHS scheduling system"; or "[s]ought asylum or other protection in a country through which the noncitizen traveled and received a final decision denying that application." *Id.* §§ 208.33(a)(2), 1208.33(a)(2). Noncitizens subject to the presumption of asylum ineligibility may rebut the presumption by demonstrating "exceptionally compelling circumstances." *Id.* §§ 208.33(a)(3), 1208.33(a)(3). Noncitizens subject to presumptive ineligibility and unable to overcome the presumption must still be considered for statutory withholding of removal and CAT protection. *See* 8 C.F.R. §§ 208.33(b)(2), 1208.33(b)(2)(ii), (4); 88 Fed. Reg. at 31,318.

In short, the Rule aims to reduce irregular entry between POEs, by encouraging migrants to seek asylum or protection in other countries and incentivizing the use of orderly and lawful pathways to enter the United States by conditioning the discretionary grant of asylum on noncitizens' availing themselves of such pathways (or demonstrating exceptionally compelling circumstances). A reduction in irregular migration will correspondingly decrease

crowding in border facilities, lessen projected severe strains on DHS border resources that could ultimately lead to more releases, and facilitate safe, humane processing. *See, e.g.*, 88 Fed. Reg. at 31,235, 31,324, 31,328.

Although the Rule thus provides incentives to use various pathways for safe, orderly, and lawful entry, those pathways were not created by the Rule and exist independently of it. The currently existing lawful pathways include, but are not limited to, refugee processing abroad under 8 U.S.C. § 1157, certain country-specific processes to obtain authorization to travel by air to the United States and to seek parole upon arrival, and expanded seasonal employment opportunities. 88 Fed. Reg. at 31,317. Those migrants who have already traveled to Mexico with the intent of entering the United States can also avoid the presumption of asylum ineligibility under the "appointment exception" by pre-scheduling an appointment to present at a POE (rather than irregularly entering between POEs or waiting at a POE). 8 C.F.R. §§ 208.33(a)(2)(ii)(B), 1208.33(a)(2)(ii)(B) (providing for an exception for those covered noncitizens who "[p]resent[] at a port of entry, pursuant to a pre-scheduled time and place"). Currently, DHS uses the existing, multi-function CBP One app to allow noncitizens to schedule a time to arrive at POEs for orderly processing. 88 Fed. Reg. at 31,317. For this purpose, CBP One allows "[n]oncitizens located in Central or Northern Mexico who seek to travel to the United States . . . to submit information in advance and schedule an appointment to present themselves at" eight southwest-border POEs instead of entering irregularly between POEs or waiting at the POE, which contribute to strains on border enforcement and congestion of POEs. *See* Advance Submission and Appointment Scheduling, https://www.cbp.gov/about/mobile-apps-directory/cbpone (last visited Mar. 15, 2024); 88 Fed. Reg. at 31,332; FAC ¶¶ 25–27, 31, 36, 39–44. Using appointments allows POEs to manage the flow into the POE of noncitizens

without documents sufficient for admission, efficiently allocate border enforcement resources, and streamline processing, thus reducing overall burdens on immigration enforcement at the border. 88 Fed. Reg. at 31,318. The Rule does not dictate processing or detention outcomes for those that schedule an appointment; all the Rule provides is that its presumption of asylum ineligibility will not apply to such noncitizens. *See generally* 8 C.F.R. §§ 208.33(a), 1208.33(a).

In July, a U.S. District Court in California vacated the Rule based on claims brought by immigration legal services organizations, *East Bay Sanctuary Covenant v. Biden*, 2023 WL 4729278 (N.D. Cal. July 25, 2023), but that order has been stayed pending appeal. *See E. Bay Sanctuary Covenant v. Biden*, No. 23-16032 (9th Cir. Aug. 3, 2023). That appeal is currently in abeyance. *E. Bay Sanctuary Covenant v. Biden*, 93 F.4th 1130 (9th Cir. 2024).

This Lawsuit. On May 23, 2023, Plaintiff filed this lawsuit seeking to enjoin the Rule in its entirety. ECF 1. On February 6, 2024, Plaintiff filed its First Amended Complaint, which challenges the Rule's appointment exception at 8 C.F.R. §§ 208.33(a)(2)(ii)(B), 1208.33(a)(2)(ii)(B), rather than the entirety of the Rule, under the APA. FAC ¶¶ 30, 54(2d)–86. The new Complaint adds a count that asserts that DHS exceeds its statutory authority by granting discretionary parole to noncitizens who schedule appointments using CBP One. FAC ¶¶ 87–103. Plaintiff contends that it is harmed because—notwithstanding that the Rule imposes consequences in the form of asylum ineligibility on those who enter without appointments or between POEs and aims to reduce the strain on immigration enforcement—the appointment system invites noncitizens to enter and be released into the United States, and will allegedly result in increased noncitizens in Texas, which will in turn lead to increased public expenditures and economic harms. FAC ¶¶ 44–53 (2d). Plaintiff seeks an injunction and vacatur of the Rule's appointment exception, an injunction "prohibiting Defendants from paroling aliens who pre-

8

**RE.097**

schedule a time and place to present at a port of entry using a DHS scheduling system," and a declaration that "Defendants' actions" are unlawful. FAC § VI (Demand for Relief).

## LEGAL STANDARDS

"A case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case." *Home Builders Ass'n of Miss., Inc. v. City of Madison, Miss.*, 143 F.3d 1006, 1010 (5th Cir. 1998). "In applying Rule 12(b)(1), the district court has the power to dismiss for lack of subject matter jurisdiction on any one of three separate bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Willoughby v. U.S. ex rel. U.S. Dept. of the Army*, 730 F.3d 476, 479 (5th Cir. 2013). Claims are subject to dismissal pursuant to Rule 12(b)(6) if the complaint does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A Rule 12(b)(6) motion should be granted if "it appears certain that the plaintiff cannot prove any set of facts that would entitle it to the relief it seeks." *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 570 (5th Cir. 2005).

## ARGUMENT

### I. The Complaint Should Be Dismissed for Lack of Jurisdiction Because Plaintiff Lacks Article III Standing.

To establish standing, Texas must show that as of the filing of its Amended Complaint it has suffered or will imminently suffer an "injury in fact" "caused" by the challenged action that a favorable decision would "likely" "redress." *Lujan v. Defs. Of Wildlife,* 504 U.S. 555, 560–61 (1992). Attenuated speculation is insufficient to establish standing, even at the pleading stage. *See id.* at 560-62, 570 n.5 (1992); *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). "When 'a

plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of someone else, much more is needed' to establish standing." *United States v. Texas*, 599 U.S. 670, 678 (2023) (quoting *Lujan*, 504 U.S. at 562). Plaintiff's claimed incidental injury allegedly arising from the Executive's discretionary immigration enforcement policies is not cognizable under Article III, and its injuries cannot be redressed by the relief it seeks.

### A.    The Complaint Does Not State a Cognizable Injury.

Here, Plaintiff's claimed harms—indirect impacts on its public fisc or economy from an alleged increase in the number of noncitizens released into Texas due to the Rule's appointment exception and the Executive's exercise of discretionary parole authority*, see* FAC at p.1 & ¶¶ 49 (1st), 54–55 (1st), 45–55 (2d)—are not cognizable injuries and are too speculative to establish Article III standing.

As the Supreme Court recently held in *Texas*, States' allegations of indirect financial harm allegedly resulting from immigration enforcement policy are historically and categorically not cognizable injuries for the purposes of Article III standing. 599 U.S. at 677–81 & n.3. Third parties like Texas who are not the subject of the challenged regulation or policy have "no judicially cognizable interest in procuring enforcement of the immigration laws." *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 897 (1984) (citing *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973)), *quoted in Texas*, 599 U.S. at 677. Just as the plaintiff States in *Texas* had no standing to challenge the Executive Branch's "enforcement discretion over arrests and prosecutions" based on allegations of indirect effects on revenue and spending, 599 U.S. at 677–81 & n.3, here, Plaintiff lacks a cognizable interest in the circumstances in which the Executive may confer the discretionary benefit of asylum. Plaintiff likewise cannot justify judicial intrusion into the Executive's decisions as to how to process applicants for admission (like noncitizens who present at POEs), including whether to use its discretionary parole authority, which are inherently discretionary immigration

enforcement decisions. *See, e.g.*, *Reno v. AADC*, 525 U.S. 471, 490–91 (1999); *Garcia-Mir v. Smith*, 766 F.2d 1478, 1484 (11th Cir. 1985).

*Texas* stands for the principle that third parties like Texas lack a judicially cognizable interest in whether or how the Executive exercises its immigration enforcement discretion against someone else. 599 U.S. at 676–77. The challenged agency actions here—the Rule's incentivization of the use of orderly appointments through an exception to a condition on asylum eligibility and the Executive's exercise of discretionary parole authority at POEs—does not differ in any meaningful way from the prosecutorial discretion guidelines challenged in *Texas* for purposes of the standing analysis. Here, Congress has charged the Executive with discretion and responsibility to manage immigration enforcement, including through determining asylum eligibility and making parole determinations. *See* 6 U.S.C. § 202(4), (5) (charging DHS with responsibility for "establishing national immigration enforcement policies and priorities" and "administering rules . . . governing . . . parole"); 8 U.S.C. §§ 1103(a)(1), 1103(g), 1158(b)(2)(C), 1158(d)(5)(B). Each of the reasons the Supreme Court articulated in *Texas* to support its conclusion that the States lacked standing to challenge immigration enforcement guidelines—including that the discretionary immigration enforcement decisions at issue involve no exercise of coercive power over the plaintiff; that challenges to those decisions implicate Article II and foreign-policy concerns like those implicated in the Rule; and that courts lack "meaningful standards" to assess such decisions that reflect the Executive's "complicated balancing" of factors like "resource constraints" and "public-safety and public-welfare needs"—applies here. *See Texas*, 599 U.S. at 678–81; *see also Heckler v. Chaney*, 470 U.S. 821, 830–32 (1985).

But even if Plaintiff's alleged injury did not squarely fall under the reasoning in *Texas*, there are "bedrock Article III constraints in cases brought by States against an executive agency

or officer" even outside the immigration enforcement context. *Texas*, 599 U.S. at 680 n.3. Federal policies routinely have incidental effects on States' expenditures, revenues, and other activities, and the Supreme Court cautioned against recognizing such "attenuated" claims by States. *See id.* This case does not involve the sort of direct injury that might allow a State to sue in limited instances. *See, e.g.*, *Florida v. Mellon*, 273 U.S. 12, 18 (1927) (holding that Florida lacked standing to challenge a federal inheritance tax because its claimed injury of "withdrawal of property" and resulting diminishment of tax base was "at most, only remote and indirect"); *Texas*, 599 U.S. at 685 n.6 (rejecting States' reliance on special solicitude and noting that *Massachusetts v. EPA*, 549 U.S. 497 (2007), involved a challenge to the denial of a statutorily authorized petition for rulemaking). Plaintiff's claimed "sovereign" injuries—a claimed pressure "to change its laws" or injury to its economy, *see* FAC ¶¶ 46, 49 (2d)—are even more attenuated and do not alter this analysis. The challenged federal actions do not directly interfere with Plaintiff's "power to create and enforce a legal code," as they do not amount to a "tangible interference with [its] authority to regulate or to enforce its laws." *Harrison v. Jefferson Parish School Board*, 78 F.4th 765, 770 (5th Cir. 2023). Any claimed pressure on Plaintiff to change its laws depends entirely on Plaintiff's own future response to the challenged actions' indirect and speculative impact on public expenditures.

Even if Plaintiff's claimed injury were cognizable, it is far too speculative to support standing. "Injury in fact" is "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not 'conjectural' or 'hypothetical.'" *Duarte ex rel. Duarte v. City of Lewisville, Tex.*, 759 F.3d 514, 517 (5th Cir. 2014) (quoting *Lujan*, 504 U.S. at 560). The Rule imposes a limit on asylum eligibility for certain noncitizens who do not avail themselves of lawful pathways to entry into the United States or seek asylum or protection in a

third country, and that limitation makes coming to the United States less attractive for those without meritorious asylum claims. Texas's argument, apparently, is that the use of appointments to preschedule arrival at a POE might cause noncitizens to enter the United States who would not otherwise have done so. Even if that contention were correct (which Defendants do not concede), it would not provide any basis for challenging the Rule, which merely establishes adverse consequences of presumptive asylum ineligibility for certain noncitizens who enter the United States in other ways, such as unlawful entries between POEs. There is no basis for Plaintiff's extraordinary claim that dissuading noncitizens from entering the country unlawfully will somehow lead to adverse consequences that might arise from the presence of more unlawfully present noncitizens in the State. *Cf. Texas v. DHS (CHNV)*, No. 6:23-CV-00007, 2024 WL 1021068, at *16 (S.D. Tex. Mar. 8, 2024) (holding that injury relating to increased immigration must be viewed in context).

Plaintiff similarly cannot plausibly allege that noncitizens who make appointments—that is, migrants who have already traveled to Mexico from their home countries—would not otherwise enter and either evade detection or be released into the United States if the appointment exception did not exist. In fact, the very point of the Rule's appointment exception is to encourage migrants who have already traveled to Mexico and who might well cross the border irregularly to use orderly methods to present themselves to immigration officers at POEs. *See, e.g.*, 88 Fed. Reg. at 31,325. This approach helps reduce the severe strain on immigration resources caused by irregular border crossers, and indeed, an overwhelmed immigration enforcement system could well produce the very harm Plaintiff is concerned with—namely, "more noncitizens being released into the interior pending immigration proceedings." 88 Fed. Reg. at 31,328; *see also id.* at 31,325; FAC ¶ 46 (2d). Nor can Plaintiff rely on generalized allegations about the economic effects of immigration in the

abstract with no demonstrable connection to noncitizens who are granted parole, let alone to particular noncitizens who are granted parole after their arrival at a POE with a CBP One appointment. *See* FAC ¶¶ 45–55 (2d) (complaining generally of costs attributable to "illegal aliens" or "aliens"); *Crane v. Johnson*, 783 F.3d 244, 252 (5th Cir. 2015) (finding no injury where state submitted evidence that "illegal immigration" increased costs but did not connect any increases to the particular policy challenged). Federal courts are not the proper venue for resolution of such diffuse and generalized complaints.

### B.   Plaintiff's Claimed Injury is Not Redressable.

Even if Plaintiff's alleged injury were cognizable, its claimed harms cannot be redressed by an order from this Court. "To determine whether an injury is redressable, a court will consider the relationship between the judicial relief requested and the injury suffered." *California v. Texas*, 593 U.S. 659, 671 (2021) (quotation marks omitted). Plaintiff's injury must be "likely to be redressed by the requested relief." *Id.* at 669; *see also Lujan*, 504 U.S. at 561 ("[I]t must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.") (cleaned up). Plaintiff seeks two categories of relief: (1) an injunction, vacatur, and declaration of the unlawfulness of the Rule's appointment exception, which corresponds to Counts 1 and 2, and (2) an injunction and declaration of the unlawfulness of grants of parole to those who pre-schedule appointments, which corresponds to Count 3. *See* FAC § VI. Plaintiff's claimed injury is not redressable by this relief. Relief against the Rule either would do nothing to alleviate the claimed harms stemming from the parole of noncitizens or is unavailable under the INA, and the relief Plaintiff seeks against grants of parole is likewise unavailable because it would direct the Executive's exercise of statutory discretion.

Counts 1 and 2 should be dismissed for lack of standing because relief pertaining to the Rule would not redress the claimed injury. *First*, any relief addressing the Rule's exception to the

presumption of asylum ineligibility for those who pre-schedule their arrival at a POE would not address the claimed source of Plaintiff's alleged harms: the parole of noncitizens after they arrive at a POE pursuant to a pre-scheduled appointment. Enjoining, vacating, or declaring unlawful the appointment exception would not restrain the use of appointments or the exercise of parole authority. CBP One and the ability to pre-schedule arrival at a POE were not created by the Rule and exist independently of it. *See* 88 Fed. Reg. at 31,317–18. Similarly, removing the appointment exception would have no impact on the availability of parole under 8 U.S.C. § 1182(d)(5)(A). An injunction or vacatur of this aspect of the Rule would not prevent immigration officers from exercising discretion to grant parole, if appropriate on a case-by-case basis, to noncitizens who are subject to the presumption of asylum ineligibility. "[R]elief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court." *Inclusive Cmtys. Project, Inc. v. Dep't of Treasury*, 946 F.3d 649, 655 (5th Cir. 2019); *see also California*, 593 U.S. at 671–72 (finding no redressability where any relief the court could grant would have no practical effect); *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 105-06 (1998) (finding no redressability where specific relief sought would not address the harms suffered).[3] Instead, the requested relief against the Rule's appointment exception would at most remove the incentive to use orderly methods of entry and would more likely contribute to the very harms that Plaintiff purportedly seeks to prevent, by taking away the Executive's carefully calibrated tool to *reduce* irregular migration.

     *Second*, an injunction or vacatur of the appointment exception is not available because statutes preclude relief. As Justice Gorsuch recognized in his concurrence in *Texas*, where the

---

[3] Viewed another way, Plaintiff's claimed harms from the exercise of parole authority are not fairly traceable to the Rule. Just as in *California v. Texas*, where the plaintiff States' alleged injury arising from one statutory provision could not support a challenge to a different provision of the same statute, *see* 593 U.S. at 671, here, Plaintiff's alleged costs arising from parole—which Defendants do not concede—cannot support a challenge to the Rule's appointment exception.

relief sought is precluded by statute and there is no other effective judicial remedy, a court cannot redress the claimed injury. 599 U.S. at 690–93.  And 8 U.S.C. § 1252(f)—which bars courts from "enjoin[ing] or restrain[ing] the operation of" sections 1221–1231 of Title 8—precludes injunctive relief interfering with the government's chosen means of operating sections 1225(b)(1), 1229a, and 1231, which are implemented by the Rule. *See Garland v. Aleman Gonzalez*, 142 S. Ct. 2057, 2064–65 (2022). The Rule's rebuttable presumption of asylum ineligibility is applicable in three contexts: affirmative asylum applications under § 1158, credible fear interviews under § 1225(b)(1), and  removal proceedings under § 1229a. Vacating the appointment exception or enjoining its application in expedited removal procedures and section 1229a removal proceedings would interfere with the government's chosen means of implementing those statutes by preventing asylum officers from making a credible fear determination under § 1225(b)(1) in the manner prescribed by the Rule, by mandating how immigration judges determine whether a noncitizen has met their burden to demonstrate eligibility for relief from removal under § 1229a(c)(4)(A), and by interfering with the agencies' chosen means of implementing the statutory withholding of removal requirement under § 1231(b)(3). Although the Rule establishes limitations on and conditions to the grant of asylum under § 1158, it *operates* in expedited and section 1229a removal proceedings and is "the way that [sections 1225, 1229a, and 1231 are] being carried out." *Aleman Gonzalez*, 142 S. Ct. at 2064. Any injunction or universal vacatur thus would impermissibly compel agency adjudicators "to take actions that (in the Government's view) are not required by" sections 1225, 1229a, and 1231 or their implementing regulations, "and to refrain from actions that (again in the Government's view) are allowed by" those statutes. *Id.* at 2066. The Court likewise lacks jurisdiction to review rules implementing the expedited removal system or to issue injunctive relief affecting that system. *See* 8 U.S.C. § 1252(a)(2)(A)(iv), (e)(1), (3); *Grace v. Barr*, 965 F.3d 883,

891 (D.C. Cir. 2020) (section 1252(e) covers "agency [regulations or] policies governing credible-fear interviews"). The Rule, including its appointment exception, "implements" the expedited removal system by "instruct[ing] asylum officers to apply the lawful pathways rebuttable presumption during credible fear screenings," and makes numerous other changes to expedited removal and credible fear procedures for those to whom the presumption applies. 8 C.F.R. §§ 208.33(b), 1208.33(b).

*Third*, the APA, 5 U.S.C. § 706(2), does not permit the primary relief Plaintiff seeks: universal vacatur of a regulation or portions thereof. That provision states that a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be" "arbitrary [and] capricious" or "otherwise not in accordance with law." 5 U.S.C. § 706(2). That provision does not authorize rendering an entire rule, or parts thereof, void. In fact, it does not pertain to remedies at all, which are governed by 5 U.S.C. § 703. Section 706(2) instead is a rule of decision governing judicial review that provides the substantive standard for finding agency action "unlawful"; the language "set aside" directs the reviewing court to disregard that unlawful action in resolving the case before it. To interpret section 706 to require universal vacatur of a regulation would allow a broad expansion of available remedies, upsetting the "bedrock practice of case-by-case judgments with respect to the parties in each case." *Arizona v. Biden*, 31 F.4th 469, 484 (6th Cir. 2022) (Sutton, J., concurring); *see also California*, 593 U.S. at 672 (remedies "ordinarily operate with respect to specific parties" rather than "on legal rules in the abstract").

For these reasons, Plaintiff's challenge to the Rule's appointment exception cannot establish standing because relief related to the Rule is not likely to redress Plaintiff's claimed injury or is unavailable, and Counts 1 and 2 should be dismissed on this basis. *See Town of Chester, N.Y. v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017) (plaintiffs must establish standing for each claim

raised); *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996) ("If the right to complain of *one* administrative deficiency automatically conferred the right to complain of *all* administrative deficiencies, any citizen aggrieved in one respect could bring the whole structure of state administration before the courts for review.").

As to Count 3, Plaintiff seeks an injunction prohibiting Defendants from granting parole to any noncitizen who uses a DHS scheduling system to pre-schedule their presentment at a POE. FAC § VI(c). This relief is likewise legally unavailable. *See Texas*, 599 U.S. at 690–93 (Gorsuch, J., concurring); *cf. Okpalobi v. Foster*, 244 F.3d 405, 426 (5th Cir. 2001) (to satisfy the redressability requirement, the court must be able to grant effective relief). Plaintiff's claim in Count 3 essentially challenges an amalgamation of thousands of individual parole decisions made pursuant to the Executive's discretionary parole authority at 8 U.S.C. § 1182(d)(5)(A). *See infra* § IV(A), (C). Federal courts may not review "decision[s] or action[s] … the authority for which is specified under this subchapter to be in the discretion of … the Secretary of Homeland Security." 8 U.S.C. § 1252(a)(2)(B)(ii). The INA specifies that any decision whether to grant parole is "in [the] discretion" of the Secretary. 8 U.S.C. § 1182(d)(5)(A). Thus, courts cannot review decisions to grant parole. *See infra* § IV(A). As courts cannot review such claims, they also cannot direct the Executive's exercise of discretion by either compelling or prohibiting the discretionary grant of parole or declaring individual grants of parole unlawful. *See Giammarco v. Kerlikowske*, 665 F. App'x 24, 25–26 (2d Cir. 2016) (given § 1252(a)(2)(B)(ii), court may not order government to parole noncitizen); *Samirah v. O'Connell*, 335 F.3d 545, 549 (7th Cir. 2003) (similar). Because the Court cannot enjoin or declare unlawful grants of parole for  noncitizens who pre-schedule their arrival at a POE or direct the exercise of parole, the relief Plaintiff seeks as to Count 3 is unavailable and cannot remedy its claimed injury.

**II. Texas is Not Within the Zone of Interests of the Relevant Immigration Statutes and Judicial Review is Not Available.**

Even if Plaintiff could establish Article III standing, its claims should be dismissed because Texas is not within the zone of interests protected by the relevant immigration statutes. The APA does not "allow suit by every person suffering injury in fact." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 395 (1987). It provides a cause of action only to a plaintiff "adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. To be "aggrieved" in that sense, "the interest sought to be protected by the complainant [must] be arguably within the zone of interests to be protected or regulated by the statute . . . in question." *Clarke*, 479 U.S. at 396 (alteration and citation omitted). When a Plaintiff is not itself the object of the challenged regulatory action, it has no right of review if its "interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Id.* at 399.

The Rule sets a condition on eligibility under the asylum statute, 8 U.S.C. § 1158. *See* 88 Fed. Reg. at 31,323; *supra* at 5; *infra* § III(A). Nothing in the asylum statute—or the INA generally—evinces any concern with State sovereigns generally or any policy goal of reducing migration specifically. The opposite is true. *See* 8 U.S.C. § 1158(d)(7) ("Nothing in this subsection shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers or any other person."). Thus, the interests Plaintiff seeks to vindicate do not fall within the zone of interests of the asylum statute.

Nor is Plaintiff within the zone of interests of the parole statute, 8 U.S.C. § 1182(d)(5)(A). *See* FAC ¶ 94 (alleging violation of parole statute); *Fed'n for Am. Immigration Reform (FAIR), Inc. v. Reno*, 93 F.3d 897, 902 (D.C. Cir. 1996) ("*FAIR*"). In *FAIR*, the D.C. Circuit held that an organization whose members were not the object of the parole statute could not bring its challenge

to a "scheme for parole" of inadmissible noncitizens because there was nothing in the "language of the statutes" nor the "legislative history that even hints at a concern about regional impact" of immigration on public services. *Id.* at 900–01. That reasoning squarely applies to Plaintiff's claim challenging DHS's use of parole for noncitizens who are processed at a POE after arriving with a CBP One appointment. *See* FAC ¶¶ 92–97.

Moreover, the INA carefully prescribes a scheme of judicial review of asylum and removal issues that affords only noncitizens—not States or other third parties—an opportunity to challenge certain types of decisions, and only through their removal proceedings. *See* 8 U.S.C. § 1252(a)(5), (b)(9), (e), (g); *Reno v. AADC.*, 525 U.S. at 486–87. Indeed, Congress has expressly committed parole decisions to DHS's discretion and made them unreviewable under § 1252(a)(2)(B)(ii), regardless of who seeks to challenge them. *See supra* § I(B); *infra* § IV(A). This statutory scheme demonstrates that Congress did not intend for "judicial review of those issues at the behest of other persons" to occur. *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 349 (1984). The INA thus precludes Plaintiff's suit. 5 U.S.C. § 701(a)(1).

## III.   Counts 1 and 2 Do Not State Facially Valid APA Challenges to the Rule.

Even if Plaintiff could establish that it has standing or is within the zone of interests, its claims should be dismissed. The challenges in Counts 1 and 2 to the Rule's appointment exception fail as a matter of law and are subject to dismissal under Rule 12(b)(6). The allegations and the Rule itself demonstrate that the Rule is not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). The Rule is a lawful and reasonable exercise of rulemaking authority—expressly authorized by Congress—to create conditions on asylum eligibility, carefully designed to address an anticipated surge in migration

by noncitizens without documents sufficient for admission into the United States once the Title 42 Order ended.

### A.    The Rule is Within the Departments' Statutory Authority and Does Not Conflict with DHS's Duty to Guard Against Illegal Entry.

Plaintiff claims in Count 1 that the Rule's appointment exception exceeds statutory authority because it contravenes the Departments' broad duties to guard against illegal entry of noncitizens. *See generally* FAC ¶¶ 56(2d)–72. This is incorrect as a matter of law. There is no question that the Departments have authority to place conditions on asylum eligibility in the first place, which necessarily means the authority to make exceptions to those conditions as well. Nor does the appointment exception contravene DHS's broad duties to guard against the illegal entry of noncitizens. Presenting for entry at a POE is not "illegal," and under the INA, noncitizens who are present in the United States, including those who enter at a POE, are permitted to seek asylum, even if inadmissible. Finally, Plaintiff cannot shoehorn its complaint about DHS's exercise of parole authority into a challenge to the Rule, which does not address parole.

First, contrary to Plaintiff's assertion, it is well within the Departments' statutory authority to promulgate the Rule and its appointment exception. *See* FAC ¶¶ 58 (2d), 66, 67. The Complaint entirely ignores that the asylum statute provides DHS and DOJ with express authority to promulgate limitations and conditions on asylum eligibility such as those set forth in the Rule. *See* FAC ¶¶ 57–58 (2d), 65; 88 Fed. Reg. at 31,323. That statute provides:

> Any alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such alien's status, may apply for asylum in accordance with this section or, where applicable, section 1225(b) of this title.

8 U.S.C. § 1158(a)(1). The asylum statute also sets forth conditions for grants of asylum and exceptions to eligibility. *See* 8 U.S.C § 1158(a)(2), (b). It further provides DHS and DOJ the

discretion whether to grant asylum and authorizes them to establish by regulation additional "limitations and conditions" on asylum eligibility beyond those set out in the statute, so long as they are "consistent with" § 1158. 8 U.S.C. § 1158(b)(2)(C), (d)(5)(B). Consistent with this authority to establish "limitations and conditions" on asylum eligibility, the Departments promulgated the Rule, which imposes a rebuttable presumption on asylum eligibility. *See* 88 Fed. Reg. at 31,321-23, 31,449-52; 8 C.F.R. §§ 208.30, 208.33, 1003.42(d), 1208.30, 1208.33. Creating exceptions to newly imposed conditions on asylum eligibility is no different than calibrating the scope of those conditions in the first instance. *See, e.g.*, 8 C.F.R. §§ 208.13(b)(1)(iii), 1208.13(b)(1)(iii) (providing exceptions to the categorical discretionary denial of asylum based on absence of well-founded fear); Asylum Eligibility and Procedural Modifications, 85 Fed. Reg. 82,260 (Dec. 17, 2020) (adopting the now-defunct third-country-transit rule, which included an exception to asylum ineligibility for certain trafficking victims).

Plaintiff nonetheless argues that the Rule's appointment exception is without proper authority because it conflicts with DHS's power and duty under 8 U.S.C. § 1103(a)(5) to "guard the boundaries and borders of the United States against the illegal entry of aliens." FAC ¶ 56 (2d) (citing 8 U.S.C. § 1103(a)(5)), 61-62 (2d).[4] But § 1103 "places no substantive limits on the

---

[4] The Complaint also cites to 8 U.S.C. § 1103(g)(2), apparently to support the argument that DOJ has exceeded its statutory authority. FAC ¶¶ 58 (2d), 63. But that provision addresses the residual immigration authority of the Attorney General following the transfer of certain DOJ duties to DHS. *See* 88 Fed. Reg. at 31,323. The Secretary of Homeland Security has the authority to create regulations and take other actions "necessary for carrying out" his responsibilities under the immigration laws, including "the administration and enforcement of [the INA] and all other laws relating to the immigration and naturalization of aliens," except insofar as those laws assign functions to other agencies. 8 U.S.C. § 1103(a)(1), (3). The Attorney General, meanwhile, retains "such authorities and functions under [the INA] and all other laws relating to the immigration and naturalization of aliens as were [previously] exercised by [EOIR], or by the Attorney General with respect to [EOIR]" (which includes the conduct of removal proceedings and review of negative credible fear determinations in expedited removal) and to establish regulations and take other

[Executive] and commits enforcement of the INA to [its] discretion." *State of Tex. v. United States*, 106 F.3d 661, 667 (5th Cir. 1997). Section 1103(a)(5) sets out a broad duty that is within the Executive's discretion to manage and is not enforceable under the APA. *Chiles v. United States*, 69 F.3d 1094, 1096 (11th Cir. 1995) (holding that the duty in § 1103(a)(5) is committed to agency discretion by law). Accordingly, Plaintiff cannot state a claim that the Rule contradicts § 1103(a)(5)'s broad and flexible mandate.

In any event, the Rule is fully consistent with § 1103(a)(5). The Rule's appointment exception does not "invite" or "incentivize" illegal entry. *See* FAC ¶¶ 58 (2d), 64; 8 U.S.C. § 1103(a)(5). The relevant criminal statute defines "improper entry" as (1) entering or attempting to enter the United States at any time or place other than as designated by immigration officers, (2) eluding examination or inspection by immigration officers, or (3) attempting or obtaining entry to the United States through fraud. 8 U.S.C. § 1325(a). And regulations provide that applications "to lawfully enter the United States shall be made in person to an immigration officer at a U.S. port-of-entry when the port is open for inspection." 8 C.F.R. § 235.1. Contrary to the Complaint's suggestion, *see* FAC ¶¶ 56 (2d), 58 (2d), 59 (2d), 61 (2d), presenting at a POE for inspection by immigration officers—except to attempt to obtain entry by fraud under § 1325(a)(3)—is not illegal under this statute. *United States v. Valencia-Mendoza*, 2020 WL 2198169, at *2 (W.D. Tex. May 6, 2020) (under 8 U.S.C. § 1325(a)(1), the government must prove that the defendant "entered at a place other than a designated port of entry"); *C.M. on behalf of D.V. v. United States*, 2023 WL 3261612, at *38 (W.D. Tex. May 4, 2023) (noting that plaintiff "bypassed the normal port of entry and entered the United States illegally"). Plaintiff is simply wrong to assert that the Rule and its

---

actions "necessary for carrying out" those responsibilities. 8 U.S.C. § 1103(g); 88 Fed. Reg. at 31,323.

**RE.112**

exception invite "illegal" entries and run contrary to § 1103(a)(5) or (g). The Rule (and the use of CBP One) instead *discourages* irregular entry to the United States. *E.g.*, 88 Fed. Reg. at 31,317, 31,344.

Further, to the extent that Plaintiff is claiming that DHS lacks authority to use an appointment system at all, its challenge is misplaced and unsupported. *See* FAC ¶¶ 58 (2d), 60 (2d). The Rule does not create an appointment system or independently authorize appointments. The legal effect of the Rule's appointment exception is to instead create an exception to the Rule's presumption of asylum ineligibility for those who make appointments to present at a POE, so as to discourage migrants who have already traveled to Mexico with the intent of seeking entry to the United States[5] from entering between POEs or waiting at a POE. Further, appointments scheduled through CBP One assist CBP in balancing its multiple missions by enabling it to "manage the flows [of migrants] in a safe and efficient manner." 88 Fed. Reg. at 31,318. This means of managing travel into POEs certainly falls within DHS's and CBP's duties to manage POEs in a safe and orderly manner that balances competing priorities including combatting terrorism, managing individual entry, and ensuring orderly and efficient flow of lawful traffic and commerce. *See* 6 U.S.C. §§ 111(b)(1), 202, 211(c), (g)(3).

Finally, Plaintiff's argument that the parole of noncitizens who were also subject to the appointment exception exceeds the statutory parole authority (*see* FAC ¶ 69) is likewise misplaced, because Count 1 is a challenge to the Rule, and the Rule does not address eligibility for parole or the circumstances under which DHS will exercise parole authority under 8 U.S.C. § 1182(d)(5)(A). Neither the Rule nor its appointment exception dictate whether noncitizens who make

---

[5] The Rule does not apply to Mexican citizens, as its presumption of asylum ineligibility only applies to noncitizens who enter the United States after having "traveled through a country other than the alien's country of citizenship [or] nationality." 8 C.F.R. §§ 208.33(a)(1), 1208.33(a)(1).

appointments will be released on parole rather than expeditiously removed or detained pending proceedings. *See, e.g.*, 88 Fed. Reg. at 31,331 (the Rule does not "set any policy regarding DHS's discretionary authority to make parole determinations for those who use the CBP One app"). For these reasons, the Rule does not exceed statutory authority, and Count 1 should be dismissed.

### B.     The Rule is Reasonable and Considers Relevant Factors.

In Count 2, Plaintiff alleges that the Rule is arbitrary and capricious because the Rule will, contrary to its stated purpose, increase the number of "illegal aliens processed at the border," FAC ¶ 76, did not consider the effects the rule has on Texas, *id.* ¶ 77, "failed to consider whether it could achieve its goal through a less-burdensome or less-sweeping means," *id.* ¶ 83, does not require noncitizens to demonstrate that they would have otherwise crossed the border without authorization to avail themselves of the exception to the presumption of asylum eligibility, *id.* ¶ 84, and "conveys a benefit on aliens without documents sufficient for admission," *id.* ¶ 85–86. These arguments misconstrue the Rule and are insufficient to state a claim under the APA. The Rule— including its appointment exception—is "reasonable and reasonably explained" and easily withstands the "deferential" arbitrary-and-capricious review standard. *See FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021).

Plaintiff misunderstands the Rule in arguing that processing as many noncitizens as possible at POEs is inconsistent with the Rule's goal "to reduce illegal immigration." FAC ¶ 76.[6] The Rule's appointment exception encourages noncitizens who have already traveled to Mexico to enter the United States through the orderly appointment process as an *alternative* to entering between POEs, with the aim of reducing the burden on immigration enforcement presented by

---

[6] "Processing" may result in expedited removal or outcomes other than parole. *See, e.g.*, 8 U.S.C. § 1225(b)(1)(A)(i) (allowing for expedited removal of those who do not claim fear).

those irregular entries. 88 Fed. Reg. at 31,316; *see also State of Texas v. U.S. DHS*, No. 23-CV-00055, 2023 WL 8285223, at *4, 12 (W.D. Tex. Nov. 29, 2023) (opining that DHS should receive noncitizens at POEs and discourage entry between POEs). This approach was adopted based on the proven success of similar approaches at reducing overall encounters, as well as irregular entries. *Id.* at 31,316–17. Contrary to Plaintiff's suggestion, to accomplish the Rule's objectives, it is not necessary that each individual noncitizen demonstrate that they would have otherwise crossed the border without authorization were it not for the appointment exception. *See* FAC ¶ 84. Such a requirement would needlessly impose the presumption of asylum ineligibility on noncitizens who never had any intent of crossing the border without authorization, and Plaintiff fails to explain how such a requirement could be operationalized.

Plaintiff's claim that the Rule failed to consider "the effects of this rule on Texas," *see* FAC ¶ 77, is refuted by the published Rule. The Rule's preamble includes a significant discussion of what a group of State Attorneys General described as "'the increased costs to the States of higher levels of unlawful aliens precipitated by' the NPRM." 88 Fed. Reg. at 31,437–38. The Departments considered those comments and responded by stating that the "rule is expected to reduce irregular migration, not increase it." *Id.* at 31,438. In support of that conclusion, the Departments cited to evidence that recent country-specific parole processes that had expanded lawful pathways while also instituting consequences for failing to use them—in line with the approach taken by the Rule—led to dramatic decreases in encounters with noncitizens from those countries. *Id.* And the Departments pointed to data they relied on in stating that in the absence of the Rule, the Departments expected even more irregular migration. *See* 88 Fed. Reg. at 31,316; 88 Fed. Reg. at 11,705-06. Although Plaintiff disagrees with the Departments' conclusions, that does not mean that the Departments failed to reasonably consider the issue. And Plaintiff does not identify any

**RE.115**

specific "less-burdensome or less-sweeping" alternative to reducing irregular migration that the Departments failed to consider in the Rule's lengthy discussion of alternatives. *See* FAC ¶ 83; 88 Fed. Reg. at 31,367-73.

Finally, Plaintiff is incorrect that the Rule conveys a benefit on undocumented noncitizens. *See* FAC ¶¶ 85–86. As explained, the Rule establishes a presumption of asylum ineligibility for certain noncitizens. *See supra* at 5–6. The Rule sets no policies regarding parole and conveys no specific benefit, immigration status, or relief. *See* 88 Fed. Reg. at 31,331, 31,449–50.

As the Complaint does not allege any facts or reasons that could establish that the appointment exception is arbitrary and capricious, Count 2 should be dismissed.

## IV. Plaintiff's *Ultra Vires* Challenge to the "DHS Scheduling System" in Count 3 is Not Viable Under the APA or Otherwise.

In Count 3, Plaintiffs assert both a common law and an APA *ultra vires* claim challenging "the [u]se and [i]mplementation of" the "DHS scheduling system" referred to in the appointment exception and alleging that DHS is acting in excess of statutory authority by allegedly granting parole to noncitizens who make appointments without conducting a "case-by-case" evaluation. FAC ¶¶ 87, 90, 93. However Plaintiff's claim is stylized, an *ultra vires* challenge provides a narrow avenue of review when an agency is acting without "any colorable basis" in authority. *Danos v. Jones*, 652 F.3d 577, 581 (5th Cir. 2011) (quotation marks omitted). The Complaint does not come close to stating a claim under that exacting standard, as the Executive is charged with discretionary authority under 8 U.S.C. § 1182(d)(5)(A) to make parole determinations for arriving noncitizens.

This new *ultra vires* claim is also subject to dismissal on several other independent grounds. As the Fifth Circuit recently reiterated, its precedent does not recognize a common law *ultra vires* claim separate and apart from an *ultra vires* claim under the APA. Plaintiff's challenges to DHS's alleged parole practices—which are not set by the Rule—face additional hurdles: parole

determinations are committed to agency discretion by statute and are thus unreviewable regardless of the claim for relief, and the Complaint identifies no policy statement or document concerning parole of noncitizens that could constitute a reviewable agency action under the APA. Accordingly, this Count should be dismissed for lack of jurisdiction or failure to state a claim.

###    A.    DHS Parole Practices Are Not *Ultra Vires*.

This case involves a challenge to a notice-and-comment Rule that limits eligibility for asylum and, as Plaintiff acknowledges, does not purport to "provide for, prohibit, or otherwise set any policy regarding DHS's discretionary authority to make parole determinations for those who use the CBP One app." FAC ¶ 91 (quoting 88 Fed. Reg. at 31,331). To the extent that Plaintiff now seeks to challenge matters outside the Rule as *ultra vires*, the Complaint plainly fails to identify any way in which the agency charged with determining the particular circumstances in which noncitizens are paroled into the United States acted with no colorable basis in authority.

Even assuming the *ultra vires* exception to sovereign immunity survives the 1976 amendments to the APA, a plaintiff seeking to invoke this exception "must 'do more than simply allege that the actions of the officer are illegal or unauthorized.'" *Danos*, 652 F.3d at 583 (quoting *Alabama Rural Fire Ins. Co. v. Naylor*, 530 F.2d 1221, 1226 (5th Cir. 1976)). "The complaint must allege facts sufficient to establish that the officer was acting 'without any authority what[so]ever,' or without any 'colorable basis for the exercise of authority.'" *Id.* (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 n.11 (1984)). Here, Plaintiff has not satisfied that demanding standard to come within that "extremely limited" doctrine. *State of Texas*, 2023 WL 8285223, at *17.

DHS is expressly authorized by statute to make discretionary decisions about whether to grant parole under 8 U.S.C. § 1182(d)(5)(A). And Congress has charged DHS and CBP with managing POEs in a safe and orderly manner to balance competing priorities including combatting

terrorism, managing individual entry, and ensuring orderly and efficient flow of lawful traffic and commerce. *See* 6 U.S.C. §§ 111(b)(1), 202, 211(c), (g)(3); 8 U.S.C. § 1103(a)(1), (3), (5). Plaintiff takes issue with grants of parole for those who have made appointments to pre-schedule their entry at a POE, alleging that parole is granted without "case-by-case" consideration—but they simultaneously acknowledge that DHS does not grant parole in every instance. *See* FAC ¶¶ 87, 90, 92–93, 97. There is no question that Congress has vested DHS with the authority to parole arriving noncitizens, and DHS has more than a colorable basis to make parole determinations. *See* 8 U.S.C. § 1182(d)(5)(A). The Complaint thus does not state a claim under any version of the *ultra vires* doctrine, and Count 3 should be dismissed.

### B.    Plaintiff's Common Law *Ultra Vires* Claim is Subject to Dismissal.

As an independent basis for dismissal, the APA supplants Plaintiff's common law *ultra vires* claim against federal officials. Before 1976, "to avoid the bar of sovereign immunity [for claims against the United States], courts indulged in the fiction that a federal official acting . . . beyond his statutory powers was acting for himself only and not as an agent of government." *Geyen v. Marsh*, 775 F.2d 1303, 1307 (5th Cir. 1985). In 1976, Congress rendered this legal fiction unnecessary by enacting Section 702 of the APA, which waived sovereign immunity for claims for nonmonetary relief against the United States, recognizing that "actions challenging official conduct are intrinsically against the United States" and should be "treated as such for all practical purposes." H.R. Rep. No. 1656, 94th Cong., 2d Sess. 11 (1976), *reprinted in* 1976 U.S. Code Cong. & Ad. News 6121, 6131; Act of Oct. 21, 1976, Pub. L. No. 94–574, § 1, 90 Stat. 2721, 2721 (codified at 5 U.S.C. § 702). By its express terms, Section 706(2)(C) of the APA offers a vehicle to challenge executive action as unconstitutional or otherwise unlawful. *See* 5 U.S.C. § 706(2)(C) (permitting court to review and set aside agency action found to be "in excess of

statutory jurisdiction, authority, or limitations, or short of statutory right").  Because the APA already provides a specific right of judicial review for allegedly *ultra vires* agency actions, a common law claim is barred.  The Fifth Circuit recently reaffirmed that, while litigants "can use the APA to assert their *ultra vires* claims," Fifth Circuit precedent casts substantial doubt on the viability of common law *ultra vires* claims because "Congress apparently did away with the *ultra vires* doctrine and other fictions surrounding sovereign immunity when it amended the APA in 1976."  *Apter v. HHS*, 80 F.4th 579, 593 (5th Cir. 2023) (cited at FAC ¶ 87).

## C.     The Court Lacks Jurisdiction to Review Plaintiff's *Ultra Vires* Claim.

As discussed above, the INA precludes jurisdiction over Plaintiff's challenge to DHS's discretionary decisions to grant parole to individual noncitizens who arrived at the POE with an appointment. "[N]otwithstanding any other provision of law (statutory or nonstatutory)," Congress has precluded judicial review of "any decision or action . . . the authority for which is specified under this subchapter to be in the discretion of . . . the Secretary of Homeland Security." 8 U.S.C. § 1252(a)(2)(B)(ii). As the INA specifies that the decision whether to grant parole rests "in [the] discretion" of the Secretary, 8 U.S.C. § 1182(d)(5)(A), Plaintiff's claim challenging DHS's grants of parole to noncitizens must be dismissed for lack of jurisdiction. *Maldonado v. Macias*, 150 F. Supp. 3d 788, 795 (W.D. Tex. 2015); *see also Samirah v. O'Connell,* 335 F.3d 545, 549 (7th Cir. 2003). These otherwise unreviewable grants of parole do not become reviewable even assuming (as Plaintiff alleges) that DHS is implementing policies or practices regarding the granting of parole in this scenario. *See Flores v. Garland,* 72 F.4th 85, 91–92 (5th Cir. 2023) (holding that reviewability under § 1252(a)(2)(B)(ii) is based solely on whether the statutory text renders the decision discretionary); *Loa-Herrera v. Trominski*, 231 F.3d 984, 990-91 & n.12 (5th Cir. 2000) (where a "discretionary judgment" is barred from review, challenges to "the *manner* in which that discretionary judgment is exercised" and to "whether the procedural apparatus supplied satisfies

regulatory, statutory, and constitutional constraints" are also barred); *cf. Patel v. Garland*, 142 S. Ct. 1614, 1622 (2022) (section 1252(a)(2)(B)(i), which bars jurisdiction to review "any judgment regarding the granting of relief" under certain INA provisions bars review of "judgments of whatever kind" covered by the statute, "not just discretionary judgments or the last-in-time judgment," and so "encompasses not just the granting of relief but also any judgment relating to the granting of relief").

**D.      Plaintiff's APA *Ultra Vires* Claim is Subject to Dismissal.**

Plaintiff's *ultra vires* claim under the APA also has several threshold flaws that provide independent grounds to dismiss.  DHS's determinations as to when to exercise its parole authority and as to how best to process arriving migrants are precisely the types of immigration enforcement and administration decisions that are committed to agency discretion by law and are thus not subject to APA review. *See* 5 U.S.C. § 701(a)(2). The use of the CBP One app to streamline and facilitate expedient processing implicates the "complicated balancing of a number of factors which are peculiarly within [the agency's] expertise." *Heckler*, 470 U.S. at 831. Appointments scheduled through CBP One assist CBP in balancing its multiple missions by enabling it to "manage the flows [of migrants] in a safe and efficient manner." 88 Fed. Reg. at 31,318. Such mission-balancing and resource-management is a core matter for executive discretion, *see Heckler*, 470 U.S. at 831, as is the question of how to "adequately guard[] the borders of the United States," *see Chiles*, 69 F.3d at 1096. Maintaining executive discretion is especially important in this arena because immigration enforcement and border management implicates the "dynamic nature of relations with other countries," *Arizona*, 567 U.S. at 397, including Mexico and other regional partners with whom the United States is working to address irregular migration. Accordingly, Plaintiff cannot assert an APA claim challenging the use of CBP One, because DHS and CBP's use of tools to efficiently manage immigration processing at POEs is committed to their discretion.

Moreover, and in any event, plaintiff's *ultra vires* claim is premised upon the allegation, on "information and belief," that Defendants presume that any noncitizen using the CBP One app satisfies the criteria necessary to be paroled into the United States, FAC ¶ 98, and thus such noncitizens are paroled "en masse" into the United States in violation of § 1182(d)(5), *id.* ¶ 94.[7] But Plaintiff does not identify a particular agency action or statement that the Court may review under the APA. *See Biden v. Texas (Texas MPP)*, 597 U.S. 785, 809 (2022). The Rule itself has nothing to do with parole. *See supra* at 28. Plaintiff simply challenges, untethered from the Rule, the rate at which DHS has granted parole to noncitizens who used the CBP One app, even while admitting that DHS does not grant parole in all instances.

Under the APA, a plaintiff may not challenge "an abstract decision apart from specific agency action." *Texas MPP*, 597 U.S. at 809. Here, Plaintiff fails to identify any "agency statement of general or particular applicability . . . designed to implement, interpret, or prescribe law or policy" on parole. 5 U.S.C. § 551(4). Certainly, the Rule is not that statement of policy, as as it does not "provide for, prohibit, or otherwise set any policy regarding DHS's discretionary authority to make parole determinations for those who use the CBP One app." 88 Fed. Reg. at 31,331. Individuals subject to the Rule may be considered for parole not because of anything in the Rule, but by virtue of § 1182(d)(5). Plaintiff simply complains that more individuals excepted from the Rule have been paroled under § 1182(d)(5) than Plaintiff would like. But "[c]ourts should

---

[7] Plaintiff also alleges that such individuals are presumed to "satisfy the criteria necessary to be granted asylum" or other protection, FAC ¶ 101, but the Complaint acknowledges that CBP officers do not determine whether noncitizens are eligible for asylum. FAC ¶ 32 (citing 88 Fed. Reg. at 31,358). Instead, CBP officers inspect and process inadmissible noncitizens for an appropriate immigration disposition, such as expedited or section 1229a removal proceedings, where the noncitizen's claim of asylum will be evaluated. *Supra* at 3–4. As the Complaint also acknowledges, noncitizens who were paroled at POEs were issued notices to appear in § 1229a removal proceedings, where they can raise asylum as a defense to removal. *See* FAC ¶¶ 58 (1st); *supra* at 29.

**RE.121**

not, and indeed cannot, review broad, generalized agency policies in the abstract. Nor can they separate an agency's decision from the statement intended to implement that decision." *Brnovich v. Biden*, 630 F. Supp. 3d 1157, 1171 (D. Ariz. 2022) (rejecting challenge to "mass parole and non-detention" policies in general, rather than a specific agency decision or document); *see also Florida v. U.S.*, 660 F. Supp. 3d 1239, 1270 (N.D. Fla. 2023) (similar).

Similarly, Plaintiff cannot amalgamate thousands of individual parole decisions into a policy for purposes of APA review. Rather, the APA requires Plaintiff to "direct its attack against some *particular* 'agency action.'" *Lujan v. National Wildlife Federation*, 497 U.S. 871, 891 (1990) (emphasis added); *see Whitewater Draw Natural Resource Conservation Dist. v. Mayorkas*, 5 F.4th 997, 1012 (9th Cir. 2021), *cert. denied*, 142 S. Ct. 713 (2021) (holding Plaintiffs cannot obtain APA review of a collection of individual actions pertaining to a single subject simply by labeling those individual actions a policy); *Arizona v. Mayorkas*, 584 F. Supp. 3d 783, 791 (D. Ariz. 2022), *appeal dismissed*, No. 22-15519, 2022 WL 6105386 (9th Cir. Sept. 12, 2022) (holding that State's challenge to a "collection of actions" as a "*de facto* program" that has encouraged migration and population growth is not actionable under the APA). The sort of broad, programmatic attack that Plaintiff seeks to bring against continuing, and ever-changing, operational processing decisions by CBP at various POEs is not actionable under the APA and instead should be addressed in "the halls of Congress, where programmatic improvements are normally made." *Lujan*, 497 U.S. at 890; *Alabama-Coushatta*, 757 F.3d at 489–90. For these reasons, Plaintiff's *ultra vires* claim, even as pleaded under the APA, should be dismissed.

## CONCLUSION

For the foregoing reasons, this Court should dismiss Plaintiff's Complaint for lack of jurisdiction or, alternatively, for failure to state a claim.

**RE.122**

Dated: March 15, 2024                    Respectfully submitted,

                                         BRIAN M. BOYNTON
                                         *Principal Deputy Assistant Attorney General*

                                         WILLIAM C. PEACHEY
                                         *Director*

                                         EREZ REUVENI
                                         *Counsel*

                                         CHRISTINA P. GREER
                                         BRIAN C. WARD
                                         *Senior Litigation Counsel*

                                         By: */s/ Katherine J. Shinners*
                                         KATHERINE J. SHINNERS
                                         *Senior Litigation Counsel*
                                         D.C. Bar No. 978141
                                         U.S. Department of Justice, Civil Division
                                         Office of Immigration Litigation – DCS
                                         P.O. Box 868, Ben Franklin Station
                                         Washington, DC 20044
                                         Tel: (202) 598-8259
                                         Fax: (202) 305-7000
                                         Email: katherine.j.shinners@usdoj.gov

                                         ELISSA P. FUDIM
                                         *Trial Attorney*

                                         *Attorneys for Defendants*

24-50717.593

## CERTIFICATE OF SERVICE

I hereby certify that on the 15th day of March, 2024, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel for Plaintiff.

/s/*Katherine J. Shinners*
KATHERINE J. SHINNERS
Senior Litigation Counsel

35

**RE.124**

**Tab 4: Response to Amended Complaint (ROA.644)**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
DEL RIO DIVISION

STATE OF TEXAS
    *Plaintiff*,

v.

ALEJANDRO MAYORKAS, in his official
capacity as Secretary of Department of
Homeland Security; UNITED STATES
DEPARTMENT OF HOMELAND
SECURITY; MERRICK GARLAND, in his
official capacity as Attorney General of the
United States, UNITED STATES
DEPARTMENT OF JUSTICE,
    *Defendants.*

No. 2:23-CV-00024

### RESPONSE TO DEFENDANTS' MOTION TO DISMISS

In defending the legality of the Final Rule and its implementation, Defendants invoke the "parole" authority under 8 U.S.C. § 1182(d)(5)(A) of the Immigration and Nationality Act (INA). *See, e.g.*, Dkt. 34 at 3. But that statute only permits the federal government to parole aliens without a legal right to be in the United States "on a case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). Defendants are abusing this parole authority by paroling virtually everyone who uses the CBP One app, in contravention of Congress's directive.

Defendants' authority is not unbounded. Congress limited the parole power to prohibit the federal government from "admit[ting] entire categories of aliens who do not qualify for admission under any other category in immigration law." H.R. Rep. No. 104–469, at 140 (1996). It is not to be used "as a supplement to Congressionally-established immigration policy." *Id.* Texas has alleged facts sufficient to reasonably infer that Defendants are acting in excess of their statutory authority and in violation of the Administrative Procedure Act (APA), and Defendants' Motion to Dismiss should be denied.

## I.    Standard of Review

When reviewing a motion to dismiss under Rule 12(b)(1), a court need only "look to the sufficiency of the allegations in the complaint because they are presumed to be true. If those jurisdictional allegations are sufficient the complaint stands." *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981). "For standing purposes, [the court must] accept as valid the merits of [plaintiff's] legal claims." *Fed. Election Comm'n v. Cruz*, 142 S. Ct. 1638, 1647 (2022). "A motion under 12(b)(1) should be granted only if it appears certain that the plaintiff cannot prove *any* set of facts in support of his claim that would entitle him to relief." *Home Builders Ass'n of Miss., Inc. v. City of Madison, Miss.*, 143 F.3d 1006, 1010 (5th Cir. 1998) (emphasis added).

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court must accept "all well-pleaded facts as true" and view "those facts in the light most favorable to the plaintiff." *See True v. Robles*, 571 F.3d 412, 417 (5th Cir. 2009). To survive a 12(b)(6) motion, a complaint need only "contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 663, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 at 570). This standard is met where "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the Defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556).

"A motion to dismiss under 12(b)(6) 'is viewed with disfavor and is rarely granted.'" *Hernandez v. Baylor Univ.*, 274 F. Supp. 3d 602, 609 (W.D. Tex. 2017) (citing *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011); *see also, e.g.*, *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009). "To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cavillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)). As the Supreme

Court explained in *Ashcroft v. Iqbal*, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." 556 U.S. 662, 679 (2009). Significantly, a court should not evaluate the merits of the allegations, but it must satisfy itself only that a plaintiff adequately pleads a legally cognizable claim. *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 (5th Cir. 2004). Texas's pleadings in this case easily survive Defendants' challenge.

## II. ARGUMENT

### A. Texas has standing.

Standing requires a plaintiff to "prove that he has suffered a concrete and particularized [injury in fact] that is fairly traceable to the challenged conduct[] and is likely to be redressed by a favorable judicial decision." *Hollingsworth v. Perry*, 570 U.S. 693, 704 (2013) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). At the motion to dismiss stage, a plaintiff need only "allege facts that give rise to a plausible claim of standing." *Barilla v. City of Houston, Texas*, 13 F.4th 427, 431 (5th Cir. 2009)). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Lujan*, 504 U.S. at 561 (quoting *Lujan v. National Wildlife Federation*, 497 U.S. 871, 889 (1990)). If the plaintiff is "an object of the action" challenged, there is ordinarily little question that the action [] caused him injury, and that a judgment preventing [] the action will redress it." *Id.* at 561–62. Texas clearly alleges facts demonstrating each element of Article III standing. *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). To survive a motion to dismiss an *ultra vires* claim, Texas need only identify some agency action that adversely affects the State. *See, e.g.*, *Apter v. Dep't of Health & Hum. Servs.*, 80 F.4th 579, 589 (5th Cir. 2023) (reversing and remanding the district court's granting of a motion to dismiss when plaintiff alleged sufficient facts demonstrating that some agency action was without statutory authority).

### 1. Texas suffers significant cognizable injuries.

To start, the Final Rule satisfies the first prong of standing and imposes judicially cognizable injuries on Texas because it incentivizes and increases immigration to ports of entry in Texas, thereby imposing costs for health care, education, and law enforcement. Such a "pocketbook injury" is "a prototypical form of injury in fact," *Collins v. Yellen*, 141 S. Ct. 1761, 1779 (2021), and it does not have to be large because, "[f]or standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'" *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 465 (2017). "Texas incurs costs from increased illegal immigration into the State in three areas: health care, education, and law enforcement." *Texas v. Garland*, No. 5:23-CV-034-H, 2024 WL 967838, at *11 (N.D. Tex. Feb. 27, 2024). And under the Fifth Circuit's precedents in particular, "such financial harms are readily cognizable and well-established." *Gen. Land Off. v. Biden*, 71 F.4th 264, 272 (5th Cir. 2023); *see also, e.g.*, *Texas v. Biden (MPP I)*, 10 F.4th 538, 547–48 (5th Cir. 2021); *Texas v. Biden (MPP II)*, 20 F.4th 928, 969–72 (5th Cir. 2021); *Texas v. United States (DACA)*, 50 F.4th 498, 517–19 (5th Cir. 2022).

*First*, consider Texas's healthcare costs. Texas roughly spent $72.2 million in 2022 to provide Emergency Medicaid coverage to illegal aliens, and it roughly spent $30.9 million in 2022 to provide Texas Children's Health Insurance Program (CHIP) Perinatal Coverage to such aliens. *Texas v. Garland*, No. 5:23-CV-034-H, 2024 WL 967838, at *11 (N.D. Tex. Feb. 27, 2024). Because "[f]ederal law requires all States to provide Emergency Medicaid coverage to aliens, which is jointly funded by the federal government and the States," "Texas is legally obligated to bear part of the cost of those services" "when qualifying aliens obtain health care services in Texas [that are] covered by Emergency Medicaid." *Id.* (citing 8 U.S.C. § 1611(b)(1)(A)). Both Medicare and Medicaid also require the provision of emergency services as a condition of participation, regardless of a recipient's lawful-presence status. *See* 42 U.S.C. § 1395dd; 42 C.F.R. § 440.255. Similarly, Texas law requires local governments to provide healthcare for the indigent, *see* Tex.

Health & Safety Code §§ 61.001 *et seq.*, and it requires nonprofit hospitals to provide unreimbursed care for the indigent as a condition of maintaining their nonprofit status. *See id.* § 311.043. Therefore, these healthcare costs are not merely speculative; they are mandatory.

*Second*, consider Texas's education costs. Texas spends millions of dollars per year on educating illegal aliens and their children. According to estimates from the Texas Education Agency, "the average funding entitlement from state and local sources for fiscal year 2023 will be $9,564 per student in attendance for an entire school year," and "[t]o provide additional bilingual education, which Texas does for most alien children, Texas must spend $11,781 to educate each student." *Texas v. Garland*, 2024 WL 967838, at *11. Importantly, "Texas's education costs rise with an increase in alien children," and historically, Texas has "encountered a sizeable number of such alien children in its schools." *Id.* Indeed, "from October 2021 to September 2022, 19,071 alien children were released to sponsors in Texas," and "Texas spent $224.67 million to educate those newly arriving children for one year." *Id.* "Such costs from these children continue so long as they are enrolled in Texas schools," *id.*, and like healthcare costs, these education costs are unavoidable because the Supreme Court has held that States like Texas are constitutionally obligated to provide free education to children of unlawfully present aliens, *Plyler v. Doe*, 457 U.S. 202 (1982).

*Third*, consider Texas's law enforcement costs. The Texas Department of Criminal Justice ("TDCJ") spends a daily amount of $77.49 systemwide for an individual inmate. *Texas v. Garland*, 2024 WL 967838, at *11. And "[t]he TDCJ held 6,914 undocumented criminal aliens with at least one felony or two misdemeanor convictions for violations of state or local law for a total of 2,019,635 days of incarceration for these aliens" for fiscal year 2022. *Id.* And "[b]ased on the number of aliens and the number of days each was held, TDCJ spent $156,501,516 incarcerating these aliens." *Id.* What's more, "reimbursement of these costs from the federal government is minimal." *Id.* In fact, "[f]or fiscal year 2021,

TDCJ spent $153,786,422 in incarceration costs for criminal aliens but received only $14,883,040 in federal reimbursement." *Id.* And on top of these incarceration costs, Texas incurs costs of approximately $4.69 a day for those criminal aliens released on parole or mandatory supervision. *Id.* Thus, it is undisputed that "Texas incurs costs from incarcerating [aliens]," and "to the extent the number of aliens in TDCJ custody increases, TDCJ's unreimbursed expenses will increase as well." *Id.*

Defendants rely on *United States v. Texas (Enforcement Priorities)*, 599 U.S. 670 (2023), to argue that Texas's injuries are "too speculative" and "historically and categorically not cognizable injuries for the purposes of Article III standing" because they only amount to "indirect financial harm allegedly resulting from immigration enforcement policy." Dkt. 34 at 10. According to Defendants, *Enforcement Priorities* "stands for the principle that third parties like Texas lack a judicially cognizable interest in whether or how the Executive exercises its immigration enforcement discretion against someone else." *Id.* at 11.

But Defendants' arguments are mistaken and misplaced. To start, *Enforcement Priorities* addressed Texas's and Louisiana's challenge to the Department of Homeland Security's guidelines, which stated that DHS would not arrest certain criminal aliens whom Congress provided "shall" be arrested. *Enforcement Priorities*, 599 U.S. at 674. In reaching its holding, the majority in *Enforcement Priorities* emphasized that "[t]he discrete standing question raised by this case rarely arises because federal statutes that purport to *require* the Executive Branch to make arrests or bring prosecutions are rare." *Id.* at 684. And because that case "involve[d] both a highly unusual provision of federal law and a highly unusual lawsuit," it "should in no way be read to suggest or imply that the Executive possesses some freestanding or general constitutional authority to disregard statutes requiring or prohibiting executive action." *Id. Enforcement Priorities* was thus "categorically different" from other standing decisions "because it implicate[d] only one discrete aspect of the executive power—namely, the Executive Branch's traditional discretion over whether to

take enforcement actions against violators of federal law." *Id.* Indeed, the majority described the case as an "extraordinarily unusual lawsuit" because the States "want[ed] a federal court to order the Executive Branch to alter its arrest policies so as to make more arrests." *Id.* at 686. Put simply, that case concerned "*only* arrest and prosecution policies, and [the majority] therefore address[ed] *only* that issue." *Id.* at 683 n.5 (emphases added).

Unlike *Enforcement Priorities*, however, Texas's claims here do not involve any attempt to compel the arrest or prosecution of anyone, and they do not amount to an "extraordinarily unusual lawsuit" that seeks to alter any arrest policy. Texas is not challenging any individual parole evaluations that take place on a case-by-case basis. Rather, Texas's claims seek to prevent the Final Rule from categorically granting parole and affirmative immigration relief to aliens simply because they pre-scheduled an appointment through the CBP One app. Even under *Enforcement Priorities*, "[m]onetary costs are of course an injury." *Id.* at 676. *Enforcement Priorities* thus does not undermine standing here because Texas's injuries are judicially cognizable.

### 2. Texas's injuries are fairly traceable to the Final Rule.

In addition to satisfying the injury-in-fact prong of standing, Texas has met the second prong because its injuries are fairly traceable to the Final Rule and the Defendant's implementation and enforcement of the Final Rule. In general, satisfying the traceability element of standing requires "no more than *de facto* causality." *Dep't of Commerce v. New York*, 139 S.Ct. 2551, 2566 (2019) (quoting *Block v. Meese*, 793 F.2d 1303, 1309 (D.C. Cir. 1986) (Scalia, J.)). And "where a causal relation between injury and the challenged action depends on the decision of an independent third party," the plaintiff must show that such third parties "will likely react in predictable ways." *California v. Texas*, 593 U.S. 659, 675 (2021). But traceability does not require Texas to demonstrate that the Defendants' actions are "the very last step in the chain of causation." *Bennett v. Spear*, 520 U.S. 154, 169–170 (1997). Indeed, Texas need only show that the Final Rule "exacerbate[s]" or "contribute[s]" to its injuries. *See DACA*, 50 F.4th at 519; *see also Massachusetts v. EPA*,

549 U.S. 497, 523 (2007) (determining that it was enough that the EPA's decision "contribute[d] to Massachusetts' injuries").

Here, Texas has more than met that standard. For starters, Texas has demonstrated that the Final Rule's CBP One provision leads to increased immigration in Texas. Specifically, because the Final Rule exempts aliens who use the CBP One app from the presumption of ineligibility for asylum, Circumvention of Lawful Pathways, 88 Fed. Reg. 31,314, 31,317–18, 31,322, (May 16, 2023), it is a mechanism Defendants use to release overwhelming numbers of aliens into the country on parole—particularly, in Texas.[1]

The CBP One app has already facilitated the entry of hundreds of thousands of aliens. Three months ago, "nearly 450,000 migrants have been allowed into the U.S. under the [CBP One app] process."[2] Contrary to Defendants' contention that the Final Rule and its use of the CBP One app are "meant to curtail illegal immigration," it "has resulted in more than a quarter of a million immigrants being released into the United States, according to new federal data."[3] That is because "[t]he Department of Homeland Security's Customs and Border Protection agency granted admission to immigrants who were not

---

[1] *See* Sophie Carson, *What's going on at the US-Mexico border, and what are asylum and parole?*, Austin American-Statesman (Feb. 19, 2024, 5:01 AM CST), https://www.statesman.com/story/news/politics/politifact/2024/02/19/whats-going-on-at-the-us-mexico-border-and-what-are-asylum-parole/72642022007/ (stating that "migrants who make appointments through the CBP One phone app and are processed at official ports of entry" are "being admitted into the U.S. through the parole authority"); *CBP One Mobile Application*, U.S. Customs & Border Protection, https://www.cbp.gov/about/mobile-apps-directory/cbpone (stating that five of the eight ports of entry that the CBP One app uses are located in Texas).

[2] *See* Camilo Montoya-Galvez, *Migrants in Mexico have used CBP One app 64 million times to request entry into U.S.*, CBS News (Feb. 12, 2024, 5:36 PM EST), https://www.cbsnews.com/news/immigration-cbp-one-app-migrants-mexico-64-million/; *see also id.* ("As of Feb. 8, U.S. officials at ports of entry along the southern border had allowed 448,701 migrants with CBP One appointments to enter the country, giving them notices to appear in immigration court to plead their cases, according to the internal government documents.").

[3] Anna Giaritelli, *Biden's CBP One app allowed 266,000 immigrants into US through 'smokescreen' process*, The Washington Examiner (Oct. 24, 2023, 9:14 PM), https://www.washingtonexaminer.com/news/2443241/bidens-cbp-one-app-allowed-266000-immigrants-into-us-through-smokescreen-process/.

*Response to Defendants' Motion to Dismiss*                                      8

refugees in 95% of cases."[4]

Moreover, documents from DHS "show 278,431 appointments scheduled through the CBP One app between Jan. 12, 2023, and Sept. 30, 2023, with 266,846 inadmissible aliens released into the interior," and "Russian and Venezuelan nationals who made appointments . . . were released on parole at a rate of 94 percent 97 percent respectively."[5] And data as recent as March 2024 shows that "[a]nother 50,000 migrants were processed at ports of entry, where the Biden administration is admitting those who use a government mobile app to secure an appointment to enter the U.S."[6]

The Final Rule and its use of the CBP One app are operating as "a smokescreen for the mass release of individuals into this country who would otherwise have zero claim to be admitted."[7] And this increased immigration resulting from the CBP One app's categorical grant of parole is especially harmful to Texas because five of the eight ports of entry from which aliens may enter under the CBP One app are located in Texas.[8] Because it is undisputed that "[a]n increased number of illegal aliens in Texas that use its social services leads to increased State costs," *Texas v. Garland*, No. 5:23-CV-034-H, 2024 WL 967838, at *10–11 (N.D. Tex. Feb. 27, 2024), Texas has completed the causal chain by alleging facts sufficient to allow the reasonable inference that the Final Rule and its implementation leads to increased immigration—and thereby, increased costs—for Texas.

---

[4]  *Id.*

[5]  *What They are Saying on Shocking New CBP One App Documents Obtained by Homeland Republicans Showing Mayorkas' "Smokescreen for the Mass Release of Individuals"*, Committee on Homeland Security (Oct. 25, 2023), https://homeland.house.gov/2023/10/25/what-they-are-saying-on-shocking-new-cbp-one-app-documents-obtained-by-homeland-republicans-showing-mayorkas-smokescreen-for-the-mass-release-of-individuals/.

[6]  Camilo Montoya-Galvez, *Migrant crossings along the southern border increase as officials prepare for larger spike*, CBS News (Mar. 5, 2024, 3:18 PM EST), https://www.cbsnews.com/news/us-mexico-border-migrant-crossings-increase-texas-spring-spike/.

[7]  *New Documents Obtained by Homeland Majority Detail Shocking Abuse of CBP One App*, Committee on Homeland Security (Oct. 23, 2023), https://homeland.house.gov/2023/10/23/new-documents-obtained-by-homeland-majority-detail-shocking-abuse-of-cbp-one-app/.

[8]  *CBP One Mobile Application*, U.S. Customs & Border Protection, https://www.cbp.gov/about/mobile-apps-directory/cbpone.

---

*Response to Defendants' Motion to Dismiss*                                                    9

In response, Defendants cite *California v. Texas*, 593 U.S. 659 (2021) for the proposition that Texas's claimed harms are not fairly traceable to the Final Rule because Texas cannot "rely on generalized allegations about the economic effects of immigration . . . to particular noncitizens who are granted parole after their arrival at a POE with a CBP One appointment." Dkt. 34 at 13–14.

But Defendants' arguments misconstrue Texas's claims and misunderstand the law. Texas's claims do not hinge on "particular noncitizens who are granted parole;" they are based on Defendants' capacious grant of parole through the Final Rule's appointment exception. Texas need not identify each "particular noncitizen[] who [was] granted parole after their arrival at a POE with a CBP One appointment." Dkt. 34 at 14. "Texas's standing [can be] robustly supported by . . . big-picture evidence" because the Final Rule's CBP One provision "is precisely the sort of large-scale policy that's amenable to challenge using large-scale statistics and figures, rather than highly specific individualized documents." *Texas (MPP II)*, 20 F.4th at 971. Texas "can show standing even if there is *some possibility* that any given person would inflict such costs even without the challenged action." *Texas v. Garland*, No. 5:23-CV-034-H, 2024 WL 967838, at *23 (N.D. Tex. Feb. 27, 2024) (emphasis added).

Even so, "[a]t the pleading stage, *general* factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presum[e] that general allegations embrace those specific facts that are necessary to support the claim." *Lujan*, 504 U.S. at 561 (emphasis added) (alterations in original) (internal quotations omitted). What's more, Defendants' argument amounts to a factual merits attack that the Fifth Circuit has previously rejected. *See, e.g.*, *Gen. Land Off.*, 71 F.4th at 272–73 (explaining that Defendants' argument that Texas's alleged failure to show a net increase in the number of illegal aliens who enter the United States "raises a factual merits defense, not a response cognizable on a motion to dismiss where allegations in Texas's complaint must be taken as true").

In sum, Defendants' contentions are simply insufficient to avoid discovery in this case. The causal chain supporting Texas's standing here is much more direct than the one the Supreme Court accepted in *Massachusetts v. EPA*. *See Massachusetts v. EPA*, 549 U.S. 497, 521–23 (2007) (holding that traceability was satisfied because EPA's refusal to regulate contributed to motor-vehicle emissions, which may in turn contribute to a rise in sea levels, which may in turn erode state coastal property). Moreover, it is of "considerable relevance that the party seeking review here is a sovereign State," because states are not "normal litigants for the purposes of invoking federal jurisdiction." *Id.* at 518, 526. States should be given "special solicitude" in the standing analysis where, as here, the State seeks to obtain judicial recourse for illegal agency action under the APA.

### 3.  Texas's injuries are redressable by this Court.

Texas has further established the final redressability prong of standing because it has shown that an order from this Court that vacates, enjoins, and declares the Final Rule's exception unlawful would decrease the costs Texas must pay for the resulting increased illegal immigration. Generally, for the redressability prong of standing, a plaintiff must show that "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). "The relief sought needn't completely cure the injury, however; it's enough if the desired relief would lessen it." *Inclusive Communities Project, Inc. v. Dep't of Treasury*, 946 F.3d 649, 655 (5th Cir. 2019) (citing *Sanchez v. R.G.L.*, 761 F.3d 495, 506 (5th Cir. 2014)).

Here, Texas's injuries are redressable because an order from this Court that grants Texas its requested relief would at least reduce the additional costs it must pay for the increased unlawful immigration incentivized by and resulting from the Final Rule's CBP One exception. Should this Court enjoin and vacate the Final Rule's CBP One provision and declare it unlawful, aliens who use the CBP One app would no longer be presumed eligible for asylum but would instead be presumed *in*eligible—as the INA contemplates for

all aliens. *See* 88 Fed. Reg. 31,314, 31,317–18, 31,322. Likewise, such an order from this Court would remove or reduce the actual impact and harmful effects caused by the CBP One provision of the Final Rule because aliens who use the CBP One app would no longer receive the legal benefit of parole that is provided to virtually every alien that pre-schedules an appointment through the app. And by reducing the number of aliens granted parole— and consequently, the number the aliens using Texas's social services—Texas would not be obligated to spend as much money on healthcare, public education, or law enforcement. Thus, Texas's injuries would be lessened and redressable by this Court.

Defendants, of course, disagree and maintain that Texas's injuries are not redressable because "[r]elief against the Rule either would do nothing to alleviate the claim harms stemming from the parole of noncitizens or is unavailable under the INA." Dkt. 34 at 14. Specifically, Defendants allege that "[e]njoining, vacating, or declaring unlawful the appointment exception would not restrain the use of appointments or the exercise of parole authority" because (1) "CBP One and the ability to pre-schedule arrival at a POE were not created by the Rule and exist independently of it," and (2) "removing the appointment exception would have no impact on the availability of parole under 8 U.S.C. § 1182(d)(5)(A)." Dkt. 34 at 15. Defendants also argue that an injunction and a vacatur "would not prevent immigration officers from exercising discretion to grant parole, if appropriate on a case-by-case basis, to noncitizens who are subject to the presumption of asylum ineligibility." Dkt. 34 at 15. In sum, Defendants argue that Texas's requested relief "would at most remove the incentive to use orderly methods of entry and would more likely contribute to the very harms that Plaintiff purportedly seeks to prevent, by taking away the Executive's carefully calibrated tool to reduce irregular migration." Dkt. 34 at 15 (emphasis omitted).

But Defendants' arguments fail for a few reasons. *First*, while Texas agrees that the Final Rule did not create CBP One and the ability to pre-schedule arrival at a lawful port of entry, Texas is not merely challenging the use of the CBP One app alone or the ability to

pre-schedule an appointment at a lawful port of entry. Instead, Texas is challenging the special treatment that the Final Rule grants to aliens who utilize those two mechanisms. Texas specifically challenges the Final Rule's *exception* to the presumption of ineligibility for asylum because *that* is the unlawful portion of the Final Rule that imposes significant harms on Texas by releasing hundreds of thousands of aliens into Texas's borders, and *that* is the portion that Defendants use to grant affirmative immigration relief to aliens.

*Second*, while the INA allows for parole, it is available "*only* on a case-by-case basis" and *only* "for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A) (emphasis added). Texas is *not* challenging the fact that the Defendants may grant parole "on a case-by-case basis;" Texas is challenging the Defendants' authority to grant parole on a *categorical* basis in violation of the INA and the APA. And because Texas challenges the programmatic and categorical granting of this affirmative immigration relief at a rate of 96% rather than the individual "case-by-case" determinations, Defendants' contention is unpersuasive.

*Third*, and finally, while Defendants maintain that Texas's tailored relief would "remove the incentive to use orderly methods of entry," Dkt. 34 at 15, the primary "incentive" under the Final Rule is its imposition of "a rebuttable presumption of ineligibility for asylum upon certain noncitizens who enter the United States from Mexico at the southwest land border or adjacent coastal borders without documents sufficient for lawful admission," *see* 88 Fed. Reg. 31,314, 31,317–18, 31,322. But Texas is not challenging that statutorily imposed incentive. Indeed, Texas is not challenging this rebuttable presumption *at all*; Texas is instead challenging an unlawfully created *exception* to this presumption that, in practice, categorically grants a legal benefit in the form of parole to hundreds of thousands of aliens that would otherwise not have received such affirmative immigration relief. Defendants' arguments confuse the issues, misunderstand Texas's claims, and distract from what really is at issue here.

**B.  No statute precludes Texas's requested relief.**

In another attempt to avoid this Court's review of their unlawful actions, Defendants argue that (1) an injunction or vacatur of the appointment exception is precluded under the INA; (2) the APA does not permit universal vacatur of the Final Rule or portions of it; and (3) Texas's requested injunction against the categorical banning of parole is prohibited under the INA. *See* Dkt. 34 at 15–18. Defendants are wrong on all counts.

**1.  Section 1252(f)(1) of the INA does not preclude Texas's requested relief.**

In the teeth of Fifth Circuit precedent, Defendants maintain that 8 U.S.C. § 1252(f)(1) bars both vacatur and the injunctive relief sought here.[9] *See* Dkt. 34 at 15–17. They are wrong as to both vacatur and injunctive relief. Section 1252(f)(1) states:

> In general, regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of [8 U.S.C. §§ 1221–32], other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated.

By looking at the text of section 1252(f)(1) and the case law, it is clear that Texas's requested vacatur and requested injunctive relief are not precluded. *First*, contrary to Defendants' allegations, section 1252(f)(1) does not bar vacatur in this case. Section 1252(f)(1)'s "[l]imit on injunctive relief" provides that "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of" sections 1221–1232 of Title 8. 8 U.S.C. § 1252(f)(1). "By its plain terms, and even by its title," section 1252(f)(1) "is nothing more or less than a limit on injunctive relief." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 481 (1999).

The Fifth Circuit has repeatedly held that vacatur is not precluded by Section 1252(f)(1) *See DACA*, 50 F.4th at 528 ("As an initial matter, § 1252(f)(1) does not apply to

---

[9]  Defendants fail to make any claim or allegation that declaratory relief is barred by this provision. Defendants thus waive any such argument.

vacatur."); *Texas v. United States*, 40 F.4th 205, 219 (5th Cir. 2022) (rejecting DHS argument that "vacatur 'prohibits' DHS from implementing the [challenged agency action] and *de facto* 'enjoin[s] or restrain[s]' the agency's enforcement decisions," and was therefore barred by Section 1252(f)(1)).

Vacatur also does not resemble an injunction. "[A]n injunction is a judicial process or mandate operating *in personam* by which, upon certain established principles of equity, a party is required to do or refrain from doing a particular thing." *Black's Law Dictionary* 937 (11th ed. 2019) (quoting 1 Howard C. Joyce, *A Treatise on the Law Relating to Injunctions* § 1, at 2-3 (1909)). Vacatur does not operate *in personam*, and it does not involve coercion. Instead, vacatur operates against a challenged action, is self-executing, and is accomplished through the court's order. It operates "in the same way that an appellate court formally revokes an erroneous trial-court judgment." Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933, 1012 (2018). Nor does vacatur compel officials to do or refrain from anything. *Garland v. Aleman Gonzalez*, 596 U.S. 543, 550 (2022). Like the revocation of a court order, judicial annulment of administrative action may alter a party's conduct, but it does not order anyone to do anything. Vacatur thus does not involve coercion. Moreover, "[a]n injunction is a[n] . . . extraordinary remedy," *Monsanto*, 561 U.S. at 165, but vacatur is a "less drastic remedy," *id.*, and "the ordinary result," *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989). Injunctions "should not be granted as a matter of course," *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010), but vacatur is the "default," *Data Mktg. P'ship, LP*, 45 F.4th at 859. And while injunctions require showing "an irreparable injury," and both "the public interest" and "the balance of hardships between the plaintiff and defendant" must favor injunctive relief, *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006), vacatur's requires none of those showings. Therefore, in line with the statutory text and Fifth Circuit precedent, section 1252(f)(1) does not apply to vacatur.

*Second*, section 1252(f)(1) does not bar the injunctive relief Texas seeks here.

Defendants contend that "[t]he Rule's rebuttable presumption of asylum ineligibility is applicable in three contexts: affirmative asylum applications under § 1158, credible fear interviews under § 1225(b)(1), and removal proceedings under § 1229a." Dkt. 34 at 16. But Defendants confuse what Section 1252(f)(1) forbids. Section 1252(f)(1) does not preclude injunctive relief whenever any provision within 8 U.S.C. §§ 1221–1232 is *relevant*; it forbids any injunctions that "order federal officials to take or refrain from taking actions to enforce, implement, or otherwise carry out" authority granted under those sections. *Garland v. Aleman Gonzalez*, 596 U.S. 543, 550 (2022)

Here, Texas's requested injunction does not violate section 1252(f)(1) because it in no way requires Defendants to *take* any action pursuant to 8 U.S.C. §§ 1221–1232. Nor does it force Defendants to "*refrain* from taking" actions to implement any part of those statutory provisions.

Texas' injuries are based on costs incurred as a result of Defendants' "affirmative immigration relief." *See DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1906 (2020). Texas is not asking the Court to compel Defendants to take any sort of enforcement action against aliens or to deport any aliens who Defendants may consider exempt from the presumption of ineligibility for asylum. An affirmative program authorizing otherwise inadmissible aliens to pre-schedule a time to present at the border and conferring the affirmative immigration relief of parole is not mere refusal to enforce the law; instead, it constitutes judicially cognizable injury and leads to *direct* injuries to Texas.

Moreover, nothing in §§ 1221–1232 authorizes DHS to broaden the categories of aliens who are entitled to asylum or parole in the United States. Likewise, in support of their statutory authority for the Final Rule and its exception for aliens who use the CBP One app, Defendants rely on 6 U.S.C § 202, 8 U.S.C. § 1103, and 8 U.S.C. § 1182. But none of those statutory provisions fall within §§ 1221–1232, which is the range of statutes covered by §§ 1252(f)(1). Thus, while the Final Rule conflicts with many parts of the INA, they are not within §§ 1221–1232 and thus fall outside the scope of Section 1252(f)(1).

Accordingly, section 1252(f)(1) does not preclude any of the relief against the Final Rule sought in this action.

### 2. The APA does not preclude Texas's requested relief.

Defendants further assert that the APA (and specifically, 5 U.S.C. § 706(2)) does not permit universal vacatur of the Final Rule or portions of it. Dkt. 34 at 17. But the Fifth Circuit recently affirmed this remedy, finding it "was well within its discretion to order vacatur" of the DACA Memorandum, *DACA*, 50 F.4th at 530. And when reviewing the prior termination of MPP, the Fifth Circuit did the same, *MPP*, 20 F.4th at 1000–01, making the availability of this remedy the law of the case.

While Defendants contend that interpreting "section 706 to require universal vacatur of a regulation would allow a broad expansion of available remedies, upsetting the 'bedrock practice of case-by-case judgments with respect to the parties in each case,'" Dkt. 34 at 17 (quoting *Arizona v. Biden*, 31 F.4th 469, 484 (6th Cir. 2022) (Sutton, J., concurring)), "vacatur of an agency action is the default rule in this Circuit." *Cargill v. Garland*, 57 F.4th 447, 472 (5th Cir. 2023) (en banc). Indeed, "[v]acatur is the only statutorily prescribed remedy for a successful APA challenge to a regulation." *Franciscan Alliance, Inc. v. Becerra*, 47 F.4th 368, 374–75 (5th Cir. 2022); *see also R.J. Reynolds Tobacco Co. v. U.S. Food & Drug Admin.*, No. 6:20-cv-00176, 2022 WL 17489170, at *21 (E.D. Tex. Dec. 7, 2022) (Barker, J.) (rejecting Federal Defendants' arguments against availability of vacatur under the APA); *Texas Med. Ass'n v. United States Dep't of Health & Hum. Servs.*, No. 6:22-cv-372, 2023 WL 1781801, at *13 (E.D. Tex. Feb. 6, 2023) (Kernodle, J.) (same).

Tellingly, courts have long relied on the "set aside" authority to vacate unlawful agency actions. For more than 30 years, vacatur has been "the ordinary result" when the D.C. Circuit "determines that agency regulations are unlawful." *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989). In the Fifth Circuit, vacatur is the "default rule." *Data Mktg. P'ship, LP v. U.S. Dep't of Labor*, 45 F.4th 846, 859 (5th Cir. 2022). And the Supreme Court has affirmed lower court decisions vacating administrative action. *See, e.g.,*

*Regents of the Univ. of California*, 140 S. Ct. at 1901 & 1916 n.7.

The text of the APA confirms this understanding. The APA provides that a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be" "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Under that text, "'[s]et aside' usually means 'vacate.'" *V.I. Tel. Corp. v. FCC*, 444 F.3d 666, 671 (D.C. Cir. 2006). In fact, when Congress adopted the APA, "set aside" meant "to cancel, annul, or revoke." *Black's Law Dictionary* 1612 (3d ed. 1933). The APA "reflected a consensus that judicial review of agency action should be modeled on appellate review of trial court judgments." Nicholas Bagley, *Remedial Restraint in Administrative Law*, 117 Colum. L. Rev. 253, 258 (2017). Just five years after the APA's enactment, the Third Circuit explained that section 706(2) "affirmatively provides for vacation of agency action." *Cream Wipt Food Prods. Co. v. Fed. Sec. Adm'r*, 187 F.2d 789, 790 (3d Cir. 1951).

This interpretation harmonizes the "set aside" authority with the rest of the APA. After all, it would be illogical for the APA to allow a court to "postpone the effective date of an agency action" during litigation, 5 U.S.C. § 705, but be powerless to terminate that action if the court concludes the action is "unlawful," *id.* § 706(2). Likewise, section 706(1) suggests that section 706(2) authorizes vacatur. The former allows courts to "compel" agency action while the latter authorizes the inverse. 5 U.S.C. § 706.

If agency actions are vacated, vacatur cannot be limited only to the parties. "[H]ow could this Court vacate the Rule with respect to the . . . plaintiffs in this case without vacating the Rule writ large? What would it mean to 'vacate' a rule as to some but not other members of the public?" *O.A. v. Trump*, 404 F. Supp. 3d 109, 153 (D.D.C. 2019). Such a result would clash with *Lujan v. National Wildlife Federation*, 497 U.S. 871 (1990). *See generally Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (discussing *Lujan* during its analysis of the scope of relief to be awarded). *Lujan's* five-Justice majority observed that an "entire" agency program is "affected" by a

successful "challenge[] under the APA." *Lujan*, 497 U.S. at 890 n.2. Similarly, *Lujan*'s four-Justice dissent explained that when a "plaintiff prevails" in APA litigation, "the result is that the rule is invalidated, not simply that the court forbids its application to a particular individual." *Id.* at 913 (Blackmun, J., dissenting).

Nationwide vacatur is also the only possibility, and relief applying to Texas alone would not provide Texas any relief, because "there is a substantial likelihood that a geographically-limited injunction would be ineffective because [alien] beneficiaries would be free to move among states." *Texas v. United States (DAPA)*, 809 F.3d 134, 188 (5th Cir. 2015); *see also Biden*, 2022 WL 17718634, at *18 ("'There is a substantial likelihood that a geographically-limited [remedy] would be ineffective,' as aliens would simply enter the United States through a non-party State." (quoting *Texas*, 40 F.4th at 229 n.18) (brackets omitted)). "In the context of immigration law, broad relief is appropriate to ensure uniformity and consistency in enforcement." *Texas*, 40 F.4th at 229 n.18.

That this incidentally benefits other States as well is not unusual. While "'as a general rule, American courts of equity did not provide relief beyond the parties to the case[,]' [a]s with all general rules, of course, this one was subject to exceptions—the most important of which was that an injunction *could* benefit non-parties as long as 'that benefit was merely incidental.'" *Feds for Med. Freedom v. Biden*, 63 F.4th 366, 387 (5th Cir. 2023) (en banc) (citations omitted). This principle applies equally to vacatur.

Because "[t]he Constitution requires 'an *uniform* Rule of Naturalization,'" *DAPA*, 809 F.3d at 187 (quoting U.S. Const. art. I, § 8, cl. 4) (emphasis in original), "Congress has instructed that 'the immigration laws of the United States should be enforced vigorously and *uniformly*,'" *id.* at 187–88 (quoting Immigration Reform and Control Act of 1986, Pub. L. No. 99–603, § 115(1), 100 Stat. 3359, 3384) (emphasis in original), "and the Supreme Court has described immigration policy as 'a comprehensive and *unified* system,'" *id.* at 188 (quoting *Arizona v. United States*, 567 U.S. 387, 401 (2012)). Thus, "[p]artial implementation of [the challenged immigration policy] would "detract[] from the

'integrated scheme of regulation' created by Congress." *Id.* (quoting *Arizona*, 567 U.S. at 401). Accordingly, the Court should continue to interpret the APA as authorizing the remedy of vacatur and recognize that it nullifies the agency action universally rather than precludes its application to any particular parties.

### 3. Section 1252(a)(2)(B)(ii) does not preclude Texas's requested relief.

Defendants argue that the decision of whether to grant parole is "in [the] discretion" of the Secretary under 8 U.S.C. § 1182(d)(5)(A), and they assert that Texas's claims essentially amount to "an amalgamation of thousands of individual parole decisions made pursuant to the Executive's discretionary parole authority at 8 U.S.C. § 1182(d)(5)(A)." Dkt. 34 at 18. Defendants maintain that 8 U.S.C. § 1252(a)(2)(B)(ii) precludes this Court's review of Texas's claims. Dkt. 34 at 18. But Defendants are mistaken.

Section 1252(a)(2)(B)(ii), for starters, does not even apply to this case. That statute only bars judicial review of a "decision or action" by the Attorney General or Secretary, not the creation of an entire program. And as discussed above, Texas is not challenging a particular "decision or action" by the Attorney General or Secretary; it is instead challenging Defendants' creation of an enormous program that broadly and categorically grants affirmative immigration relief to large swaths of aliens.

Worse, Defendants' "amalgamation" argument lacks a textual basis in the statute. When section 1252(a)(2)(B)(ii) references any "decision or action" of the Attorney General or Secretary, it explicitly uses those words in the singular form. But in support of their "amalgamation" argument, Defendants quote section 1252(a)(2)(B)(ii) and explicitly add an "s" to the word "decision" and the word "action," respectively. *See* Dkt. 34 at 18 (stating that courts may not review the "decision[s] or action[s]" of DHS under 8 U.S.C. § 1252(a)(2)(B)(ii)). Defendants make plural what Congress wrote in the singular. Only by adding an "s" to those words can Defendants construe the statute as prohibiting Texas's

claims. Dkt. 34 at 18. Taking the statute as written, Defendants' arguments fall apart. After all, it is impossible to amalgamate a singular "decision" or a singular "action." Defendants' citation to *Flores v. Garland*, 72 F.4th 85, 91–92 (5th Cir. 2023) and *Loa-Herrera v. Trominski*, 231 F.4th 984 (5th Cir. 2000) for the proposition that Texas's *ultra vires* claims are unreviewable fare no better. *See* Dkt. 34 at 32. *Garland* considered whether a district court had jurisdiction to review DHS's denial of an immigrant's I-485 application, 72 F.4th at 88, and *Trominski* considered only whether a district court could review an individual parole decision. *Trominski*, 231 F.4th at 991. Neither of these cases bear on this court's jurisdiction to review Defendants' operation of a mass parole program. Defendants' self-serving changes to section 1252(a)(2)(B)(ii) must be rejected.

But even if the text, structure, and purpose of the statute did not conclusively determine jurisdiction, the *Thunder Basin* factors demonstrate that jurisdiction is proper. *See Feds for Medical Freedom v. Biden*, 63 F.4th 366, 379–81 (5th Cir. 2023); *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994). These factors are (1) whether "a finding of preclusion could foreclose all meaningful judicial review;" (2) whether the claims are "wholly collateral" to the statutory scheme; and (3) whether the claims are "outside the agency's expertise." *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 186 (2023) (quoting *Thunder Basin*, 510 U.S. at 212–13).

*First*, finding the Plaintiffs' claims precluded "could foreclose all meaningful judicial review." *Axon Enter., Inc.*, 598 U.S. at 190. The INA does not provide a process to challenge the process. That is the function of the APA. If a statute that denies review of a singular decision to remove an alien is construed to prohibit review of a challenge to the agency's decision-making process entirely, then there is no judicial review left.

*Second*, the Plaintiffs' claims are "wholly collateral" to the statutory scheme because "[t]he challenges to the [Secretary's] authority have nothing to do with" individual determinations of removal or parole. *Id.* at 193. A claim is wholly collateral if, as here, it is "challenging the [agency's] power to proceed at all, rather than actions taking in

the agency proceedings." *Id.* at 192.

     *Third*, and finally, an APA challenge is outside the Department of Homeland Security's expertise. Claims fall outside an agency's expertise when they "raise 'standard questions of administrative' and constitutional law, detached from 'considerations of agency policy.'" *Id.* at 194. Although the "standard questions of administrative and constitutional law" Plaintiffs raise here are about the parole authority, no expertise in immigration law or policy is needed to resolve them. Accordingly, section 1252(a)(2)(B)(ii) does not strip this Court of jurisdiction.

## C. The Final Rule is reviewable under the APA.

     The APA makes "agency action presumptively reviewable." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 226 (quotation marks omitted). While Defendants contend that "Texas is not within the zone of interests protected by the relevant immigration statutes," Dkt. 34 at 19, the zone-of-interest inquiry is "not especially demanding." *See, e.g.*, *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014) (quotation omitted).

     To fall within the zone of interests, a plaintiff need only show that its interest is "arguably within the zone of interests to be protected or regulated by" the statutes that it claims to have been violated. *Patchak*, 567 U.S. at 224–25; *Association of Data Processing Service Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970). The Supreme Court has "always conspicuously included the word 'arguably' in the test to indicate that the benefit of any doubt goes to the plaintiff." *Patchak*, 567 U.S. at 225. A plaintiff need not point to "any indication of congressional purpose to benefit" it. *Id.* at 225. Instead, "[t]he test forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Id.* (quoting *Clarke v. Security Industry Ass'n*, 479 U.S. 388, 399 (1987)).

     Texas easily satisfies this test. The INA provides "a comprehensive federal

statutory scheme for regulation of immigration and naturalization" and "set[s] the terms and conditions of admission to the country and the subsequent treatment of aliens lawfully in the country." *DACA*, 50 F.4th at 521 (internal quotations omitted) (quoting *Chamber of Com. v. Whiting*, 563 U.S. 582, 587 (2011)). States "bear[] many of the consequences of unlawful immigration," and "[t]he problems posed to the State by illegal immigration must not be underestimated." *Arizona v. United States*, 567 U.S. 387, 397, 398 (2012). Moreover, the Fifth Circuit has recognized that the INA is intended to protect against imminent and actual harm to the State's fisc, and fiscal harms to the State fall within the INA's zone of interest. *Texas (MPP II)*, 20 F.4th at 975 (citing *Demore v. Kim*, 538 U.S. 510, 517–22 (2003)); *see, e.g.*, *DAPA*, 809 F.3d at 163.

Defendants counter that Texas's interests do not fall within the zone of interests of specific statutory provisions—namely, "the asylum statute" or "the parole statute." Dkt. 34 at 19–20. But Defendants are wrong. By focusing only on the zone of interest of the so-called "asylum statute" and the "parole statute," in particular, Defendants misapply the zone-of-interest test because they are focusing on the interests of specific portions of the INA rather than the INA generally. Both the Fifth Circuit and the Supreme Court have rejected such "jiu-jitsu" arguments. *See MPP II*, 20 F.4th at 975–76 (explaining that the Federal Government's argument was constituted a "particular form of jiu-jitsu" that was "at odds with both Fifth Circuit and Supreme Court precedent" because the Federal Government "focused on the zone of interests of two subparagraphs in [a specific statutory section] rather than that of the INA . . . as a whole" (emphasis in original)); *see also DAPA*, 809 F.3d at 163 (analyzing the INA's zone of interests, not the zone of one particular provision); *Clarke*, 479 U.S. at 401 ("In considering whether the 'zone of interest' test provides or denies standing in these cases, we first observe that the Comptroller's argument focuses too narrowly on 12 U.S.C. § 36, and does not adequately place § 36 in the overall context of the National Bank Act."). Texas's claims against the Final Rule fall within the INA's zone of interests.

**D.  The Final Rule Exceeds the Statutory Limits of the INA.**

Defendants contend that the Final Rule is consistent with the INA, and even if it were not, that the INA forecloses the Court's jurisdiction over Texas's claims. Defendants' arguments are misplaced.

Texas has alleged facts sufficient to support the reasonable inference that the Final Rule and its implementation exceed Defendants' statutory authority. A federal agency cannot act absent congressional authorization. *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). It cannot confer power upon itself. *Id.* "To permit an agency to expand its power in the face of a congressional limitation on its jurisdiction would be to grant to the agency power to override Congress." *Id.* at 374–75. Put simply, "[a]gencies may play the sorcerer's apprentice but not the sorcerer himself." *Alexander v. Sandoval*, 532 U.S. 275, 291 (2001).

The Immigration and Nationality Act (INA) provides a comprehensive statutory scheme to govern immigration into the United States. *See* 8 U.S.C. § 1157, *et seq*. For individuals who are not otherwise admissible, the INA allows the federal government to parole them "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." *See* 8 U.S.C § 1182(d)(5)(A); *see also Texas (MPP II)*, 20 F.4th at 947. The INA does not, however, allow the use of the parole authority to create categorical admissions programs. *See Texas v. Biden*, 646 F. Supp. 3d 753, 776 (N.D. Tex. 2022) ("Section 1182(d)(5)(A)'s historical context confirms DHS cannot exercise its parole authority to parole *categories* of aliens, rather than individuals." (emphasis added)).

Defendants' contention that the Final Rule "limits the circumstances in which noncitizens can obtain asylum" fundamentally mischaracterizes both the text and the effect of the Rule. *See* Dkt. 34 at 3. The Final Rule presumes that aliens "who enter the United States from Mexico at the southwest land border or adjacent coastal borders without documents sufficient for lawful admission" are ineligible for asylum. 88 Fed. Reg. 31,450 (8 C.F.R. § 208.33(a)). But the Final Rule excepts from this presumption aliens who

"[p]resent[] at a port of entry, pursuant to a pre-scheduled time and place" through the CBP One app. 88 Fed. Reg. 31,450 (8 C.F.R. § 208.33(a)(2)(B)). The statutory framework governing asylum, however, demonstrates that all aliens are presumed ineligible for asylum because they must satisfy the statutory requirements to be granted that relief. By excepting CBP One app users from the presumption, the Final Rule changes the burden of proof to establish eligibility for asylum in a way that renders it inconsistent with the INA.

While the INA allows aliens to *apply* for asylum, it does not *presume* that any are eligible. Rather, the burden to demonstrate eligibility for asylum is always on the applicant. *See, e.g.*, *East Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 758 (9th Cir. 2018) (recognizing that the INA requires an asylum applicant to establish refugee status and the applicant bears the burden of supporting such a finding); *Hasan-Nayem v. U.S. Att'y Gen.*, 55 F.4th 831, 843 (11th Cir. 2022) ("To establish eligibility for asylum, the applicant bears the burden of proving his statutory 'refugee' status.'"). The Final Rule's exception for CBP One users from the presumption of ineligibility for asylum necessarily lessens the asylum applicant's burden of proof, even though the INA directly places the burden of proof on the applicant. *See* 8 U.S.C. § 1158(b)(1)(B) ("The burden of proof is on *the applicant* . . . ." (emphasis added)). The INA and the Final Rule also conflict because "[a]n applicant [for asylum] is not entitled to a presumption of credibility." *East Bay Sanctuary Covenant*, 932 F.3d at 758. Indeed, there are entire "classes of aliens [who are] categorically ineligible to apply for asylum." *Id.* Because the INA presumes that all aliens are ineligible for asylum by placing the burden of proof on the applicant to sustain relief, the Final Rule's exception from the presumption of ineligibility for asylum is inconsistent with the INA.

While the Attorney General "may provide by regulation for any other conditions or limitations on the consideration of an application for asylum *not inconsistent with* [the INA]," any such condition cannot alter the statutory framework imposed by Congress. 8 U.S.C. § 1158(d)(5)(B) (emphasis added). Defendants may impose additional "limitations," but they cannot impose incentives. *See* 8 U.S.C. § 1158(d)(5)(B).

Under the INA, aliens without documents sufficient for lawful admission are deemed "inadmissible." 8 U.S.C. § 1182(a)(7). These inadmissible aliens are the same aliens to whom the Final Rule and its exception apply. *See, e.g.*, 88 Fed. Reg. 31,321. But Defendants cite no statutory authority supporting the proposition that Defendants may except *any* inadmissible aliens from the INA's built-in presumption of ineligibility for asylum—much less inadmissible aliens whose exception from the presumption is based on their pre-scheduling a time to present themselves at a port of entry. *See generally* Dkt. 34. Although the INA allows inadmissible aliens to seek asylum, it also preserves the public's interest in requiring inadmissible aliens to demonstrate their entitlement to affirmative immigration relief. By excepting certain inadmissible aliens from this general framework, the Final Rule upsets this statutory balance.

Defendants cite *State of Tex. v. United States*, 106 F.3d 661, 667 (5th Cir. 1997) for the proposition that Defendants' obligation under 8 U.S.C. § 1103(a)(5) to "guard the boundaries and borders of the United States against the illegal entry of aliens" has "no substantive limits on the [Executive]." Dkt. 34 at 24–25 (internal quotation marks omitted). But while that statute may not include a standalone cause of action like that at issue in *State of Tex.*, 106 F.3d at 667, its terms demonstrate that Congress did not intend that executive agencies would encourage, incentivize, or invite inadmissible aliens to present at ports of entry at the southwestern border, as the Final Rule expressly contemplates. *See* 88 Fed. Reg. 31,342 (stipulating that aliens without documents sufficient for lawful admission "are encouraged and incentivized" through the Final Rule's exception "to make an appointment using the CBP One app to present themselves at a [port of entry] for inspection"); *see also* 88 Fed. Reg. 31,399 (stipulating that "[n]oncitizens who are not eligible for [other parole programs] can schedule an appointment to present at a southwest land border POE through the CBP One app and be exempted from the rule").

Defendants cite 8 U.S.C. § 1103(g)(2) for their authority to promulgate the Final Rule. *See* Fed. Reg. 31,323. But that statute limits the Attorney General's authority under

the INA to establishing regulations that are necessary to carrying out its requirements. *Compare* 8 U.S.C. § 1103(g)(2), *with* 8 U.S.C. § 1103(a)(5). Defendants fail to cite *any* provision of the INA whose requirements necessitate that Defendants incentivize and encourage aliens without documents sufficient for lawful admission to travel to and gather at a United States port of entry when they have not demonstrated any entitlement to protection from removal or any preexisting intention to travel to the United States. The Final Rule is facially inconsistent with the INA, and Defendants lack statutory authority to implement it.

### E. The Final Rule is Arbitrary and Capricious.

Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary and capricious." *See* 5 U.S.C. § 706(2)(A). An agency action is arbitrary or capricious if it fails to "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983).

The Final Rule allows otherwise inadmissible aliens who pre-schedule a time to cross the border to receive a legal benefit that is not available to other applicants. Defendants aver that they are merely "manag[ing] the flow" of illegal immigrants by excepting certain aliens from the INA's general statutory provisions. Dkt. 34 at 26 (citing 88 Fed. Reg. at 31,318). But the exception for users of the CBP One app is wholly arbitrary. For instance, while the pre-scheduling feature of the CBP One app is only available in northern and central Mexico, the Rule's exception for CBP One users "does not apply to Mexican citizens." Dkt. 34 at 26 n.5; 88 Fed. Reg. 31,399. Rather, it applies only to aliens who have traveled to Mexico from their home country. *Id.* The Final Rule expressly "encourage[s]" aliens "outside northern and central Mexico . . . to use various pathways available to lawfully travel to the United States, and they will be able to use the app once they are in the geofenced area and thus closer to the United States." 88 Fed. Reg. 31,399.

In sum, the Final Rule incentives aliens who have migrated to Mexico to continue to a United States port of entry even though Defendants acknowledge they do not have documents sufficient for lawful admission. *See also* Dkt. 34 at 23 (acknowledging that the Final Rule is intended to assist "[aliens] without documents sufficient for admission into the United States"). Defendants concede that the migrants who are the object of this rule lack a visa and "are generally inadmissible." 88 Fed. Reg. 31,343. But despite that fact, the Final Rule's exception does not require any showing that migrants who traveled to Mexico had any intention of continuing to the United States.

Defendants also had an obligation "to consider *Texas's* expenses and costs when contemplating" the effect of changes to the federal immigration scheme in Texas. *Texas v. United States*, 524 F. Supp. 3d 598, 655 (S.D. Tex. 2021) (emphasis added). Defendants do not come close to having satisfied this obligation. Defendants point to 88 Fed. Reg. 31,437–38 as the sum of their consideration of the effects on states. Dkt. 34 at 28. In response to State Attorneys General who lodged concerns that states would bear the costs of "higher levels of unlawful aliens," Defendants asserted that they "disagree[d] with the characterization of the rule as precipitating higher levels of irregular migration." 88 Fed. Reg. 31,438. But decreasing "irregular migration" between ports of entry is a separate issue from an overall increase in "unlawful aliens" who lack documents sufficient for lawful admission and who have no underlying legal right to be in the United States. "Admission and status are fundamentally distinct concepts. . . . An individual who presents himself at an immigration checkpoint . . . and is given permission to enter has been admitted regardless of whether he had any underlying legal right to do so. . . . Status, by contrast, usually describes the type of permission to be present in the United States that an individual has." *Gomez v. Lynch*, 831 F.3d 652, 658 (5th Cir. 2016).

Even so, decreasing unlawful immigration is expressly *not* the goal. *See, e.g.*, Dkt. 34 at 8–9 (contending that "[a] reduction in *irregular migration* will correspondingly decrease crowding in border facilities . . ." (emphasis added)). Rather, Defendants intend to

decrease "*irregular migration*" between ports of entry; they do not intend to decrease the number of aliens who have no underlying legal right to be in the United States. *See id.* And in fact, Defendants intend to pass on the costs of this Final Rule to Texas. The Final Rule expressly contemplates that "border states," like Texas, and "local communities" will "absorb releases from CBP border facilities and provide support to the migrant community." 88 Fed. Reg. 31,325. Coupled with Defendants' intent to "process significantly more individuals" at ports of entry, Defendants failure to consider the effect of this Final Rule on Texas is itself enough to deny Defendants' Motion to Dismiss. *See* 88 Fed. Reg. 31,325.

Defendants wholly failed to engage with the concern that the Final Rule's exception would operate to increase the number of unlawful aliens in the United States, the majority of which are funneled through ports of entry in Texas. "Stating that a factor was considered . . . is not a substitute for considering it." *Getty v. Fed. Sav. & Loan Ins. Corp.*, 805 F.2d 1050, 1055 (D.C. Cir. 1986); *see also Corrosion Proof Fittings v. EPA*, 947 F. 2d 1201, 1226 (5th Cir. 1991) ("The EPA's failure to consider the regulatory alternatives, however, cannot be substantiated by conclusory statements."). Where, as here, "the agency has failed to provide even that minimal level of analysis, its action is arbitrary and capricious and so cannot carry the force of law." *Encinco Motorcars, LLC v. Navarro*, 579 U.S. 211, 136 S. Ct. 2117, 2125 (2016). Courts "do not defer to the agency's conclusory or unsupported suppositions," *United Techs. Corp. v. U.S. Dep't of Def.*, 601 F.3d 557, 562 (D.C. Cir. 2010), nor are agency actions "involving an issue of deep economic and political significance" entitled to deference, *City & Cnty. Of San Francisco v. Trump*, 897 F.3d 1225, 1242 (9th Cir. 2018) (cleaned up).

## F.  Defendants' actions are ultra vires.

Texas brings both a common law and statutory *ultra vires* cause of action. Dkt. 30 at 22. Relevant to this Court's resolution of a motion to dismiss, "[w]hen faced with such a 'difficult question' of the reviewability of certain executive actions, the Supreme Court

has in recent years adopted the practice of 'assum[ing] without deciding' justiciability." *Murphy Co. v. Biden*, 65 F.4th 1122, 1130 (quoting *Trump v. Hawaii*, 138 S. Ct. 2392, 2407 (2018)). *Ultra vires* causes of action do not require the plaintiff to identify a "final agency action." *See Apter*, 80 F.4th at 587. Instead, plaintiffs can assert *ultra vires* causes of action challenging an official's actions that exceed his statutory authority. *Id.* Likewise, "for agencies charged with administering congressional statutes," "[b]oth their power to act and how they are to act is authoritatively prescribed by Congress, so that when they act improperly . . . what they do is ultra vires. . . . [T]he question . . . is always whether the agency has gone beyond what Congress has permitted it to do." *City of Arlington, Tex. v. F.C.C.*, 569 U.S. 290, 297–98 (2013). While conclusory assertions are insufficient to survive a motion to dismiss, a plaintiff need only plead facts which, taken as true, demonstrate that an official is acting beyond his authority. *See Twombly*, 550 U.S. 544 at 570. Texas's allegations easily meet that standard here.

While DHS has "discretion to parole applicants 'only on a case-by-case basis for urgent humanitarian reasons or significant public benefit,'" "under the APA, DHS's exercise of discretion [to grant parole] within that statutory framework must be reasonable and reasonably explained." *Biden v. Texas*, 597 U.S. 785, 807 (2022). Defendants' own data demonstrates that 95.8% of all inadmissible aliens who scheduled appointments through the CBP One app were ultimately released into the United States on parole.[10] Taken as true—which this Court must for purposes of ruling on a motion to dismiss—Defendants' data shows that Defendants are exercising their parole authority on a categorical basis in violation of the statutory provision authorizing them to confer such affirmative relief. *See Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are

---

[10] *New Documents Obtained by Homeland Majority Detail Shocking Abuse of CBP One App*, U.S. House of Representatives, https://homeland.house.gov/2023/10/23/new-documents-obtained-by-homeland-majority-detail-shocking-abuse-of-cbp-one-app/ (Oct. 23, 2023).

true (even if doubtful in fact)." (quotation marks, citations, and footnote omitted)). Defendants wholly fail to explain how a 96% rate of admission on parole is "reasonable," and they fail to "reasonably explain[]" how a 96% rate of admission into the United States on parole satisfies the Congressional mandate that parole be granted in only limited circumstances. *See generally* Dkt. 34.

At this stage, Defendants "ha[ve] not offered even a 'colorable basis' for rejecting [Texas's] argument." *Apter*, 80 F.4th at 588. Indeed, Defendants acknowledge that "many noncitizens who are encountered at the border and released pending their immigration proceedings will spend *years* in the United States regardless of the outcomes of their cases." 88 Fed. Reg. 31,337 (emphasis added). Defendants cannot point to any statutory authority that allows them to parole aliens *en masse*. Paroling nearly all aliens who use the CBP One app is not a "case-by-case" determination; it is a blanket approval. The 4.2% difference between the app users who were granted parole and those who were not is so infinitesimal it could be explained by aliens who never showed up to their appointment or who crossed between ports of entry. That an overwhelming number of CBP One app users were granted parole supports the reasonable inference that the Final Rule's exception and the implementation of the CBP One app are functioning as an illegal parole program, and Defendants' Motion to Dismiss Texas's *ultra vires* claims should be denied.

Moreover, Defendants contend that the near 96% rate at which CBP One app users are granted parole is a result of Defendants' exercise in "ensuring orderly and efficient flow of lawful traffic and commerce." *See* Dkt. 34 at 26, 29. Defendants' capacious interpretation of this authority requires the application of the Major Questions Doctrine.

The Supreme Court's guidance in *West Virginia v. EPA* should form the lodestar of the Court's analysis. 597 U.S. 697 (2022). In that case, the Court considered whether an EPA regulation that required shifting electricity generation from coal-fired plants to natural gas and renewables was "within the power granted to it by the Clean Air Act." *Id.* at 706. While noting that "generation shifting" (i.e., moving electricity production from coal to

less carbon-intensive sources) could be described as a "system" as a matter of "definitional possibilities," the Court emphasized that "almost anything" could be a "system" under the Government's expansive interpretation and that "shorn of all context, the word is an empty vessel." *Id.* at 732. Thus, the Court held that "[s]uch a vague statutory grant is not close to the sort of clear authorization required by our precedents." *Id.* The Court distinguished this from other uses of "system" in the Clean Air Act, because "[i]t is one thing for Congress to authorize regulated sources to use trading to comply with a preset cap. . . . It is quite another to simply authorize EPA to set the cap itself wherever the Agency sees fit." *Id.* at 733.

Much as it was impermissible for the EPA to set a cap on coal-fired carbon emissions "wherever the Agency [saw] fit" based on the vague and long-enacted statutory provision at issue, it is likewise impermissible for Defendants to "manage the flow" of people at ports of entry by simply granting them parole in wholesale fashion.

The Final Rule's presumption of ineligibility mirrors the INA's statutory scheme, which also presumes that aliens are inadmissible unless they satisfy one of the exceptions from removal. But Defendants' use and implementation of the Final Rule's carve-out for aliens who use the CBP One app is without authority. The Final Rule's general presumption of ineligibility restates the law; the exception from the presumption alters the statutory framework. Defendants cannot do that which Congress has not clearly delegated to it; they cannot alter the INA's statutory scheme by exempting *any* aliens from the INA's requirement that the burden to establish eligibility for asylum remains on the applicant.

Defendants' contention that the Final Rule is based on their authority to "manag[e] [ports of entry] in a safe and orderly manner" fares no better. Dkt. 34 at 28. By that logic, Defendants could keep ports of entry "safe and orderly" by directing aliens to cross the border between ports of entry instead of through the ports of entry. Even Defendants seem to recognize that the INA would not go so far as to allow that. *See* Dkt. 34 at 25.

Defendants cite 8 U.S.C. § 1158 to support the proposition that the Final Rule

"establishes limitations on and conditions to the grant of asylum." Dkt. 34 at 18. While Defendants may establish *limitations*, they do not have Congressional authority to grant exceptions to those limitations. *See* section II(D) *supra*. But even if the Final Rule's exception were lawful, none of the statutes Defendants cite contemplate *increasing* the number of aliens admitted at the southwestern border who have no underlying legal right to remain in the United States. *See generally* Dkt. 34.

Defendants seek to evade meaningful judicial review of the Rule by describing their authority as "broad." Dkt. 34 at 4. But if Defendants are correct—that they can "make a 'radical or fundamental change' to a statutory scheme" to make the ports more "orderly"—that that certainly would present non-delegation concerns. *West Virginia v. EPA*, 597 U.S. 697, 723 (2022); *see also Kentucky v. Biden*, 23 F.4th 585, 607 n.14 (6th Cir. 2022). Quite simply, the "breadth of authority" Defendants have asserted under this purportedly broad grant of authority and the "economic and political significance" of this assertion require a *clear* congressional authorization before concluding that Congress meant to confer such authority. *West Virginia*, 597 U.S. at 723. The vast economic and political significance of this issue and the breadth of authority claimed by Defendants demand application of the Major Questions Doctrine.

## III. PRAYER

For all these reasons, the State of Texas respectfully requests that the Court deny Defendants' Motion to Dismiss.

Dated May 9, 2024.

Respectfully submitted.

**KEN PAXTON**
Attorney General of Texas

*/s/ Amy Snow Hilton*
**AMY SNOW HILTON**
Special Counsel
Tex. State Bar No. 24097834
Amy.Hilton@oag.texas.gov

**BRENT WEBSTER**
First Assistant Attorney General

**RALPH MOLINA**
Deputy Attorney General for Legal
Strategy

**ETHAN SZUMANSKI**
Special Counsel
Tex. State Bar No. 24123966
Ethan.Szumanski@oag.texas.gov

**RYAN D. WALTERS**
Chief, Special Litigation Division

**COUNSEL FOR THE STATE OF TEXAS**

Office of the Attorney General of Texas
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 463-4139

### CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on May 9, 2024, and that all counsel of record were served by CM/ECF.

*/s/ Amy Snow Hilton*
**AMY SNOW HILTON**

**TAB 5: REPLY IN SUPPORT OF AMENDED COMPLAINT (ROA.682)**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
DEL RIO DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | |
| | § | Case No. 2:23-CV-00024-AM |
| ALEJANDRO MAYORKAS, | § | |
| Secretary of Homeland Security, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**DEFENDANTS' REPLY IN SUPPORT OF
MOTION TO DISMISS FIRST AMENDED COMPLAINT**

Dated:     May 30, 2024          Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

WILLIAM C. PEACHEY
*Director*

EREZ REUVENI
*Counsel*

CHRISTINA P. GREER
BRIAN C. WARD
*Senior Litigation Counsel*

By: /s/ *Katherine J. Shinners*
KATHERINE J. SHINNERS (*pro hac vice*)
*Senior Litigation Counsel*
DC Bar No. 978141
U.S. Department of Justice, Civil Division
Office of Immigration Litigation – DCS
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel: (202) 598-8259
Fax: (202) 305-7000
Email: katherine.j.shinners@usdoj.gov

ELISSA P. FUDIM
*Trial Attorney*

*Attorneys for Defendants*

**INTRODUCTION**

The Court should grant Defendants' Motion (ECF 34) and dismiss the First Amended Complaint. Plaintiff's response to the Motion relies throughout on two basic misconceptions about the effect and scope of the Circumvention of Lawful Pathways Rule (the Rule). *See* Opposition (ECF 41). First, contrary to Plaintiff's arguments, the Rule does not alter the statute's placement of the burden of proof on the asylum applicant. *See* 8 U.S.C. § 1158(b)(1)(B). Asylum is a discretionary form of relief from removal for noncitizens in the United States who demonstrate, *inter alia*, past persecution or a well-founded fear of persecution in their home country on account of a protected ground. 8 U.S.C. §§ 1101(a)(42)(A), 1158(b). The Rule, promulgated jointly by the Departments of Homeland Security and Justice ("the Departments"), does not lighten the applicant's burden to prove eligibility for asylum. Instead, it establishes a rebuttable presumption of asylum *ineligibility* for certain noncitizens who cross the U.S.-Mexico border during a two-year period. *See generally* Circumvention of Lawful Pathways, 88 Fed. Reg. 31,314 (May 16, 2023); 8 C.F.R. §§ 208.33, 1208.13(f), 1208.33. If the presumption applies and is not rebutted, the noncitizen cannot obtain asylum, although the noncitizen must still be considered for statutory withholding of removal or protection under the Convention Against Torture. At the same time, to encourage use of orderly pathways and discourage unlawful entry, the Rule provides that this presumption of asylum ineligibility does not apply to those noncitizens who enter at a Port of Entry (POE) pursuant to a pre-scheduled appointment (the "appointment exception"). *See* 8 C.F.R. §§ 208.33(a)(2)(ii)(B), 1208.33(a)(2)(ii)(B). Contrary to Plaintiff's arguments, the Rule does not entitle those noncitizens to a presumption of asylum *eligibility*. Instead, to obtain asylum, such noncitizens still bear the burden of proof to demonstrate past persecution or a well-founded fear of persecution, that they are not subject to other eligibility bars, and that they merit a favorable exercise of discretion, just as all asylum applicants have had to do since the passage of the asylum statute.

Second, contrary to Plaintiff's arguments, the Rule has no bearing on the Executive's exercise of parole authority and does not create a mass parole program. The Rule does not address

or set any policy regarding parole determinations for any inadmissible noncitizens, whether or not they schedule appointments. And the Department of Homeland Security's (DHS) parole determinations are not reviewable or in excess of its statutory authority.

Because Plaintiff's standing and merits arguments depend on its misconceptions of how the Rule operates, those arguments fail as a matter of law, and the Complaint should be dismissed.

## ARGUMENT

I.    **Plaintiff Lacks Article III Standing.**

A.    **The Complaint Does Not State a Cognizable Injury.**

Plaintiff's allegations of indirect impacts on its public fisc or economy allegedly arising from the Rule's appointment exception or the Executive's exercise of discretionary parole authority at POEs do not clear the threshold hurdle to plead a cognizable, non-speculative injury. *See* Opp. 4–7.

First, Plaintiff's arguments for standing cannot survive the reasoning of *United States v. Texas (Enforcement Priorities)*, 599 U.S. 670 (2023). *See* Mot. 10–12. *Enforcement Priorities* determined that States have no cognizable injury arising from Executive Branch guidelines concerning its exercise of "enforcement discretion over arrests and prosecutions" for immigration violations. *Texas (Enforcement Priorities)*, 599 U.S. at 679.

Plaintiff's challenge to the Rule and to the Executive's exercise of its statutory parole authority is not meaningfully distinct from the States' challenge to the immigration enforcement discretion guidelines in *Enforcement Priorities* for purposes of the standing analysis. That is because Plaintiff claims injury allegedly arising from whether or how the Executive is exercising its immigration enforcement discretion against others. In *Enforcement Priorities*, Texas and Louisiana alleged that an Executive policy regarding the arrest and removal of immigration violators caused them increased social-service and law-enforcement costs because under the policies the government failed to arrest more noncitizens. *Texas (Enforcement Priorities)*, 599 U.S. at 674.  Here, Plaintiff similarly claims it will incur social-service and law-enforcement costs due

2

**RE.164**

to the release of noncitizens who are processed at POEs. Opp. 8–9. Thus, although Plaintiff argues that it is not attempting to "compel the arrest or prosecution of anyone," Opp. 7, Plaintiff's core complaint is that the Executive is not arresting, detaining, or removing enough of the noncitizens it encounters at POEs. That is essentially the complaint that was presented in *Enforcement Priorities*. And the reasons the Supreme Court articulated in *Enforcement Priorities* to conclude the States lacked standing to challenge immigration enforcement guidelines apply fully here— including that the decisions at issue involve no exercise of coercive power over the Plaintiff; that challenges to those decisions implicate Article II and foreign-policy concerns like those implicated in the Rule; and that courts lack "meaningful standards" to assess such decisions that reflect the Executive's "complicated balancing" of factors like "resource constraints" and "public-safety and public-welfare needs." *See* Mot. 11 (citing *Texas (Enforcement Priorities)*, 599 U.S. at 678–81, and *Heckler v. Chaney*, 470 U.S. 821, 830–32 (1985)).

Regardless, however, Plaintiff's claimed injury from incidental effects of federal policy on its expenditures is not cognizable even outside the immigration enforcement context. Mot. 11–12. The Supreme Court in *Enforcement Priorities* cautioned generally against recognizing such "attenuated" theories of injury due to the "bedrock Article III constraints in cases brought by States against an executive agency." *Texas (Enforcement Priorities)*, 599 U.S. at 680 n.3. Plaintiff's claimed "monetary costs" (Opp. 7) thus provide no basis to distinguish this case from *Enforcement Priorities*; the very same costs were rejected by the Supreme Court as non-cognizable injuries. *See Texas (Enforcement Priorities)*, 599 U.S. at 674, 676–78, 680 n.3; *see also E. Bay Sanctuary Covenant v. Biden*, No. 23-16032, 2024 WL 2309476, at *3–4 (9th Cir. May 22, 2024) (holding that States did not have "significant protectible interest" in "reducing immigration" or "minimizing expenditures" to support intervention). Nor does it matter that Plaintiff argues its "claims seek to prevent the Final Rule from categorically granting parole and affirmative immigration relief," Opp. 7, because its claims are still based on indirect, attenuated injury. But this assertion is in any event incorrect, because nothing in the Rule grants parole or provides affirmative immigration relief, categorically or otherwise. *See infra* § III(A).

Second, Plaintiff's claimed injury is also too speculative to permit this lawsuit to go forward. *See* Mot. 12–14. Even at the pleading stage, the plaintiff must "clearly ... allege facts demonstrating" each element of Article III standing. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). And, as courts within the Fifth Circuit have emphasized based on an analysis of pre-*Enforcement Priorities* Fifth Circuit precedent, it is not enough to assert that a particular immigration policy results in noncitizens being released into the State, which allegedly leads to State expenditures. Instead, States must plausibly allege that the immigration policy would lead to an increased number of noncitizens relative to the status quo—that is, the number of noncitizens who would be present in the State if the challenged policy did not exist—and that attendant costs would increase. *Texas v. United States Dep't of Homeland Sec.*, No. 6:23-CV-00007, 2024 WL 1021068, at *15–17 (S.D. Tex. Mar. 8, 2024) (*Texas (CHNV)*) (stating that harm "has long been understood in the immigration context" as meaning harm "relative to the status quo, and relative to Plaintiff's position absent the challenged policy"), *appeal filed*, No. 24-40160 (5th Cir. Mar. 12, 2024). In other words, "the baseline for these analyses is not zero immigration." *Arizona v. Garland*, No. 6:22-cv-01130, 2024 WL 1645417, at *11 (W.D. La. Apr. 16, 2024) (characterizing *Texas (CHNV)*).

Plaintiff has not made any allegations that would show injury under this standard. It has argued only that noncitizens who schedule appointments through CBP One™ and are thus subject to the appointment exception are also being granted parole at POEs, which results in high numbers of noncitizens being released in Texas. *See* Opp. 8–10; *see also* ECF 30, First Am. Compl. (FAC) ¶¶ 58–59 (1st). At most, therefore, it argues that the number of noncitizens released at POEs will be reduced if the appointment exception no longer existed. Opp. 10; *see also id.* at 12. Even if this allegation were plausible (and it is not, because the Rule's appointment exception does not dictate parole policies or outcomes, *see* Mot. 14–15; *infra* § I(B)(1)), it is not enough to state an injury because it does not account for the overall immigration context. Plaintiff has made no factual allegations that, if proven, would establish that the Rule as a whole leads "to increased immigration—and thereby, increased costs—for Texas" over what would be the case if the Rule's

appointment exception did not exist. *See* Opp. 9.[1]  To the contrary, if the appointment exception were vacated, that would remove much of the incentive for noncitizens with potentially meritorious asylum claims to seek out orderly entry at POEs, because they would be subject to the rebuttable presumption of asylum ineligibility either way. And that in turn could very well lead to more irregular entries between POEs, an overwhelmed immigration system, and "more noncitizens being released into the interior pending immigration proceedings," Mot. 13 (citing 88 Fed. Reg. at 31,328). Indeed, Plaintiff has asserted elsewhere that irregular entries between POEs lead to the same social-service expenditures as does the parole of noncitizens. *See Gen. Land Off. v. Biden*, 71 F.4th 264, 272 (5th Cir. 2023). It is incumbent on Plaintiff to plausibly allege that the appointment exception leads to overall increased immigration, over what would be the case without the exception, and it has failed to do so.  Accordingly, its Complaint must be dismissed.

> **B.     Plaintiff's Claimed Injury is Not Redressable.**

Even if Plaintiff's alleged injury were cognizable, its claimed harms cannot be redressed by an order from this Court. Its Complaint seeks two forms relief: (1) relief against the Rule, namely, injunction, vacatur, and declaration of the unlawfulness of the Rule's appointment exception; and (2) relief against parole, namely an injunction that would prohibit Defendants from granting parole for *any* noncitizen who has scheduled an appointment to enter the United States at a POE, or declaring such acts unlawful. *See* FAC § VI. This requested relief either would not remedy the claimed harms or is legally unavailable. Accordingly, the Complaint does not adequately allege redressability.

> 1.  Standing to Challenge the Rule (Counts 1 and 2).

As to the first type of relief Plaintiff seeks, relief that is directed against the Rule cannot redress Plaintiff's claimed injury. Parole decisions for noncitizens who schedule appointments are

---

[1] Further, the relevant status quo for these purposes would not be the levels of migration when the Title 42 public health orders were in effect from March 2020 to May 2023, as those orders meant that noncitizens without documents sufficient for admission were generally precluded entry or expelled without processing under the immigration statutes. *See* Mot. 2. Those orders have expired, and no relief that Plaintiff seeks in this suit would resurrect them.

not governed or dictated by the Rule. Thus, removing or declaring unlawful the Rule's appointment exception has no impact on parole determinations, which are the source of Plaintiff's claimed injury. Mot. 14–15. Plaintiff's argument to the contrary again improperly conflates parole determinations with the Rule's appointment exception to the presumption of asylum ineligibility. *See* Opp. 12–13.

Indeed, even if the presumption of asylum ineligibility applies to a particular noncitizen, that does not, as a legal matter, prevent an immigration officer from granting parole to that noncitizen. That noncitizen could be processed for placement in § 1229a removal proceedings before the Executive Office for Immigration Review (EOIR) and granted parole by U.S. Customs and Border Protection (CBP). *See* Mot. 4, 5. The presumption of asylum ineligibility, if unrebutted, would still apply in removal proceedings to render the noncitizen ineligible for discretionary asylum relief. *See* 8 C.F.R. §§ 1208.3(a)(1), 1208.13(f). Nor is a noncitizen to whom the presumption is not applied presumed to be *eligible* for asylum, as Plaintiff claims (at Opp. 11). *See infra* § III(A). A noncitizen who is not subject to the Rule's rebuttable presumption of asylum ineligibility must still meet his burden of proof to establish asylum eligibility. *See id.* Thus, Plaintiff's argument that eliminating one of the Rule's exceptions to the presumption of asylum ineligibility for certain noncitizens will also eliminate a (non-existent) presumption of asylum eligibility or necessarily prevent grants of parole to such noncitizens is incorrect as a matter of law. *See* Opp. 12, 13.[2]

Further, the Court lacks authority to enter an injunction or vacatur of the appointment exception due to 8 U.S.C. § 1252(f)(1)'s bar on injunctive relief, the Immigration and Nationality Act's (INA) limits on jurisdiction to review the expedited removal system and issue relief related

---

[2] Plaintiff argues it is entitled to special solicitude in establishing traceability. Opp. 11. But it still must be "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). In any event, the Supreme Court in *Enforcement Priorities* rejected States' reliance on special solicitude where they challenged an exercise of immigration enforcement discretion, not the denial of a statutorily authorized petition for rulemaking as in *Massachusetts v. EPA*, 549 U.S. 497 (2007). *Texas (Enforcement Priorities)*, 599 U.S. at 685 n.6.

**RE.168**

thereto, and the Administrative Procedure Act's (APA) limits on available relief.

Section 1252(f)(1) bars courts from "enjoin[ing] or restrain[ing] the operation of" sections 1221–1231 of Title 8. That provision precludes vacatur or injunctive relief against the Rule's appointment exception because such an injunction would interfere with the government's operation of covered statutes by imposing requirements on the adjudication of asylum claims in expedited removal under § 1225(b)(1) and removal proceedings under § 1229a. *See* Mot. 16 (citing *Garland v. Aleman Gonzalez*, 596 U.S. 543, 548–50 (2022)). Vacating the appointment exception or enjoining its application would prevent asylum officers and immigration judges from making a credible fear determination under § 1225(b)(1) in the manner prescribed by the Rule. It would also mandate how immigration judges determine whether a noncitizen has met their burden to demonstrate eligibility for relief from removal under § 1229a(c)(4)(A) by necessarily requiring the application of the presumption to those to whom the Rule did not intend it to apply. If unrebutted, the presumption prevents the noncitizen from establishing eligibility for asylum. *See* Mot. 15–16.

Plaintiff argues that an injunction or vacatur of the appointment exception is not precluded by § 1252(f)(1) because the relief does not compel a particular enforcement action or compel removal. Opp. 16. But the Supreme Court has rejected this simplistic view of § 1252(f)(1)'s constraints. Section 1252(f)(1) does not refer only to the statutes themselves, but also to "the way [they are] being carried out." *Aleman Gonzalez*, 596 U.S. at 550; *see also Hamama v. Adducci,* 912 F.3d 869, 879–80 (6th Cir. 2018) (holding § 1252(f)(1) barred injunction that imposed limitations on what the government can and cannot do in implementing covered removal and detention provisions). Thus, although the Rule establishes a condition on asylum eligibility under 8 U.S.C. § 1158, it *operates* in expedited and § 1229a removal proceedings and is the way that sections 1225(b)(1) and 1229a are being carried out with respect to the adjudication of asylum claims.

Further, contrary to Plaintiff's argument (at Opp. 14–15), § 1252(f)(1) precludes vacatur where, as here, the vacatur order would "enjoin or restrain the operation of" the covered provisions beyond an individual noncitizen. Like an injunction, vacatur "restrict[s] or stop[s] official action,"

*Direct Mktg. Ass'n v. Brohl*, 575 U.S. 1, 13 (2015), by prohibiting officials from relying on the agency action under review. Here, the requested vacatur is practically equivalent to Plaintiff's requested injunction, because it would prevent the Departments from implementing the Rule's appointment exception. Vacatur therefore possesses the hallmark of the relief barred by § 1252(f)(1).

Consistent with that functional approach, the Supreme Court has repeatedly given a broad interpretation to terms such as "injunction" in other statutes. For example, the Court interpreted a statute conferring jurisdiction over appeals from "injunction[s]" in certain civil actions to apply to orders with a "coercive" effect. *Aberdeen & Rockfish R.R. v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 422 U.S. 289, 307 (1975). The Court commented that it had "repeatedly exercised jurisdiction under [the provision] over appeals from orders" that were "not cast in injunctive language but which by their terms simply 'set aside' or declined to 'set aside' orders of the [agency]." *Id.* at 308 n.11 (quotation omitted). Here, too, vacatur of the Rule's appointment exception would operate like an injunction requiring expanded application of the Rule's presumption beyond what the Departments intended. The Fifth Circuit authority determining that § 1252(f)(1) does not preclude vacatur (cited at Opp. 14–15) runs contrary to— or is at least in significant tension with—the Supreme Court's broader interpretation of an "injunction" as encompassing orders (like vacatur) that have coercive effect. And the text of § 1252(f)(1) is not limited to "injunctions" but applies to orders that "enjoin or restrain the operation of" the covered provisions—and the terms "enjoin" and "restrain" easily encompass a judicial vacatur that interferes with the government's operation of the provisions. *See Aleman Gonzalez*, 596 U.S. at 550.[3]

This Court similarly lacks authority to issue relief affecting the expedited removal

---

[3] In describing § 1252(f)(1) as "nothing more or less than a limit on injunctive relief" in *Reno v. AADC*, the Supreme Court was merely holding that the statute did not provide "an affirmative grant of jurisdiction" to consider a selective-enforcement claim. 525 U.S. 471, 481–82 (1999). It did not consider the question presented here—whether vacatur falls within the statute's limits on relief.

system—such as any injunctive relief, vacatur, or declaratory relief—that precludes the application of the Rule's appointment exception in expedited removal procedures. *See* Mot. 16–17; *see also* 8 U.S.C. § 1252(a)(2)(A)(iv), (e)(1), (3); *Grace v. Barr*, 965 F.3d 883, 891 (D.C. Cir. 2020). Plaintiff does not respond to this point, apparently conceding it.

Finally, the APA, 5 U.S.C. § 706(2), does not permit universal vacatur of a regulation or portions thereof. Mot. 17. Although Fifth Circuit decisions identify vacatur as an available remedy under the APA, *see* Opp. 17 (citing, *inter alia*, *Data Mktg. P'ship, LP v. U.S. Dep't of Labor*, 45 F.4th 846, 859 (5th Cir. 2022)), Defendants make this argument to preserve it. *See* Mot. 17.

For these reasons, Plaintiff lacks standing to challenge the Rule's appointment exception because relief related to the Rule is not likely to redress Plaintiff's claimed injury or is unavailable, and Counts 1 and 2 should be dismissed on this basis. Mot. 17–18.

2.   Standing to Challenge Parole Determinations (Count 3).

The second type of relief Plaintiff seeks—an injunction or related relief prohibiting Defendants from granting parole to *any* noncitizen who uses a DHS scheduling system to pre-schedule their presentment at a POE, FAC § VI(c)—is likewise legally unavailable. As discussed below, *infra* § IV(A), the INA deprives courts of jurisdiction to review discretionary decisions or actions like grants of parole. This prohibition on review necessarily precludes relief—like the relief Plaintiff seeks—that would direct the Executive's exercise of discretion by either compelling or prohibiting the discretionary grant of parole or declaring certain grants of parole unlawful. *See* Mot. 18 (citing *Giammarco v. Kerlikowske*, 665 F. App'x 24, 25–26 (2d Cir. 2016) and *Samirah v. O'Connell*, 335 F.3d 545, 549 (7th Cir. 2003)). Because the INA deprives the Court of jurisdiction to enjoin or declare unlawful grants of parole for noncitizens who pre-schedule their arrival at a POE or direct the exercise of parole, the relief Plaintiff seeks as to Count 3 is unavailable and cannot redress its claimed injury.

## II.   Texas is Not Within the Zone of Interests of the Relevant Immigration Statutes.

Even if Plaintiff could establish Article III standing, Texas is not within the zone of

interests protected by the relevant immigration statutes. Plaintiff is not itself the subject of the challenged regulatory actions. Accordingly, it has no right of review because its "interests are so marginally related to . . . the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987). Nothing in the asylum or parole statutes, or the INA in general, evinces any concern with a policy goal of reducing migration or with States' concerns with impacts of immigration. Mot. 19-20 (citing, *inter alia*, 8 U.S.C. § 1158(d)(7); *Fed'n for Am. Immigr. Reform, Inc. v. Reno*, 93 F.3d 897, 902 (D.C. Cir. 1996)).

Plaintiff argues that Defendants focus too narrowly on the particular asylum and parole provisions at issue. Opp. 23. But these are the relevant statutory provisions, because Plaintiff challenges the Departments' creation of conditions on asylum eligibility under the asylum statute as well as DHS's use of its parole authority.  Plaintiff's "grievance must arguably fall within the zone of interests protected or regulated by the statutory provision . . . invoked in the suit," *Bennett v. Spear*, 520 U.S. 154, 162 (1997), although the structure of the INA is relevant to place the relevant asylum and parole statutes in context for purposes of the zone-of-interests inquiry, *see Clarke*, 479 U.S. at 401. Moreover, Plaintiff points to no provision of the INA that suggests that the immigration statute is concerned with States' fiscal or other interests, or with the fiscal impact of immigration generally. To the contrary, the INA throughout reflects the principle that its provisions are addressed only to—and may be challenged, if at all, only by—individual noncitizens who are regulated by the INA. Mot. 20. Congress clearly did not intend for "judicial review of those issues at the behest of other persons." *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 349 (1984). The INA similarly contains several provisions specifically aimed at protecting the Executive's discretion in the immigration context from the courts. *See, e.g.*, 8 U.S.C. § 1252(a)(2)(B); *AADC*, 525 U.S. at 486-87. And to the extent the Fifth Circuit has previously held that States are within the zone of interests of other immigration provisions, *see* Opp. 23 (citing *Texas v. Biden*, 20 F. 4th 928, 975 (2021) (addressing § 1225(b)(2)), *rev'd*, *Biden v. Texas*, 597 U.S. 785 (2022), and *Texas v. United States*, 809 F.3d 134, 163 (5th Cir. 2015) (addressing

prosecutorial discretion)), the Supreme Court has since made clear in *Enforcement Priorities*—relying on principles that inform not only the scope of Article III but also the scope of the APA's cause of action—that third parties like Plaintiff have no cognizable interest in the way the Executive enforces the immigration laws against others. The INA thus precludes Plaintiff's suit. 5 U.S.C. § 701(a)(1).

### III.   Counts 1 and 2 Do Not State Valid APA Challenges to the Rule.

#### A.   The Rule's Appointment Exception is Within the Departments' Statutory Authority.

Dismissal of Count 1 is proper as a matter of law because the Rule's provisions—including its appointment exception—are well within the Departments' statutory authority with respect to asylum and removal. Mot. 21–25. Indeed, Plaintiff accepts the premise that the Departments may, through regulation, place conditions on asylum eligibility like the Rule's rebuttable presumption of asylum ineligibility. Opp. 25. It nonetheless argues that the Departments somehow lack authority to define the contours of those conditions by making *exceptions* to the presumption of asylum ineligibility. *See* Opp. 25–26, 32–33. But this cannot be. Congress's grant of authority to create conditions or limitations on asylum eligibility necessarily encompasses the ability to define the boundaries of those conditions or limitations, such as by creating exceptions to those conditions or limitations. *See* Mot. 22 (citing examples of asylum regulations creating eligibility conditions with exceptions).

Nor is the appointment exception "inconsistent with" the asylum statute or the INA generally. Contrary to Plaintiff's arguments, the appointment exception does not alter the asylum statute's allocation of the burden of proof. *See* Opp. 25–26. That burden remains on the asylum applicant, even if the applicant is excepted from the Rule's rebuttable presumption. Asylum is a discretionary form of relief from removal for noncitizens in the United States who experienced persecution or have a well-founded fear of persecution in their home country on account of a protected ground. 8 U.S.C. § 1158(b); *see also* 8 U.S.C. § 1101(a)(42)(A) (definition of "refugee"). The burden of proof is on asylum applicants to demonstrate that they meet this

standard. 8 U.S.C. § 1158(b)(1)(B). The Rule added a rebuttable presumption of asylum ineligibility that applies to certain noncitizens who enter the United States via the southwest land border or adjacent coastal borders. If the presumption applies and is not rebutted, the noncitizen cannot obtain asylum. Although the Rule excepts from this presumption those noncitizens who enter at a POE pursuant to a pre-scheduled appointment, 8 C.F.R. § 208.33(a)(2)(ii)(B), to obtain asylum, those noncitizens must still separately demonstrate that they have been persecuted or have a well-founded fear of persecution on account of a protected ground, that they are not subject to any asylum eligibility bars, and that they merit a favorable exercise of discretion. *See, e.g.*, 8 U.S.C. § 1158(b); 8 C.F.R. §§ 208.33, 1208.13. The Rule thus does not entitle those noncitizens to a presumption of asylum *eligibility* and does not "lessen[] the burden of proof on the applicant." *See* Opp. 25.

The Rule's appointment exception is also fully consistent with other provisions of the INA, including § 1103(a)(5). That provision is a *grant* of authority to the Secretary; it does not limit his authority to delineate the contours of a condition on asylum eligibility and indeed places no "substantive limits on the Executive." Mot. 22–23 (quoting *State of Tex. v. United States*, 106 F.3d 661, 667 (5th Cir. 1997)). But even if it did place any such limits, the Rule's appointment exception on its face does not "invite" or "incentivize" illegal entry. Mot. 23–24. Plaintiff's argument to the contrary (at Opp. 26) relies on a conflation of improper entry between POEs with entry at a POE and should thus be rejected. Nor does § 1103(g)(2), by allowing the Attorney General to establish regulations he "determines to be necessary" to carry out his immigration authorities and functions and those of EOIR (a component of the Department of Justice (DOJ)), place any relevant limit on DOJ's authority under 8 U.S.C. §§ 1158(b)(2)(C) and (d)(5)(B) to promulgate regulations concerning the application of conditions on asylum eligibility in immigration proceedings conducted before EOIR. *See* Opp. 26–27; *Lenis v. U.S. Atty. Gen.*, 525 F.3d 1291, 1293 (11th Cir. 2008) (describing the statute as granting "general authority over immigration and nationalization matters to the Attorney General"). In promulgating the Rule, the Attorney General determined it to be necessary. The Complaint does not state a claim that the Rule's appointment exception

exceeds the Departments' statutory authority, and Count 1 should be dismissed.

### B.      The Rule is Reasonable and Considers Relevant Factors.

Count 2 also does not state a claim. The Rule—including its appointment exception—is "reasonable and reasonably explained" and easily withstands the "deferential" arbitrary-and-capricious review standard. *See FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021); Mot. 25–27. Plaintiff's arguments to the contrary rely on a misconstruction of the Rule and its rationales.

Plaintiff argues that the Rule is arbitrary and capricious because, it claims, the Rule's intent is not to reduce overall migration but only irregular entries between POEs, and because the Departments did not consider Texas's concerns that the Rule would lead to higher numbers of noncitizens entering the United States through POEs. Opp. 28–29. Although the Rule's express aim is to reduce irregular migration, a reduction in irregular migration certainly would address Texas's concerns. Indeed, the Rule's approach of coupling incentives to use orderly pathways with new consequences for a failure to use those pathways was modeled after the separate parole-process approaches, which were successful at reducing overall migration from affected populations and not just irregular entries. 88 Fed. Reg. at 31,316–17 (noting that DHS estimated that the drop in encounters between POEs with noncitizens of nationalities covered by the parole processes was four times greater than the number of noncitizens permitted entry to the United States under the parole processes).  Further, a reduction in irregular migration alone would reduce burdens Plaintiff claims to face. The Departments reasoned that a reduction in irregular entries would reduce the strain on border states and non-governmental organizations, allowing them to "better absorb releases from CBP border facilities and provide support to the migrant community." *Id.* at 31,325. Based on this approach, the appointment exception is not "arbitrary," as Plaintiff claims. *See* Opp. 27. It seeks to discourage migrants who have traveled to Mexico from entering irregularly between POEs. *See e.g.*, 88 Fed. Reg. at 31,427 ("The purpose of this rule is to discourage irregular migration by encouraging migrants, including those who may seek asylum,

to use lawful, safe, and orderly pathways to the United States.").

For similar reasons, the Rule's preamble refutes Plaintiff's assertion that the Departments "wholly failed to engage with" Plaintiff's concerns about "the effects of this rule on Texas." Opp. 29; FAC ¶ 77; Mot. 26–27 (citing 88 Fed. Reg. at 31,316, 31,437–38). Although Plaintiff asserts that Texas was concerned with "higher levels of unlawful aliens" and not just crossings between POEs (Opp. 28), the Departments' response that the Rule seeks to reduce irregular migration and promote more orderly processing at POEs reflects its consideration of the impacts of the Rule on states like Plaintiff of surges in border crossings by noncitizens without documents sufficient for admission. *See, e.g.*, 88 Fed. Reg. at 31,328; 88 Fed. Reg. at 11,729. Again, although Plaintiff disagrees with the Departments' conclusions, that does not mean that the Departments failed to reasonably consider the issue. As the Complaint does not allege any reasons that could establish that the appointment exception is arbitrary and capricious, Count 2 should be dismissed.

## IV. Plaintiff's *Ultra Vires* Challenge in Count 3 Is Not Viable.

### A.  The Court Lacks Jurisdiction Over Count 3.

The INA precludes jurisdiction over Plaintiff's claim in Count 3. Congress has insulated from judicial review DHS's decisions to grant parole to individual noncitizens who enter at POEs with an appointment, because the decision whether or not to grant parole rests "in [the] discretion" of the Secretary. Mot. 30–31; 8 U.S.C. § 1182(d)(5)(A); 8 U.S.C. § 1252(a)(2)(B)(ii); *Maldonado v. Macias*, 150 F. Supp. 3d 788, 795 (W.D. Tex. 2015); *see also Samirah v. O'Connell*, 335 F.3d 545, 549 (7th Cir. 2003).

Plaintiff argues that § 1252(a)(2)(B)(ii)'s bar to judicial review does not apply here because it is challenging an alleged parole "program," and § 1252(a)(2)(B)(ii) applies only to singular decisions. Opp. 20–21. Yet § 1252(a)(2)(B)(ii) applies equally to challenges to policies and practices governing the manner of making discretionary actions or decisions, as well as to each underlying decision or action. *See* Mot. 30–31. Indeed, in other contexts, courts have found that § 1252(a)(2)(B)(ii) barred policy-and-practice challenges. *See e.g.*, *Cheejati v. Blinken*, 97 F.4th 988, 993 (5th Cir. 2024) (holding that § 1252(a)(2)(B)(ii) barred challenge to practice concerning

adjustment of status codified in a regulation, because the practice concerned matters within the agency's discretion); *Gebhardt v. Nielsen*, 879 F.3d 980, 987 (9th Cir. 2018) (holding that § 1252(a)(2)(B)(ii) barred challenge to standards used to reach discretionary decision, because those standards were not collateral to the discretionary decision). Thus, if an individual noncitizen attempted to challenge a parole-related policy or process related to the underlying denial of parole, the noncitizen's challenge would be unreviewable under § 1252(a)(2)(B)(ii). There is no basis in the statutory text to exempt Plaintiff's claim from this judicial-review bar simply because it is challenging many grants of parole rather than one, or simply because it is a State rather than a noncitizen subject to the parole determination.

Plaintiff relies only on *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994) (Opp. 21), but the *Thunder Basin* factors do not apply here because § 1252(a)(2)(B)(ii) is an express jurisdiction-stripping provision. *See Bank of Louisiana v. Fed. Deposit Ins. Corp.*, 919 F.3d 916, 922–23 (5th Cir. 2019); *Bohon v. FERC*, 92 F.4th 1121, 1123 (D.C. Cir. 2024). In any event, Plaintiff's argument fails even under *Thunder Basin*.  Plaintiff's claim that DHS lacks statutory authority to grant parole in the manner alleged is not "collateral to" unreviewable individual parole decisions—it is inextricably intertwined with each individual parole determination. And determining the circumstances under which parole is warranted as a matter of discretion is certainly within DHS's expertise. *See Thunder Basin*, 510 U.S. at 213–14 (determining the legal questions raised required interpretation of the Mine Act, which fell within the agency's expertise). Accordingly, an application of the *Thunder Basin* factors would not support a finding of jurisdiction over Count 3.

Finally, Plaintiff does not directly respond to Defendants' arguments that the APA has superseded any common-law *ultra vires* claim, Mot. 29–30, or that Plaintiff's APA claim in Count 3 has other threshold flaws that provide independent grounds to dismiss: DHS's determinations as to when and how to exercise its parole authority are committed to agency discretion by law and are thus not subject to APA review, and Plaintiff has failed to identify a particular agency action or statement that is reviewable under the APA. Mot. 31–33. Accordingly, the Court may dismiss Count 3 on these grounds.

**B.  Count 3 Does Not State an *Ultra Vires* Claim Under Any Theory.**

The Complaint does not state a claim that DHS's use and implementation of the "DHS Scheduling System" is *ultra vires.* Mot. 28–29. As an initial matter, the Rule challenged in this case concerns a limit on eligibility for asylum and does not purport to "provide for, prohibit, or otherwise set any policy regarding DHS's discretionary authority to make parole determinations for those who use the CBP One app." FAC ¶ 91 (quoting 88 Fed. Reg. at 31,331). Accordingly, Plaintiff cannot state a claim that the Rule or its appointment exception constitutes an *ultra vires* "mass parole program." *See* FAC ¶¶ 93–103.[4]

To the extent that Plaintiff seeks to challenge matters outside the Rule as *ultra vires*, Plaintiff does not come close to alleging that DHS is acting without "any colorable basis" in authority by granting parole to noncitizens who are processed at POEs after entering with a pre-scheduled appointment. *See Danos v. Jones*, 652 F.3d 577, 581 (5th Cir. 2011). Congress has expressly charged the Executive with discretionary authority to make parole determinations for arriving noncitizens. 8 U.S.C. § 1182(d)(5)(A). The parole statute provides that the Secretary of Homeland Security "may, except as provided in subparagraph (B) or in section 1184(f) of this title, in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States." *Id.* Even if, as Plaintiff alleges, DHS were to "presume the [noncitizen who uses the CBP One app to schedule a time and place to present at a POE] satisfies the criteria necessary to be paroled into the United States," *see* FAC ¶ 98; *see also* Opp. 30–31, DHS would have at least a "colorable basis" to process those noncitizens for further individual consideration of eligibility for parole. Plaintiff points to no statutory limitation that precludes the use of a presumption when making a "case-by-case" parole determination, or that caps the number of noncitizens who may be granted parole. For example, the statute does not preclude a presumption that noncitizens from particular countries face widespread humanitarian

---

[4] The Opposition argues that the Defendants lack statutory authority to create exceptions to conditions on asylum eligibility, *see* Opp. 32–33, but those arguments are incorrect. *See supra* § III(A). Moreover, Count 3 does not contain any allegations related to these arguments.

**RE.178**

issues, or that the parole of noncitizens who have submitted advance information via the CBP One™ app and passed national security and criminal checks would present a significant public benefit, so long as the agency determines that the standards for parole are met in each individual case.[5] Section 1182(d)(5)(A) sets no limit on how widespread an urgent humanitarian reason or significant public benefit may be, so long as there is a "case-by-case" determination. To state an *ultra vires* claim, Plaintiff must do more than "allege that the actions of the officer are illegal or unauthorized." *Danos*, 652 F.3d at 583 (quoting *Ala. Rural Fire Ins. Co. v. Naylor*, 530 F.2d 1221, 1226 (5th Cir. 1976)). It must point to a "specific statutory limitation" on the Executive's powers. *Naylor*, 530 F.2d at 1226. Plaintiff has not done so.

The Major Questions Doctrine does not alter this analysis. *See* Opp. 31–33. That doctrine is applied only in "extraordinary cases" where an agency invokes new, unanticipated regulatory power, such as power that falls outside its domain, *see West Virginia v. EPA*, 597 U.S. 697, 722–23 (2022); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000), or where it is relying on a "long-extant statute" to claim "unheralded power," *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014). It also applies only to agency action that has "vast political and economic significance" such as new regulatory action that directly impacts 80% or more of the nation, *Ala. Ass'n of Realtors v. Dep't of Health and Human Servs.*, 141 S. Ct. 2485, 2489 (2021) (addressing nationwide eviction moratorium), or directly imposes vaccination and testing requirements on more than 84 million people, *Nat'l Fed'n of Ind. Business v. OSHA*, 142 S. Ct. 661 (2022) (addressing emergency temporary standard imposing COVID-19 vaccination and testing requirements to regulate workplace safety). Here, grants of parole to noncitizens seeking admission are not a new exercise of authority. "Every administration, including the Trump and Biden administrations, has utilized this authority to some extent." *Biden v. Texas*, 597 U.S. 785, 806 (2022); *see also supra* n.5. The use of parole for migrants fleeing humanitarian concerns in

---

[5] Indeed, there is a long history of the Executive using the authority under § 1182(d)(5)(A) to parole noncitizens of particular nationalities, often based on foreign policy concerns. *See, e.g.*, Cuban Family Reunification Program, 72 Fed. Reg. 65,588 (Nov. 21, 2007); Implementation of Haitian Family Parole Reunification Program, 79 Fed. Reg. 75581 (Dec. 18, 2014).

their home countries thus fits well within the statutory text and long historical tradition. Accordingly, this case does not present a scenario where the agency is using a "long-extant statute," *Util. Air Regulatory Grp.*, 573 U.S. at 324, or "making . . . policy judgments" outside its area of "expertise," *West Virginia*, 597 U.S. at 729. Nor does Plaintiff allege DHS's exercise of parole has the type of vast nationwide impact—such as direct, intrusive regulation of vast swaths of the nation—that has triggered the Major Questions Doctrine. Plaintiff asserts only indirect impact based on increased expenditures due to DHS exercising parole authority to release noncitizens. *See, e.g.*, Opp. 4–6. Accordingly, the Major Questions Doctrine does not apply, and the parole statute provides more than a "colorable basis" for DHS to exercise parole authority in the manner Plaintiff alleges. Accordingly, Count 3 does not state a claim.

## CONCLUSION

For the foregoing reasons and those stated in Defendants' Motion, this Court should dismiss Plaintiff's Complaint for lack of jurisdiction or, alternatively, for failure to state a claim.

Dated: May 30, 2024                    Respectfully submitted,

                                       BRIAN M. BOYNTON
                                       *Principal Deputy Assistant Attorney General*

                                       WILLIAM C. PEACHEY
                                       *Director*

                                       EREZ REUVENI
                                       *Counsel*

                                       CHRISTINA P. GREER
                                       BRIAN C. WARD
                                       *Senior Litigation Counsel*

                                       By: /s/ *Katherine J. Shinners*
                                       KATHERINE J. SHINNERS
                                       *Senior Litigation Counsel*
                                       D.C. Bar No. 978141
                                       U.S. Department of Justice, Civil Division
                                       Office of Immigration Litigation – DCS
                                       P.O. Box 868, Ben Franklin Station
                                       Washington, DC 20044
                                       Tel: (202) 598-8259
                                       Fax: (202) 305-7000
                                       Email: katherine.j.shinners@usdoj.gov

                                       ELISSA P. FUDIM
                                       *Trial Attorney*

                                       *Attorneys for Defendants*

24-50717.702

**CERTIFICATE OF SERVICE**

I hereby certify that on the 30th day of May 2024, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel for Plaintiff.

/s/*Katherine J. Shinners*
KATHERINE J. SHINNERS
Senior Litigation Counsel

20

**RE.182**

**Tab 6: Amended Memorandum and Order (ROA.732)**



FILED

AUG 0 5 2024

CLERK, U.S. DISTRICT CLERK
WESTERN DISTRICT OF TEXAS
BY_____
                              DEPUTY

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
DEL RIO DIVISION**

| | |
|---|---|
| **STATE OF TEXAS,** § | |
| § | |
| *Plaintiff,* § | |
| § | |
| **v.** § | **Civil Cause No. 2:23-CV-00024-AM** |
| § | |
| **ALEJANDRO MAYORKAS, in his** § | |
| **official capacity as Secretary of** § | |
| **Homeland Security; UNITED STATES** § | |
| **DEPARTMENT OF HOMELAND** § | |
| **SECURITY; MERRICK GARLAND,** § | |
| **in his official capacity as Attorney** § | |
| **General of the United States; and the** § | |
| **UNITED STATES DEPARTMENT OF** § | |
| **JUSTICE,** § | |
| § | |
| *Defendants.* § | |

## AMENDED MEMORANDUM OPINION AND ORDER

Before the Court is the Defendants' Motion to Dismiss the Plaintiff's First Amended

Complaint ("FAC"). (ECF No. 34.) The Court has reviewed the FAC (ECF No. 23-2), the Motion

to Dismiss (ECF No. 34), the Plaintiff's Response (ECF No. 41), the Defendants' Reply

(ECF No. 42-1), the Defendants' Notice of Supplemental Authority (ECF No. 44-1),

the Plaintiff's Response to the Notice of Supplemental Authority (ECF No. 46), and the relevant

law. For the following reasons, the Court **GRANTS** the Motion.

### I. BACKGROUND

This case concerns a dispute between the State of Texas ("Texas") and various federal

officials and entities, namely: Alejandro Mayorkas, in his official capacity as Secretary of

Homeland Security; the United States Department of Homeland Security ("DHS");

Merrick Garland, in his official capacity as Attorney General of the United States; and the United States Department of Justice ("DOJ") (collectively, "the Defendants"). (FAC at 1.) Texas challenges a rule (the "Rule") that DHS and DOJ promulgated to address migrant crossings at the United States-Mexico border.[1]

The Rule presumes that migrants who traveled through a country other than their own before crossing the southwest border are ineligible for asylum. 88 Fed. Reg. 31,314, 31,321-22. It exempts from that presumption aliens who schedule appointments at a designated Port of Entry ("POE") using the CBP One mobile application ("CBP One app" or "app"). *Id.* at 31,322. Texas claims this exception grants immigration relief in violation of the Immigration and Nationality Act ("INA") to hundreds of thousands of migrants to whom DHS would otherwise deny entry into the United States. (*See generally* FAC.) Texas asks the Court to vacate the Rule's exception for CBP One app users, enjoin its enforcement, and declare the Defendants' acts unlawful. (*Id.* at 1-2.) The Court summarizes Texas's allegations below.

## A. Factual Background

### a. *Title 42 Order*

The Centers for Disease Control and Prevention ("CDC") authorized the expulsion of noncitizens who lacked sufficient documents for entry into the United States under Title 42 ("Title 42 Order") during the COVID-19 pandemic. (FAC 3 at ¶ 9.) Expelled migrants could not assert asylum claims, and DHS did not place them in immigration proceedings under that order.

---

[1] The United States District Court for the Northern District of California vacated the Rule in July 2023. *E. Bay Sanctuary Covenant v. Biden*, 683 F. Supp. 3d 1025, 1030, 1054 (N.D. Cal. 2023). However, the United States Court of Appeals for the Ninth Circuit stayed the district court's order pending appeal and held the appeal in abeyance. *E. Bay Sanctuary Covenant*, No. 23-16032, 2023 WL 11662094 (9th Cir. Aug. 3, 2023); *E. Bay Sanctuary Covenant v. Biden*, 93 F.4th 1130 (9th Cir. 2024) (mem.). The Rule thus remains in effect.

**RE.185**

(*Id.*) The Biden Administration announced that the Title 42 Order would expire on May 11, 2023. (*Id.* at ¶ 10.)

### b. *The CBP One App*

United States Customs and Border Protection ("CBP") launched the CBP One app on October 28, 2020. (*Id.* 6 at ¶ 23.) Upon its release, the app offered functions such as providing Form I-94 information and allowing travelers to schedule inspection appointments for perishable cargo.[2] (*Id.* at ¶ 24.) CBP introduced new app features in January 2023 that allow noncitizens in central or northern Mexico to schedule an appointment to present themselves at a port of entry ("POE"). (*Id.* 6-7 at ¶¶ 25-26.) App users input their method of entry (land, air, or sea), name, physical location, photo, contact and family information, and preferred POE among eight POEs, five of which are in Texas: Brownsville, El Paso, Eagle Pass, Hidalgo, and Laredo.[3] (*Id.* 9 at ¶¶ 39-40, 44.) Migrants may seek asylum or other forms of protection from removal during their appointment but not through the app. (*Id.* 9-10 at ¶¶ 45-46.)

### c. *The Rule*

DHS and DOJ jointly issued a notice of proposed rulemaking on February 23, 2023 for a new regulation designed to encourage app use and streamline POE processing in anticipation of a migrant surge after the Title 42 Order expired. (*Id.* 7 at ¶¶ 27-28); *see generally* 88 Fed. Reg. 11,704. The Defendants jointly issued the Rule, titled "Circumvention of Lawful Pathways," on May 16, 2023 after the notice-and-comment process concluded. (FAC 7 at ¶ 29); 88 Fed. Reg.

---

[2] Form I-94 records an admitted alien's arrival and departure ("admit until") dates. *See Form I-94, Arrival/Departure Record, Information for Completing USCIS Forms*, U.S. CITIZENSHIP & IMMIGR. SERVS., https://www.uscis.gov/forms/all-forms/form-i-94-arrivaldeparture-record-information-for-completing-uscis-forms (last visited July 23, 2024); *see generally Official Site for Travelers Visiting the United States*, U.S. CUSTOMS & BORDER PROT., https://i94.cbp.dhs.gov/I94/ (last visited July 23, 2024).

[3] Users must be physically located in northern or central Mexico to request an appointment. (FAC 9 at ¶ 43.)

**RE.186**

24-50717.734

31,314. The Rule creates a presumption of asylum ineligibility for noncitizens who enter the United States from Mexico at the southwest land border or adjacent coastal borders, after traveling through a country other than their country of citizenship or nationality. (FAC 7-8 at ¶¶ 30-31.)

The Rule instructs asylum officers and immigration judges to apply the presumption during removal proceedings and credible fear screenings. *See* 88 Fed. Reg. 31,450. The presumption does not apply to unaccompanied children, *id.*, or noncitizens who: (1) "provided appropriate authorization to travel to the United States to seek parole, pursuant to a DHS-approved parole process;" (2) "[p]resented at a port of entry, pursuant to a pre-scheduled time and place;" (3) "presented at a port of entry without a pre-scheduled time and place" and "demonstrate[] by a preponderance of the evidence that it was not possible to access or use the DHS scheduling system" as a result of certain barriers; or (4) sought and was denied "asylum or other protection in a country through which" they traveled. *Id.* The Rule's presumption ostensibly raises the evidentiary burden that aliens must satisfy to gain asylum.[4] The INA requires asylum applicants to demonstrate refugee status, and the Rule presumes applicants are not refugees. *See, e.g.*, 8 U.S.C. § 1158(b)(1)(B)(i). Applicants may overcome that presumption by demonstrating "exceptionally compelling circumstances" such as medical emergencies and "extreme threat[s] to life and safety." *Id.* The Rule's exceptions waive this additional requirement. *Id.*

### d. Texas's Challenge to the Rule

Texas challenges the Rule's exception for migrants who schedule appointments using the CBP One app. (*See generally* FAC.) According to Texas, the "app has facilitated the largest

---

[4] The Northern District of California found that the Rule's presumption of ineligibility makes it harder for aliens to gain asylum. *E. Bay Sanctuary Covenant*, 683 F. Supp. 3d at 1041 ("[t]he Rule effectively conditions asylum eligibility on whether a noncitizen qualifies for any of three exceptions").

expansion of migrant processing" at southwest-border POEs in history. (*Id.* 8 at ¶ 34 (quotation marks omitted).) The appointment exception purportedly encourages aliens to enter the United States without establishing that they meet an exception to removal or may lawfully remain in the country. (*Id.* 10 at ¶ 49.) Texas contends that the exception "confers a legal benefit" on otherwise-inadmissible app users, deeming them to have entered the United States legally. (*Id.* 10-11 at ¶ 51.) The Rule allegedly incents migrants who lack documents or meritorious asylum claims to enter the United States during an all-time-high inflow of such migrants. (*Id.* 14 at ¶ 47.) Texas claims it suffers significant costs from app-facilitated migration because five of the eight POEs are in Texas. (*Id.* 13 at ¶¶ 44-45.)

CBP has allegedly expanded the availability of CBP One app appointments over time. (*Id.* 11 at ¶ 56.) The Defendants made approximately 740 appointments available per day before the Title 42 Order expired. (*Id.* 11-12 at ¶ 57.) Daily availability increased to 1,000 after its expiration, then climbed to 1,450 on June 30, 2023. (*Id.* 12 at ¶ 57 & n.16.)

The Defendants allegedly parole nearly all migrants who use the CBP One app. (*Id.* at ¶ 58.) Between January 12, 2023 and September 30, 2023, migrants scheduled 278,431 CBP One app appointments and the Defendants issued "notices to appear" to and paroled 266,846 app users. (*Id.*) Texas alleges that the Defendants' "*en masse*" parole inflicts public-services costs on Texas. (*Id.* 13 at ¶ 45.)

Texas filed suit on May 23, 2023, seeking to enjoin the Rule's appointment exception. (ECF No. 1.) The Court granted the Defendants a time extension to file an answer (ECF No. 8), and the Defendants filed a Motion to dismiss the Complaint on August 30, 2023. (ECF No. 20.) The Court granted Texas an extension of time to respond to the Defendants' Motion to Dismiss the Complaint, and Texas requested leave to amend its Complaint on November 10, 2023.

24-50717.736

(ECF Nos. 22, 23.)  The Court granted Texas's request and dismissed the Defendant's Motion to Dismiss the Complaint without prejudice.  (ECF No. 29.)

Texas filed its FAC on February 5, 2024.  The FAC asks the Court to vacate, declare unlawful, and enjoin implementation of the Rule's appointment exception.  (FAC at 25.) Count I alleges that the exception exceeds statutory authority and violates 5 U.S.C. § 706(2)(A), (C).  (*Id.* 16-19 at ¶¶ 54-72.)  Count II alleges that the exception is arbitrary and capricious under 5 U.S.C. § 706(2)(A).  (*Id.* 20-22 at ¶¶ 73-86.)  Count III alleges that the app's scheduling function is *ultra vires* under common law and under 5 U.S.C. § 702.  (*Id.* 22-24 at ¶¶ 87-103.)

The Defendants moved to dismiss the FAC on March 15, 2024.  (ECF No. 34.)  Texas filed a Response in Opposition on May 10, 2024.  (ECF No. 41.)  The Defendants filed a Reply on May 30, 2024.  (ECF No. 42-1.)  The Defendants filed a Notice of Supplemental Authority on July 3, 2024.  (ECF No. 44-1.)  Texas filed a Response to the Notice of Supplemental Authority on July 15, 2024.  (ECF No. 46.)  The Motion to Dismiss (ECF No. 34) is now ripe for decision.

## II. ANALYSIS

### A. Statutory Background

"Any alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival . . .) . . . may apply for asylum . . . ." 8 U.S.C. § 1158(a)(1).  Aliens whom the DHS Secretary or the Attorney General determines are "refugees" qualify for asylum.[5]  *Id.* § 1158(b)(1)(A).  Asylum applicants bear the burden of proof to show

---

[5] Generally, the term "refugee" under the INA refers to migrants who cannot return to their home country due to "persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion."  8 U.S.C. § 1101(a)(42)(A).  Asylum applicants must establish that "race, religion, nationality, membership in a particular social group, or political opinion was or will be at least one central reason for persecuting the applicant."  *Id.* § 1158(b)(1)(B)(i).

refugee status. *Id.* § 1158(b)(1)(B)(i). The Attorney General may promulgate regulations that "establish additional limitations and conditions, consistent with this section, under which an alien shall be ineligible for asylum." *Id.* § 1158(b)(2)(C).[6]

The DOJ generally must detain applicants until their asylum proceedings conclude. *Id.* § 1225(b)(1)(B)(iii)(IV) ("Any alien subject to the procedures under this clause shall be detained pending a final determination of credible fear of persecution."). However, the Attorney General "in his discretion" may "parole [an alien] into the United States . . . ." *See id.* § 1182(d)(5)(A). This discretion "is not unbounded." *Biden v. Texas*, 597 U.S. 785, 806 (2022). The DOJ may parole asylum applicants "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." *Id.* § 1182(d)(5)(A). Congress added this language to address "concern that parole under § 1182(d)(5)(A) was being used by the executive to circumvent congressionally established immigration policy." *Cruz-Miguel v. Holder*, 650 F.3d 189, 199 n.15 (2d Cir. 2011) (discussing 1996 amendment to INA's parole provision). At least one court in this circuit has rejected grants of parole "on a categorical basis by a broad, programmatic decision." *Texas v. Biden*, 646 F. Supp. 3d 753, 774 (N.D. Tex. 2022), *appeal dismissed*, No. 23-10143, 2023 WL 5198783 (5th Cir. May 25, 2023).

---

[6] Because the Court lacks jurisdiction to address the Rule 12(b)(6) arguments, the Court does not reach whether the Rule was properly promulgated or whether the Defendants' parole decisions violate the INA's requirements. Moreover, the Court is aware of an internal DHS report indicating that the program on which the Rule was based was rife with fraud. *See, e.g.*, Camilo Montoya-Galvez, *U.S. Pauses Migrant Sponsorship Program Due to Fraud Concerns*, CBSNEWS.COM (Aug. 2, 2024), https://www.cbsnews.com/news/us-migrant-sponsorship-program-paused-cuba-haiti-nicaragua-venezuela/; Adam Shaw, *Biden Admin Freezes Controversial Migrant Flight Program after Fraud Revelations*, FOXNEWS.COM (Aug. 2, 2024), https://www.foxnews.com/politics/biden-admin-freezes-controversial-migrant-flight-program-after-fraud-revelations. No party has provided a copy of this report to the Court. Regardless, the report does not affect the Court's standing analysis.

**RE.190**

**B.  Dismissal Under Rule 12(b)(1) – Subject Matter Jurisdiction**

The  Defendants'  Motion  to  Dismiss  proceeds  under  Rules  12(b)(1)  and  12(b)(6). (ECF No. 34.)  "When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits."  *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).  The Court therefore first addresses the Defendants' Rule 12(b)(1) arguments.

Under Federal Rule of Civil Procedure 12(b)(1), "[a] case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case."  *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998) (quotation marks and citation omitted).  The plaintiff must prove jurisdiction.  *Id.* Courts assessing subject matter jurisdiction under Rule 12(b)(1) may consider: "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981).

The  power  of  the  federal  judiciary  extends  only  to  "Cases"  and  "Controversies." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337 (2016); U.S. Const. art. III, § 2.  "One element of the case-or-controversy requirement is that [a plaintiff], based on [its] complaint, must establish that [it has] standing to sue."  *Raines v. Byrd*, 521 U.S. 811, 818 (1997).  A plaintiff need only "allege facts that give rise to a plausible claim of . . . standing" at the motion-to-dismiss stage. *Cornerstone Christian Sch. v. Univ. Interscholastic League*, 563 F.3d 127, 134 (5th Cir. 2009). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those

specific facts that are necessary to support the claim.'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990)).

A plaintiff "does not have standing to challenge a government regulation simply because [it] believes that the government is acting illegally." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024) (citing *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 473 (1982)). It may not sue based only on an "asserted right to have the Government act in accordance with law." *Id.* (quotation omitted). There is no general "overs[ight of] the conduct of the National Government by means of lawsuits in federal courts." *Id.* at 396 (quotation omitted) (citing *United States v. Texas* (*Enforcement Priorities*), 599 U.S. 670, 685 (2023)).

The "irreducible constitutional minimum of standing contains three elements." *Lujan*, 504 U.S. at 560. "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo*, 578 U.S. at 338. The plaintiff bears the burden to show standing. *Id.* "[P]laintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).

The first prong of the standing inquiry is injury. "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 578 U.S. at 339 (quoting *Lujan*, 504 U.S. at 560). Particularity requires that the plaintiff be affected in a "personal and individual way." *Id.* (quoting *Lujan*, 504 U.S. at 560 n.1). A plaintiff who seeks to ensure that a defendant complies with the law does not have "grounds for Article III standing" absent

24-50717.740

some "physical, monetary, or cognizable intangible harm traditionally recognized as providing a basis for a lawsuit in American Courts." *TransUnion*, 594 U.S. at 427-28.

The FAC alleges cognizable injuries in the form of healthcare, education, and law enforcement expenditures.[7] Generally, a "pocketbook injury" is "a prototypical form of injury in fact." *Collins v. Yellen*, 594 U.S. 220, 243 (2021). "For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'" *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 465 (2017) (citation omitted). Texas cites another district court's factual findings to support its claim that it has standing to challenge federal programs that allegedly cause Texas to "incur[] costs from increased illegal immigration into the State in . . . health care, education, and law enforcement." *Texas v. Garland*, No. 5:23-CV-034-H, 2024 WL 967838, at *11 (N.D. Tex. Feb. 27, 2024).[8]

Texas first alleges healthcare costs. (FAC 15 at ¶¶ 50-54; *see also* ECF No. 39 at 4-5.) The Northern District of Texas found that Texas spends millions to provide Emergency Medicaid coverage and Texas Children's Health Insurance Program Perinatal Coverage to migrants and their children. *Garland*, 2024 WL 967838, at *11. Federal law requires States to provide Medicare and Medicaid emergency services without regard to a recipient's immigration status. *See* 42 U.S.C. § 1395dd; 42 C.F.R. § 440.255. Texas bears part of the cost of those services when qualifying

---

[7] The Court declines to address allegations of harm abandoned in Texas's Response to the Motion to Dismiss. (*Compare* FAC 13-14 at ¶ 45-49, *with* ECF No. 39 at 3-6); *see McClelland v. Katy Indep. Sch. Dist.*, 63 F.4th 996, 1010 (5th Cir. 2023) ("a party abandons a claim by failing to defend it in response to motions to dismiss") (collecting cases), *cert. denied*, 144 S. Ct. 348 (2023) (mem.), *reh'g denied*, 144 S. Ct. 629 (2024) (mem.). The Court has considered these alleged injuries, including costs derived from driver's license subsidies, depression of citizens' wages, and harms to Texas's sovereignty, and finds they do not support Article III standing.

[8] Texas alleges general healthcare, education, and law enforcement costs. (*See* FAC; ECF No. 39 at 13-16.) Texas provides the specific amounts listed below in its Response to the Defendants' Motion to Dismiss (ECF No. 41) and cites *Garland*, 2024 WL 967838, for each figure.

**RE.193**

24-50717.741

migrants obtain covered healthcare services in Texas.  *Garland*, 2024 WL 967838, at *11 (citing 8 U.S.C. § 1611(b)(1)(A)).

Texas also alleges education costs. (FAC 14 at ¶ 47; *see also* ECF No. 39 at 5.)  It claims it spends millions per year to educate migrants and their children. (ECF No. 39 at 5.)  The Northern District of Texas found that "the average funding entitlement from state and local sources for fiscal year 2023 will be $9,564 per student in attendance for an entire school year," and "[t]o provide additional bilingual education, which Texas does for most alien children, Texas must spend $11,781 to educate each student."  *Garland*, 2024 WL 967838, at *11 (quotations omitted). Texas cannot avoid these costs because "consistent with the Equal Protection Clause of the Fourteenth Amendment, Texas may [not] deny to undocumented school-age children the free public education that it provides to children who are citizens of the United States or legally admitted aliens."  *Plyler v. Doe*, 457 U.S. 202, 205 (1982).

Texas last alleges law enforcement costs. (FAC 13 at ¶ 45; *see also* ECF No. 39 at 5.) The Northern District of Texas found that the Texas Department of Criminal Justice ("TDCJ") spends a daily amount of $77.49 systemwide for an individual inmate. *Garland*, 2024 WL 967838, at *11.  The TDCJ incarcerated 6,914 undocumented aliens for violations of state or local law for a total of 2,019,635 days in fiscal year 2022 and spent $156,501,516.  *Id.*  Texas spent approximately $4.69 per day for those released on parole or mandatory supervision.  *Id.* "[R]eimbursement of these costs from the federal government is minimal."  *Id.*  For fiscal year 2021, TDCJ spent $153,786,422 on such incarceration costs but received only $14,883,040 in federal reimbursement.  *Id.*  "'[T]o the extent the number of aliens in TDCJ custody increases, TDCJ's unreimbursed expenses will increase as well.'"  *Id.* (citation omitted).

The Fifth Circuit has found that "financial harms are readily cognizable and well-established" when a State claims they arise from an unlawful federal program. *See Gen. Land Off. v. Biden*, 71 F.4th 264, 272 (5th Cir. 2023); *see also, e.g., Texas v. Biden (MPP I)*, 10 F.4th 538, 547-48 (5th Cir. 2021); *Texas v. Biden (MPP II)*, 20 F.4th 928, 969-72 (5th Cir. 2021), *as revised* (Dec. 21, 2021), *rev'd and remanded*, 597 U.S. 785 (2022); *Texas v. United States (DACA)*, 50 F.4th 498, 517-19 (5th Cir. 2022).   However, the Supreme Court has more recently narrowed plaintiffs' standing to challenge federal programs based on indirect, downstream monetary costs such as those Texas claims here. *See, e.g., Enforcement Priorities*, 599 U.S. 670;[9] *All. for Hippocratic Med.*, 602 U.S. 367.

Texas and Louisiana alleged in *Enforcement Priorities* that an Executive policy concerning the arrest and removal of noncitizens inflicted higher social-service and law-enforcement costs on States because the federal government failed to arrest more noncitizens under that policy.   599 U.S. at 674.    The Supreme Court held that States have no cognizable injury arising from Executive Branch guidelines concerning the exercise of Article II foreign-policy and "[law-]enforcement discretion over arrests and prosecutions" for immigration law violations. *Id.* at 679.   "[F]or standing purposes, the absence of coercive power over the plaintiff makes a difference:   When 'a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of someone else, much more is needed' to establish standing.'" *Id.* at 678 (quoting *Lujan*, 504 U.S. at 561-62).   "A 'telling indication of the severe constitutional problem' with the States' assertion of standing to bring th[at] lawsuit '[wa]s the lack of historical

---

[9] "[F]ederal policies frequently generate indirect effects on state revenues or state spending.   And when a State asserts, for example, that a federal law has produced only those kinds of indirect effects, the State's claim for standing can become more attenuated." *Id.* at 680 n.3. (citing *Massachusetts v. Laird*, 400 U.S. 886 (1970), and *Florida v. Mellon*, 273 U.S. 12, 16-18 (1927)).

**RE.195**

precedent' supporting it." *Id.* at 677 (quoting *Free Enter. Fund v. Public Co. Acct. Oversight Bd.*, 561 U.S. 477, 505 (2010) and *Raines v. Byrd*, 521 U.S. 811, 826 (1997)). The Supreme Court anticipated that "green-light[ing]" such a suit would precipitate challenges to "alleged Executive Branch under-enforcement of any similarly worded laws—whether they be drug laws, gun laws, obstruction of justice laws, or the like." *Id.* at 681. The Court "declin[ed] to start the Federal Judiciary down that uncharted path." *Id.*

These principles apply here. The Rule and its appointment exception do not involve the exercise of coercive power over Texas. *See Enforcement Priorities*, 599 U.S. at 678-81. The Rule implicates foreign-policy and law-enforcement discretion that Article II entrusts to the Executive Branch. *See id.* Texas "ha[s] not cited any precedent, history, or tradition of courts ordering the Executive Branch to change its" asylum policies so that the Executive Branch denies asylum or parole to more migrants. *Id.* at 677. While *Enforcement Priorities* noted that detention policies "arguably might" yield a different standing calculus, this case does not concern "the continued detention of noncitizens who have already been arrested" because the Defendants parole the migrants at issue without first arresting them.[10] *Id.* at 683.[11] The FAC therefore fails to allege judicially cognizable harm.

---

[10] Texas has not alleged that the Defendants arrest app users before paroling them.

[11] The court in *Garland* neither cited nor engaged with the reasoning of *Enforcement Priorities* in finding that Texas's indirect costs passed constitutional muster. *See* 2024 WL 967838, at *21-22 (applying pre-*Enforcement Priorities* Fifth Circuit precedents). However, at least one district court has found that *Enforcement Priorities* does not bar Article III standing based on the kinds of injuries Texas alleges based on that decision's potential "continued detention" exception. *See Florida v. United States*, No. 3:21-CV-1066-TKW-ZCB, 2024 WL 677713, at *2 (N.D. Fla. Feb. 20, 2024) (discussing *Enforcement Priorities*, 599 U.S. at 683 (quoting *Biden*, 597 U.S. 785, which left unanswered "whether the detention requirement in [8 U.S.C. §] 1225(b)(2)(A) is subject to principles of law enforcement discretion, as the Government argues, or whether the Government's current practices simply violate that provision.")). The *Florida* court reaffirmed its pre-*Enforcement Priorities* finding that additional public-education costs allegedly derived from immigration parole policies constitute cognizable injuries. 2024 WL 677713, at *2. Notably, that decision concerned a direct challenge to parole polices. *Id.* Here, Texas

**RE.196**

24-50717.744

Texas lacks Article III standing for want of cognizable harm. The Court thus need not address the traceability or redressability prongs of Article III standing analysis. Accordingly, the Court also lacks subject matter jurisdiction to reach the Defendants' Rule 12(b)(6) arguments. The Court therefore must dismiss the FAC without prejudice.[12]

### III. CONCLUSION

For the foregoing reasons, the Defendants' Motion to Dismiss (ECF No. 34) is **GRANTED**. The Amended Complaint is **DISMISSED WITHOUT PREJUDICE**. Texas shall have thirty (30) days from the date of this Memorandum Opinion and Order to amend its pleading to allege facts sufficient to establish Article III standing.

IT IS SO ORDERED.

SIGNED and ENTERED on this 5th day of August 2024.

ALIA MOSES
Chief United States District Judge

---

challenges an asylum policy with potential consequences for asylum and parole determinations. *Enforcement Priorities* contemplates no similar exception for asylum policies.

[12] "When a district court dismisses a case for lack of subject matter jurisdiction, the proper course is to dismiss the case without prejudice." *See Fort Bend Cnty. v. U.S. Army Corps of Eng'rs*, 59 F.4th 180, 191 n.4 (5th Cir. 2023); *Ramming*, 281 F.3d at 161. "This requirement prevents a court without jurisdiction from prematurely dismissing a case with prejudice." *Ramming*, 281 F.3d at 161.

24-50717.745

**TAB 7: NOTICE OF APPEAL (ROA.746)**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
DEL RIO DIVISION

STATE OF TEXAS
    *Plaintiff,*

v.

ALEJANDRO MAYORKAS, in his official
capacity as Secretary of Department of
Homeland Security; UNITED STATES
DEPARTMENT OF HOMELAND
SECURITY; MERRICK GARLAND, in his
official capacity as Attorney General of the
United States, UNITED STATES
DEPARTMENT OF JUSTICE,
    *Defendants.*

No. 2:23-cv-00024

### DEFENDANT'S NOTICE OF APPEAL OF FINAL ORDER

Defendant the State of Texas ("Texas"), by and through the Office of the Attorney General of Texas, appeals this Court's Order entered on August 5, 2024, to the United States Court of Appeals for the Fifth Circuit. See Amended Order granting Motion to Dismiss, ECF No. 48. That Order granted the Motion to Dismiss First Amended Complaint filed by Alejandro Mayorkas, in his official capacity; U.S. Department of Homeland Security; Merrick Garland, in his official capacity; and U.S Department of Justice (collectively, the "Defendants). See Amended Order granting Defendants' Motion to Dismiss, ECF No. 48; see also Defendants' Motion to Dismiss First Amended Complaint, ECF No. 34.

The order granting dismissal is appealable pursuant to 28 U.S.C. § 1291.

Dated September 3, 2024.                    Respectfully submitted.

**KEN PAXTON**                              /s/ Ryan Kercher
Attorney General of Texas                   **RYAN KERCHER**
                                            Deputy Chief, Special Litigation Division
**BRENT WEBSTER**                           Tex. State Bar No. 24060998
First Assistant Attorney General            ryan.kercher@oag.texas.gov

**AUSTIN KINGHORN**                         **JACOB PRZADA**
Deputy Attorney General for Legal Strategy  Special Counsel
                                            Tex. State Bar No. 24125371
**RYAN D. WALTERS**                         jacob.przada@oag.texas.gov
Chief, Special Litigation Division
                                            **COUNSEL FOR THE STATE OF TEXAS**

                                            Office of the Attorney General of Texas
                                            P.O. Box 12548, Capitol Station
                                            Austin, Texas 78711-2548
                                            (512) 463-4139


### CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on September 3, 2024, and that all counsel of record were served by CM/ECF.

/s/Ryan Kercher
RYAN KERCHER

## CERTIFICATE OF SERVICE

On November 20, 2024, these record excerpts were served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

*/s/ Ryan Kercher*
RYAN KERCHER
Special Counsel