No. 24-50717

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

State of Texas,

*Plaintiff-Appellant*,

v.

Alejandro Mayorkas, Secretary, U.S. Department of Homeland Security; United States Department of Homeland Security; Merrick Garland, U.S. Attorney General; United States Department of Justice,

*Defendants-Appellees*,

On Appeal from the United States District Court
for the Western District of Texas, Case No. 2:23-cv-00024

## BRIEF FOR DEFENDANTS-APPELLEES

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*
EREZ REUVENI
*Assistant Director*

KATHERINE J. SHINNERS
*Senior Litigation Counsel*
U.S. Department of Justice, Civil Division
Office of Immigration Litigation,
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
BRIAN C. WARD
CHRISTINA GREER
*Senior Litigation Counsel*

## CERTIFICATE OF INTERESTED PERSONS

Under the fourth sentence of Fifth Circuit Rule 28.1.1, Appellees, as governmental parties, are not required to provide a certificate of interested persons.

*/s/ Katherine J. Shinners*
KATHERINE J. SHINNERS
United States Department of Justice

## STATEMENT REGARDING ORAL ARGUMENT

Appellees respectfully request oral argument in this case.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........................................................ i

STATEMENT REGARDING ORAL ARGUMENT ............................................. ii

TABLE OF CONTENTS ................................................................................... iii

TABLE OF AUTHORITIES ............................................................................. v

INTRODUCTION ........................................................................................... 1

STATEMENT OF JURISDICTION .................................................................... 3

ISSUE PRESENTED ....................................................................................... 4

STATEMENT OF THE CASE ........................................................................... 4

I.      Legal Background on Asylum and Immigration Processing of
        Arriving Noncitizens ........................................................................ 4

II.     The Circumvention of Lawful Pathways Rule .................................. 8

III.    Procedural HIstory of this Lawsuit ................................................ 13

SUMMARY OF THE ARGUMENT ................................................................. 17

STANDARD OF REVIEW ............................................................................. 19

ARGUMENT ............................................................................................... 19

I.      Plaintiff Lacks Article III Standing. .............................................. 19

        A.      Plaintiff's Alleged Injury of Incidental, Downstream Costs Is
                Not Cognizable. ................................................................. 20

        B.      Plaintiff's Claimed Injury is Speculative and Attenuated. .............. 40

        C.      Plaintiff is Not Entitled to Special Solicitude. ................... 44

D.  Plaintiff's Claimed Injury is Not Fairly Traceable to the Rule or Redressable by the Relief it Seeks. ...............................................48

II.  This Court Need Not Reach Plaintiff's Other Arguments. .......................... 52

CONCLUSION ...................................................................................... 55

CERTIFICATE OF COMPLIANCE ...................................................... 566

CERTIFICATE OF SERVICE .............................................................. 577

# TABLE OF AUTHORITIES

*Arizona v. Biden*,
  40 F.4th 375 (6th Cir. 2022) ........................................................ 25, 45

*Arizona v. Garland*,
  No. 6:22-cv-01130, 2024 WL 1645417 (W.D. La. Apr. 16, 2024) ................... 41

*Arizona v. United States*,
  567 U.S. 387 (2012) ....................................................................... 7

*Arnesen v. Raimondo*,
  115 F.4th 410 (5th Cir. 2024) ........................................................ 52

*Bennett v. Spear*,
  520 U.S. 154 (1997) ..................................................................... 53

*Biden v. Texas*,
  597 U.S. 785 (2022) ................................................................. 30, 31

*Califano v. Yamasaki*,
  442 U.S. 682 (1979) ..................................................................... 51

*California v. Texas,*
  593 U.S. 659 (2021) ................................................................. 46, 48

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ................................................................. 19, 43

*Clarke v. Sec. Indus. Ass'n*,
  479 U.S. 388 (1987) ..................................................................... 53

*Cornerstone Christian Sch. v. Univ. Interscholastic League*,
  563 F.3d 127 (5th Cir. 2009) ...................................................... 19, 20

*Crane v. Johnson*,
  783 F.3d 244 (5th Cir. 2015) ........................................................... 7

*Dep't of Commerce v. New York*,
  588 U.S. 752 (2019) ................................................................. 33, 46

*East Bay Sanctuary Covenant v. Biden*,
   93 F.4th 1130 (9th Cir. 2024) ...................................................13

*East Bay Sanctuary Covenant v. Biden*,
   683 F. Supp. 3d 1025 (N.D. Cal. 2023) ...................................13

*East Bay Sanctuary Covenant v. Biden*,
   No. 23-16032 (9th Cir. Aug. 3, 2023) .....................................13

*Fed'n for Am. Immigration Reform, Inc. v. Reno*,
   93 F.3d 897 (D.C. Cir. 1996) ...................................................53

*Flores v. Garland*,
   72 F.4th 85 (5th Cir. 2013) ......................................................51

*Florida v. Mellon*,
   273 U.S. 12 (1927) ...................................................................24

*Food & Drug Admin. v. All. for Hippocratic,
   Med.*, 602 U.S. 367 (2024) .................................................... 15, passim

*Gen. Land Off. v. Biden*,
   71 F.4th 264 (5th Cir. 2023) ....................................................42

*Giammarco v. Kerlikowske*,
   665 F. App'x 24 (2d Cir. 2016) ................................................52

*Haaland v. Brackeen*,
   599 U.S. 255 (2023) .................................................................36

*Harrison v. Jefferson Parish School Board*,
   78 F.4th 765 (5th Cir. 2023) ....................................................46

*In re Bonvillian Marine Serv., Inc.*,
   19 F.4th 787 (5th Cir. 2021) ................................................ 26, 47

*Leng May Ma v. Barber*,
   357 U.S. 185 (1958) ...................................................................8

*Loa-Herrera v. Trominski,*
  231 F.3d 984 (5th Cir. 2000) ..................................................51

*Louisiana v. Nat'l Oceanic & Atmospheric Admin.,*
  70 F.4th 872 (5th Cir. 2023) .................................................47

*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992) .............................................. 20, 23, 46

*Marino v. Nat'l Oceanic & Atmospheric Admin.,*
  33 F.4th 593 (D.C. Cir. 2022) ...............................................49

*Massachusetts v. EPA,*
  549 U.S. 497 (2007) ......................................... 44, 45, 46, 47

*Massachusetts v. Laird,*
  400 U.S. 886 (1970) ...........................................................25

*Matter of E-R-M- & L-R-M,*
  25 I. & N. Dec. 520 (BIA 2011) ................................7, 28, 49

*Netflix, Inc. v. Babin,*
  88 F.4th 1080 (5th Cir. 2023) ...............................................45

*Okpalobi v. Foster,*
  244 F.3d 405 (5th Cir. 2001) ...............................................52

*Paterson v. Weinberger,*
  644 F.2d 521 (5th Cir. 1981) ...............................................19

*Printz v. United States,*
  521 U.S. 898 (1997) ...........................................................24

*Reno v. Am.-Arab Anti-Discrimination Comm.,*
  525 U.S. 471 (1999) ...........................................................28

*Rollins v. Home Depot USA,*
  8 F.4th 393 (5th Cir. 2021) ..................................................38

*Samirah v. O'Connell*,
  335 F.3d 545 (7th Cir. 2003) ................................................. 32, 51, 52

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016) ................................................................. 20

*State of Tex. v. United States*,
  106 F.3d 661 (5th Cir. 1997) ..................................................... 39

*Texas v. Biden,*
  20 F.4th 928 (5th Cir. 2021) ...................................................... 35

*Texas v. United States Dep't of Homeland Sec.*,
  No. 6:23-cv-00007, 2024 WL 1021068 (S.D. Tex. Mar. 8, 2024) ..................... 41

*Texas v. United States*,
  40 F.4th 205 (5th Cir. 2022) ...................................................... 44

*Texas v. United States*,
  599 U.S. 670 (2023) ....................................................... 7, passim

## STATUTES

5 U.S.C. § 706(2) .................................................................. 50

5 U.S.C. § 706(2)(A) ............................................................... 14

6 U.S.C. § 557 ...................................................................... 5

8 U.S.C. § 1101(a)(42)(A) ........................................................... 5

8 U.S.C. § 1158(a)(1) ............................................................... 5

8 U.S.C. § 1158(a)(1)-(2) ........................................................... 4

8 U.S.C. § 1158(b)(1)(A) ..................................................... 4, 5, 31

8 U.S.C. § 1158(b)(2)(A) ............................................................ 5

8 U.S.C. § 1158(b)(2)(C) .................................................... 5, 9, 31

8 U.S.C. § 1158(d)(5)(B) .................................................................9

8 U.S.C. § 1158(d)(7)...................................................................53

8 U.S.C. § 1182(d)(5)(A) ...................................................... 8, passim

8 U.S.C. § 1225(a)(1)....................................................................6

8 U.S.C. § 1225(a)(3)....................................................................6

8 U.S.C. § 1225(b)(1)(A)................................................................6

8 U.S.C. § 1225(b)(1)(A)(ii) ...........................................................6

8 U.S.C. § 1225(b)(1)(B)(ii) ...........................................................7

8 U.S.C. § 1225(b)(1)(B)(v) ...........................................................7

8 U.S.C. § 1225(b)(2)(A) ........................................................... 7, 49

8 U.S.C. § 1229a ........................................................................7

8 U.S.C. § 1229(a)(1)....................................................................7

8 U.S.C. § 1231 ..........................................................................5

8 U.S.C. § 1231(a)(2)...................................................................31

8 U.S.C. § 1231(b)(3)....................................................................5

8 U.S.C. § 1226(c) ......................................................................31

8 U.S.C. § 1252(a)(2)(A)(iv) .........................................................50

8 U.S.C. § 1252(e) .....................................................................50

8 U.S.C. § 1252(f).......................................................................50

8 U.S.C. § 1252(a)(2)(B)(ii) ...................................................... 51, 54

28 U.S.C. § 1291 ...................................................................................4

28 U.S.C. § 1331 ...................................................................................3

28 U.S.C. § 2201 ...................................................................................3

Pub. L. No. 105-277 ...............................................................................5

## REGULATIONS

8 C.F.R. § 100.4 ....................................................................................6

8 C.F.R. § 274a.12(c)(8) .......................................................................36

8 C.F.R. § 208.13(f) ...................................................................... 10, 34

8 C.F.R. § 208.16(c) ..............................................................................5

8 C.F.R. § 208.17(a) ..............................................................................5

8 C.F.R. § 208.18 ..................................................................................5

8 C.F.R. § 208.30 ..................................................................................6

8 C.F.R. § 208.30(c) ..............................................................................7

8 C.F.R. § 208.30(c)-(g) ........................................................................7

8 C.F.R. § 208.33 ................................................................................34

8 C.F.R. § 208.33(a)(1) .................................................................. 10, 12

8 C.F.R. § 208.33(a)(1)-(2) ..................................................................12

8 C.F.R. § 208.33(a)(2) .........................................................................10

8 C.F.R. § 208.33(a)(2)(ii)(B) ..............................................................12

8 C.F.R. § 208.33(a)(3) .........................................................................10

8 C.F.R. § 208.33(b) ................................................................................10

8 C.F.R. § 208.33(b)(2) ............................................................................11

8 C.F.R. § 212.5(b)(5) ...............................................................................8

8 C.F.R. § 235.3(b)(4) ...............................................................................6

8 C.F.R. § 1003.14(a) ...............................................................................7

8 C.F.R. § 1208.2(b) .................................................................................7

8 C.F.R. § 1208.13(f) ........................................................................ 10, 35

8 C.F.R. § 1208.17(a) ...............................................................................5

8 C.F.R. § 1208.18 ...................................................................................5

8 C.F.R. § 1208.33 .................................................................................35

8 C.F.R. § 1208.33(a)(1)-(2) ...................................................................12

8 C.F.R. § 1208.33(a)(2) .........................................................................10

8 C.F.R. § 1208.33(a)(2)(ii)(B) ...............................................................12

8 C.F.R. § 1208.33(a)(3) .........................................................................10

8 C.F.R. § 1208.33(b) .............................................................................10

8 C.F.R. § 1208.33(b)(2)(ii) ....................................................................11

45 Fed. Reg. 37,392 (June 2,1980) .........................................................30

86 Fed. Reg. 42,828 (Aug. 5, 2021)..........................................................9

88 Fed. Reg. 11,704 (Feb. 23, 2023) ......................................................1, 9

88 Fed. Reg. 31,314 (May 16, 2023) ................................ 1, 9, 11, 12, 13, 32, 35, 42

## FEDERAL RULES OF CIVIL PROCEDURE

Fed. R. Civ. Pro. 12(b)(1)............................................................................14

Fed. R. Civ. Pro. 12(b)(6)............................................................................14

## OTHER

Ann Woolhandler & Michael G. Collins, *State Standing*,
  81 Va. L. Rev. 387 (1995)......................................................................45

**INTRODUCTION**

In 2023, the Department of Homeland Security (DHS) faced historically high levels of migration across the U.S.-Mexico border, which threatened to undermine its ability to deliver timely consequences to noncitizens who crossed the border without authorization and could not show an entitlement to remain in the United States to pursue relief from removal. DHS anticipated that the end of the Title 42 public health orders on May 11, 2023, would cause encounter levels to remain extremely high or to increase. In response, DHS and the Department of Justice (DOJ) (collectively, the "Departments") jointly promulgated a rule that imposes a rebuttable presumption of asylum ineligibility on certain noncitizens who cross the southwest border without authorization. *See* Circumvention of Lawful Pathways, 88 Fed. Reg. 31,314 (May 16, 2023) (the "Rule"); Circumvention of Lawful Pathways, 88 Fed. Reg. 11,704, 11,708 (proposed Feb. 23, 2023) (notice of proposed rulemaking (NPRM)). This presumption of asylum ineligibility applies at any stage where the noncitizen's asylum claim is considered—whether in a credible fear interview before an asylum officer as part of expedited removal procedures, or in removal proceedings before an immigration judge. The Rule also excepts certain noncitizens from the presumption of asylum ineligibility, including noncitizens who schedule an appointment to present for inspection at a port of entry (the "appointment exception"). The Rule aimed to discourage irregular entries and

1

encourage orderly, lawful means for noncitizens to enter the United States. The goal was to reduce the burden on border enforcement and allow DHS to more effectively deter irregular migration and deliver immediate consequences to those who do not use those means.

Despite the Rule's efforts to reduce burdens from unlawful migration, including on border states, Texas takes issue with it. Texas does not claim that the Rule as a whole is unlawful, and it does not challenge the presumption of asylum ineligibility. Instead, it claims that the Departments lacked authority to except noncitizens who arrive at a port of entry pursuant to an appointment from the Rule's presumption. Texas argues that the appointment exception exceeds the Departments' statutory authority and is arbitrary and capricious because many noncitizens who present with pre-scheduled appointments at ports of entry are placed in removal proceedings before an immigration judge and released into the United States via the Executive's discretionary parole authority. Texas alleges that this exceeds the statutory parole authority and claims that it is harmed because these noncitizens will increase Texas's population and eventually cause Texas to increase its expenditures on law enforcement, health care, and education.

The district court correctly dismissed Texas's complaint for failure to allege Article III injury. Under recent Supreme Court precedent, Texas's claimed indirect injury from discretionary decisions concerning immigration enforcement is not

legally or judicially cognizable. Apart from that threshold issue, Texas also has not plausibly alleged that the Rule's appointment exception will cause an increase in its population over what would be the case without the exception. Further, given its claimed injury, Texas's challenge to the Rule is misplaced. Texas asserts that it is harmed because parole of those who schedule appointments encourages noncitizens to enter the United States and enables them to reside in Texas. But the Rule is only about a condition on asylum eligibility. It does not set policies regarding parole or govern parole determinations, which are separate discretionary determinations made by U.S. Customs and Border Protection (CBP) officers at the port of entry. The appointment exception does not dictate whether a noncitizen will be granted parole. Accordingly, a court cannot redress Texas's claimed harm by vacating or enjoining the appointment exception. Nor can it permissibly enjoin all grants of parole to those who schedule appointments, as such discretionary parole decisions are not governed by the Ruel and are not subject to judicial review.

The Court should affirm the district court's dismissal of the complaint for lack of Article III standing.

## STATEMENT OF JURISDICTION

Texas alleged jurisdiction under 28 U.S.C. §§ 1331 and 2201(a). ROA.437. The district court dismissed Texas's complaint without prejudice for lack of jurisdiction on August 5, 2024. ROA.732. Texas declined to amend its complaint

and noticed its appeal on September 3, 2024. ROA.746. This Court has jurisdiction

over the appeal under 28 U.S.C. § 1291.

## ISSUE PRESENTED

Whether Plaintiff-Appellant, the State of Texas, has Article III standing to

challenge a regulatory exception to a regulatory presumption of asylum ineligibility,

where Texas's claimed injury is an indirect impact on State spending due to an

alleged increase in population.

## STATEMENT OF THE CASE

I.   **Legal Background on Asylum and Immigration Processing of
     Arriving Noncitizens.**

DHS's actions to pursue removal of noncitizens in the United States who lack

documents sufficient for admission are governed by the INA's resource-intensive

procedures, including procedures permitting certain noncitizens to seek asylum and

other protection from removal. Under the asylum statute, noncitizens who arrive in

the United States may, with some exceptions, apply for asylum, a discretionary form

of relief from removal. *See* 8 U.S.C. § 1158(a)(1)-(2), (b)(1)(A). The statute

provides:

> Any alien who is physically present in the United States or who arrives
> in the United States (whether or not at a designated port of arrival and
> including an alien who is brought to the United States after having been
> interdicted in international or United States waters), irrespective of such
> alien's status, may apply for asylum in accordance with this section or,
> where applicable, section 1225(b) of [Title 8 of the U.S. Code].

4

8 U.S.C. § 1158(a)(1). The Secretary of Homeland Security or the Attorney General "may," in their discretion, grant asylum to a noncitizen applicant who, among other things, demonstrates persecution or a well-founded fear of persecution in their home country on account of race, religion, nationality, membership in a particular social group, or political opinion. 8 U.S.C. §§ 1158(b)(1)(A), 1101(a)(42)(A). Congress set forth limitations and conditions on asylum eligibility and provided the Attorney General and the Secretary of Homeland Security[1] with discretion to establish additional limitations and conditions. 8 U.S.C. § 1158(b)(2)(A), (C); *see also id.* § 1158(d)(5)(B). Congress has mandated, however, that noncitizens may not be removed to a country where their life or freedom would be threatened because of a protected ground or they would be tortured. 8 U.S.C. § 1231(b)(3) (statutory withholding of removal); Pub. L. No. 105-277, div. G, § 2242 (Oct. 21, 1998) (codified at 8 U.S.C. § 1231 note), 8 C.F.R. §§ 208.16(c), 208.17(a), 208.18, 1208.16(c), 1208.17(a), 1208.18 (protection under the Convention Against Torture (CAT)).

---

[1] The INA's references to the Attorney General in these asylum provisions refer to both the Attorney General and the Secretary of Homeland Security. *See* 6 U.S.C. § 557.

Noncitizens without documents sufficient for admission who are present in the United States—whether they arrived a designated port of entry (POE)[2] or crossed irregularly between POEs—are deemed applicants for admission and are subject to inspection by immigration officers. *See* 8 U.S.C. § 1225(a)(1), (3). Certain applicants for admission who upon inspection are determined to be inadmissible because they are not in possession of a valid travel or entry document may be subject to expedited removal procedures. *See* 8 U.S.C. § 1225(b)(1)(A). Noncitizens subject to expedited removal procedures may be removed without further hearing or review, unless the noncitizen indicates an intent to apply for asylum, a fear of persecution or torture, or a fear of return to their home country. 8 U.S.C. § 1225(b)(1)(A)(ii); 8 C.F.R. §§ 208.30, 235.3(b)(4). If a noncitizen processed for expedited removal indicates such an intent or fear, DHS uses a "credible fear" screening to identify potentially valid claims for asylum, statutory withholding of removal, and CAT protection. Under the credible fear procedures, the immigration officer refers the noncitizen to an asylum officer for a credible fear interview to assess any persecution and torture claims. 8 U.S.C. § 1225(b)(1)(A)(ii); 8 C.F.R. §§ 208.30, 235.3(b)(4). If the noncitizen demonstrates at the credible fear interview a significant possibility

---

[2] By regulation, CBP has designated ports of entry (POEs) for noncitizens seeking admission to the United States. *See* 8 C.F.R. § 100.4 (last amended Dec. 3, 2015). Land POEs are classified as Class A, B, or C. *See id.* "Class A means that the port is a designated Port-of-Entry for all aliens." *Id.*

that they could establish eligibility for asylum or other available protection from removal, they are either retained by the asylum officer for further consideration of their asylum application, or placed in removal proceedings under 8 U.S.C. § 1229a before an immigration judge of the Executive Office for Immigration Review (EOIR), where they may apply for asylum or other protection as a defense to removal. 8 U.S.C. § 1225(b)(1)(B)(ii), (v); 8 C.F.R. §§ 208.30(c)–(g), 1208.2(b).

Upon inspection, CBP officers, in their discretion, may refer inadmissible noncitizens directly to Section 1229a removal proceedings before EOIR, which are commenced by issuance and filing of a "notice to appear." *See* 8 U.S.C. §§ 1225(b)(2)(A), 1229(a)(1); 8 C.F.R. § 1003.14(a). DHS has authority to place applicants for admission in Section 1229a removal proceedings even if those noncitizens also could be subjected to expedited removal. *See Matter of E-R-M- & L-R-M-*, 25 I. & N. Dec. 520, 521–24 (BIA 2011).[3]

Immigration officers such as CBP officers also have the discretion to parole applicants for admission into the United States, including noncitizens who are processed for expedited removal or Section 1229a removal proceedings. The INA

---

[3] Further, the decision whether to place any particular noncitizen in removal proceedings at all is a matter of DHS's core prosecutorial discretion. *See Texas v. United States*, 599 U.S. 670, 679 (2023) (*Enforcement Priorities*) (citing *Arizona v. United States*, 567 U.S. 387, 396 (2012)). Section 1225 "does not limit the authority of DHS to determine whether to pursue the removal of the immigrant" in the first place. *Crane v. Johnson*, 783 F.3d 244, 249 (5th Cir. 2015).

authorizes the Secretary of Homeland Security, "in his discretion," to "parole" applicants for admission "temporarily under such conditions as [the Secretary] may prescribe" "on a case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). This statutory authority accords with the Executive Branch's authority over management of the border and foreign affairs, including its historical discretion to grant parole. *See, e.g.*, *Leng May Ma v. Barber*, 357 U.S. 185, 190 (1958) (describing parole as a device used to release noncitizens "while administrative proceedings are conducted" without effecting a change in legal status). By regulation, parole is generally permissible for noncitizens subject to expedited removal "whose continued detention is not in the public interest" as determined by DHS officials, provided they do not present a national security, public safety, or flight risk. 8 C.F.R. §§ 212.5(b)(5), 235.3(b)(2)(iii), 235.3(b)(4)(ii).

## II.    The Circumvention of Lawful Pathways Rule

From March 20, 2020, until May 11, 2023, most noncitizens without documents sufficient for admission who sought to enter the United States at its southwest borders were not subject to processing under the INA as described just above. Instead, they were subject to expulsion under a series of public health orders issued by the Centers for Disease Control and Prevention to combat the COVID-19 pandemic (the Title 42 Orders). *See* Public Health Reassessment and Order Suspending the Right to Introduce Certain Person from Countries Where a

Quarantinable Communicable Disease Exists, 86 Fed. Reg. 42,828 (Aug. 5, 2021). Under the Title 42 Orders, covered noncitizens were generally not permitted to cross the border to enter the United States at POEs, and, if encountered in the United States, were generally expelled to Mexico or their home countries without processing under the immigration authorities at Title 8, including processing for asylum. *See id.*; ROA.438.

In early 2023, the President announced that the public health emergency would end on May 11, 2023, which would cause the then-operative Title 42 Order to terminate. ROA.438; 88 Fed. Reg. at 11,708. Absent further action, the end of the Title 42 Order was expected to cause the number of migrants seeking to irregularly enter the United States at the southwest border to surge to or remain at all-time highs—an estimated 11,000 migrants daily. 88 Fed. Reg. at 31,331. It was anticipated that, absent policy change, the end of the Title 42 Order would result in many more migrants crossing the border and asserting protection claims, which would in turn overwhelm DHS's ability to process migrants and lead to an increase in the number of noncitizens released into the country. 88 Fed. Reg. at 31,328; *see also id.* at 31,325.

To prevent this expected overwhelming of DHS resources, the Departments issued the Rule pursuant to their authority to set conditions on asylum. 88 Fed. Reg. at 31,314, 31,323–34; 8 U.S.C. §§ 1158(b)(2)(C), (d)(5)(B); *see also* 88 Fed. Reg.

at 11,704; ROA.438, 442. The Rule generally establishes a "rebuttable presumption of ineligibility for asylum" that applies to certain noncitizens who enter the United States at the southwest land border or adjacent coastal borders "without documents sufficient for lawful admission" between May 11, 2023, and May 11, 2025. 88 Fed. Reg. at 33,314; 8 C.F.R. §§ 208.33(a)(1), 1208.33(a)(1). The presumption applies to asylum determinations in any context, including in Section 1229a removal proceedings and in credible fear screenings under expedited removal procedures. 8 C.F.R. §§ 208.13(f), 1208.13(f), 208.33(b), 1208.33(b).

The presumption of asylum ineligibility does not apply to noncitizens who used certain lawful, orderly methods of entry into the United States: those who were "provided appropriate authorization to travel to the United States to seek parole, pursuant to a DHS-approved parole process"; "[p]resented at a port of entry, pursuant to a pre-scheduled time and place"; "presented at a port of entry without a pre-scheduled time and place" but who can "demonstrate[] by a preponderance of the evidence that it was not possible to access or use the DHS scheduling system"; or "[s]ought asylum or other protection in a country through which the noncitizen traveled and received a final decision denying that application." *Id.* §§ 208.33(a)(2), 1208.33(a)(2). The presumption may also be overcome if a noncitizen demonstrates "exceptionally compelling circumstances." *Id.* §§ 208.33(a)(3), 1208.33(a)(3). Noncitizens subject to presumptive ineligibility and unable to overcome the

presumption must still be considered for statutory withholding of removal and CAT protection. *See* 8 C.F.R. §§ 208.33(b)(2), 1208.33(b)(2)(ii), (4); 88 Fed. Reg. at 31,318.

The Rule thus aims to reduce irregular entry between POEs by encouraging migrants to seek asylum or protection in other countries and incentivizing the use of orderly and lawful pathways to enter the United States. It conversely seeks to discourage migrants from disregarding orderly methods of entry in favor of irregular entry, which increases the number of noncitizens unlawfully present in the country. A reduction in irregular migration between POEs would correspondingly decrease crowding in border facilities, lessen strains on DHS border resources that would otherwise ultimately lead to more releases, and facilitate safe, humane processing. *See, e.g.*, 88 Fed. Reg. at 31,235, 31,324, 31,328.

Although the Rule provides incentives to use orderly means of entry, the Rule does not create those orderly means of entry, which exist independently of it. Currently existing lawful pathways include refugee processing abroad, certain country-specific processes to obtain authorization to travel by air to the United States and to seek parole upon arrival, and expanded seasonal employment opportunities. 88 Fed. Reg. at 31,317. Migrants who use these pathways are not subject to the Rule's presumption of asylum ineligibility, in most cases because they are exempt from the terms of the Rule because they did not enter across the southwest border or

11

they have documents sufficient for admission. *See* 8 C.F.R. §§ 208.33(a)(1)–(2), 1208.33(a)(1)–(2).

Individuals who are in Mexico may also avoid the presumption of asylum ineligibility under the "appointment exception" by using the CBP One app to pre-schedule an appointment to present at a POE. *See* 8 C.F.R. §§ 208.33(a)(2)(ii)(B), 1208.33(a)(2)(ii)(B) (excepting noncitizens who "[p]resent[] at a port of entry, pursuant to a pre-scheduled time and place" from the presumption). That is, the Rule incentivizes noncitizens who are already seeking to enter the United States to schedule their entries at POEs rather than irregularly crossing between POEs or presenting at POEs without appointments. This helps avoid strains on border enforcement, long lines of potential asylum-seekers waiting to enter and be inspected by immigration officers at POEs, and congestion at POEs. Currently, DHS uses the existing, multi-function CBP One app to allow noncitizens to schedule a time to arrive at a POE for inspection. 88 Fed. Reg. at 31,317. For this purpose, CBP One allows "[n]oncitizens who seek to travel to the United States . . . to submit information in advance and schedule an appointment to present themselves at" eight southwest-border POEs. *See* Advance Submission and Appointment Scheduling, https://www.cbp.gov/about/mobile-apps-directory/cbpone (last visited Dec. 8, 2024); 88 Fed. Reg. at 31,332; ROA.442–44, ROA.469. Using appointments and advance submission of information allows CBP to manage the flow into the POE of

12

noncitizens without documents sufficient for admission, efficiently allocate border enforcement resources, and streamline processing, thus reducing overall burdens on immigration enforcement at the border. *See* 88 Fed. Reg. at 31,318.

The Rule does not dictate immigration processing or detention outcomes for those who schedule an appointment or who may qualify for any other exception to the presumption of asylum ineligibility. It merely provides that the presumption will not apply to such noncitizens.

In July 2023, a U.S. District Court in California vacated the Rule based on claims brought by immigration legal services organizations, *East Bay Sanctuary Covenant v. Biden*, 683 F. Supp. 3d 1025 (N.D. Cal. 2023), but that order has been stayed pending appeal, *East Bay Sanctuary Covenant v. Biden*, No. 23-16032 (9th Cir. Aug. 3, 2023). That appeal is currently in abeyance. *East Bay Sanctuary Covenant v. Biden*, 93 F.4th 1130 (9th Cir. 2024).

## III.     Procedural History of this Lawsuit.

In May 2023, Texas filed its original complaint, claiming that the Rule exceeded the Departments' statutory authority and was arbitrary and capricious. ROA.8–24. The complaint generally asserted that the Rule "incentivize[d] illegal immigration" and would increase the number of noncitizens in Texas. *See, e.g.*, ROA.19–20. This initial complaint asked the district court to set aside and enjoin the Rule in its entirety. ROA.23–24.

After Defendants moved to dismiss the original complaint, Texas amended its complaint. *See* ROA.436–510. The amended complaint primarily challenged and sought relief against the Rule's appointment exception to the presumption of asylum ineligibility. *See* ROA.451, ROA.455, ROA.457, ROA.460. The Complaint asserted that the appointment exception exceeds statutory authority and is not in accordance with the law under the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A), (C) (ROA.451–54); that the appointment exception is arbitrary and capricious under the APA, 5 U.S.C. § 706(2)(A) (ROA.455–57); and that DHS's "scheduling system" is *ultra vires* under the APA and the common law, alleging that DHS acts outside its discretionary parole authority by issuing Notices to Appear and parole to most of the noncitizens who present at POEs with CBP One appointments (ROA.457–59). The Complaint sought an injunction and vacatur of the Rule's appointment exception, an injunction "prohibiting Defendants from paroling aliens who pre-schedule a time and place to present at a port of entry using a DHS scheduling system," and a declaration that "Defendants' actions" are unlawful. ROA.460.

Defendants moved to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). *See* ROA.558–93. Defendants argued that Texas lacks Article III standing because indirect impacts of immigration enforcement decisions on Texas's expenditures from an alleged increase in the number of noncitizens in the State is not a cognizable injury and is in any event too speculative and attenuated to support

standing, and Texas's claimed harms cannot be redressed by the relief sought. Defendants also argued that Texas is not within the zone of interests of the relevant immigration statutes, that Texas's claim challenging the "DHS scheduling system" failed for additional threshold jurisdictional reasons, and that the Complaint failed to state any claim.

On August 5, 2024, the district court granted Defendants' motion to dismiss, reaching only one threshold issue: whether Texas's alleged indirect economic injury constituted a cognizable injury for purposes of Article III standing. *See* ROA.739–45. The district court held that it did not. The court explained that, although the complaint alleged costs "in the form of health care, education, and law enforcement expenditures," ROA.741, and although this Court has found that such pocketbook harms can constitute an Article III injury, the Supreme Court had "more recently narrowed plaintiffs' standing to challenge federal programs based on indirect, downstream monetary costs such as those Texas claims here." ROA.743 (citing *Texas v. United States*, 599 U.S. 670 (2023) (*Enforcement Priorities*), and *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367 (2024) (*Alliance*)). As the Supreme Court stated in *Enforcement Priorities*, "when a State asserts . . . that a federal law has produced only . . . indirect effects [on state revenues or state spending], the State's claim for standing can become more attenuated." ROA.743 (citing *Enforcement Priorities*, 599 U.S. at 680 n.3). The district court further

15

explained that, in *Enforcement Priorities*, the Supreme Court had rejected Texas's and Louisiana's assertions of injury from guidelines concerning the enforcement of immigration laws, holding that the two States lacked standing to challenge the exercise of "Article II foreign-policy and '[law-]enforcement discretion over arrests and prosecutions' for immigration law violations." ROA.743 (citing *Enforcement Priorities*, 599 U.S. at 674, 679) (alteration by district court). As the Supreme Court stated, "the absence of coercive power over the plaintiff makes a difference" to the courts' assessment of standing, and more is needed to establish standing where the "asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of someone else." ROA.743 (citing *Enforcement Priorities*, 599 U.S. at 678). Further, there was no historical precedent supporting a challenge to "under-enforcement" of the immigration laws. *See* ROA.743 (citing *Enforcement Priorities*, 599 U.S. at 677, 681).

The district court held that the same principles relied on by the Supreme Court in *Enforcement Priorities* applied to this case. ROA.744. First, Texas is not regulated by the Rule, as "the Rule and its appointment exception do not involve the exercise of coercive power over Texas." *Id.* (citing *Enforcement Priorities*, 599 U.S. at 678–81). Second, like the guidelines at issue in *Enforcement Priorities*, "the Rule implicates foreign-policy and law-enforcement discretion that Article II entrusts to the executive branch." ROA.744 (citing *Enforcement Priorities*, 599 U.S. at 678–

81). Third, Texas had not cited any precedent, history, or tradition "of courts ordering the Executive Branch to change its asylum policies so that the Executive Branch denies asylum or parole to more migrants." ROA.744 (citing *Enforcement Priorities*, 599 U.S. at 677). Finally, the district court did not see any reason to depart from *Enforcement Priorities'* standing analysis, because Texas did not allege or assert that its case concerned "the continued detention of noncitizens who have already been arrested." ROA.744 (citing *Enforcement Priorities*, 599 U.S. at 678). It concluded that the Complaint "therefore fail[ed] to allege judicially cognizable harm." ROA.744. On this ground, the district court dismissed the complaint without prejudice, allowing Texas thirty days to amend its complaint. *Id.* Texas declined to amend its complaint, instead noticing its appeal from a final decision on September 3, 2024. ROA.746.

## SUMMARY OF THE ARGUMENT

The district court correctly held that Texas's Complaint did not allege a judicially cognizable injury for purposes of Article III standing. As the Supreme Court explained in its *Enforcement Priorities* decision, the indirect impact of immigration enforcement policies on Texas's expenditures is not a cognizable harm for standing purposes. Thus, even assuming Texas could prove that it will expend more money on noncitizens as a result of the Rule's appointment exception, its claims cannot proceed, because this injury is not cognizable for purposes of Article

III standing. Although Texas is not directly challenging a policy concerning arrests and prosecutions, its theory of injury—and the challenged federal actions—are not meaningfully distinct from those at issue in *Enforcement Priorities*, and that decision controls the standing analysis here.

Texas also cannot meet the other requirements for standing. Its Complaint does not plausibly allege that there will be an imminent, non-speculative increase in noncitizens—and a corresponding increase in expenditures—over and above what would be the case if the Rule's appointment exception did not exist.

Texas argues it is entitled to special solicitude in the redressability analysis. But recent Supreme Court authority says it is not. And even if it were, special solicitude would not relieve Texas of its burden to allege cognizable injury.

Nor can Texas establish redressability based on the allegations in the Complaint. First, there is a mismatch between Texas's claimed injury and the policy it primarily challenges. Relief pertaining to the Rule's appointment exception will not remedy Texas's claimed harms. Vacatur or injunction of the appointment exception—which is just about whether the noncitizen will be subject to one condition on asylum eligibility—would have no legal effect on immigration officers' discretion to grant parole, nor would it require DHS to cease using an appointment system. The remaining form of relief Plaintiff seeks—an injunction or declaration of unlawfulness of grants of parole to those who enter at POEs with pre-scheduled

18

appointments—cannot be obtained through a challenge to the Rule's conditions on asylum eligibility. In any event, such relief would interfere with DHS's discretion to make individualized parole determinations, which Congress has insulated from judicial review.

 The Court should thus affirm the district court's conclusion that Texas has not alleged Article III standing.

## STANDARD OF REVIEW

This Court reviews the district court's dismissal of a complaint for lack of standing *de novo*. *Cornerstone Christian Sch. v. Univ. Interscholastic League*, 563 F.3d 127, 133 (5th Cir. 2009). When dismissal was based on a facial attack on jurisdiction, the court reviews "whether the complaint is sufficient to allege the jurisdiction." *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981).

## ARGUMENT

### I.     Plaintiff Lacks Article III Standing.

"By limiting who can sue, the standing requirement implements the Framers' concept of the proper—and properly limited—role of the courts in a democratic society." *Alliance*, 602 U.S. at 380 (citation and quotation omitted). To establish Article III standing, a plaintiff must demonstrate an injury that is (1) concrete, particularized, and actual or imminent; (2) fairly traceable to the challenged conduct; and (3) redressable by a favorable ruling. *Clapper v. Amnesty Int'l USA*, 568 U.S.

398, 409 (2013). The asserted injury must be "legally and judicially cognizable." *Enforcement Priorities*, 599 U.S. at 676. At the pleading stage, "the plaintiff must clearly allege facts demonstrating each element" of standing. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (cleaned up).

Here, the district court correctly dismissed Texas's Complaint because it did not plead a cognizable Article III injury. The Supreme Court's decision in *Enforcement Priorities* makes clear that Texas's claimed increased expenditures based on alleged increases in population due to the Rule are not cognizable harms. But even assuming Texas could state a cognizable injury, the Complaint still does not "allege facts that give rise to a plausible claim of [Texas's] standing." *See Cornerstone Christian*, 563 F.3d at 134 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)). The Complaint does not plausibly allege that the appointment exception leads to more new noncitizens in Texas over what would be the case absent that exception. Texas's claimed injury—an increase in paroled noncitizens— is not fairly traceable to the appointment exception or redressable by its vacatur. Finally, judicial relief concerning discretionary grants of parole is unavailable.

### A.    Plaintiff's Alleged Injury of Incidental, Downstream Costs Is Not Cognizable.

In its Complaint, Texas alleges injury based on the theory that the Rule's appointment exception increases the number of noncitizens entering and residing in Texas, allegedly causing the State to increase its expenditures on healthcare, social

services, education, and law enforcement. ROA.449–50. As the district court correctly recognized, the Supreme Court has held that this type of indirect injury based on the Executive Branch's discretionary immigration enforcement choices is not judicially cognizable. *See* ROA.743–45 (relying on *Enforcement Priorities*, 599 U.S. 670). The district court correctly rejected Texas's theory of injury on this basis.

1. *Enforcement Priorities* Requires Rejection of Plaintiff's Theory of Downstream Injury from Federal Immigration Policy.

This case begins and ends with the Supreme Court's decision in *Enforcement Priorities*. That decision rejected a materially identical theory of standing to the theory Texas advances here, and it abrogates this Court's prior cases relying on asserted social-service expenditures to conclude that States have established a cognizable injury to challenge federal immigration policy.

In *Enforcement Priorities*, the Supreme Court acknowledged the "bedrock Article III constraints in cases brought by States against an executive agency or officer" in rejecting Texas's and Louisiana's challenge to DHS's guidelines for immigration enforcement. *Enforcement Priorities*, 599 U.S. at 680 n.3. The plaintiff States in *Enforcement Priorities* had argued that the challenged immigration enforcement policy increased the number of unlawful immigrants in the United States, and that, in response, the States increased education and healthcare expenditures. *See id.* at 674; Brief for Respondents at 13, *Enforcement Priorities*, 599 U.S. 670 (No. 22-58). The Supreme Court rejected the argument that such

diffuse harms could support Article III standing. *Enforcement Priorities*, 599 U.S. at 680 n.3. It explained that "in our system of dual federal and state sovereignty, federal policies frequently generate indirect effects on state revenues or state spending." *Id.* When a State asserts "that a federal law has produced only those kinds of indirect effects, the State's claim for standing can become more attenuated." *Id.* Thus, the court held that the plaintiffs' assertions regarding increased education and healthcare costs failed to "overcome[] the fundamental Article III problem with th[eir] lawsuit." *Id.*

The Supreme Court's reasoning in *Enforcement Priorities* controls the standing analysis here. *See Alliance*, 602 U.S. at 384 (holding that federal courts should "chiefly" evaluate standing "by comparing the allegations of the particular complaint to those made in prior standing cases"). Like in *Enforcement Priorities,* the challenged action—the Rule—does not directly regulate or injure the State of Texas. The Rule governs asylum eligibility for noncitizens in the context of pre-existing statutory asylum and removal procedures. It does not impose any direct costs or requirements on Texas. It does not, for example, require Texas to act or to refrain from acting, determine its federal funding, or deprive it of a legal right. The Supreme Court has consistently held that "when the plaintiff is not himself the object of the government action or inaction he challenges," plaintiffs face a "substantially

more difficult" burden to establish standing. *Alliance*, 602 U.S. at 382; *see Enforcement Priorities*, 599 U.S. at 680 n.3; *Lujan*, 504 U.S. at 561

The plaintiffs in *Enforcement Priorities* made the same argument to the Supreme Court as Texas does here—that the challenged immigration enforcement policy results in a net increase in the number of immigrants residing in Texas, which in turn leads Texas to make additional expenditures for education, law enforcement, emergency healthcare, and other social services expenditures. *Compare* Brief for Respondents at 13, *Enforcement Priorities*, 599 U.S. 670 (No. 22-58), and *Priorities*, 599 U.S. at 670 (alleging harm from costs to "supply social services such as healthcare and education to noncitizens who should be (but are not being) arrested by the Federal Government"), *with* Brief of Appellant (Doc. 15) ("Br.") 10–12 *and* ROA.449–50 (alleging Texas would incur healthcare, law enforcement, education and other social services costs as a result of an alleged increase in arriving noncitizens released into the United States).[4] Just as such harms were insufficient in *Enforcement Priorities* to support a finding of state standing to challenge federal

---

[4] Even assuming, as Plaintiff argues (Br. 26), that the Rule conferred an affirmative immigration benefit on noncitizens who schedule appointments to present at POEs—it does not, *see infra* § I.A.2—that would not make Texas's claimed injury any more direct. Regardless of whether Texas is challenging an alleged failure to act or an affirmative grant of an immigration benefit, its theory of injury is still based on downstream spending as a result of an increase of individuals in the State and those individuals' independent choices, actions, or inaction, as well as a variety of other independent factors and influences.

policy, these alleged downstream effects of the Rule on Texas's expenditures cannot support Article III injury here.

A contrary rule would be at odds with bedrock principles of our federal system, in which the United States and the States have sovereignty over the same territory and people. When a State suffers a "direct injury" at the hands of the federal government, it may be able to sue the United States. *Florida v. Mellon*, 273 U.S. 12, 18 (1927) (holding that Florida lacked the necessary direct injury to challenge a federal inheritance tax alleged to have economic effects on the State). But a State cannot sue the federal government based on the indirect effect of federal policies that regulate people within the State. Although such policies may have derivative consequences for the State itself, recognizing a State's interest in avoiding these incidental effects is inconsistent with the autonomy of the national and state sovereigns to act directly "within their respective spheres." *Printz v. United States*, 521 U.S. 898, 920 (1997). That is particularly true where, as here, those incidental effects derive from the independent actions of individuals who reside in the State.

Texas's theory of State standing has startling implications. Under Texas's view, any federal action that increases (even indirectly) the number of noncitizens in a State creates standing because the State may increase its expenditures in response. Other States could use equivalent logic to claim injury from any federal action that has the effect of *reducing* noncitizen populations, on the theory that

24

noncitizens pay state taxes or otherwise contribute economically such that State expenditures are increased without them.

Nor is the problem limited to immigration. Virtually any federal action—from prosecuting crime to imposing taxes to managing federal property—could incidentally affect state finances. The Supreme Court's decision in *Massachusetts v. Laird*, 400 U.S. 886 (1970), cited in *Enforcement Priorities*, 599 U.S. at 680 n.3, shows where Texas's theory leads. There, Massachusetts sued the Secretary of Defense to enjoin the Vietnam War. The Court summarily rejected the suit, *id.* at 886, but Justice Douglas argued in dissent that the State had standing, *id.* at 887-891. On Texas's theory, the Court was wrong, and Justice Douglas was right. Surely the Vietnam War caused at least one dollar in peripheral harm to Massachusetts, such as the loss of drafted residents' taxable income. Because almost every federal policy will affect the people within the States, almost every federal policy will indirectly affect the States themselves. If such effects satisfy Article III, "what limits on state standing remain?" *Arizona v. Biden*, 40 F.4th 375, 386 (6th Cir. 2022)

In short, following *Enforcement Priorities*, it is no longer sufficient for a State simply to argue that some change in federal policy may cause a change in population that may cause changes in the State's expenditures. 599 U.S. at 680, n.3. When faced with an identical theory of harm in *Enforcement Priorities*, the Supreme Court found the plaintiffs lacked standing. *Id*. Thus, to the extent decisions from this Court have

recognized this theory of downstream injury as giving rise to standing to challenge federal immigration policy, those decisions are not in line with this more recent Supreme Court precedent. *See In re Bonvillian Marine Serv., Inc.*, 19 F.4th 787, 792 (5th Cir. 2021) (explaining that prior decisions may be abrogated where they have "fallen unequivocally out of step with some intervening change in the law" or where "a subsequent Supreme Court opinion establishes a rule of law inconsistent with" this Court's precedent or "fundamentally changes the focus of the relevant analysis").[5]

2. The Standing Analysis in *Enforcement Priorities* Is Indistinguishable from the Standing Analysis Here.

Although the Supreme Court in *Enforcement Priorities* rejected the same theory of State injury that Texas asserts here, Texas argues that it is inapplicable and that the holding is limited to challenges to non-prosecution policies (Br. 21). But Texas offers no substantial reason why the Supreme Court's logic would change based on the type of *federal policy* challenged where there is no difference in the type of *injury* asserted.

Further, the challenged policy in this case *does* involve discretionary immigration enforcement decisions and is not materially distinguishable from the

---

[5] The Supreme Court even more recently emphasized the importance of the requirement of immediacy of injury as to non-State plaintiffs, to avoid drawing courts into all sorts of generalized grievances with federal policy. *Alliance*, 602 U.S. at 392–93; *infra* at 43.

challenge to immigration enforcement guidelines in *Enforcement Priorities*. As an

initial matter, Texas's ultimate complaint is with the presence of noncitizens in its

State, allegedly due to the manner in which the Executive Branch exercises its

immigration enforcement discretion. Br. 18 (asserting that "Texas incurs substantial

cost due to the presence of illegal aliens within the State").[6] Texas challenges the

Departments' decision to exercise their enforcement discretion to not apply the

Rule's presumption of asylum ineligibility to certain noncitizens. Texas claims that

it is injured because, due to the Rule's appointment exception, too many arriving

noncitizens are present in Texas because they are supposedly paroled *en masse* and

are not, in Texas's words, given a "case-by-case evaluation" of their asylum claim.

Br. 3, 8, 9, 24, 27; *see also* Br. 2, 14, 15, 29 (seeking reduction in "the number of

paroled aliens in the State"). The parole decision—which is not governed by the

Rule or the appointment exception—is also a discretionary determination. And the

only effects of the parole decision on a noncitizen's asylum claim are on *when and*

*where* that claim will be heard; noncitizens who are paroled and placed in removal

proceedings through a notice to appear, as alleged here, *see* ROA.447, would

generally apply for asylum and receive an individualized determination on their

---

[6] *See also, e.g.*, Br. 2 (asserting that noncitizens who make appointments "are waived into the United States on parole"), 9–10 (alleging "use of the Final Rule to expand the number of aliens released into Texas"), 24; ROA.450 (alleging State expenditures on migrants who "enter[] and remain[] in Texas"); ROA.651.

asylum claim in those proceedings. *See supra* at 7. To the extent Texas is claiming it is injured because noncitizens are placed in Section 1229a removal proceedings, where they may assert their asylum claim, rather than processed for expedited removal and referred to asylum officers to be screened under credible fear procedures, its claimed injury arises from DHS's election to place noncitizens in one form of removal procedure rather than another. That is a core matter of Executive Branch immigration enforcement. *See Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483–84 (1999); *Matter of E-R-M-*, 25 I. & N. Dec. at 521–24. Texas's interest thus hinges on the circumstances in which the federal government does, or does not, exercise its enforcement discretion, including whether to use particular removal procedures. Texas thus cannot escape the reasoning of *Enforcement Priorities*. Whether Texas is challenging the Rule's conditions on asylum eligibility or grants of parole (which are not governed by the Rule's terms), its fundamental complaint is with, and its claimed injury stems from, the alleged increased presence of noncitizens in its State due to allegedly lax immigration enforcement. Its claims are thus, in essence, the same as the claims in *Enforcement Priorities*.

Moreover, *Enforcement Priorities*' reasoning is not limited to claims strictly seeking to compel arrest and prosecution. It stands for the broader principle that third parties like Texas with only indirect alleged harms lack a judicially cognizable

28

interest in whether or how the Executive exercises its immigration discretion against someone else. *Enforcement Priorities*, 599 U.S. at 676–77. And the federal policy Texas challenges here is materially indistinguishable from that challenged in *Enforcement Priorities* for purposes of the standing analysis. At their core, both the Rule and parole determinations represent an exercise of immigration discretion that implicates the same Article II powers and foreign-policy concerns as did the prosecution guidelines at issue in *Enforcement Priorities*. The relief Texas seeks would directly interfere with that discretion. The district court correctly held that Texas was essentially seeking an order directing the Executive Branch to "change its asylum policies so that the Executive denies asylum or parole to more migrants." ROA.744.

Each of the reasons the Supreme Court articulated in *Enforcement Priorities* for declining to recognize State injury based on indirect harm from immigration prosecution guidelines apply equally here.

First, as discussed, the Rule does not involve the exercise of coercive power over Texas. *See Enforcement Priorities*, 599 U.S. at 678.

Second, Texas does not cite any history and tradition of courts' intervening in the Executive Branch's discretionary determinations regarding how to enforce limitations on asylum eligibility. The Supreme Court in *Enforcement Priorities* made clear that in assessing standing, courts must consider whether the injury is

judicially cognizable by looking to "history and tradition" to determine if the "asserted injury" is the type that has "traditionally" been "redressable in federal court" as opposed to the type of dispute that should be resolved through the political process. *Enforcement Priorities*, 599 U.S at 676-78. Here, the asserted injury does not satisfy these requirements. Under its statutory authority, the Executive Branch has, for decades, issued regulations and decisions governing the availability of asylum. *See, e.g.*, Aliens and Nationality; Refugee and Asylum Procedures, 45 Fed. Reg. 37,392, 37,392 (June 2, 1980) (establishing regulatory bars to the granting of asylum); 55 Fed. Reg. at 30,674, 30,678, 30,683 (1990) (establishing rule regarding asylum claims). And yet Texas has "not cited any precedent, history or tradition" of judicial review of the Executive Branch's failure to designate more noncitizens as ineligible for asylum. *Enforcement Priorities*, 599 U.S. at 676.

To the extent Texas's claims are viewed as challenges to grants of parole, Texas likewise has not cited any "precedent, history or tradition" of judicial review of the Executive's use of its longstanding discretionary parole authority. *Enforcement Priorities*, 599 U.S. at 676; *see Biden v. Texas*, 597 U.S. 785, 806 (2022) ("*MPP*") ("Every administration, including the Trump and Biden administrations, has utilized this [parole] authority to some extent."); *see also id.* at 815, 816 (Kavanaugh, J., concurring) ("Nothing in the relevant immigration statutes at issue here suggests that Congress wanted the Federal Judiciary to improperly

second-guess the President's Article II judgment" with respect to foreign-policy considerations governing the use of parole).

Third, both *Enforcement Priorities* and this case involve Article II discretion. The guidelines at issue in *Enforcement Priorities* concerned enforcement actions the statutes provided DHS "shall" take. *See* 8 U.S.C. §§ 1226(c), 1231(a)(2). The Court explained that the plaintiff States' challenge nevertheless was not cognizable because it implicated the Executive's inherent Article II discretion to decide when and how to enforce the law. *Enforcement Priorities*, 599 U.S. at 684-85. This case concerns actions for which Congress *expressly* placed authority in the discretion of the Executive Branch. Congress provided that the Secretary of Homeland Security and the Attorney General "may grant asylum" to those who meet statutory baseline requirements, 8 U.S.C. § 1158(b)(1)(A), and "may by regulation establish additional limitations and conditions . . . under which an alien shall be ineligible for asylum," *id.* § 1158(b)(2)(C). *See MPP*, 597 U.S. at 802 ("This Court has repeatedly observed that the word 'may' *clearly* connotes discretion.") (cleaned up). Similarly, to the extent Texas is challenging parole determinations, Congress in the parole statute specified that the Secretary "may, . . . , in his *discretion* parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States." 8 U.S.C. § 1182(d)(5)(A) (emphasis added);

*Samirah v. O'Connell*, 335 F.3d 545, 549 (7th Cir. 2003). Thus, this case arguably implicates Article II discretion to an even greater extent than *Enforcement Priorities*, as Congress *expressly* granted the Executive Branch the discretion to determine the propriety of conditions of asylum eligibility and of grants of parole for individual arriving noncitizens.

Fourth, substantial "foreign-policy objectives" undergird the Rule, which embodies efforts to address hemisphere-wide migration patterns through cooperation with regional partners. *Enforcement Priorities*, 599 U.S. at 679; *see, e.g.*, 88 Fed. Reg. at 31,314.

Fifth, the challenged policies here involve a "complicated balancing" of factors, including foreign affairs, "inevitable resource constraints and regularly changing public-safety and public-welfare needs," which weigh against finding that "federal courts" are "the proper forum for resolving" such disputes. *Enforcement Priorities*, 599 U.S. at 680. The Rule is itself the product of the complicated balancing of many different factors—including the government's limited enforcement resources, its assessment of public-safety and public-welfare implications of the situation at the southwest border, and its efforts to address migration patterns through intergovernmental initiatives—that courts may not meaningfully assess.

The claimed injury in this case is thus just like that asserted in *Enforcement*

*Priorities*, and it implicates the same concerns that animated the Supreme Court's reasoning in that case. Accordingly, contrary to Texas's argument, it is *Enforcement Priorities,* not *Department of Commerce*, that "directly control[s]" the standing analysis here. *See* Br. 22. In *Department of Commerce*, the plaintiff States and others challenged the inclusion of a citizenship question on the census, which the evidence showed would predictably result in noncitizen households responding to the census at lower rates. *Dep't of Commerce v. New York*, 588 U.S. 752, 760, 766–68 (2019). This undercounting of state residents would lead to a loss of federal funding that is distributed based on the state's population. *See id.* Unlike here, the plaintiff States in *Department of Commerce* were not challenging discretionary enforcement decisions that implicate foreign-policy and similar concerns. And unlike here, the plaintiff States' theory of injury in *Department of Commerce* was not based on downstream expenditures from federal policies' alleged impact on the States' populations; instead, it was based on based on the direct loss of federal funding from the expected undercounting of the actual population. Although *Department of Commerce* and this case both involve State plaintiffs, the cases are otherwise not alike, and the theory of injury here is even more attenuated.

Texas further seeks to distinguish the *Enforcement Priorities* standing analysis by arguing that the Rule is "affirmative immigration relief" which "offer[s]" "admission into Texas" and grants "*en masse* parole." Br. 23, 24. The Rule does no

such thing. The Rule creates a rebuttable presumption of asylum ineligibility, beyond the pre-existing statutory and regulatory requirements for applying for and obtaining asylum, that is applicable to certain noncitizens who cross the southwest border. By the Rule's own terms, some noncitizens—including those who enter at a POE with a pre-scheduled appointment—are not subject to this presumption of asylum ineligibility. But the Rule does not provide any affirmative benefit to those noncitizens who are excepted from the presumption. It does not lessen their burden to otherwise establish eligibility for asylum. It does not "forego," "waive," or "vitiate" the required "case-by-case asylum claim evaluation." Br. 14, 15. In accordance with 8 U.S.C. § 1225(b), noncitizens who, upon inspection at a POE, are deemed inadmissible due to lack of valid entry documents are generally placed in either expedited removal proceedings, where they may undergo the credible fear process, or regular removal proceedings, where they may apply for asylum as a defense to removal. Noncitizens still must establish that they are eligible for asylum under all the preexisting statutory and regulatory procedures if they assert asylum as a defense to removal. *See supra* at 4–7. Thus, the Rule's appointment exception creates no new asylum benefit.

The Rule likewise does not govern or dictate the parole determinations for noncitizens who schedule CBP One appointments to present at POEs. It does not mention parole or set any policies regarding parole. *See* 8 C.F.R. §§ 208.13(f),

208.33, 1208.13(f), 1208.33; *see also* 88 Fed. Reg. at 31,331 (the Rule does not "set any policy regarding DHS's discretionary authority to make parole determinations for those who use the CBP One app"). And the Rule's appointment exception does not grant immigration status or employment authorization. The Rule does not make any "class of persons newly eligible" for a governmental benefit, nor does it "remov[e] a categorical bar on receipt of governmental benefits." Br. 26. The appointment exception does not grant the noncitizen "admission" into the United States. *See* Br. 24. All it does is except from the presumption of asylum ineligibility those who schedule their arrival at a POE.

But even if Texas's claims are viewed as a challenge not to the Rule itself, but to the parole of noncitizens who present with CBP One appointments (and even if such claims were otherwise reviewable), this would not distinguish this case from *Enforcement Priorities*. Texas's claimed costs arise from the claimed presence of paroled noncitizens in its State and their projected use of public services that Texas asserts are required for all "unlawfully present" or "undocumented" noncitizens present in the State—not from any immigration or other governmental benefit that noncitizens may obtain specifically as a result of having received parole or that is dependent on the noncitizens' status. Br. 24 (asserting that "admission into Texas offered by the Final Rule bestows healthcare, education, and CHIP benefits on newly-arrived aliens in Texas"); Br. 10–12; *Texas v. Biden (MPP)*, 20 F.4th 928,

969 (5th Cir. 2021), *rev'd and remanded*, 597 U.S. 785 (2022) (noting that Texas "subsidize[s] healthcare for immigrants, regardless of immigration status"). Even if parole in some cases indirectly allows a noncitizen to apply for some additional benefit beyond release (such as work authorization—which is also available to certain asylum applicants, *see* 8 C.F.R. § 274a.12(c)(8)), such benefits are not relevant to this standing analysis. And Texas cannot assert any interest on behalf of its residents from alleged labor-market impacts on wages of noncitizens entering the labor market (Br. 10; ROA.449). *See Haaland v. Brackeen*, 599 U.S. 255, 295 (2023) ("State[s] do[] not have standing as *parens patriae* to bring an action against the Federal government.") (quotation marks omitted). Texas's core interest is in what it views as inadequate immigration enforcement (in part through the use of parole), not in the "provision of legal benefits or legal status." *See Enforcement Priorities*, 599 U.S. at 683. Accordingly, the challenged policy here does not "implicate more than . . . the Executive's . . . enforcement discretion" and does not "lead to a different standing analysis." *Id.*

More to the point, Plaintiff reads *Enforcement Priorities* too narrowly. The Supreme Court made clear in *Enforcement Priorities* that: (1) indirect costs of the type alleged here are insufficient to establish standing; (2) history and tradition matter, and where there is no history or tradition of justiciability, there likely is no standing; (3) special solicitude does not apply where States allege indirect injury

36

from population growth (discussed further *infra* § I.C); and (4) States generally lack standing to challenge the Executive's discretionary choices, particularly with respect to decisions concerning arrest and prosecution. The Supreme Court did not cabin these first three points to immigration cases challenging arrest policies or non-enforcement; it did not even cabin them to immigration cases. Only with respect to its holding that States generally lack standing to challenge the Executive's discretionary choices did the Court carve out possible distinctions. *See Enforcement Priorities*, 599 U.S. at 681–83. And even there, the Supreme Court simply acknowledged that certain factors might affect the standing analysis in "cases involving the Executive Branch's alleged failure to make more arrests or bring more prosecutions," and reserved resolution of those questions for another day. 599 U.S. at 681. Thus, even assuming the Rule's appointment exception somehow did provide a legal benefit, and even assuming that this benefit meant the case involved more than discretionary decisions regarding immigration enforcement, this would not dilute the force of the remainder of the Supreme Court's holdings. But even as to the Supreme Court's holding that States generally lack standing to challenge the Executive's discretionary choices, this case is more like *Enforcement Priorities* than different from it. *See supra* at 28–32.

Texas next argues that *Enforcement Priorities* does not control because the Rule "constitutes abdication of Appellees' statutory responsibilities to grant parole

only on a case-by-case basis for significant public benefit or urgent humanitarian reasons." Br. 27. In *Enforcement Priorities*, the Supreme Court recognized that a plaintiff arguably would have standing to "obtain review of agency non-enforcement if an agency 'has consciously and expressly adopted a general policy that is so extreme as to amount to an abdication of its statutory responsibilities.'" *Id*. (quoting 599 U.S. at 682-83). Texas did not even raise this argument below and so has forfeited it. *See* ROA.650; *Rollins v. Home Depot USA*, 8 F.4th 393, 397 (5th Cir. 2021).

Regardless, even if Texas had alleged an extreme case of abdication of duty, that would not change the fact that its claimed injury of indirect impacts from federal immigration policy is not cognizable. But Texas has not made any such plausible allegation. Again, the Rule itself sets out no policies or directives regarding the exercise of parole authority. Thus, the Rule cannot "prevent[] immigration officials from enforcing [the] limiting provisions of the parole statute" as Texas claims. *See* Br. 28. Further, the Rule hardly constitutes the "extreme case of non-enforcement" the Supreme Court said "arguably could exceed the bounds of enforcement discretion." *See Enforcement Priorities*, 599 U.S. at 683. The Rule *adds* a presumption of asylum ineligibility for most noncitizens who enter irregularly between POEs along the southwest border or who present at southwest-border land

POEs without a CBP One appointment, thereby strengthening immigration enforcement.

Moreover, Texas's Complaint does not allege "a total disregard of Congress's limits on the parole authority." *See* Br. 28. The Complaint instead alleges that DHS is granting parole to a good percentage of the noncitizens who present at ports of entry with a CBP One appointment. ROA.447. According to the Complaint, this means that immigration officers are not engaging in a case-by-case inquiry to determine eligibility for parole for these noncitizens, ROA.458—although this assertion is belied by Plaintiff's acknowledgment that not everyone who presents with an appointment is found to satisfy the criteria for parole or merit a favorable exercise of discretion. Notably, the Complaint does not allege that DHS is issuing parole to all inadmissible noncitizens who cross the southwest border. It also acknowledges that DHS is placing paroled noncitizens in Section 1229a removal proceedings by issuing them a notice to appear. ROA.447. At most, therefore, the Complaint alleges that DHS is focusing enforcement on those who cross between POEs, not that it is completely abdicating its responsibilities. "Real or perceived inadequate enforcement of immigration laws does not constitute a reviewable abdication of duty." *State of Tex. v. United States*, 106 F.3d 661, 667 (5th Cir. 1997).

Texas cannot meaningfully distinguish its alleged injury from that which the Supreme Court rejected as non-cognizable in *Enforcement Priorities*, and its claimed harms cannot support Article III standing as a matter of law.

**B.     Plaintiff's Claimed Injury is Speculative and Attenuated.**

Even assuming Plaintiff's claimed injury were cognizable, it is based on speculation and relies on an attenuated chain of events. Injuries that are speculative, or which are too remote—even if predictable—are insufficient to support Article III standing. *See Alliance*, 602 U.S. at 383.[7] Enforcing these limits on standing are important, as there is no general oversight "of the conduct of the National Government by means of lawsuits in federal courts," and some issues must be "left to the political and democratic processes." *Id*. at 396; *see id.* at 382 ("Vindicating the *public* interest (including the public interest in Government observance of the Constitution and laws) is the function of Congress and the Chief Executive.") (citation omitted).

To make a showing of injury here, it is not enough to assert that individuals enter or are released into the United States under a particular immigration policy. Instead, States must initially plausibly allege that the policy leads to a *net increase* in noncitizens, and a corresponding *net increase* in expenditures because of those

---

[7] Where an unregulated plaintiff asserts prospective injury from government regulation, the requirements of causation and imminence of injury often overlap. *See Alliance*, 602 U.S. at 385 n.2.

specific noncitizens, over what would be the case if the policy did not exist. Harm "has long been understood in the immigration context" as meaning harm "relative to the status quo, and relative to Plaintiff's position absent the challenged policy." *Texas v. United States Dep't of Homeland Sec.*, No. 6:23-cv-00007, 2024 WL 1021068, at *15–17 (S.D. Tex. Mar. 8, 2024) ("*CHNV*") (relying on Fifth Circuit precedent), *appeal filed*, No. 24-40160 (5th Cir. Mar. 12, 2024). In other words, "the baseline for these analyses is not zero immigration." *Arizona v. Garland*, No. 6:22-cv-01130, 2024 WL 1645417, at *11 (W.D. La. Apr. 16, 2024), *appeal filed*, No. 24-30359 (5th Cir. June 11, 2024).

The Complaint here did not include allegations that would plausibly show injury under this standard. Here, Texas would have to plausibly allege that the appointment exception results in more noncitizens present in Texas than would be present absent the appointment exception. Texas asserts that the Rule "entice[s]" noncitizens to schedule appointments through CBP One and enter at POEs, and that these noncitizens are granted parole at POEs, which results in high numbers of noncitizens being released in Texas. *See* Br. 14; ROA.447–49. At most, therefore, Texas alleges that the number of noncitizens entering and released at POEs will be reduced if the appointment exception no longer existed. This bare, conclusory allegation, even if proven, is not enough to state an injury because it ignores the overall immigration context. Even if fewer noncitizens scheduled CBP One

appointments to enter at POEs, the Complaint includes no specific factual allegations that fewer noncitizens would enter overall, or that fewer noncitizens would be released into Texas overall, if the appointment exception did not exist. As noted, the appointment exception does not dictate parole determinations. Thus, the Complaint does not allege a *net* increase in releases—and thereby, increased costs—for Texas over what would be the case if the appointment exception did not exist.

To the contrary, the Rule cites evidence that a prior limitation on asylum eligibility, without any accompanying incentive for orderly entry, did not have a meaningful impact on migration trends. *Id.* at 31,403 & n.304. And other approaches that coupled incentives to orderly entry with consequences for failure to use those methods were successful in reducing *overall* encounters. 88 Fed. Reg. at 31,317 & n.26. Indeed, if the appointment exception did not exist, there would be less incentive for noncitizens with potentially meritorious asylum claims to seek out scheduled entries at POEs, because they would be subject to the rebuttable presumption of asylum ineligibility either way. And that in turn could very well lead to more irregular entries *between* POEs, an overwhelmed immigration system, and "more noncitizens being released into the interior pending immigration proceedings." 88 Fed. Reg. at 31,328. Such releases would in turn, according to Texas, lead to the same social-service expenditures that Texas claims as harm from the appointment exception. *See Gen. Land Off. v. Biden*, 71 F.4th 264, 272 (5th Cir.

2023) (Texas asserting that irregular entries impose social-services costs). It is incumbent on Texas to plausibly allege that the appointment exception leads to a net increase in its population, and its Complaint fails to do so.

But even if Texas had plausibly alleged that the Rule results in an increase in releases over what would be the case if the appointment exception did not exist, the impact on its expenditures is too remote to support standing. It depends on an "attenuated chain of inferences," *Clapper*, 568 U.S. at 414 & n.5, that those additional noncitizens will remain in Texas, and will subsequently take particular actions such as not obtaining health insurance, seeking health benefits, and committing crimes, and that these actions will in fact cause an increase in Texas's out-of-pocket expenditures. The Supreme Court's decision in *Alliance*, which rejected plaintiffs' allegations of downstream "monetary" harm from the government's loosened regulation of certain medication, affirms that Texas cannot establish standing to challenge allegedly lax immigration regulations based on claims of indirect financial injury. *See Alliance*, 602 U.S. at 391–92. Just as "[t]eachers in border states" may not "sue to challenge allegedly lax immigration policies that lead to overcrowded classrooms," *id.*, neither may Texas sue the government whenever it alleges that a federal policy increases, even indirectly, the number of noncitizens in the State who may ultimately use State law enforcement, health care, and education resources.

### C.    Plaintiff is Not Entitled to Special Solicitude.

Texas incorrectly argues that it need not meet "all the normal standards for redressability and immediacy" because it is entitled to special solicitude in the standing analysis. Br. 30, 32. Although the Court need not reach this question—because Texas's injury is not legally or judicially cognizable—the Supreme Court's decision in *Enforcement Priorities* also confirmed that special solicitude has no application when a State asserts standing based on the type of indirect costs Texas asserted here. *Enforcement Priorities*, 599 U.S at 674.

The plaintiffs in *Enforcement Priorities* argued—and this Court concluded—that they were entitled to special solicitude under *Massachusetts v. EPA*, 549 U.S. 497 (2007), because they had a procedural right to sue "under the APA" and were challenging an agency's alleged "failure to protect certain formerly 'sovereign prerogatives that are now lodged in the Federal Government,'" including the 'power to admit or exclude aliens." Brief for Respondents at 16–17, *Enforcement Priorities*, 599 U.S. 670 (No. 22-58); *Texas v. United States*, 40 F.4th 205, 216 & n.4 (5th Cir. 2022). The Supreme Court recognized plaintiffs based "part of their argument for standing" on *Massachusetts*, and rejected that argument. It explained that the States' reliance on *Massachusetts* was misplaced because that case "involved a challenge to the denial of a statutorily authorized petition for rulemaking, not a challenge to an exercise of the Executive's enforcement discretion." *Enforcement Priorities*, 599

U.S. at 680 n.3, 685 n.6; *see also id.* at 689 (Gorsuch, J., concurring);[8] *Netflix, Inc. v. Babin*, 88 F.4th 1080, 1090 (5th Cir. 2023) (noting that "the 'special solicitude' once afforded to states under *Massachusetts v. EPA* . . . , with respect to justiciability doctrines like standing, seems to also be falling out of favor with the Supreme Court").

The Supreme Court's refusal to extend *Massachusetts* to permit States to challenge alleged underenforcement of immigration laws makes sense. In affording a State "special solicitude" in *Massachusetts*, the Supreme Court explicitly relied on two features absent here. 549 U.S. at 520. First, *Massachusetts* involved the threatened loss of the State's sovereign territory—a harm long been treated as distinctive and legally cognizable. *See id.* at 518-519; Ann Woolhandler & Michael G. Collins, *State Standing*, 81 Va. L. Rev. 387, 415–16 (1995) (discussing 19th-century cases). This case, in contrast, involves "indirect effects on state revenues or state spending"—a commonplace consequence of federal policies. *Enforcement Priorities*, 599 U.S. at 680 n.3; *see also Arizona*, 40 F.4th at 386 (noting that indirect fiscal burdens are a "humdrum" feature of regulations). Second, *Massachusetts*

---

[8] As Justice Gorsuch, writing for himself and two other Justices, explained: "Before *Massachusetts v. EPA*, the notion that States enjoy relaxed standing rules 'ha[d] no basis in our jurisprudence.' … Nor has 'special solicitude' played a meaningful role in this Court's decisions in the years since." *Id.* (citation omitted). The concurrence warned, "it's hard not to think … that lower courts should just leave that idea on the shelf in future" cases. *Id.*

attached "critical importance" to the State's "procedural right" under the Clean Air Act to challenge the denial of a petition for rulemaking on emissions standards. 549 U.S. at 516, 518, 520. "[A] person … accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy." *Lujan*, 504 U.S. at 572 n.7. The INA, however, creates no procedural right for third parties to challenge an asylum or parole policy. Nor did the Supreme Court accept the States' invitation in *Enforcement Priorities* to locate a specific right to challenge immigration enforcement in the general provisions of the APA; it clearly stated that *Massachusetts* "does not control this case." 599 U.S. at 685 n.6. And the Supreme Court has not applied special solicitude in other cases where it might otherwise have been implicated if an APA claim alone were enough. *See*, *e.g.*, *California v. Texas*, 593 U.S. 659, 673–80 (2021); *Dep't of Commerce*, 588 U.S. at 766.

Further, the "quasi-sovereign interest" that Texas claims in its brief—an "interest in classifying aliens," Br. 34—was the same interest asserted by the plaintiffs in *Enforcement Priorities* and rejected by the Supreme Court. The Rule also does not implicate any sovereign interest in Texas's power to create and enforce a legal code. *See* Br. 33–44 (asserting a pressure "to change its laws"). The challenged federal actions do not amount to a "tangible interference with [Texas's] authority to regulate or to enforce its laws." *Harrison v. Jefferson Parish School*

*Board*, 78 F.4th 765, 770 (5th Cir. 2023). Further, unlike in prior cases before this Court, Texas does not identify a specific law that it is pressured to change, or why. *See* ROA.449. And any claimed pressure on Texas to change its laws further depends entirely on Texas's own future response to the challenged actions' indirect and speculative impact on public expenditures.

Texas is not entitled to special solicitude, because the Supreme Court's *Enforcement Priorities* decision has squarely rejected its application in cases like this one. This Court's precedent granting States special solicitude in the standing analysis is "out of step" with this intervening change in law. *See Bonvillian*, 19 F.4th at 792. And in any event, even when courts have relied on the special solicitude doctrine, they have not relieved States of the obligation to meet the basic requirements of Article III by showing a concrete injury traceable to the challenged agency action. *Massachusetts*, 549 U.S. at 522. At most, the Supreme Court and this Court have suggested that special solicitude may lower the threshold for establishing redressability or immediacy. *Id.* at 517-18; *DACA*, 50 F.4th at 514; *Louisiana v. Nat'l Oceanic & Atmospheric Admin.*, 70 F.4th 872, 882 (5th Cir. 2023). But a looser standard for redressability or immediacy cannot overcome the failure to allege a cognizable, non-speculative injury. *See id.*

47

### D.   Plaintiff's Claimed Injury is Not Fairly Traceable to the Rule or Redressable by the Relief it Seeks.

Texas's claimed injury is not caused by the Rule or redressable by the relief Texas seeks. The Complaint seeks two forms of relief: (1) relief against the Rule, namely, injunction, vacatur, and declaration of the unlawfulness of the Rule's appointment exception; and (2) relief against parole, namely, an injunction that would prohibit Defendants from issuing parole for *any* noncitizen who has scheduled an appointment to enter the United States at a POE. *See* ROA.460. Plaintiff's alleged injury is not "likely to be redressed by th[is] requested relief," *California*, 593 U.S. at 669, because the relief either would not remedy the claimed harms or is legally unavailable.

The injury Plaintiff complains of—paroled noncitizens—is not fairly traceable to the Rule's appointment exception. *See California*, 593 U.S. at 679 (concluding that traceability was not met where the statutory provision challenged as unconstitutional would not demonstrate the unlawfulness of other provisions that allegedly caused injury). Correspondingly, relief against the Rule's appointment exception cannot redress Texas's claimed injury, and Texas has thus not alleged standing to challenge the appointment exception. Plaintiff asserts that "rescission of the Rule would reduce the number of paroled aliens in the State." Br. 29. But vacating, enjoining, or declaring unlawful the Rule's appointment exception has no legal effect on parole determinations. CBP immigration officers at POEs would

remain free, as now, to make discretionary parole determinations under 8 U.S.C. § 1182(d)(5)(A) for individuals who present at a POE, with or without an appointment. Officers would likewise retain discretion to determine the appropriate removal proceedings for arriving noncitizens. *See* 8 U.S.C. § 1225(b)(2)(A); *Matter of E-R-M- & L-R-M-*, 25 I. & N. Dec. at 521–24. Nor would vacatur of the Rule compel DHS to cease using appointments to more efficiently manage processing of undocumented migrants at POEs. Redressability cannot be established where a "judicial decree rendering" a regulatory exception "a nullity does nothing to change the fact that federal officials possess the same underlying" discretion without the regulatory exception. *Enforcement Priorities*, 599 U.S. at 691 (Gorsuch, J., concurring); *see also Marino v. Nat'l Oceanic & Atmospheric Admin.*, 33 F.4th 593, 597 (D.C. Cir. 2022) (finding no redressability where requested relief would not change underlying enforcement discretion).

Texas does not directly respond to these points. *See* Br. 28–29. Texas's current theory of redressability (and causation) appears to be that, absent the appointment exception's incentive to enter at POEs, some noncitizens would not seek to enter the United States at all. *See* Br. 29–30. But this theory is, at least in part, based on the incorrect premise that the appointment exception is the same thing as parole or an immigration benefit. *See id.* This theory is also unsupported by factual allegations. Even assuming that eliminating the appointment exception meant that fewer

noncitizens would schedule CBP One appointments, Texas has not plausibly alleged facts tending to show that noncitizens would not alternatively attempt to enter irregularly between POEs or wait in line at POEs. And those noncitizens could still be released into the United States—particularly if DHS's resources at the border are overwhelmed. *See supra* § I.B. Texas's claimed injury of public-services expenditures arises, if at all, from the release of noncitizens and their presence in the State; its claimed injury does not depend on whether those noncitizens are presumed ineligible for asylum.[9]

Further, Texas cannot use its challenge to the Rule to obtain the second type of relief it seeks—an injunction prohibiting Defendants from granting parole to *any* noncitizen who uses a DHS scheduling system to pre-schedule their arrival at a POE. Texas argues that the appointment exception grants "*en masse* parole" (Br. 24; *see also* ROA.454, ROA.457, ROA.459), but, as explained, the appointment exception does not govern parole decisions. Even if the district court were to ultimately

---

[9] Defendants also argued below that Texas's claimed injury was not redressable for the independent reason that relief against the Rule is legally unavailable. Defendants argued that the INA, at 8 U.S.C. § 1252(a)(2)(A)(iv), (e), and (f)(1), does not permit an injunction against the Rule's application in removal proceedings or expedited removal, and that the APA, 5 U.S.C. § 706(2), does not permit universal vacatur of a regulation or portions thereof. ROA.574–76; *see also* Br. 31–32, 40–41 (addressing these arguments). Defendants do not assert these arguments on appeal as an alternate ground in support of dismissal of the Complaint. But Defendants do not waive, and specifically preserve, these arguments concerning the proper scope of any remedy, should the case proceed beyond the pleadings stage. *See also infra* § II.

determine that the Rule's appointment exception cannot withstand APA review, this cannot support relief pertaining to a different agency action (parole). *See* 5 U.S.C. § 706(2); *cf. Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) ("[T]he scope of injunctive relief is dictated by the extent of the violation established."). And Texas has not pointed to a particular, discrete policy that it is challenging other than the Rule.

Moreover, relief pertaining to parole is legally unavailable. Congress has precluded judicial review of "any decision or action . . . the authority for which is specified under this subchapter to be in the discretion of . . . the Secretary of Homeland Security." 8 U.S.C. § 1252(a)(2)(B)(ii). As the INA specifies that the decision whether to grant parole rests "in [the] discretion" of the Secretary, 8 U.S.C. § 1182(d)(5)(A), courts may not review claims challenging DHS's parole determinations. *See Samirah,* 335 F.3d at 549.

Texas is essentially challenging an amalgamation of thousands of parole decisions at POEs and seeking to declare unlawful or enjoin each individual exercise of parole authority.[10] Courts cannot review such discretionary parole decisions, and

---

[10] These unreviewable grants of parole would not become reviewable or capable of being enjoined even if Texas were challenging a discrete policy or practice regarding the exercise of parole authority. *See Flores v. Garland*, 72 F.4th 85, 91–92 (5th Cir. 2013) (reviewability under § 1252(a)(2)(B)(ii) is based solely on whether the statutory text renders the decision discretionary); *Loa-Herrera v. Trominski*, 231 F.3d 984, 990–91 & n.12 (5th Cir. 2000) (where a "discretionary

*Continued on next page.*

they thus also cannot direct the Executive's exercise of discretion by either compelling or prohibiting the discretionary grant of parole or issuing a declaration that individual grants of parole are unlawful. *See Giammarco v. Kerlikowske*, 665 F. App'x 24, 25–26 (2d Cir. 2016) (given § 1252(a)(2)(B)(ii), court may not order government to parole noncitizen); *Samirah*, 335 F.3d at 549 (similar). Accordingly, redressability is not met here, because the relief Plaintiff seeks pertaining to parole is precluded by statute and because relief pertaining to the Rule would not remedy the claimed harms. *See Enforcement Priorities*, 599 U.S. at 690–93. (Gorsuch, J., concurring); *cf. Okpalobi v. Foster*, 244 F.3d 405, 426 (5th Cir. 2001) (to satisfy the redressability requirement, the court must be able to grant effective relief).

## II.    This Court Need Not Reach Plaintiff's Other Arguments.

Texas asks this Court to decide several issues unrelated to Article III standing that the district court did not address, some of which were not advanced by Defendants as grounds for dismissal. Br. 34–41. The Court need not reach these questions on appeal. If this Court finds the Complaint adequately alleges Article III standing, the appropriate course is for this Court to remand to the district court to consider these issues in the first instance. *See, e.g.*, *Arnesen v. Raimondo*, 115 F.4th 410, 414 (5th Cir. 2024) ("[W]e remand for the district court to address the

---

judgment" is barred from review, challenges to 'the *manner* in which that discretionary judgment is exercised" and to "whether the procedural apparatus supplied satisfies" legal requirements are also barred).

ratification theory . . . so that we will be better positioned to weigh in on this issue and consider the other issues raised.") (internal quotations and citation omitted). Defendants nonetheless briefly address Plaintiffs' arguments here, including to explain why the Court should not consider them.

First, Texas argues that it falls within the zone of interests of the INA, Br. 35, but the zone of interests is determined not by "the overall purpose of the Act … but by reference to the particular provision of law," *Bennett v. Spear*, 520 U.S. 154, 175-77 (1997). Plaintiff's interests are not "arguably within the zone of interests to be protected or regulated by" either the asylum or the parole statute. *See Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 395 (1987). Nothing in the asylum statute—or the INA generally—evinces any concern with State sovereigns generally or any policy goal of reducing migration specifically. *See* 8 U.S.C. § 1158(d)(7) ("Nothing in this subsection shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers or any other person."). Nor is Texas within the zone of interests of the parole statute, 8 U.S.C. § 1182(d)(5)(A). *See Fed'n for Am. Immigration Reform, Inc. v. Reno*, 93 F.3d 897, 900–02 (D.C. Cir. 1996). And to the extent this Court has previously held that States are within the zone of interests of other immigration provisions, the Supreme Court has since made clear in *Enforcement Priorities*—relying on principles that inform not only the scope of Article III but also the scope

of the APA's cause of action—that third parties like Texas have no cognizable interest in the way the Executive enforces the immigration laws against others.

Second, Texas argues that the Rule is final agency action that is reviewable under the APA. Br. 36–39. This is a strawman, as Defendants did not argue that the *Rule* was not final agency action, nor did they argue that § 1252(a)(2)(B)(ii) or the APA's terms precluded review of Texas's two claims challenging the *Rule*. Instead, Defendants argued that, to the extent Texas is challenging the use of an appointment system to manage the flow of travelers into the POE or DHS's exercise of parole authority—neither of which are governed by the Rule's terms—these actions are not reviewable. *See* ROA.589–92. Accordingly, Texas's arguments in this regard miss the point, and the Court need not, and should not, address them here. Defendants reiterate, however, that the Rule does not "establish[] eligibility for a unique program" or "remove[] barriers to benefit eligibility." Br. 38, 40. Instead, it establishes a presumption of asylum *in*eligibility for some noncitizens who cross the Southwest border.

Finally, Texas argues that universal vacatur is the appropriate remedy. Br. 40–41. This issue is premature, and the Court should not address it at this time. If the Court were to reverse the district court's dismissal of the complaint, the proper scope of any remedy should be decided by the district court if Plaintiff ultimately succeeds on the merits. *See supra* n.9.

## CONCLUSION

This Court should affirm the district court's dismissal of the Complaint.

December 20, 2024                    Respectfully submitted,

                                    BRIAN M. BOYNTON
                                    *Principal Deputy Assistant*
                                    *Attorney General*

                                    EREZ REUVENI
                                    *Assistant Director*

                                    CHRISTINA P. GREER
                                    BRIAN C. WARD
                                    *Senior Litigation Counsel*

                                    */s/ Katherine J. Shinners*
                                    KATHERINE J. SHINNERS
                                    *Senior Litigation Counsel*
                                    U.S. Department of Justice, Civil Division
                                    Office of Immigration Litigation,
                                    District Court Section
                                    P.O. Box 868, Ben Franklin Station
                                    Washington, DC 20044
                                    Tel: (202) 598-8259
                                    Email: katherine.j.shinners@usdoj.gov

**CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because, excluding parts of the document exempted by Fed. R. App. P. 32(f) and Fifth Cir. R. 32.1, it contains 12,982 words.

This brief complies with the typeface and the type style requirements of Fed. R. App. P. 35(a)(5)-(6), and Fifth Cir. R. 32.1 because it has been prepared in a proportionally spaced typeface using Word 14-point Times New Roman typeface.

*/s/ Katherine J. Shinners*
KATHERINE J. SHINNERS
United States Department of Justice

**CERTIFICATE OF SERVICE**

I certify that on December 20, 2024, I electronically filed this brief with the

Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by

using the appellate CM/ECF system. Participants in the case are registered CM/ECF

users, and service will be accomplished by the appellate CM/ECF system.

<div align="right">

*/s/ Katherine J. Shinners*
KATHERINE J. SHINNERS
United States Department of Justice

</div>